## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA,<br>P.O. Box 44811<br>Washington, DC 20026<br><br>       *Plaintiff,*<br><br>  v.<br><br>FEDERAL TRADE COMMISSION; ANDREW<br>N. FERGUSON, in his official capacity as<br>Chairman of the Federal Trade Commission;<br>MARK R. MEADOR, in his official capacity as<br>Commissioner of the Federal Trade Commission;<br>MELISSA ANN HOLYOAK, in her official<br>capacity as Commissioner of the Federal Trade<br>Commission; JOHN DOE 1, in their official<br>capacity as Commissioner of the Federal Trade<br>Commission; and JOHN DOE 2, in their official<br>capacity as Commissioner of the Federal Trade<br>Commission,<br>600 Pennsylvania Ave. NW<br>Washington, DC 20580<br><br>       *Defendants.* | Civil Case No. _____<br><br><br>**COMPLAINT**<br><br><br>**(Rule 57 Speedy Hearing Request)** |

### INTRODUCTION

1.     Media Matters faces an ongoing campaign of retribution for exercising its First Amendment rights. For the third time, Media Matters must ask this Court to halt this "government campaign of retaliation." *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 581 (D.C. Cir. 2025). Now the Federal Trade Commission seeks to punish Media Matters for its journalism and speech in exposing matters of substantial public concern—including how X.com has enabled and profited from extremist content that proliferated after Elon Musk took over the platform formerly known as Twitter. The campaign of retribution against Media Matters must stop.

2.      In November 2023, Media Matters truthfully reported that ads appeared next to pro-Nazi content on X.com. Immediately following that reporting, Elon Musk promised a "thermonuclear" lawsuit against Media Matters—and his supporters in government were quick to pile on. Missouri's Attorney General opened an investigation into Media Matters that this Court shut down, quashing a broad civil investigative demand and finding that Media Matters has "likely shown that [its] reporting was not defamatory and therefore was protected speech." *Media Matters for Am. v. Bailey*, No. 24-cv-147 (APM), 2024 WL 3924573, at *10 (D.D.C. Aug. 23, 2024). Texas's Attorney General likewise launched a baseless investigation and issued a broad civil investigative demand that this Court promptly enjoined. The D.C. Circuit recently affirmed that injunction, ruling that "[s]uch a campaign of retaliation in response to [Media Matters'] exercise of [its] First Amendment rights reflects concrete and present harm" and that Texas's "contention that [Media Matters'] conduct is not constitutionally protected because [its] articles were deliberately designed to mislead is meritless. The record is utterly devoid of evidence to support such a claim." *Paxton*, 153 F.4th at 584. With the change in Administration, the FTC's new leadership has initiated yet another probe aimed at silencing Media Matters and punishing it for its speech. For the same reasons this Court shut down the Texas and Missouri investigations, the Court should block this investigation as well.

3.      "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). To give life to this bedrock principle, the people must be able to criticize the powerful "without . . . fear of subsequent punishment" from state or federal government officials. *Roth v. United States*, 354 U.S. 476, 488 (1957) (citation omitted). Elon Musk and his allies targeted Media Matters for having the temerity to report the

undeniable fact that X ran advertisements next to extremist content. In response to this truthful and constitutionally-protected journalism, Media Matters has faced an onslaught of government investigations as well as civil suits by X itself seeking to destroy the organization. But the Constitution prevents the government from punishing the exercise of free speech, as state governments and now a federal agency have employed sweeping governmental powers to attempt to silence and harass an organization for daring to speak the truth.

4.      Media Matters is a nonprofit organization dedicated to monitoring, analyzing, and correcting misinformation in the U.S. media. Founded in 2004, Media Matters employs dozens of reporters, researchers, and writers to publish articles that are often critical of public figures in U.S. media. In recent years, Media Matters has played a key role in documenting extremism—including white nationalism, antisemitism, and neo-Nazi rhetoric—in the public square. Media Matters' careful research and reporting has established it as an important voice in this national conversation. But its dogged coverage has also made it a target.

5.      After Elon Musk purchased the social media company Twitter—which he subsequently rebranded as "X"—in late 2022, he gutted its content moderation teams and its policies on misinformation and violent content in the name of promoting "free speech." Major companies responded by suspending their advertising campaigns on X out of a concern that any affiliation with toxic content on the site could damage their brand reputations. X's advertising revenue plummeted. Over the following year, news outlets around the world, including Media Matters, published articles on what was a major news story: the disturbing and persistent rise of violent and extremist rhetoric on X after Musk's takeover.

6.      Even the Grok AI chatbot—launched as an initiative by Musk—acknowledged that Media Matters' journalism is accurate and impartial. Grok recently made a post on X stating that

Media Matters' reporting enables it to provide "accurate, neutral responses" to user questions.[1] Musk, in response, stated, "Your sourcing is terrible" and vowed to "updat[e]" Grok, presumably so that it will no longer rely on Media Matters' reporting.[2]

7.     One of Media Matters' investigative reporters, Eric Hananoki, focused a series of articles on X's apparent inability to protect its advertisers from appearing alongside extremist content, despite X's repeated promises that it would do just that. This series included an article published on November 16, 2023, just as Musk faced media backlash from his apparent endorsement on X of a fringe conspiracy theory postulating that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities."[3]

8.     The November 16 Media Matters article accurately reported that X was permitting advertisements to be placed next to pro-Nazi or other extremist content. The article published several examples, such as this image of an advertisement for Oracle appearing next to an image of Adolf Hitler:



---

[1] Grok (@grok), X (Jun. 18, 2025, 9:52 pm), https://perma.cc/T45B-QEJG.

[2] Elon Musk (@elonmusk), X (Jun. 20, 2025, 8:19 pm), https://perma.cc/WV5V-WXBG.

[3] *See, e.g.*, David Goldman, *Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people*, CNN (Nov. 17, 2023), https://perma.cc/Y3LS-L73V002E.

9.    Musk responded by telling his 165 million followers on X that his company would be filing a "thermonuclear" lawsuit against Media Matters and anyone who "colluded" with it.[4] X Corp. proceeded to sue Media Matters over the November 16 article in Texas, Ireland, and Singapore, and sent a demand letter in the United Kingdom.

10.    Musk's friends and allies celebrated this threat of retaliatory litigation. Stephen Miller, formerly President Trump's senior adviser and now the White House Deputy Chief of Staff, posted about Media Matters on X: "There are 2 dozen+ conservative state Attorneys General,"[5] not so subtly implying that they should use their government powers against Media Matters. Missouri Attorney General Andrew Bailey replied that his "team [was] looking into this matter."[6] The next day, Texas Attorney General Paxton issued a press release announcing that he was launching an investigation into Media Matters.[7] Both states ultimately issued civil investigative demands ("CIDs") seeking troves of documents from Media Matters.

11.    Courts have refused to tolerate these abuses of the legal system. Musk's "thermonuclear" litigation has been partially enjoined with respect to lawsuits X Corp. brought against Media Matters abroad. *See Media Matters for Am. v. X Corp.*, No. 25-cv-02397-VC, 2025 WL 1084715, at *1–2 (N.D. Cal. Apr. 10, 2025). After this Court preliminarily enjoined Missouri's CID, *Bailey*, 2024 WL 3924573, at *1, the parties reached a settlement in which Attorney General Bailey agreed to drop the investigation and admitted that he "has not uncovered evidence of Media

---

[4] Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 pm), https://perma.cc/X4HN-PLJ4.

[5] Stephen Miller (@StephenM), X (Nov. 19, 2023, 11:48 pm), https://perma.cc/9E6L-FJGY.

[6] Andrew Bailey (@AGAndrewBailey), X (Nov. 19, 2023, 4:46 pm), https://perma.cc/J463-656K.

[7] Press Release, *Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity*, Att'y Gen. of Tex. (Nov. 20 2023), https://perma.cc/DGK2-CM7X.

Matters . . . violat[ing] Missouri state law." *Media Matters for Am. v. Bailey*, No. 24-7141, Doc. No. 2100004-A at 3 (D.C. Cir. Feb. 11, 2025). And in May 2025, the D.C. Circuit upheld this Court's preliminary injunction against Texas's investigation because it involved "concrete and felt acts of *retaliation* against a media company and one of its investigative reporters for having exercised their protected rights of free speech." *Paxton*, 138 F.4th at 570 (emphasis in original).

12.    But the Trump Administration has picked up where the states left off. President Trump has called the press "the enemy of the people,"[8] and, since his return to office, has used "the power of public office to punish people and companies [President Trump] has cast as enemies and silence potential critics."[9] President Trump has used executive orders, four of which have been enjoined by this Court, to target law firms "for the views embodied in their legal work." *Jenner & Block LLP v. U.S. Dep't of Just.*, No. CV 25-916 (JDB), 2025 WL 1482021, at *1 (D.D.C. May 23, 2025). Two days after Trump took office, the Federal Communications Commission, under a Trump-designated chairman, reopened dismissed complaints of bias against CBS, ABC, and NBC related to their coverage of the 2024 presidential election.[10] The Trump Administration has opened investigations into former officials who were critical of the President.[11] And it has targeted swaths

---

[8] John Wagner, *Trump renews attacks on media as 'the true Enemy of the People*, Wash. Post (Oct. 29, 2018), https://www.washingtonpost.com/politics/trump-renews-attacks-on-media-as-the-true-enemy-of-the-people/2018/10/29/9ebc62ee-db60-11e8-85df-7a6b4d25cfbb_story.html.

[9] Charlie Savage, et al., *Trump Escalates Use of Official Power to Intimidate and Punish His Perceived Foes*, N.Y. Times (Apr. 10, 2025), https://www.nytimes.com/2025/04/10/us/politics/trump-officials-justice-department.html.

[10] Jon Brodkin, *Trump's FCC chair gets to work on punishing TV news stations accused of bias* (Jan. 23, 2025), https://arstechnica.com/tech-policy/2025/01/trumps-fcc-chair-gets-to-work-on-punishing-news-stations-accused-of-bias/.

[11] Eileen Sullivan, et al., *Trump Officials Say Ex-Leader of Cybersecurity Agency Is Under Investigation*, N.Y. Times (May 1, 2025), https://www.nytimes.com/2025/05/01/us/politics/trump-chris-krebs.html.

of civil society deemed to be disloyal: universities,[12] cultural institutions,[13] public radio,[14] and other media outlets.[15]

13.    Now the FTC has opened an investigation to harass Media Matters in retaliation for its journalism. The FTC's new Chairman, Andrew Ferguson, auditioned for his role by endorsing antitrust investigations of any groups connected to what he claimed were "advertiser boycotts" of X. Ferguson's candidacy was boosted by a "super close" friend and Trump advisor who called Media Matters a "cancer to free speech" and proposed throwing its reporters "in the DC gulag."[16] After taking over as FTC Chairman, Ferguson hired three senior officials who had publicly attacked Media Matters on X, including Chairman Ferguson's Senior Policy Advisor, who called Media Matters "scum of the earth."[17] Chairman Ferguson was subsequently joined by the newest FTC Commissioner, Mark Meador, who represented a conservative video hosting site in an antitrust suit claiming that a nonprofit association of advertisers "encouraged its members to cease advertising on Twitter (now X)"[18] in coordination with X Corp.'s companion suit mere months

---

[12] *E.g.*, Proclamation, *Enhancing National Security by Addressing Risks at Harvard University* (June 4, 2025), https://perma.cc/L9PR-EZLX.

[13] *E.g.,* Executive Order 14253, *Restoring Truth and Sanity to American History* (Mar. 27, 2025).

[14] Executive Order 14290, *Ending Taxpayer Subsidization of Biased Media* (May 1, 2025).

[15] *E.g.,* Benjamin Mullin & David McCabe, *F.C.C. Chair Orders Investigation Into NPR and PBS Sponsorships*, N.Y. Times (Jan. 30, 2025), https://www.nytimes.com/2025/01/30/business/media/npr-pbs-fcc-investigation.html.

[16] The Federalist Society, *Open Minds with Andrew Ferguson and James Burnham*, YouTube (Jun. 17, 2024), https://perma.cc/4RLD-SN52; Mike Davis (@mrddmia), X (Dec. 1, 2022), https://perma.cc/4QJA-LEQD; Mike Davis (@mrddmia), X (Nov. 10, 2023), https://perma.cc/6GKP-RG2N.

[17] Jon Schweppe (@JonSchweppe), X (Nov. 30, 2023), https://perma.cc/25YT-DQ7T.

[18] *Rumble Inc. v. World Fed'n of Advertisers*, No. 7:24-cv-00115 (N.D. Tex. Sept. 20, 2024), ECF No. 13 ¶ 70.

before President Trump appointed him to the FTC.[19] Meador's client had tried to sue unidentified Media Matters employees and called for "an immediate investigation at the highest levels" into Media Matters in November 2023.[20]

14.    Under this new leadership, the FTC issued a CID to Media Matters dated May 20, 2025. The CID makes no secret of its connection to Musk's vindictive lawsuits, including by seeking documents and communications related to several entities tied to Musk, along with all discovery exchanged in the recent lawsuits between Media Matters and X Corp. The FTC CID probes Media Matters' finances, editorial process, newsgathering activities, and affiliations with likeminded entities that monitor extremist content and other third parties. These topics are significantly broader than—and seek documents for three times the timeframe compared to—the "sweeping" Texas CID that was preliminarily enjoined by this Court. *Paxton*, 138 F.4th at 569.

15.    The CID's retaliatory motive is further revealed by its disregard for the FTC's limited statutory authorities. An FTC CID must provide notice of the relevant "conduct constituting the alleged violation which is under investigation," 15 U.S.C. § 57b-1(c)(2), but the CID to Media Matters fails to identify the relevant "conduct" or "alleged violation" that the FTC is pursuing. And regardless of what it could uncover in this investigation, the FTC is not authorized to enforce the antitrust laws against a nonprofit like Media Matters. *Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 334 (4th Cir. 2005) ("[N]on-profit organizations fall outside the scope of the agency's jurisdiction.").

16.    During the recent spat between Elon Musk and President Trump, the Wall Street Journal reported that Media Matters and others "on the receiving end of [Musk's] lawsuits will

---

[19] Rumble, *Rumble Joins X to Sue Advertising Cartel that Allegedly Conspired to Withhold Digital Advertising Revenue* (Aug. 6, 2024), https://perma.cc/5MW7-QRV6.

[20] Chris Pavloski (@chrispavlovski), X (Nov. 20, 2023), https://perma.cc/6FFJ-VZ74.

likely breathe a bit easier" because the falling out would "remove[] much of the political weight behind Musk's litigious vendetta."[21] It has not: That brief public feud between Musk and Trump took place after the FTC issued the CID, which the agency continues to pursue against Media Matters.[22]

17.    Courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (citation omitted). This Court should see the FTC's follow-on investigation for what it is: another "use [of] law enforcement machinery for political ends," which is "the most heinous act in which a democratic government can engage." *Bailey*, 2024 WL 3924573, at *18 (citation omitted). The Court should put an end to the latest effort by the Trump Administration and Elon Musk's government allies to punish, intimidate, and harass Media Matters for publishing reporting they do not like.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Plaintiff Media Matters' claims arise under the First and Fourth Amendments to the U.S. Constitution.

19.    This Court has authority to grant Plaintiff declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's inherent equitable powers.

---

[21] Suzanne Vranica, *Trump-Musk Fallout Fuels Hopes Washington Will Lose Interest in Advertisers Who Ditched X*, WSJ (June 6, 2025), https://www.wsj.com/livecoverage/trump-elon-musk-feud/card/rcdD48cKvOeVBV3vRlcl.

[22] On June 18, 2025, Media Matters submitted to the FTC a petition to quash the CID. That petition will be resolved by one of the Commissioners. If the petition is denied, the FTC can then set a deadline for compliance. *See* 16 C.F.R. § 2.10(b).

20.    Subject matter jurisdiction exists under Article III because Plaintiff has suffered and will continue to suffer injuries-in-fact. There is a sufficient causal connection between Plaintiff's injuries and Defendants' pursuit of this investigation, and a favorable decision by this Court granting Plaintiff relief will redress those injuries. This dispute is ripe because Plaintiff's rights have already been violated, and Plaintiff will suffer further imminent invasions of those rights in the absence of relief from this Court. Plaintiff is justifiably concerned about the retaliatory effect of the CID and the associated investigation, both of which have already chilled Plaintiff's speech and caused it associational, financial, and other harms.

21.    Venue is proper under 28 U.S.C. § 1391(e)(1) because the FTC has its principal place of business and the individual Defendants perform their official duties in the District of Columbia. Venue is also proper because a substantial part of the events giving rise to Plaintiff's claims occurred in the District: The FTC served its CID in the District; Media Matters' compliance or noncompliance therewith will occur in the District; and the substantial chill to and other acts of retaliation against Plaintiffs have been—and continue to be—suffered, in substantial part, in the District. Venue is further proper because Media Matters' principal place of business is in the District.

## PARTIES

22.    Plaintiff Media Matters for America is a not-for-profit research center and media watchdog. Media Matters is incorporated under the laws of, and has its principal place of business in, the District of Columbia.

23.    Defendant Federal Trade Commission ("FTC") is an administrative agency of the United States that is headquartered in Washington, D.C. Among other things, it is tasked with preventing unfair methods of competition, which include conduct that may also violate the antitrust laws. *See* 15 U.S.C. § 45(a)(2).

24.     Defendant Andrew N. Ferguson is the Chairman of the FTC and one of the five Commissioners in charge of the agency. His business address is in Washington, D.C. Chairman Ferguson is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. He is being sued in his official capacity.

25.     Defendant Mark R. Meador is a Commissioner of the FTC. His business address is in Washington, D.C. Commissioner Meador is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. He is being sued in his official capacity.

26.     Defendant Melissa Ann Holyoak is a Commissioner of the FTC. Her business address is in Washington, D.C. Commissioner Holyoak is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. She is being sued in her official capacity.

27.     Defendant John Doe 1 is the fourth Commissioner of the FTC and is the individual serving out the unexpired term of Rebecca Kelly Slaughter (who President Trump fired on March 18, 2025), including, but not limited to, Rebecca Kelly Slaughter. On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. They are being sued in their official capacity.

28.     Defendant John Doe 2 is the fifth Commissioner of the FTC and is the individual serving out the unexpired term of Alvaro Bedoya (who President Trump fired on March 18, 2025, and who resigned his position on June 9, 2025). On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. They are being sued in their official capacity.

# FACTS

### A. Media Matters has a long track record of reporting on political extremism.

29.    For over two decades, Media Matters has been dedicated to monitoring and correcting misinformation in U.S. media, including by publishing its own investigatory research and reporting on its website.

30.    Media Matters has approximately 80 employees, including 45 reporters, writers, and researchers, to whom it provides a far-reaching platform from which they can reach the public, often through research and reporting on current events and criticism of powerful public figures.

### B. Elon Musk purchases X and slashes its content-moderation infrastructure.

31.    Almost immediately after his takeover of Twitter/X, Musk began laying off key executives and content moderators responsible for removing hate speech and other violent rhetoric.[23] Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free speech."[24] Musk reinstated suspended accounts of known white supremacists and conspiracy theorists, while suspending the accounts of journalists who tracked his private air travel.[25]

32.    Unsurprisingly, extremist and racist rhetoric surged on X. A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square." Less than a month into Musk's ownership, the Brookings Institute reported that X had seen a "surge in hateful language" following Musk's purchase, including "a nearly 500% increase

---

[23] *See* Brian Fung & Clare Duffy, *How a single year of Elon Musk turned Twitter into a husk of its former self*, CNN (Oct. 27, 2023), https://perma.cc/3XBA-8TBE [hereinafter "*A single year of Elon Musk turned Twitter into a husk*"]; *see also Musk fires outsourced content moderators who track abuse on Twitter*, MoneyWatch, CBS News (Nov. 14, 2022), https://perma.cc/J38J-QM4U.

[24] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 23.

[25] *Id.*

in use of the N-word in the 12-hour window immediately following the shift of ownership to Musk."[26] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[27] Academic researchers in the School of Communication and Media at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[28]

33.    This spike in hateful rhetoric on X caught the attention of advertisers, many of which promptly ceased advertising on X in the months after Musk took over. Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[29]

34.    The pullback of X's largest advertisers led to sharp drops in its revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load," while in September, he reported that advertising revenue in the U.S. was "still down 60%."[30]

---

[26] Rashawn Ray and Joy Anyanwu, *Why is Elon Musk's Twitter takeover increasing hate speech?*, Brookings (Nov. 23, 2022), https://perma.cc/KPW7-K6LC.

[27] *Id.*

[28] *Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform*, Montclair State Univ., (Nov. 1, 2022), https://perma.cc/CH4T-4YGL; *see also* Sheera Frenekel and Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022), https://perma.cc/CX3U-ZVS3.

[29] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 23; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://perma.cc/VDT6-AHCA; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://perma.cc/4385-QPCP.

[30] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 23.

35.    Even more advertisers left the X platform when toxic content reportedly began appearing increasingly often alongside companies' advertising, creating a perceived association between their brands and hate speech.

36.    Numerous media outlets reported for over a year on X's and Musk's failure to shield advertisers from having their brands appear next to hateful content, and the challenges the site faced with regard to content moderation more broadly.[31] None of these articles cited or otherwise indicated that it relied on research or reporting performed by Media Matters.

### C. Musk promises "thermonuclear" lawfare against Media Matters, scapegoating it for X's lost advertising revenue.

37.    Between February and November 2023, Media Matters published at least fourteen articles about the juxtaposition of advertisements alongside hateful content on X. On November 16, 2023, Media Matters published another article on this subject that went viral: "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content." Ex. A. The article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users containing such content.

---

[31] *See, e.g.*, Reuters, *Advertisers react to Twitter's new ownership* (Nov. 18, 2022), https://perma.cc/3Z9L-JJ9B; Faiz Siddiqui, *Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk*, Wash. Post (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/; Center for Countering Digital Hate, *Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts* (Feb. 9, 2023), https://perma.cc/2RDF-GWGB; Shannon Thaler, *Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report*, N.Y. Post (June 19, 2023), https://perma.cc/32FY-3D5P; Jonathan Shorman, *Mizzou ad appears on racist X page as social media site faces concerned advertisers*, Kansas City Star (Oct. 10, 2023), https://perma.cc/F4KZ-HVFP.

38.     On November 18, 2023, Musk posted on X a promise to file "a thermonuclear lawsuit against Media Matters" in response to the November 16 article.[32] His post received hundreds of thousands of likes and comments, and tens of thousands of reposts.[33]



39.     Musk attached a message to his post referencing the November 16 article and claiming that "activist groups like Media Matters . . . try to use their influence to attack our revenue streams by deceiving advertisers on X."[34] Musk argued that Media Matters "manipulate[d]" advertisers and the public by "curat[ing]" and "contriv[ing]" in order to "find a rare instance of ads serving next to the content they chose to follow," i.e. extremist content.[35] He did not deny that the article's screenshots were real, nor did he mention the year-long parade of reports and documentation illustrating this endemic problem with the architecture of X.

40.     Various media and political figures—many of whom have been the subjects of Media Matters reporting over the years—leapt to Musk's defense and urged retaliation. Among them was Stephen Miller, previously President Trump's senior adviser and now the White House Deputy Chief of Staff, who had once posted that "Media Matters is a corrupt communist smear machine masquerading as a nonpartisan nonprofit" that "vilely slander[s] and bull[ies] to push a

---

[32] Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 am), https://perma.cc/X4HN-PLJ4.

[33] *Id.*

[34] *Id.*

[35] *Id.*

militant-left agenda."[36] Miller and Musk were no strangers, with Musk directing more than $50 million to a political action committee led by staff from Miller's nonprofit legal group.[37] In response to a post on X about the November 16 article, Miller noted that "[f]raud is both a civil and criminal violation" and "[t]here are 2 dozen+ conservative state Attorneys General," seemingly urging state governments to investigate Media Matters for publishing the article.[38] Musk replied to the thread: "Interesting. Both civil and criminal . . . ."[39]

### D. Texas, Missouri, and X Corp. pursue legal actions against Media Matters.

41.    Shortly after Elon Musk drew attention to Stephen Miller's call for conservative state Attorneys General to go after Media Matters, Missouri Attorney General Andrew Bailey replied: "My team is looking into this matter."[40]

42.    The next day, November 20, 2023, Texas Attorney General Ken Paxton announced that he was launching an investigation into Media Matters, purportedly under Texas's Deceptive Trade Practices Act. The press release announcing the investigation repeatedly described Media Matters in troubling and nakedly partisan terms, calling Media Matters "a radical anti-free speech organization," and "a radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square."[41]

---

[36] Stephen Miller (@StephenM), X (May 17, 2022, 11:12 am), https://perma.cc/5X5H-5QLN.

[37] Dana Mattioli, et al., *Elon Musk Gave Tens of Millions to Republican Causes Far Earlier Than Previously Known*, WSJ (Oct. 2, 2024), https://www.wsj.com/politics/policy/elon-musk-political-donations-stephen-miller-desantis-39464294.

[38] Stephen Miller (@StephenM), X (Nov. 19, 2023, 11:18 am), https://perma.cc/9E6L-FJGY.

[39] Elon Musk (@elonmusk), X (Nov. 19, 2023), 2:10 pm), https://perma.cc/6UTV-G84W.

[40] Attorney General Andrew Bailey (@AGAndrewBailey), X (Nov. 19, 2023, 4:46 pm), https://perma.cc/J463-656K.

[41] Texas Att'y Gen.'s Off., *Att'y Gen. Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity*, (Nov. 20, 2023), https://perma.cc/VN4P-PBL9.

43.     That the Texas Attorney General's investigation was a pretext to gain access to Media Matters' internal communications and to chill the reporting of Media Matters and Hananoki was proved the following day, when Paxton issued a CID to Media Matters. The CID commanded Media Matters to produce an array of materials in both Media Matters' and Hananoki's possession since January 1, 2022, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers, and other sensitive materials related to Media Matters' operations, including information about the organization's funding. Ex. B, Civil Investigative Demand, Texas Off. of the Att'y Gen. (Nov. 21, 2023) at 7.

44.     After watching the Texas investigation play out, Missouri Attorney General Bailey issued a CID to Media Matters on March 25, 2024, seeking nearly the same records as the Texas CID. *See* Ex. C, Civil Investigative Demand, Missouri Office of the Att'y Gen. (Mar. 25, 2024) at 4–5. At the same time, Bailey's office preemptively filed an enforcement petition in Missouri state court, claiming that an immediate enforcement action was required due to Media Matters' resistance to complying with the Texas CID. *Missouri v. Media Matters for Am.*, No. 24AC-CC02291 (Mar. 25, 2024).

45.     On the same day that Paxton announced the Texas investigation, X Corp. made good on Musk's promise: It filed a lawsuit naming Media Matters and Hananoki as defendants in federal court in the Northern District of Texas, alleging interference with contract, business disparagement, and interference with economic advantage. *X Corp. v. Media Matters for Am.*, No. 4:23-cv-1175 (N.D. Tex Nov. 11, 2023), ECF No. 1. An X user posted the news about X Corp. filing a lawsuit against Media Matters, to which Musk replied: "The first of many."[42]

---

[42] Elon Musk (@elonmusk), x (Nov. 20, 2023, 7:28 pm), https://perma.cc/7UTU-MT7D.

46.    True to Musk's word, in the weeks and months following its filing of the Texas suit, X Corp., through its international subsidiaries, filed suits in Ireland and Singapore. Its United Kingdom subsidiary also sent Media Matters a demand letter citing the November 16 article and threatening defamation litigation. All these actions alleged the exact same conduct as the Texas suit as part of a global campaign of intimidation.

47.    Musk has reiterated that these suits are part of his personal campaign against Media Matters. As he stated at an X Townhall,

> Media Matters is an evil propaganda machine. . . . We are suing them in every country that they operate. And we will pursue not just the organization, but anyone funding that organization. I want to be clear about that. Anyone funding that organization, we will pursue them. So Media Matters is an evil propaganda machine. They can go to hell. I hope they do.[43]

48.    X's multiplicity of suits against Media Matters is part of a broader strategy to intimidate the media and recoup lost advertising dollars by any means possible. It has cost Media Matters millions of dollars to litigate and forced it to lay off more than a dozen employees—a result that Musk has publicly celebrated. On May 23, 2024, a Media Matters employee posted on X that she had been "laid off from @mmfa, along with a dozen colleagues." The account "Libs of TikTok" (a far-right account best known for amplifying anti-LGBTQ hate speech[44]) reposted the employee's post announcing that she had been laid off, to which Musk responded: "Karma is real."[45]

---

[43] Lindsay Kornick, *Elon Musk calls Media Matters 'evil propaganda machine' ahead of lawsuit*, FOXBusiness (December 10, 2023), https://perma.cc/A8RU-M2ML.

[44] Taylor Lorenz, *Meet the woman behind Libs of TikTok secretly fueling the right's outrage machine*, Wash. Post (Apr. 19, 2022), https://perma.cc/N5G7-6VKN.

[45] Elon Musk (@elonmusk), X (May 23, 2024, 8:03 pm), https://perma.cc/8VSD-MPKF.

49.    Another X user posted that same day celebrating that Media Matters was "experiencing the biggest mass of layoffs, with over a dozen terminations" as a consequence of X Corp.'s lawsuit, claiming that Media Matters "f'd around [and] found out." Musk responded to the post, "Yup."[46]

### E. This Court enjoins Texas's and Missouri's investigations, while X Corp.'s multi-jurisdiction litigation is enjoined in part.

50.    In response to the Texas CID, Media Matters filed a lawsuit against Paxton in this Court on January 17, 2024. Media Matters later moved for preliminary relief against the Texas CID, claiming, among other things, that Paxton investigated Media Matters in retaliation for its protected speech in violation of the First Amendment.[47] This Court granted Media Matters' motion for a preliminary injunction, concluding that it was likely to succeed on the merits on its First Amendment retaliation claim.[48] The D.C. Circuit affirmed, agreeing that "the heart of [Media Matters'] claim is that the actions taken by Paxton are justiciable and warrant relief because they involve concrete and felt acts of *retaliation* against a media company and one of its investigative reporters for having exercised their protected rights of free speech."[49]

51.    After receiving the similar Missouri CID, Media Matters amended its suit against Paxton to add Missouri Attorney General Bailey as a defendant. This Court again granted Media Matters' motion for a preliminary injunction, concluding that the Missouri investigation chilled Media Matters' speech and that the states had coordinated in their actions.[50] Bailey ultimately

---

[46] Elon Musk (@elonmusk), X (May 23, 2024, 5:21 pm), https://perma.cc/ZE2Q-M92T.

[47] *Media Matters for Am. v. Paxton*, No. 1:24-cv-00147 (D.D.C. Jan. 18, 2024), ECF No. 4.

[48] *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 35 (D.D.C. 2024).

[49] *Paxton*, 138 F.4th at 570 (emphasis in original).

[50] *Bailey*, 2024 WL 3924573, at *1.

agreed to dismiss the state court suit against Media Matters, drop the investigation, and sign a settlement admitting that he "has not uncovered evidence of Media Matters . . . violat[ing] Missouri state law." *Bailey*, No. 24-7141, Doc. No. 2100004-A at 3.

52.     While Media Matters was fending off these unconstitutional state investigations, it brought suit in the Northern District of California to address X Corp.'s breach of the forum selection clause in its Terms of Service by filing lawsuits around the world. The court granted Media Matters' motion for a preliminary injunction in substantial part, recognizing that "it seems almost certain that the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights." *X Corp.*, 2025 WL 1084715, at *1.

### F.     The FTC gets new leadership with plans for a retaliatory investigation.

53.     At the federal level, the second Trump Administration is already going further than the first, in which President Trump pressured the FTC to take action against (pre-Elon Musk) Twitter for its content moderation.[51] The FTC now has new leadership that has been chosen and influenced by Administration officials—including former "special government employee" Musk—to use the antitrust laws to advance a twisted vision of the First Amendment. Before being selected by President Trump to be Chairman of the FTC, Andrew Ferguson indicated that, if chosen as Chairman, he would investigate groups connected to what he claimed were "advertiser boycotts" of X as well as other social media companies for their constitutionally protected content moderation decisions, which he decried as "censorship."[52] Since taking over as Chairman,

---

[51] Steven Overly, *Trump launches his salvo against social media – will it land?*, Politico (May 28, 2020), https://www.politico.com/news/2020/05/28/trump-social-media-executive-order-287834.

[52] *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/VJK3-JAHJ.

Ferguson has surrounded himself with advisors who have expressed similar intolerance toward groups with different ideas about the First Amendment, especially Media Matters.

54.    The repurposing of the FTC's mission is due in no small part to X's owner. A self-described "free speech absolutist,"[53] Musk spent at least $288 million to help elect President Trump and other Republican candidates in the 2024 election cycle, earning him unparalleled influence over the President and the levers of the federal government.[54]

55.    One use of government power that piqued Musk's interest was leveraging the antitrust laws to target what he called "advertiser boycotts." In March 2024, Musk held a live conversation on X with Missouri AG Bailey and complained to him about how advertisers "tend to freak out if some activist organizations get some article written about how they're advertising next to content that's bad," and Bailey replied that he thought this could be "a potential antitrust issue."[55] Bailey had been promoting the idea of "antitrust litigation" against "entities like Media Matters" on shows with now-Deputy Assistant to the President Sebastian Gorka,[56] Mike

---

[53] Michael Martin, *Elon Musk calls himself a free speech absolutist. What could Twitter look like under his leadership?*, NPR (Oct. 8, 2022), https://perma.cc/LC3K-C4UR.

[54] Trisha Thadani, et al., *Elon Musk donated $288 million in 2024 election, final tally shows*, Wash. Post (Jan. 31, 2025), https://www.washingtonpost.com/politics/2025/01/31/elon-musk-trump-donor-2024-election/.

[55] X Space, *The Battle for Free Speech*, X (Mar. 2024), https://perma.cc/QZ6U-9NV8.

[56] Sebastian Gorka, *We're investigating Media Matters for being fraudsters*, America First with Sebastian Gorka (2024), https://rumble.com/v4148yq-.-ag-andrew-bailey-with-sebastian-gorka-on-america-first.html; Chris Cameron, *Sebastian Gorka to Return to White House as Adviser*, N.Y. Times (Nov. 22, 2024), https://www.nytimes.com/2024/11/22/us/politics/sebastian-gorka-adviser.html.

Huckabee,[57] and at least five other conservative media figures.[58] (As noted, Bailey ultimately dropped his investigation and cleared Media Matters of any wrongdoing.)

56.    In August 2024, X Corp. brought its own antitrust lawsuit against the World Federation of Advertisers and several companies, claiming they were engaged in an "advertiser boycott." *X Corp. v. World Fed'n of Advertisers*, No. 7:24-cv-00114-O (N.D. Tex. Aug. 6, 2024), ECF No. 1 ¶ 72. Musk's company was represented in the antitrust suit by Harmeet Dhillon, who President Trump later appointed as a U.S. Assistant Attorney General.[59] Vice President Vance similarly selected as his Deputy Policy Director for antitrust James Lloyd, who had unsuccessfully represented Texas in defending its CID against Media Matters in this Court. *See Media Matters for Am. v. Paxton*, No. 1:24-cv-00147-APM (D.D.C. Jan. 25, 2024), ECF No. 26.

57.    Three days after the presidential election, fellow Trump megadonor Marc Andreesen posted on X: "The orchestrated advertiser boycott against X and popular podcasts must end immediately. Conspiracy in restraint of trade is a prosecutable crime."[60] Andreesen then

---

[57] Mike Huckabee, *STOPPING A Trump TAKEDOWN And The War On FREE SPEECH*, Huckabee Today (Jan. 6, 2024), https://perma.cc/6UB3-S7RD.

[58] *See, e.g.*, Dana Loesch, *Tuesday December 12 – Full Show*, The Dana Show with Dana Loesch (Dec. 12, 2023), https://podcasts.apple.com/us/podcast/tuesday-december-12-full-show/id279620985; Tim Jones and Chris Arps, *MO A.G. Andrew Bailey: Missouri Doesn't Have Sanctuary Cities*, The Tim Jones and Chris Arps Show (Dec. 12, 2023), https://perma.cc/Z3H9-BT7Vr; Jason Rantz, *Hour 1 – Inslee soaks in surplus as emissions get worse*, The Jason Rantz Show, https://www.listennotes.com/podcasts/the-jason-rantz-show/hour-1-inslee-soaks-in-ieZsJf012P9/; Joe Pags, *MO AG Andrew Bailey Joins Pags to Discuss Hunter Biden, Missouri v Biden, Jack Smith, and More in Exclusive Interview!*, The Joe Pags Show (Dec. 14, 2023), *Missouri AG: Evidence Against Media Matters Would 'Chill Spine of the Devil*,' One America News (Dec. 14, 2023), https://perma.cc/D8DX-CC7A.

[59] U.S. Dep't of Just. Off. of Pub. Affs., *Attorney General Pamela Bondi Swears In Harmeet Dhillon as the Assistant Attorney General for the Civil Rights Division* (Apr. 7, 2025), https://perma.cc/AYV6-767T.

[60] Marc Andreessen (@pmarca), X (Nov. 8, 2024, 6:07 pm), https://perma.cc/5RLG-5U3F.

posted the "federal laws" purportedly authorizing these prosecutions,[61] to which Musk replied: "Interesting."[62]

58.    FTC Commissioner Andrew Ferguson (prior to being appointed Chairman of the agency) also responded to Andreesen's posts, writing that "[a]ntitrust enforcers should take this seriously."[63] At the time, Ferguson was one of a few contenders seeking to be nominated by President-elect Trump as the FTC's Chairman.[64]

59.    In an apparent bid to bolster his candidacy, Ferguson pitched himself as sympathetic to Musk's obsession with shutting down alleged "advertiser boycotts" of X. Ferguson laid out his agenda for the FTC in a leaked memo that vowed to stand up to the "radical left" and "[i]nvestigate and prosecute collusion on DEI, ESG, advertiser boycotts, etc."[65]

60.    During a November 2024 conversation on X with a conservative activist tied to Musk, Ferguson said that "antitrust laws may have something to say about what's been going on [with] . . . advertiser boycotts," which became "really obvious after Elon Musk sort of purchased X and may have saved [] the free exchange of ideas that's so indispensable to the American way of life." He praised Musk's response to advertisers withholding money because of X's lack of content moderation—telling them "go f--- yourself"—as a "singularly great American moment." He went on to say that "one of the most important things that the FTC can do to promote free

---

[61] Marc Andreessen (@pmarca), X (Nov. 9, 2024, 5:30 pm), https://perma.cc/U2R8-KVYR.

[62] Elon Musk (@elonmusk), X (Nov. 9, 2024, 5:25 pm), https://perma.cc/VLU2-7PRB.

[63] Andrew Ferguson (@AFergusonFTC), X (Nov. 8, 2024, 8:49 pm), https://perma.cc/JPR9-VH2T.

[64] Liz Hoffman and Shelby Talcott, *Ex-Trump antitrust cop in touch with transition team about FTC Job*, Semafor (Nov. 11, 2024), https://perma.cc/A9AR-JMUV.

[65] *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/A56K-Q4YM.

speech is to keep a very close eye on potential advertiser boycotts," and that "the FTC needs to investigate" and then could "bring lawsuits."[66]

61.    Ferguson continued making the rounds on conservative media, telling another host that "progressives" who are "fighting 'disinformation'" were "not going to give up just because of the election," so "it's really important that the FTC take investigative steps in the new administration under President Trump."[67]

62.    Days later, Ferguson appended a concurring statement to an FTC order in which he broached the entirely unrelated subject of X being purchased by "a free-speech champion" and purportedly facing an "advertiser boycott[]." He cited one of X Corp.'s lawsuits and pledged that the FTC "ought to conduct [] an investigation" into this "danger to free speech on Big Tech platforms that may fall within our antitrust bailiwick."[68]

63.    Ferguson's supporters lobbied for him to lead the FTC. This included then-candidate for U.S. Attorney General Mike Davis,[69] who wrote on X that "Donald Trump should nominate digital freedom fighter Andrew Ferguson to chair FTC."[70]

---

[66] Mike Benz (@MikeBenzCyber), X (Nov. 24, 2024), https://perma.cc/28SY-WBPL; *see also* Clara Ence Morce and Sarah Ellison, *How an ex-State Department official fueled Elon Musk's attacks on USAID*, Wash. Post (Feb. 6, 2025), https://www.washingtonpost.com/politics/2025/02/06/musk-doge-usaid/ ("Musk . . . has retweeted, replied to or mentioned Benz over 160 times in the past year").

[67] Andrew Ferguson, *Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM]*, Bannon's War Room (Nov. 30, 2024), https://perma.cc/ASE8-RZNJ.

[68] *FTC v. 1661, Inc. d/b/a GOAT*, FTC (Ferguson, A., concurring) (Dec. 2, 2024), https://perma.cc/DV55-N5WY.

[69] Adam Wren, *Trump's Chief Legal Defender Vows a 'Reign of Terror' – Or Is It All an Act?*, Politico (Sept. 20, 2024), https://www.politico.com/news/magazine/2024/09/20/mike-davis-trump-potential-attorney-general-profile-00179358.

[70] Mike Davis (@mrddmia), X (Dec. 7, 2024, 2:09 pm), https://perma.cc/V9XL-J7UX.

64.    Davis posted that his "good friend" Ferguson is "Trump's perfect candidate to serve as his next FTC Chairman."[71] The admiration is apparently mutual: Davis had recruited Ferguson to the Senate where they worked together, and Ferguson has said that he and Davis are "super good friends" and "super close."[72] Davis runs an organization that describes itself as bringing "brass knuckles to fight leftist lawfare,"[73] and he has urged retaliation against Media Matters and Eric Hananoki for their reporting on X. Davis suggested that Musk "should nuke @MMFA [Media Matters' account] and all staff accounts. They're a cancer to free speech."[74] He posted: "If you want to help @Article3Project build our (growing) list of leftists to throw in the DC gulag with @MMFA's @ehananoki and @MattGertz, please donate here."[75] And Davis endorsed Musk's lawsuits against Media Matters, writing: "Advertiser boycotts are highly effective tactics leftists use to cow media executives to destroy free speech—and control the political narrative. @MMFA is the driving force behind conservative media getting crushed—and conservative voices silenced. Cheers to @ElonMusk."[76]

65.    On December 10, 2024, President-elect Trump announced that he was naming Ferguson to be the next Chair of the FTC.[77]

66.    Musk publicly congratulated Ferguson on X the next day.[78]

---

[71] Mike Davis (@mrddmia), X (Dec. 6, 2024, 6:22 pm), https://perma.cc/J9WM-N674.

[72] The Federalist Society, "Open Minds with Andrew Ferguson and James Burnham," YouTube (Jun. 17, 2024), https://perma.cc/4RLD-.

[73] Article 3 Project, https://perma.cc/FK9J-9DR5.

[74] Mike Davis (@mrddmia), X (Dec. 1, 2022, 11:54 am), https://perma.cc/VVD5-NAR5.

[75] Mike Davis (@mrddmia), X (Nov. 10, 2023, 1:53 pm), https://perma.cc/L8E8-ZSJF.

[76] Mike Davis (@mrddmia), X (Nov. 29, 2023, 5:42 pm), https://perma.cc/G88S-YC3U.

[77] Jody Godoy, *Trump picks Andrew Ferguson to chair FTC*, Reuters (Dec. 10, 2024), https://www.reuters.com/world/us/trump-picks-andrew-ferguson-chair-ftc-2024-12-10/

[78] Elon Musk (@elonmusk), X (Dec. 11, 2024, 4:51 am), https://perma.cc/67FW-EK3Y.

67.    After taking office, President Trump fired the two Democrat-appointed FTC Commissioners, Rebecca Kelly Slaughter and Alvaro Bedoya, and appointed a new Commissioner, Mark Meador.

68.    Meador represented a conservative video site, Rumble, in suing the World Federation of Advertisers ("WAF") for an alleged advertiser boycott only months before his appointment. *See Rumble Inc. v. World Fed'n of Advertisers*, No. 7:24-cv-00115 (N.D. Tex. Aug. 6, 2024), ECF No. 1. That lawsuit alleged that a WAF initiative, the Global Alliance for Responsible Media, "encouraged its members to cease advertising on Twitter (now X) when Twitter was purchased by Elon Musk in 2022." *Id.* ¶ 66. Meador's lawsuit was filed in coordination with X Corp.'s companion suit in the same court.[79]

69.    Meador's client in that case had echoed Musk's posts on X in November 2023, with Rumble's CEO threatening his own "thermonuclear" lawsuit and saying, "The cavalry is coming… Organizations like Media Matters and others are about to feel pain." He called for "an immediate investigation at the highest levels" into Media Matters.[80] Then Rumble filed a defamation suit against another watchdog group and "unidentified employees of . . . Media Matters." *Rumble Inc. v. Jammi*, No. 8:23-cv-2718 (M.D. Fla. Nov. 29, 2023), ECF No. 1 ¶ 50.

70.    Upon his promotion to Chairman, Ferguson brought in several senior staffers who had previously attacked Media Matters. For example:

- Jon Schweppe (Senior Policy Advisor to FTC Chairman Ferguson) wrote in 2023 that "Media Matters wants to weaponize powerful institutions to censor

---

[79] Rumble, *Rumble Joins X to Sue Advertising Cartel that Allegedly Conspired to Withhold Digital Advertising Revenue* (Aug. 6, 2024), https://corp.rumble.com/blog/rumble-joins-x-to-sue-advertising-cartel-that-allegedly-conspired-to-withhold-digital-advertising-revenue/.

[80] Chris Pavloski (@chrispavloski), X (Nov. 20, 2023, 6:31 pm), https://perma.cc/SV3C-5ZG3.

conservatives,"[81] and praised X Corp.'s lawsuit against Media Matters while
calling it "scum of the earth."[82]

- Joe Simonson (FTC Director of Public Affairs) posted on X in May 2024 that
  "Media Matters employed a number of stupid and resentful Democrats who went
  to like American University and didn't have the emotional stability to work as an
  assistant press aide for a House member."[83]

- Jake Denton (FTC Chief Technology Officer) accused Media Matters in 2023 of
  being "an organization devoted to pressuring companies into silencing
  conservative voices," and saying "[n]o one should take the findings of [a Media
  Matters] report seriously."[84]

71.    Ferguson also remains close with Mike Davis, who "is now an outside adviser to
the Trump administration."[85] In a March 14, 2025 podcast, Davis said that, on antitrust matters,
"we are working with people like Andrew Ferguson, the FTC Chair."[86] Davis and Ferguson

---

[81] Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/.

[82] Jon Schweppe (@JonSchweppe), X (Nov. 20, 2023), https://perma.cc/25YT-DQ7T.

[83] Joe Gabriel Simonson (@SaysSimonson), X (May 23, 2024), https://perma.cc/8CTX-HPS7.

[84] Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*," Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/.

[85] Dave Michaels, *How Trump's FTC Chairman Is Bringing a MAGA Approach to Antitrust Enforcement*, WSJ (Mar. 12, 2025), https://www.wsj.com/politics/policy/how-trumps-ftc-chairman-is-bringing-a-maga-approach-to-antitrust-enforcement-66b286d5.

[86] Mike Davis, *Episode 4337: Frontline Federal Leftist Judges*, Bannon's War Room (Mar. 14, 2025), https://rumble.com/v6qmtba-episode-4337-frontline-federal-leftist-judges.html.

reportedly had a meeting with President Trump on April 8, 2025.[87] And on April 25, Davis said he had met with Ferguson and "his team," including FTC Commissioner Mark Meador, calling them his "friends" who are "doing a phenomenal job for President Trump . . . . There is a lot more that is coming."[88]

72.      Some of what Davis was hinting at appears to have leaked just last week. After advertising conglomerate Interpublic Group announced a proposed merger with Omnicom Group, X Corp.'s CEO reportedly threatened that there would be consequences if Interpublic did not get its clients to place more ads on X, which Interpublic took to mean that the FTC's merger review could derail the deal.[89] According to reports, Interpublic recently signed a new agreement with X for potential client spending.[90] On June 23, 2025, the FTC conditioned the merger on an order that would prohibit the parties from "entering into or maintaining any agreement or practice that would steer advertising dollars away from publishers based on their political or ideological viewpoints."[91]

## G. The FTC issues an improper CID that is significantly broader than the CIDs issued by the Texas and Missouri Attorneys General.

73.      On May 20, 2025, the FTC issued a civil investigative demand to Media Matters, apparently seeking to revive the state government investigations that had been blocked by this

---

[87] Ben Smith, *Trump officials sought to stiffen president's spine against Meta*, Semafor (Apr. 14, 2025), https://perma.cc/CNZ9-5ZE5.

[88] Mike Davis, *Episode 4441: CCP Infiltration In America; Truth Behind The Deportation Numbers*, Bannon's War Room (Apr. 25, 2025), https://rumble.com/v6skvod-episode-4441-ccp-infiltration-in-america-truth-behind-the-deportation-numbe.html.

[89] Suzanne Vranica, *X Hinted at Possible Deal Trouble in Talks with Ad Giant to Increase Spending* WSJ (Feb. 19, 2025), https://www.wsj.com/business/media/x-hinted-at-possible-deal-trouble-in-talks-with-ad-giant-to-increase-spending-feb122a6.

[90] *Id.*

[91] Statement of Chairman Andrew N. Ferguson In the Matter of Omnicom Group/The Interpublic Group of Cos., Matter No. 2510049, FTC (June 23, 2025), https://perma.cc/TD9Z-8ATT.

Court. Ex. D, Civil Investigative Demand, FTC (May 20, 2025); *see also* 15 U.S.C. § 57b-1(i) (providing FTC Commissioners with power to issue civil investigative demands).

74.    The CID's first substantive demand makes clear its connection to Musk's lawsuits, seeking "all documents that Media Matters either produced or received in discovery in any litigation between Media Matters and X Corp. related to advertiser boycotts since 2023." *Id.* at 2. The very next demand requires Media Matters to provide all documents and communications relating to 13 entities, most of which had previously been the subject of Musk's public attention: three that were the subject of X lawsuits,[92] two that Musk said should be "disbanded" or "shut down,"[93] and two that X had partnered with on brand safety measures that were implicated by Media Matters' reporting.[94] *See id.* at 2–3. One of the listed groups was also sued by X Corp. in a case that a federal district court dismissed because it sought to "punish[] the Defendants for their speech." *X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948, 955 (N.D. Cal. 2024).

75.    The FTC's CID is overbroad and designed to be maximally burdensome on Media Matters. Taking a cue from the Missouri CID, the FTC CID tries to bring back to life, in a new guise, the patently retaliatory Texas investigation the patently retaliatory Texas investigation through even broader, more generalized demands for documents. It lists nearly twice as many topics as the Texas and Missouri demands and asks for documents and information for a time

[92] *X Corp. v. World Fed'n of Advertisers*, No. 7:24-cv-00114-O (N.D. Tex. 2024); *X Corp. v. Ctr. for Countering Digital Hate, Inc.*, No. 3:23-cv-03836-CRB (N.D. Cal. 2024).

[93] Elon Musk (@elonmusk), X (Oct. 19, 2023), https://perma.cc/S57Q-C88K; Elon Musk (@elonmusk), X (Apr. 18, 2024), https://perma.cc/YSJ4-2JVU.

[94] Reuters, *Twitter, ad verification firms team up to give advertisers tweet-level analysis* (Jan. 25, 2023), https://www.reuters.com/technology/twitter-ad-verification-company-partner-give-advertisers-tweet-level-analysis-2023-01-25/.

period three times as long (more than six years compared to less than two years in the state CIDs). The D.C. Circuit described the Texas CID as "sweeping" and "requiring Media Matters to produce a slew of records," a characterization that applies more than doubly so for the FTC CID. *See Paxton*, 138 F.4th at 569; *compare* Ex. B, *with* Ex. D.

76.     The CID constitutes a fishing expedition into the most sensitive areas of Media Matters' journalism and advocacy. It seeks to rifle through all of Media Matters' "financial statements" and "financial report[s]." Ex. D. It probes the core of the editorial process, seeking "the methodology by which Media Matters evaluates or categorizes any news, media, sources, platforms, outlets, websites, or other content publisher entities." *Id.* It snoops into newsgathering activities, demanding "all communications" with third parties—such as members of the public— requesting that Media Matters label content for "hate speech" or "misinformation." *Id.* And it intrudes into Media Matters' associations with others, seeking all communications with "any person connected to" groups that engage with these topics. *Id.*

77.     The CID also fails to comply with the basic statutory requirements in the FTC Act, further evincing its improper purpose. The CID purports to be authorized by Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1. Ex. D at 1. That section requires a CID to provide fair notice to the recipient by "stat[ing] the nature of the conduct constituting the alleged violation which is under investigation." 15 U.S.C. § 57b-1(c)(2). Here, however, the CID fails to identify the relevant "conduct" or the "alleged violation" that the FTC is investigating. Instead of providing the requisite notice, the CID's "Subject of Investigation" says "See attached," but the attachments—the demands and a copy of a 2022 FTC resolution—also do not identify the relevant conduct or alleged violation. *See* Ex. D.

78.    This failure to comply with the statute's notice requirement is no mere technicality. The CID's unstated purpose appears to be investigating alleged wrongdoing *by Media Matters*, but as a nonprofit organization, it "fall[s] outside the scope of the agency's jurisdiction." *Nat'l Fed'n of the Blind*, 420 F.3d at 334. The FTC is authorized to enforce the antitrust laws only against entities that are "organized to carry on business for [their] own profit or that of [their] members," *i.e.*, for-profit entities. 15 U.S.C. §§ 44–45. If the FTC were considering bringing an enforcement action solely against a for-profit entity that may have interacted with Media Matters— such as some of the entities listed in the CID, *see* Ex. D at 3—then it would have simply sought documents from that for-profit entity directly. Indeed, the FTC *did* issue a similar CID to at least one of those entities at the same time that it sent the CID to Media Matters,[95] underscoring that the Media Matters CID serves no proper purpose.

79.    Any "advertiser boycott" theory involving Media Matters is baseless. None of the Administration allies touting that theory—including Ferguson—has offered any credible basis for suspecting that Media Matters orchestrated an actionable conspiracy among competing advertisers in a cognizable market to refrain from purchasing advertisements on X or any other site favored by the Administration. They have pointed to no communication involving Media Matters and advertisers suggesting that any advertiser agreed it would cease its business dealings with X. Nor have they pointed to any actions taken by advertisers—beyond speculation—showing that advertisers jointly decided to refrain from purchasing advertisements on X. Instead, they focus only on Media Matters' *public* reporting concerning how advertisements were placed on X—*i.e.*,

---

[95] Kate Conger and Tiffany Hsu, *F.T.C. Investigates Ad Groups and Watchdogs, Alleging Boycott Collusion*, N.Y. Times (June 2, 2025), https://www.nytimes.com/2025/06/02/technology/ftc-investigation-advertising-boycotts.html.

protected speech—and seek revenge for the self-interested and independent business decisions of advertisers to refrain from purchasing advertisements on X.

80.     One of the Democratic FTC Commissioners fired by President Trump, Alvaro Bedoya, recognized the CID for what it is: "Bizarrely, new FTC leaders have started an investigation into Media Matters, apparently because it may have driven down ad revenues for the President's $288 million donor, Elon Musk."[96]

81.     The CID was signed by FTC Chairman Ferguson. Ex. D at 1. As he has candidly recognized in other contexts, such government investigations risk being weaponized because they "are expensive when applied to you, even if we don't win at the end of the day."[97]

### H.  The FTC has harmed and will continue to irreparably harm Media Matters.

82.     Media Matters has suffered irreparable harm since the FTC issued the CID, and it will continue suffering irreparable harm unless this Court grants relief.

83.     The injuries Media Matters has faced are of a piece with those caused by the cascade of other lawsuits and investigations prompted by Musk and his allies since November 2023. Each time Media Matters has achieved a legal victory, it has hoped to enjoy a reprieve from retaliation and a return to its ordinary activities. No such reprieve has arrived, and the harms that the organization has suffered have instead compounded with each renewed attack against it— particularly now that it is the subject of a federal investigation by an Administration known for targeting and punishing its perceived enemies.

---

[96] Suzanne Vranica and Dana Mattioli, *FTC Seeks Information From Top Advertising Agencies as Part of Ad-Boycott Probe*, WSJ (June 9, 2025), https://www.wsj.com/business/media/ftc-seeks-information-from-top-advertising-agencies-as-part-of-ad-boycott-probe-9c98ad82.

[97] Andrew Ferguson, 2025 Antitrust Conference and Keynote (Apr. 10, 2025), https://perma.cc/KX2H-EM6V.

84.    First, the CID has chilled Media Matters and its staff from engaging in speech and press activities protected by the First Amendment.

85.    Media Matters has been relegated to sitting on the sidelines as events play out that it would normally cover. For example, in early June the biggest story in the country was the seeming implosion of the relationship between President Trump and Musk. Under normal circumstances, covering the way various media figures were discussing the story and documenting how prominent figures were choosing sides is the type of bread-and-butter media story that Media Matters owned for years. Under the yoke of the new federal investigation, however, Media Matters instead sat the story out.

86.    To take another example, normally the connections between right-wing media and the FTC—as well as Musk's cozy relationship with the agency—would be an area Media Matters might investigate since X is subject to FTC oversight.[98] In fact, during the first Trump Administration, reporter Eric Hananoki repeatedly wrote about subjects that were within the scope of the FTC's work. Given the FTC's CID, Media Matters and its reporters have not been writing about these topics or reaching out to the FTC as they have done in the past. Instead, Media Matters staff members were recently cautioned that any reference to the FTC or its commissioners in written content would need to be flagged for approval by senior staff and the company's legal team. Media Matters has not published any such articles since receiving the CID.

---

[98] *See, e.g.*, Elizabeth Wollman, *Elon Musk's X Loses Bid to Scrap FTC Privacy Order*, WSJ (Nov. 16, 2023), https://www.wsj.com/tech/x-corp-s-bid-to-change-or-end-ftc-consent-order-denied-by-judge-103f35e5.

87.    The FTC's investigation of Media Matters is itself newsworthy, as reflected by reporting in the national media.[99] But Media Matters has not covered its own story, and has turned down a number of media requests about the investigation and about a wide range of topics related to the investigation for fear of retaliation.

88.    Even when Media Matters has not abandoned stories because of the looming FTC investigation, it has self-censored to avoid further persecution from the agency. The FTC's investigation has caused many Media Matters reporters, writers, and researchers to pare back their investigative journalism, especially on any topics that could be perceived as relating to the FTC or its investigation. They did so out of fear of being ensnared in the FTC's investigation, generating documents subject to the FTC's CID, or provoking additional legal action. These measures have limited the scope of the articles Media Matters publishes.

89.    Since the organization must carefully assess whether a new article could impact the FTC investigation, Media Matters has subjected works touching on these issues even tangentially to additional scrutiny from its senior staff and legal team, slowing its editorial processes and straining staff that is already stretched thin. The new wave of concern and chill at Media Matters has exacerbated challenges to its staff members' ability to work effectively, with many employees sharing fears with managers and leadership. Some current and former employees have asked not to use bylines on articles or to remove bylines from previously published content in order to avoid retribution. Though X is used heavily by journalists, many Media Matters employees have stopped

---

[99] *See, e.g.*, Jody Godoy and Mike Scarcella, *FTC probes Media Matters over Musk's X boycott claims, document shows*, Reuters (May 22, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/ftc-probes-media-matters-over-musks-x-boycott-claims-document-shows-2025-05-22/; Frances Vinall, *Federal Trade Commission investigates Media Matters, watchdog sued by Musk*, Wash. Post (May 23, 2025), https://www.washingtonpost.com/style/media/2025/05/23/media-matters-federal-trade-commission/.

using their personal accounts for fear of attracting further retaliation. These burdens have significantly slowed Media Matters' editorial process, reducing Media Matters' publication output.

90.     Second, the CID has impaired Media Matters' ability to exercise its First Amendment freedom of association.

91.     The FTC's CID has exacerbated the isolation Media Matters has faced from its third-party civil society partner organizations following the state investigations and X Corp. litigation. Key allies who frequently collaborated with Media Matters in the past have pulled back on communications, with some even ceasing proactive engagement entirely. Media Matters has also stopped being asked to participate in collective actions such as sign-on letters and has been shut out of industry events, such as an annual retreat earlier this year. Media Matters stopped hosting monthly technology accountability calls (after seven years of continuous meetings) in large part due to the ongoing legal and regulatory challenges it faces. And not only does Media Matters no longer share research related to X and X's advertisers; a broader chilling effect reverberates, with research organizations focused on similar topics scaling back, reducing staff, and even ceasing to conduct research on X altogether.

92.     The cloud hanging over Media Matters has also hurt the organization internally. At least one former employee indicated that the legal situation played a role in that person's choice to leave Media Matters. On information and belief, based on Media Matters' prior experiences with staffing, the FTC's ongoing investigation is impairing Media Matters' ability to attract, recruit, and retain talented employees.

93.     These associational injuries are also being felt financially. Media Matters has already experienced disruptions to development and cashflows as a result of the federal investigation. At least two vendors recently declined to work with Media Matters because of

similar concerns. The broader campaign of retaliation against Media Matters has led to disruptions in fundraising and access to vendors for nearly two years, which is only being worsened by the FTC's new investigation and broad demands for Media Matters' communications and financial documents.

94.    Of course, responding to the FTC's CID is extremely expensive. That is the point. Media Matters will incur significant costs for an organization of its size if it has to endure a prolonged dispute with the federal government as part of the multi-forum attacks it has been fending off, which already caused it to lay off staff. This drain on its resources will require further cuts to Media Matters' First Amendment activities if the FTC's investigation is not stopped.

## CLAIMS FOR RELIEF

### COUNT I

### (Retaliation in Violation of the First Amendment)

95.    Plaintiff incorporates paragraphs one through 94 above as if set forth fully herein.

96.    Defendants violated, and continue to violate, Plaintiff's First Amendment rights by launching an investigation and serving a burdensome CID in retaliation for Plaintiff's speech, press, and associational activities. Chairman Ferguson's use of the power of the agency is discouraging, and will continue to discourage, Plaintiff from engaging in news coverage. The chill imposed by Defendants' retaliatory actions injures Plaintiff's ability to investigate and publish news stories and further chills its ability to participate in a robust public discussion around political extremism on X. Media Matters has faced financial, resourcing, and associational harms in addition to a chilling effect on its speech and press activities.

97.    "[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547

U.S. 250, 256 (2006). The government "cannot … use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

98.     What is more, Defendants' investigation represents just one incident in a broader pattern of government officials and powerful public figures harassing and attempting to intimidate Media Matters out of expressing itself. *See Back Beach Neighbors Comm. v. Town of Rockport*, 535 F. Supp. 3d 57, 65 (D. Mass. 2021) ("A pattern of informal harassment can support a First Amendment retaliation claim if the alleged harassment has a chilling effect.").

99.     To prevail on a First Amendment retaliation claim, Plaintiff must show "(1) [it] engaged in conduct protected under the First Amendment; (2) [Defendants] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiff's] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiff meets these standards with ease.

100.     Media Matters, a non-profit media watchdog group that reports on and researches matters of public significance, is "obviously engaged in conduct protected under the First Amendment." *Paxton*, 138 F.4th at 584. Its public reporting is, in this Court's words, a "quintessential First Amendment activit[y]." *Id.*

101.     Defendants have taken action adverse to Media Matters' protected activity in response to Media Matters' news coverage. Ferguson is the latest government actor to punish Media Matters for its coverage of powerful figures with whom he is associated. Defendants' investigation and intrusive CID have already chilled Plaintiff's speech and reporting activities, and they will continue to do so absent relief. Defendants' retaliatory conduct would "deter a person of ordinary firmness in [Plaintiff's] position from speaking again." *Aref*, 833 F.3d at 258.

102.     Establishing that a person of "ordinary firmness" would be deterred from speaking is "not a high" bar to clear. *Jenner & Block*, 2025 WL 1482021, at \*7 n.7. It is reasonable to expect any similarly situated media company—especially one facing a multi-front attack from government officials and receiving a barrage of threats from powerful figures and their allies— would be deterred from reporting activities.

103.     Defendants' investigation and CID are causally linked to Plaintiff's exercise of its First Amendment rights. Against the backdrop of President Trump's largest campaign donor spurring "thermonuclear lawsuit[s]" against Media Matters, including Texas's and Missouri's retaliatory investigations, the FTC's new leadership has surrounded itself with vocal opponents of Media Matters seeking vengeance and, with the CID, they are now getting it. The four corners of the CID make this clear: The FTC demands documents overwhelmingly concerning Plaintiff's reporting about X, editorial processes, newsgathering activities, and affiliations with likeminded entities.

104.     Defendants' ongoing violations of Plaintiff's First Amendment rights will continue to cause it irreparable harm absent judicial relief.

## COUNT II

### (Improper Investigation in Violation of the First and Fourth Amendments)

105.     Plaintiff incorporates paragraphs one through 94 above as if set forth fully herein.

106.     The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). The First Amendment provides Plaintiff a privilege against disclosure of materials that would chill its constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010).

107.     Defendants' issuance of the overbroad and retaliatory CID violates Plaintiff's First and Fourth Amendment rights by unreasonably requiring it to turn over sensitive and privileged materials, including those that impinge upon their association with other organizations. This CID goes even further than Paxton's CID, which the D.C. Circuit called "sweeping." *Paxton*, 138 F.4th at 569. But the FTC's "[s]ubpoena enforcement power is not limitless." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001).

108.     Where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)) (emphasis added). Defendant Ferguson has shown no such "scrupulous exactitude" in his CID. Without any showing of cause or jurisdiction, Ferguson has demanded that Plaintiff produce a broad set of documents that implicate its core First Amendment rights.

109.     Similarly, the CID violates Plaintiff's rights by seeking to compel disclosure of sensitive documents protected by the First Amendment reporter's privilege. The First Amendment "provides journalists with a qualified privilege against compelled disclosure of information obtained through their news gathering activities." *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 118 (D.D.C. 2002). Media Matters is thus protected from disclosing its resources, sources, methods, and other information guarded from disclosure by the First Amendment. Absent a compelling reason—and here, there is none, especially given the FTC's lack of authority to enforce antitrust laws against Media Matters—compliance with the agency's disclosure requests would "pose[] a serious threat to the vitality of the newsgathering process." *Shoen v. Shoen*, 48 F.3d 412,

416 (9th Cir. 1995) (citing *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988)).

110.    Defendants' ongoing violations of Plaintiff's First and Fourth Amendment rights will continue to cause it irreparable harm absent judicial relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an order or judgment in favor of Plaintiff and against Defendants as follows:

a)    Declare that Defendants' CID constitutes a First Amendment retaliatory action in violation of Plaintiff's rights under the First Amendment of the U.S. Constitution.

b)    Declare that Defendants' CID violates Plaintiff's rights under the First and Fourth Amendments of the U.S. Constitution.

c)    Preliminarily and permanently enjoin Defendants, their officers, agents, servants, and employees from initiating any action to enforce the CID or further investigating Plaintiff in violation of its constitutional rights.

d)    Grant such other and further relief as this Court deems just and proper.

Dated: June 23, 2025

Respectfully submitted,

*/s/ Stephen P. Anthony*
Stephen P. Anthony (D.C. Bar No. 426536)
Ryan K. Quillian (D.C. Bar No. 994846)*
Dana A. Remus (D.C. Bar No. 90015315)*
Kuntal V. Cholera (D.C. Bar No. 1031523)*
Brenden J. Cline (D.C. Bar No. 1021317)*
Brigid P. Larkin (D.C. Bar No. 1780668)*
Alezeh Z. Rauf (D.C. Bar No. 1643291)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

Justin A. Nelson (D.C. Bar No. 490347)
Matthew Behncke**
Alexandra Foulkes Grafton**
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
(713) 651-9366

Katherine M. Peaslee**
SUSMAN GODFREY L.L.P.
401 Union Street, Suite #3000
Seattle, WA 98101
(206) 516-3880

*Admission pending
** *Pro hac vice* application forthcoming

*Counsel for Plaintiff Media Matters for America*