## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA,<br>P.O. Box 44811<br>Washington, DC 20026<br><br>    *Plaintiff*,<br><br> v.<br><br>FEDERAL TRADE COMMISSION; ANDREW N. FERGUSON, in his official capacity as Chairman of the Federal Trade Commission; MARK R. MEADOR, in his official capacity as Commissioner of the Federal Trade Commission; MELISSA ANN HOLYOAK, in her official capacity as Commissioner of the Federal Trade Commission; JOHN DOE 1, in their official capacity as Commissioner of the Federal Trade Commission; and JOHN DOE 2, in their official capacity as Commissioner of the Federal Trade Commission<br>600 Pennsylvania Ave., NW<br>Washington, DC 20580<br><br>    *Defendants.* | Civil Case No. 25-1959 |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 4

    A.    For more than two decades, Media Matters has addressed extremism, bias, and misinformation in online and print media. ................................... 4

    B.    Musk acquired Twitter and gutted its content moderation practices, creating an unregulated forum that drove away advertisers. ................. 5

    C.    Media Matters continued to report on developments at Twitter following Musk's takeover and Musk, in turn, retaliated with a "thermonuclear" litigation campaign. ................................................................. 7

    D.    Musk and Attorneys General Paxton and Bailey targeted Media Matters because of its journalism. ................................................................. 8

    E.    This Court has halted the CIDs issued by Texas and Missouri. ........................... 9

    F.    The FTC picked up where the other retaliatory litigations against Media Matters left off. ................................................................. 11

    G.    The FTC's CID has already chilled the speech of Media Matters and its journalists. ................................................................. 15

STANDARD OF REVIEW ............................................................................... 17

ARGUMENT ................................................................................................... 17

I.    Media Matters is likely to prevail on the merits of its claims. ........................... 17

    a.    Plaintiff is likely to establish that the FTC retaliated against its constitutionally protected activities in violation of the First Amendment. ................................................................. 17

        i.    Media Matters' newsgathering and reporting are protected First Amendment activities. ........................................... 18

        ii.    The FTC's CID has been, and will continue to be, sufficient to deter Plaintiff's protected activities. ................................. 18

        iii.    The FTC's retaliatory actions are causally linked to Plaintiff's constitutionally protected activities. .......................... 21

    b.    Plaintiff is likely to establish that the FTC's CID violates both the First and Fourth Amendments to the U.S. Constitution. .......................... 28

II.     Plaintiff will suffer irreparable harm absent an injunction against the CID. .................... 31

III.    The remaining equitable factors strongly favor granting preliminary relief..................... 34

CONCLUSION .................................................................................................................... 36

CERTIFICATE OF SERVICE ............................................................................................. 37

# TABLES OF AUTHORITIES

**Page(s)**

## Cases

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ...................................................................17, 18, 19

*Bailey v. Fed. Bureau of Prisons*,
    No. 24-1219 (PLF), 2024 WL 3219207 (D.D.C. June 28, 2024) ...........................31

*Black Lives Matter Dist. of Columbia v. Trump*,
    544 F. Supp. 3d 15 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th
    1003 (D.C. Cir. 2023) ..........................................................................................21

*Burley v. Nat'l Passenger Rail Corp.*,
    801 F.3d 290 (D.C. Cir. 2015) ..............................................................................28

*Centro Tepeyac v. Montgomery Cnty.*,
    722 F.3d 184 (4th Cir. 2013) ................................................................................34

*Cigar Ass'n of Am. v. U.S. FDA*,
    317 F. Supp. 3d 555 (D.D.C. 2018) ......................................................................31

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) ................................................................................18

*Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*,
    854 F.3d 683 (D.C. Cir. 2017) ..............................................................................26

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) ..........................................................................19, 20

*Davis v. Dist. of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998) ............................................................................32

*F.T.C. v. Church & Dwight Co., Inc.*,
    665 F.3d 1312 (D.C. Cir. 2011) ............................................................................20

*Fla. EB5 Invs., LLC v. Wolf*,
    443 F. Supp. 3d 7 (D.D.C. 2020) .....................................................................17, 34

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ................................................................................35

*Goodwin v. Dist. of Columbia*,
    579 F. Supp. 3d 159 (D.D.C. 2022) ......................................................................21

*Grajales v. P.R. Ports Auth.*,
  682 F.3d 40 (1st Cir. 2012) ..................................................................................21

*Greatness v. Fed. Election Comm'n*,
  831 F.3d 500 (D.C. Cir. 2016) ..............................................................................17

*Hartley v. Wilfert*,
  918 F. Supp. 2d 45 (D.D.C. 2013) ..................................................................18, 20

*Hartman v. Moore*,
  547 U.S. 250 (2006) ..............................................................................................17

*Hawkins v. Dist. of Columbia*,
  923 F. Supp. 2d 128 (D.D.C. 2013) .......................................................................21

*Hutira v. Islamic Republic of Iran*,
  211 F. Supp. 2d 115 (D.D.C. 2002) .......................................................................29

*Jenner & Block LLP v. U.S. Dep't of Just.*,
  No. 25-916 (JDB), 2025 WL 1482021 (D.D.C. May 23, 2025) ..............................18

*Johnson v. Dist. of Columbia*,
  726 F. Supp. 3d 8 (D.D.C. 2024), *reconsideration denied*, No. CV 20-2944
  (RC), 2024 WL 3858547 (D.D.C. Aug. 19, 2024) ..................................................21

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) ........................................................................32, 34

*Kiernan v. Town of Southampton*,
  734 F. App'x 37 (2d Cir. 2018) .............................................................................21

*Klayman v. Obama*,
  142 F. Supp. 3d 172 (D.D.C. 2015) .......................................................................35

*Lacey v. Maricopa Cnty.*,
  693 F.3d 896 (9th Cir. 2012) ................................................................................30

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) (en banc) ...................................................................35

*League of Women Voters of the U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ..................................................................................35

*Lewis v. City of Boston*,
  321 F.3d 207 (1st Cir. 2003) .................................................................................22

*Lewis v. Gov't of the Dist. of Columbia*,
  161 F. Supp. 3d 15 (D.D.C. 2015) .........................................................................22

*Marcus v. Search Warrants of Prop. at 104 East Tenth St.*,
   367 U.S. 717 (1961) ................................................................................31

*Massey v. Johnson*,
   457 F.3d 711 (7th Cir. 2006) ................................................................21

*Media Matters for Am. v. Bailey*,
   No. 24-cv-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024)
   ...........................................................................................2, 10, 17, 25

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) .......................................2, 10, 13, 18, 32, 33, 34

*Media Matters for Am. v. Paxton*,
   732 F. Supp. 3d 1 (D.D.C. 2024) .................................................2, 10, 17, 25, 33

*Media Matters for Am. v. Paxton*,
   24-cv-147 (APM) (D.D.C. Jan. 18, 2024) ..............................................9

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
   460 U.S. 575 (1983) ................................................................................35

*N. A. A. C. P. v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ...........................................................................26, 27

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971) (Black, J., concurring) ........................................32

*Nat'l Fed'n of the Blind v. FTC*,
   420 F.3d 331 (4th Cir. 2005) ................................................................25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024) ................................................................................18

*Okla. Press Publ'g Co. v. Walling*,
   327 U.S. 186 (1946) ...........................................................................29, 30

*Pebble Ltd. P'ship v. Env't Prot. Agency*,
   310 F.R.D. 575 (D. Alaska 2015) .........................................................30

*Perry v. Schwarzenegger*,
   591 F.3d 1147 (9th Cir. 2009) ..............................................................29

*Playboy Enters. Inc. v. Meese*,
   639 F. Supp. 581 (D.D.C. 1986) ..........................................................19

*Prysmian Cables & Sys. USA, LLC v. Szymanski*,
   573 F. Supp. 3d 1021 (D.S.C. 2021) ....................................................35

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
   831 F.3d 500, 511 (D.C. Cir. 2016) ...................................................................17, 34

*Roth v. United States,*
   354 U.S. 476 (1957) ...........................................................................................18, 35

*S.C. Freedom Caucus v. Jordan,*
   677 F. Supp. 3d 352 (D.S.C. 2023) ........................................................................20

*Shoen v. Shoen,*
   48 F.3d 412 (9th Cir. 1995) .....................................................................................29

*Smith v. De Novo Legal, LLC,*
   905 F. Supp. 2d 99 (D.D.C. 2012) .....................................................................21, 23

*Turner v. U.S. Agency for Glob. Media,*
   502 F. Supp. 3d 333 (D.D.C. 2020) ........................................................................20

*United States v. Cross Senior Care, Inc., LLC,*
   No. 8:19-MC-8-T-33TGW, 2019 WL 11502849 (M.D. Fla. Nov. 6, 2019) ...........20

*United States v. Cuthbertson,*
   630 F.2d 139 (3d Cir. 1980) .....................................................................................30

*White v. Lee,*
   227 F.3d 1214 (9th Cir. 2000) .................................................................................19

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ...............................................................................................16, 34

*Wis. Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) .................................................................................31

*Xiaomi Corp. v. Dep't of Def.,*
   No. 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) .................................32

*Zurcher v. Stanford Daily,*
   436 U.S. 547 (1978) ...........................................................................................29, 30

**Statutes and Rules**

15 U.S.C. § 44 ................................................................................................................25

15 U.S.C. § 45 ................................................................................................................25

15 U.S.C. § 49 ................................................................................................................19

Fed. R. Civ. P. 26(b)(1) .................................................................................................20

Fed. R. Civ. P. 5(a) ...................................................................................................................37

## INTRODUCTION

Plaintiff Media Matters for America has been the target of an ongoing retaliatory campaign because powerful government actors disapprove of its journalism. This Court has already halted two unlawful state-level investigations into Media Matters. The Federal Trade Commission ("FTC") has now stepped in, launching a similar—and indeed, broader—investigation in response to the same protected speech that the state-level investigations sought to squelch. This Court should prevent the FTC from leveraging the power of the federal government to punish Media Matters for its speech.

Media Matters is a nonprofit media organization. For years, its journalism has cast a spotlight on misinformation and toxic content online, including on prominent social media sites such as X, YouTube, Facebook, and Instagram. That journalism, however, has made it a political target. Many influential partisan political operatives have long criticized Media Matters' push for social media companies to moderate content on their sites. Simmering tensions about Media Matters' journalism boiled over when Media Matters published an article suggesting that Elon Musk's laissez-faire approach to content moderation on X left the platform littered with extremist content—including Nazi propaganda—and that advertisements on X appeared alongside that content. Musk, in response, threatened Media Matters with a "thermonuclear" series of lawsuits, and then followed through on that threat with lawsuits in the Northern District of Texas and in multiple foreign jurisdictions. His political allies also jumped in. The Attorneys General of Texas and Missouri (the "State AGs") each issued a sweeping civil investigative demand ("CID") to Media Matters. This Court, however, preliminarily enjoined both CIDs, concluding that they violated the First Amendment because they were likely issued in retaliation for Media Matters' protected speech. Since then, the Missouri AG abandoned his CID and acknowledged that Media Matters had done nothing wrong. The D.C. Circuit subsequently affirmed the district court's

decision to issue a preliminary injunction against the Texas AG's CID. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 581 (D.C. Cir. 2025); *Media Matters for Am. v. Bailey*, No. 24-cv-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024); *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 35 (D.D.C. 2024).

The FTC is the latest government entity to join the retaliatory campaign, issuing an even broader CID to Media Matters on May 20, 2025. Covering a time frame triple the length of the Texas CID, the FTC CID attempts to probe all aspects of Media Matters' operations, including its editorial process, finances, internal research, and external communications. On June 23, 2025, Media Matters filed this case, claiming that the FTC's CID, like the State AGs' CIDs, is unconstitutional because it retaliates against Media Matters for its protected speech in violation of the First Amendment and because it impermissibly probes into Plaintiff's journalistic activities in violation of the First and Fourth Amendments. Media Matters now moves for a preliminary injunction against the FTC's CID and investigation. Because Media Matters satisfies each element required for a preliminary injunction, the Court should grant its motion.

*First*, Media Matters is likely to succeed on the merits of each of its claims. Media Matters is likely to succeed on its First Amendment retaliation claim because multiple factors make clear that the FTC issued its CID in response to Media Matters' protected speech. For example, several key FTC personnel, including Chairman Ferguson, and their political allies have repeatedly attacked Media Matters, explicitly and impliedly, for its reporting. Indeed, in promoting his candidacy for his current role, Ferguson pledged to "fight wokeness" by "investigat[ing] . . . advertiser boycotts," which Musk had publicly accused Media Matters of instigating, both in posts

on X and in litigation.[1] Further, a senior FTC official hired by Ferguson went so far as to call Media Matters "scum of the earth."[2] And the timing and substance of the FTC's CID also support an inference of an improper motive behind the CID. The CID comes at the heels of two related, failed state-level CIDs, and it also substantively overlaps with those state-level CIDs.

Additionally, there is no sound justification for the CID, further confirming that it was not issued for any legitimate investigative purpose. The FTC has no statutory authority to enforce the antitrust laws against a nonprofit like Media Matters. And the FTC has never offered a sound basis for suspecting that Media Matters has violated any antitrust law. Though several FTC officials have publicly accused Media Matters of participating in an "advertiser boycott" of X, the only evidence they point to is *public advocacy and reporting* by Media Matters concerning X—which is protected speech, not a call for an unlawful boycott. Former FTC Commissioner Bedoya thus called the FTC's investigation into Media Matters "bizarr[e]."[3] And, critically, multiple administration allies have also publicly called on people to cease doing business with certain companies, including MSNBC, and yet it does not appear that the FTC has investigated *them*. That strongly suggests that the decision to issue a CID to Media Matters was not driven by a genuine concern about unlawful "boycotts."

Put simply, too many factors justify the inference that the FTC issued its CID because Media Matters did what the Constitution permits: express its views on matters of significant public concern. Media Matters is thus likely to prevail on its First Amendment retaliation claim.

---

[1] *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/VJK3-JAHJ.

[2] Jon Schweppe (@JonSchweppe), X (Nov. 30, 2023, 12:34 pm), https://perma.cc/25YT-DQ7T.

[3] Suzanne Vranica and Dana Mattioli, *FTC Seeks Information From Top Advertising Agencies as Part of Ad-Boycott Probe*, WSJ (June 9, 2025), https://www.wsj.com/business/media/ftc-seeks-information-from-top-advertising-agencies-as-part-of-ad-boycott-probe-9c98ad82.

Additionally, Media Matters is likely to succeed on the merits of its claim that the FTC's CID impermissibly seeks sensitive journalistic materials in violation of the First and Fourth Amendments. As there is no sound justification for seeking those materials, the FTC's CID impermissibly subjects Plaintiff to an intrusive and unjustified government inspection that has chilled—and risks continuing to chill—Plaintiff's journalistic activities.

*Second*, the remaining preliminary injunction factors favor an injunction against the FTC's CID. The CID is irreparably harming Media Matters. Each day the CID remains in effect, it continues to intimidate Media Matters' reporters, consume its resources, and discourage other entities and persons from associating with Media Matters—all of which impacts Media Matters' ability to report on significant public matters. Conversely, the CID does not benefit the FTC or the public. Again, the FTC cannot even enforce the antitrust laws against Media Matters, and it has never offered a credible basis for suspecting that Media Matters has done anything unlawful. Thus, the balance of the equities also favors granting the preliminary injunction.

Multiple factors confirm that the FTC has abused its powers to punish what it views as a political opponent. The First Amendment does not permit the FTC's conduct, and neither should this Court. The Court should grant Plaintiff's Motion for a Preliminary Injunction.

## BACKGROUND

### A.    For more than two decades, Media Matters has addressed extremism, bias, and misinformation in online and print media.

Since it was established in 2004, Media Matters has published articles on extremism and bias in the news. Compl. ¶¶ 4, 70 (June 23, 2025), ECF No. 1. As part of its mission to address misinformation, Media Matters has reported on the spread of misinformation and extremist rhetoric (including neo-Nazi images, antisemitic conspiracy theories, and racial slurs) on websites

that host user-generated content, including, but not limited to, Facebook, Instagram, YouTube and X. Compl. ¶ 29.

In its articles, Media Matters has stated that those sites have a responsibility to the public to monitor and remove false or extremist user content.[4] Its reporting became even more important in 2022, when Elon Musk submitted a bid to purchase Twitter, retracted that bid, and was sued by Twitter to hold him to his offer.[5] Media Matters' President Angelo Carusone publicly stated that Musk's stated goal of sharply reducing content moderation on Twitter would turn it into a "cauldron[] of misinformation and abuse."[6] Mr. Carusone also warned that advertisers would not be interested in a no-holds-barred version of Twitter; "[a]dvertisers want to know that their ads are not going to appear alongside extremists, that they're not going to be subsidizing or associating with the types of things that would turn off potential customers[.]"[7]

Those warnings set the stage for what eventually became a nearly two-year campaign to silence Media Matters and stifle its coverage of political extremism and misinformation online.

### B.    Musk acquired Twitter and gutted its content moderation practices, creating an unregulated forum that drove away advertisers.

Musk completed his purchase of Twitter in October 2022. Almost immediately, he dismantled the site's content moderation systems, drastically reduced staff responsible for removing hate speech, eliminated infrastructure policies targeted at flagging misinformation and violent content, and reinstated accounts known for white supremacist rhetoric. Compl. ¶ 31. With

---

[4] Payton Armstrong, *YouTube has provided a home for Rudy Giuliani's election denial after WABC canceled his radio shows*, Media Matters for Am. (Oct. 31, 2024), https://perma.cc/XH6H-B63L.

[5] Shannon Bond, *Here's what Elon Musk will likely do with Twitter if he buys it*, OPB (Oct. 7, 2022), https://perma.cc/T5YZ-2HSW.

[6] *Id.*

[7] *Id.*

these guardrails gone, the number of posts containing once-banned content predictably ballooned. *Id.* ¶ 32. For example, slurs against gay men and Black Americans on the site increased by 58 and 200 percent, respectively.[8] And the use of the n-word increased nearly 500% in the twelve hours after Musk officially bought the site.[9]

The private sector response came quickly, too. Advertisers saw the rapid increase in conspiracy theories and hate speech on X, *id.*, and, hesitant to have their products displayed next to posts that would offend the vast majority of their customers, pulled their advertisements from the site. *Id.* ¶ 33. X's revenue plummeted. *Id.* ¶ 34. Prominent conservatives like Mike Davis— well-known friend of FTC Chairman Andrew Ferguson and vocal advocate for using the legal system to punish political opponents[10]—blamed Media Matters. He viewed Media Matters' warnings to advertisers as a "cancer to free speech," and encouraged Musk to "nuke [Media Matters'] and all staff accounts."[11] Davis has said directly that Musk's lawsuit was an opportunity

---

[8] Sheera Frenkel and Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022), https://perma.cc/CX3U-ZVS3.

[9] *Id.*

[10] Mike Davis (@mrddmia), X (Jan. 20, 2025, 1:23 am) https://perma.cc/TEY2-Y6YN ("Dear Lawfare Democrats: . . . Lawyer up."); Mike Davis (@mrddmia), X (Nov. 7, 2024, 10:10 pm) https://perma.cc/HVF8-932H (Regarding "Trump's opponents": "Fuck them. Let's unify them in prison."); Mike Davis (@mrddmia), X (Nov. 6, 2024, 1:42 am) https://perma.cc/XQ78-GL6V ("Dear Jack Smith; Lawyer up."); Mike Davis (@mrddmia), X (Nov. 9, 2024, 9:48 pm) https://perma.cc/TAU2-8BPQ ("FEMA Official who allegedly told workers to avoid Florida homes with Trump signs" "must face federal prosecution"); Mike Davis (@mrddmia), X (Nov. 6, 2024, 9:23 am) https://perma.cc/NT8X-7PU3 ("Lawyer up, @Liz_Cheney); Mike Davis (@mrddmia), X (Oct. 31, 2024, 9:50 pm) https://perma.cc/N8AT-ZL7V (telling the Colorado Secretary of State to "lawyer up"); Mike Davis (@mrddmia), X (May 31, 2024, 8:17am) https://perma.cc/RZX8-XL6A (to Republicans who believe they "are too principled to retaliate" to "Biden's . . . lawfare," "[y]ou are too weak, stupid, and dangerous to keep around"); Mike Davis (@mrddmia), X (Dec. 30, 2024, 9:09 pm) https://perma.cc/WQ8Y-ZZWW ("Lawyer up, Mark [Milley]"); Mike Davis (@mrddmia), X (Jan. 17, 2025, 10:17 pm) https://perma.cc/N3WL-JW5S (telling former Attorney General Merrick Garland to "lawyer up"); Mike Davis (@mrddmia), X (Dec. 9, 2024, 7:51 pm) https://perma.cc/6XTC-MMD4 (telling former Representative Liz Cheney that he will "sue [her] ass into the ground").

[11] Mike Davis (@mrddmia), X (Dec. 1, 2022, 11:54 am), https://perma.cc/4QJA-LEQD.

for conservatives to access Media Matters' records, explaining that "[t]aking Media Matters to court will air much of the corrupt entity's dirty laundry."[12]

By July 2023, X's advertising revenue was reportedly down 50% compared to the prior year. Compl. ¶ 34. Advertising revenue for X in the United States in particular apparently dropped even further in the following months, falling to a level as much as 60% lower than the prior year by September 2023. *Id.* And the blowback against Media Matters grew in turn. Jon Schweppe, a longtime critic of Media Matters and proponent of using antitrust litigation as a "political solution" to create "a free and honest public square" online,[13] posted in June 2023 a restatement of his view that "Media Matters wants to weaponize powerful institutions to censor conservatives."[14] Within months of that post, Schweppe became Senior Policy Advisor to FTC Chairman Andrew Ferguson. Jake Denton, now the FTC's Chief Technology Officer, agreed with Schweppe, calling Media Matters "an organization devoted to pressuring companies into silencing conservative voices." *Id.*

### C. Media Matters continued to report on developments at Twitter following Musk's takeover and Musk, in turn, retaliated with a "thermonuclear" litigation campaign.

Media Matters did not back down. In 2023, Plaintiff published at least fourteen articles about Musk and X, many of which showed that X displayed advertisements next to extremist content. Compl. ¶ 37. Numerous media outlets reported on the same topic. *Id.* ¶ 36. On November 16, 2023, Media Matters' reporter Eric Hananoki published an article titled "As Musk endorses

---

[12] Jason Cohen, *'Compelling': Legal experts Say Elon Musk's X Has A Good Case Against Media Matters*, Daily Caller (Nov. 21, 2023), https://dailycaller.com/2023/11/21/compelling-legal-experts-say-elon-musks-x-has-a-good-case-against-media-matters/.

[13] Jon Schweppe, *Biden's Thought Police*, The American Mind (Sept. 16, 2020), https://perma.cc/L7R8-VL4C.

[14] Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/.

antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content." *Id.* ¶ 37. The article included screenshots of six advertisements from major corporations next to at least nine user-generated posts that included pro-Nazi content. *Id.*.

Musk responded two days later. He never disputed that the screenshots contained real images displayed on X. Nor did he dispute that X was no longer swiftly removing pro-Nazi content from the platform. *Id.* ¶ 39. Instead, he claimed that "activist groups like Media Matters . . . try to use their influence to attack our revenue streams by deceiving advertisers on X." He insisted that Media Matters "manipulate[d]" advertisers and the public by "curat[ing]" and "contriv[ing]" in order to "find a rare instance of ads serving next to the content they chose to follow," i.e. extremist content. *Id.*. He further promised that X would file "a thermonuclear lawsuit against Media Matters" in response to the November 16 article, which he filed four days later. *Id.* ¶ 38.

Musk's political allies quickly jumped into the fray. Stephen Miller, previously a senior advisor and now White House Deputy Chief of Staff to President Trump, responded to posts about the article by stating that "[f]raud is both a civil and criminal violation" and "[t]here are 2 dozen+ conservative state Attorneys General," not so subtly suggesting that state attorneys general investigate Media Matters. *Id.* ¶ 40. Musk responded to the post, quadrupling its viewership with his larger platform. *Id.* ¶ 40 nn. 38, 39. And at least two attorneys general publicly heeded the call. On November 19, 2023, Missouri's Attorney General Andrew Bailey responded: "My team is looking into this matter." *Id.* ¶ 41. Ken Paxton, Texas's Attorney General, announced his investigation into Media Matters just one day later. *Id.* ¶ 42.

### D.  Musk and Attorneys General Paxton and Bailey targeted Media Matters because of its journalism.

Following through on their online threats, Paxton, Bailey, and Musk set to work targeting Media Matters. On November 21, 2023, Paxton issued a CID to Media Matters, demanding

documents at the core of its journalistic mission. Compl. ¶ 43. This included documents underlying Media Matters' research and reporting, as well as communications with possible sources at X and its advertisers. ¶ 43. A few months later, Bailey issued his own CID on behalf of the state of Missouri, largely requesting the same documents. *Id.* ¶ 44. Simultaneously, Bailey's office preemptively filed a lawsuit in Missouri state court to enforce the CID, under the theory that Media Matters' response to the Texas CID was inadequate and therefore Media Matters was already failing to comply with the Missouri CID. *Id.*

Meanwhile, Musk filed suits against Media Matters worldwide. First, he filed suit in November 2023 in the Northern District of Texas, bringing state law claims of interference with contract, business disparagement, and interference with economic advantage. *Id.* ¶ 45. Musk took to X to announce his intentions, responding to a post about the suit by stating: "The first of many." *Id.* X Corp. quickly made good on this message, filing nearly identical suits against Media Matters through subsidiaries in Ireland and Singapore, and issuing a demand letter through a subsidiary in the United Kingdom. *Id.* ¶ 46. Musk was not shy about his motivation: he wanted to cut Media Matters down at its knees. "We are suing them in every country that they operate," Musk explained, notwithstanding the fact that Media Matters operates only in the United States. *Id.* ¶ 47. He continued: "And we will pursue not just the organization, but anyone funding that organization." *Id*.

### E.    This Court has halted the CIDs issued by Texas and Missouri.

Rather than give in to intimidation, Media Matters challenged the Texas CID in this Court. Media Matters asserted that the Texas AG issued the CID in retaliation for its protected speech in violation of the First Amendment. *See* Mot. Prelim. Inj. at 1, *Media Matters for America v. Paxton*, 24-cv-147 (APM) (D.D.C. Jan. 18, 2024), ECF No. 4. This Court agreed, citing in particular Paxton's "description of Media Matters as a 'radical anti-free speech' . . . organization," as

9

evidence of retaliatory intent, and granting Media Matters' motion for a preliminary injunction. *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 28 (2024). The D.C. Circuit affirmed, concluding that "the heart of [Media Matters'] claim is that the actions taken by Paxton are justiciable and warrant relief because they involve concrete and felt acts of *retaliation* against a media company and one of its investigative reporters for having exercised their protected rights of free speech." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) (emphasis in original). Importantly, both courts also recognized that the "record is utterly devoid of evidence to support" the claim that the articles were false or misleading. *Id.* at 585; *see also Paxton*, 732 F. Supp. 3d at 27 (declining to give merit to defendant's arguments that Hananoki's articles were "deliberately designed to mislead").

Missouri's retaliatory CID gained even less traction. The district court entered a preliminary injunction against the investigation, explaining that AG Bailey's "public statements [offered] direct evidence of retaliatory intent" against Media Matters. *Media Matters for Am. v. Bailey*, No. 24-CV-147 (APM), 2024 WL 3924573, at *14 (D.D.C. Aug. 23, 2024), *appeal dismissed sub nom. Media Matters for Am. v. Paxton*, No. 24-7141, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025). These statements included Bailey's "consistently characteriz[ing] Media Matters in ideological terms." *Id.* at *15. The court also emphasized Bailey's statement that Media Matters is a "radical progressive advocacy group masquerading as a 501(c)(3) . . . when in reality what they really want to do is . . . silence conservative voices." *Id.* This direct evidence, taken with the Missouri AG's shifting justifications for its investigation, established that Media Matters was likely to succeed on the merits of its claims. *Id* at *18. Indeed, the court's conclusion was confirmed by the subsequent settlement of the matter, under which Bailey signed a sworn

statement that the investigation "ha[d] not uncovered evidence of Media Matters . . . violat[ing] Missouri state law." Compl. ¶ 51.

### F. The FTC picked up where the other retaliatory litigations against Media Matters left off.

Notwithstanding these recent judicial losses, the campaign to target Media Matters for its journalism continues. In particular, the new leadership at the FTC picked up where their state counterparts left off.

The FTC's focus on Media Matters began with President Trump's elevation of Andrew Ferguson to FTC Chairman in January 2025. Prior to being selected for the role of Chairman, Ferguson had already made plain his views on content moderation in his role as an FTC Commissioner. In a September 2024 dissenting statement from an FTC report, Ferguson described decisions to remove user-generated content as an "Orwellian" "censorship regime."[15] In November of that year, immediately following the election, he began publicly chiding advertisers who were hesitant to work with X for fear that their ads might run alongside offensive user content. Ferguson rebranded their lawful, independent economic decisions as impermissible "advertiser boycotts," stating that "antitrust enforcers should take this seriously." Compl. ¶¶ 57–58. He stated in an interview that "one of the most important things the FTC can do to promote free speech is to keep a very close eye on" such advertiser behavior. *Id.* ¶ 60. In a leaked document setting out his qualifications to be FTC Chairman, Ferguson promised to "investigate and prosecute" so-called "advertiser boycotts." *Id.* ¶ 59.

---

[15] Andrew N. Ferguson, *Concurring and Dissenting Statement of Commissioner Andrew N. Ferguson Regarding the Social Media and Video Streaming Services Report, Commission File No. P205402*, FTC (Sept. 19, 2024), https://perma.cc/NM2D-BT9U (cited in ¶ 53 n.52).

Once he became Chairman, Ferguson made good on that promise. He started with an FTC Request for Information in which the agency sought public comment on "technology platform censorship."[16] Ferguson made clear that this request was targeted at advocates for online content moderation such as Media Matters. Ferguson's own words showed that his objection to content moderation was driven by his disagreement with the viewpoint of the content moderators. Speaking at the University of Chicago, he attributed the FTC's public comment request to the concern that "platforms [can] engage in censorship—whether on their own initiative, in collusion with each other, or at the behest of *left-wing* public officials, regulators, advertisers, *or other DNC interest groups*."[17]

Ferguson is not alone. He has surrounded himself with like-minded senior officials, who have unabashedly accused Media Matters of "censorship" since well before Musk's 2023 lawsuits. As noted above, Ferguson brought on Jon Schweppe as Senior Policy Advisor and Jake Denton as FTC Chief Technology Officer. Both had long targeted Media Matters, claiming that it "want[ed] to weaponize powerful institutions to censor conservatives," (Schweppe), was "the scum of the [E]arth," (Schweppe), and supposedly "pressur[ed] companies into silencing conservative voices," (Denton).[18] To round out the group, Ferguson hired Joe Simonson as FTC Director of Public Affairs. Simonson believed that Media Matters was out to "cancel" conservative voices and praised X's litigation against Media Matters. He called Media Matters reporters "stupid and

---

[16] *Request for Public Comment Regarding Technology Platform Censorship*, FTC, https://perma.cc/965D-5KXR.

[17] *Transcript: FTC Chairman Andrew Ferguson Keynote*, Promarket (Apr. 17, 2025), https://perma.cc/R8FT-4LLJ (emphasis added).

[18] Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*," Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/.

resentful Democrats who went to like American University and didn't have the emotional stability to work as an assistant press aide for a House member."[19]

Ferguson and his allies thus believed that Media Matters' journalism and advocacy were suppressing the views that they favored. On May 20, 2025, several months after the D.C. Circuit heard oral argument in the *Paxton* matter, Ferguson signed off on the FTC's CID to Media Matters that is the subject of this lawsuit. The CID began seeking documents produced in the X lawsuit. Compl. ¶ 75. And the FTC's iteration of the ongoing campaign against Media Matters is broader by orders of magnitude compared to its state predecessors. *Id.* ¶ 76. The FTC CID demands documents, data, and information dating back to January 1, 2019 (i.e., more than six years ago), which is at least three times longer than the Texas AG's CID that the D.C. Circuit described as "sweeping." *Paxton*, 138 F.4th at 569, 581. And the FTC CID demands essentially every document[20] relating to content moderation created by Media Matters during that expansive timeframe, including the following:

- "all documents that Media Matters either produced or received in discovery in any litigation between Media Matters and X Corp. related to advertiser boycotts since 2023."

- "all documents relating to other entities that purport to track, categorize, monitor, analyze, evaluate, or rate news, media, sources, platforms, outlets, websites, or

---

[19] Joe Gabriel Simonson (@SaysSimonson), X (May 23, 2024, 7:04 pm), https://perma.cc/8CTX-HPS7; Joe Gabriel Simonson (@SaysSimonson), X (May 23, 2024, 10:59 pm), https://perma.cc/MBA3-T9CB?type=image.

[20] The FTC's' definition of "document" includes "computer files; email messages; text messages; instant messages and chat logs; other Messaging Applications; group chats; voicemails and other audio files; calendar entries; schedulers; drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed electronically; copies of documents that are not identical duplicates of the originals in that Person's files; notes of meetings or telephone calls; and copies of documents the originals of which are not in the possession, custody, or control of Media Matters." Ex. A, FTC CID at 5–6; *see also* Ex. C, Media Matters' Petition to Quash at 11–12. This virtually limitless interpretation of the term "document" is so broad and burdensome as to render compliance essentially impossible.

> other content publisher entities for 'brand suitability,' 'reliability,' 'misinformation,' 'hate speech,' 'false' or 'deceptive' content, or similar categories."

- all communications between Media Matters and more than a dozen online advocates against online misinformation and hate speech.

- "all communications between Media Matters and any other person regarding any request for Media Matters to label any news, media, sources, outlets, platforms, websites, or other content publishers entities for 'brand suitability,' 'reliability,' 'misinformation,' 'hate speech,' 'false' or 'deceptive' content, or similar categories, regardless of whether the request was fulfilled."

These requests strike deep into the core of Media Matters' journalistic and nonprofit mission. For example, Media Matters was founded in part to combat misinformation and employs reporters for exactly that purpose; the CID seeks *all* documents relating to other entities that track and monitor misinformation. It further demands *all* communications about online monitoring—a clear attempt to determine Media Matters' sources at social media companies and likeminded outside entities, including other civil society organizations, that communicated about sites like X.

Tellingly, the CID itself failed to comply with the basic requirements of the FTC Act. Compl. ¶ 77. It did not give Media Matters fair notice of the "alleged violation" being investigated.[21] *Id.* It also did not explain why Media Matters, a nonprofit, would be subject to an FTC investigation—after all, nonprofits are not subject to the FTC's enforcement authority. *Id.* ¶ 78. The CID's boilerplate language and sweeping demands leave Media Matters with no better idea of why it is under investigation than it had when served with Paxton's or Bailey's CID—but this time, the organization is left with the full weight of a looming federal investigation. *Id.*

---

[21] On July 7, 2025, the FTC sent Media Matters a letter modifying the "Subject of the Investigation" in the CID. (*See* Exhibit B to Declaration of Stephen P. Anthony ("Ex. B"), FTC Letter.) This belated attempt to comply with its own statute still falls short and shows that the FTC itself believed its original CID did not provide Media Matters with fair notice of the alleged violation being investigated, thus providing additional evidence of the pretextual nature of the FTC's investigation.

### G.    The FTC's CID has already chilled the speech of Media Matters and its journalists.

The weight of the FTC CID has already had a real and material impact on Media Matters, its journalists, and their collective First Amendment rights.

For instance, recently, X's artificial-intelligence chatbot, Grok, began to spew antisemitic tropes following Musk's statement that he improve[d] the chatbot, and that users "should notice a difference when [they] ask [it] questions."[22] Although this type of story is normally Media Matters' bread-and-butter reporting, it has refrained from reporting it due to the ongoing campaign of retribution against it from entities hoping to curry favor with Musk. Declaration of Benjamin Dimiero at ¶ 22 ("Dimiero Declaration"). Similarly, Media Matters journalists like Eric Hananoki have refrained from publishing the types of stories about media ties at the FTC that they would have published even during the first Trump administration. Compl. ¶ 86; Dimiero Declaration at ¶¶ 21, 25. With the federal investigation ongoing, all articles about the FTC and its connections to Musk are flagged for additional approval and review so that management can decide whether the publication is worth the risk of additional retaliation. Compl. ¶ 86; Dimiero Declaration at ¶¶ 21, 30. On an individual level, journalists at Media Matters are self-censoring to avoid punishment for their affiliation with the organization. Compl. ¶ 88; Dimiero Declaration at ¶¶ 20-27; Declaration of Cynthia Padera at ¶¶ 17-18 ("Padera Declaration"). Staff members are less willing to investigate newsworthy ties between federal agencies and partisan media organizations. Compl. ¶ 89; Dimiero Declaration at ¶¶ 20, 21, 25.

Media Matters' content moderation advocacy has also been stifled. Compl. ¶ 90; Padera Declaration at ¶ 19; Declaration of Julie Millican at ¶¶ 14-15 ("Millican Declaration"). Other

---

[22] Lisa Hagen, et al., *Elon Musk's AI chatbot, Grok, started calling itself 'MechaHitler,'* NPR (July 9, 2025), https://perma.cc/YB6Z-6924.

organizations committed to combating misinformation and hate speech online have limited their communication with Media Matters, including by no longer engaging with Media Matters for public-facing advocacy like sign-on letters. Compl. ¶ 91; Millican Declaration at ¶¶ 14-15. Also due to the investigations and litigations, Media Matters has also refrained from sharing its research into X and X's advertisers, which it used to share freely with other research organizations. Compl. ¶ 92; Millican Declaration at ¶¶ 14-15; Dimiero Declaration at ¶ 27. To give a concrete example, Elon Musk made headlines yet again in early July of this year when he reprogrammed X's AI Chatbot, Grok, in part because of its reliance on Media Matters as a source.[23] A week later, Grok had deemed itself "MechaHitler," and was posting antisemitic conspiracy theories in response to posts across the platform.[24] In years past, Media Matters would have conducted research and reporting on those posts and shared its findings with the public, reporters, and other organizations. Dimiero Declaration at ¶¶ 22-24. Because of the FTC's ongoing "boycott" investigation, Media Matters was forced to sit on the sidelines for yet another national story. *See id.* This goes to the core of Media Matters' messaging capabilities and has made it more difficult for the organization to retain staff.

The onslaught of government investigations has predictably restricted Media Matters financially. Padera Declaration at ¶ 22. MMFA has amended or curtailed communications with partner organizations in a myriad of ways to avoid exposing them to or ensnaring them in ongoing litigation or investigations. Millican Declaration at ¶ 15.

---

[23] *See* Grok (@grok), X (July 8, 2025, 5:37 pm), https://perma.cc/63SD-KW4B.

[24] Lisa Hagen et al., *Elon Musk's AI chatbot, Grok, started calling itself 'MechaHitler'*, NPR (July 9, 2025), https://perma.cc/657A-A3QL.

## STANDARD OF REVIEW

A plaintiff seeking preliminary relief must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) that "the balance of equities tips in [their] favor;" and (4) that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when plaintiff attempts to preliminarily enjoin a government action," *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020), "because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## ARGUMENT

**I.    Media Matters is likely to prevail on the merits of its claims.**

> **a.    Plaintiff is likely to establish that the FTC retaliated against its constitutionally protected activities in violation of the First Amendment.**

Multiple factors confirm that the FTC—much like the Texas and Missouri AGs—issued its CID to punish Media Matters for engaging in speech disfavored by certain government officials. That is a clear First Amendment violation.

"[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To prevail on its retaliation claim, Plaintiff must show that "(1) [it] engaged in conduct protected under the First Amendment; (2) [the FTC] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiff's] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiff is likely to prove each of these elements. In two other similar matters involving similar facts, this Court has already found that Plaintiff was the target of an

unlawful campaign of retribution. *Paxton*, 732 F. Supp. 3d at 28; *Bailey*, 2024 WL 3924573, at *15. The Court should reach the same conclusion here.

### i.    Media Matters' newsgathering and reporting are protected First Amendment activities.

The journalistic activities that precipitated the FTC's CID are undoubtedly protected by the First Amendment. They involved research and reporting on topics of public concern—including the rise of extremist content on X—which goes to the core of the First Amendment. *See supra* at 4-8; *Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech and press" by the First Amendment "assure[s] [an] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."). In *Paxton*, the D.C. Circuit described the Media Matters reporting that—both then and now—sparked government retaliation as a "quintessential First Amendment activit[y]." *Paxton*, 138 F.4th at 585; *see also* Reassignment Order ("Reassignment Order"), *Media Matters for America v. Federal Trade Commission*, 1:25-cv-01959-APM (D.D.C. June 25, 2025), ECF No. 7.

### ii.    The FTC's CID has been, and will continue to be, sufficient to deter Plaintiff's protected activities.

The Supreme Court has held that government actors "cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). Defendants, through their investigation and CID, have taken "action sufficient to deter a person of ordinary firmness in [Plaintiff's] position from speaking again." *Aref*, 833 F.3d at 258. Critically, this standard is "not a high" bar to clear, *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 25-916 (JDB), 2025 WL 1482021, at *7 n.7 (D.D.C. May 23, 2025), and Plaintiff need not "prove that the allegedly retaliatory conduct," in this case the CID, "caused [them] to cease First Amendment activity altogether," *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). It is sufficient to show—as

Plaintiff does—that the FTC's CID would chill certain First Amendment activities of similarly situated individuals and organizations of ordinary firmness. *See id*. Moreover, Plaintiff's "actual response" to the CID "provides some evidence of the tendency of that conduct to chill First Amendment activity." *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine*, 411 F.3d at 500).

Here, the FTC has issued a burdensome CID—enforceable through a petition in federal court—that calls for several categories of sensitive materials, conduct that would plainly "deter a person of ordinary firmness in [Plaintiff's] position from speaking again." *Aref*, 833 F.3d at 258; *see also Playboy Enters. Inc. v. Meese*, 639 F. Supp. 581, 585 (D.D.C. 1986) (the mere "threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" would suffice to deter protected speech). That is particularly true here given the larger retribution campaign that serves as the backdrop for the FTC's CID. *See* Reassignment Order.

Courts have found that a government investigation is sufficient to chill protected speech. Indeed, the Fourth Circuit found a plaintiff's speech chilled when a state board told him that "he and his website were under investigation" and that the board had "statutory authority" to dictate the content he could publish on his website—actions that pale in comparison to a federal investigation by an agency with broad enforcement powers. *Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013); *see also White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (concluding government officials "unquestionably chilled the plaintiffs' exercise of their First Amendment rights" through a retaliatory investigation even though the officials "did not ban or seize the plaintiffs' materials, and . . . ultimately decided not to pursue either criminal or civil sanctions against them").

The predictable—and intended—chilling effect of the FTC's investigation and CID is reinforced by the power federal law vests in the agency to punish Plaintiff for noncompliance,

including seeking judicial enforcement of the CID, *see* 15 U.S.C. § 49, even though, as a nonprofit, Media Matters *should* be exempt from FTC enforcement actions.[25] *See also*, Exhibit C to Declaration of Stephen P. Anthony ("Ex. C"), Media Matters' Pet. to Quash FTC CID at 7–10. These potential sanctions further establish an "asserted chill [that] would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *S.C. Freedom Caucus v. Jordan*, 677 F. Supp. 3d 352, 367 (D.S.C. 2023). Moreover, in contrast to ordinary litigation, where Media Matters can resist burdensome discovery through the rules of civil procedure, the FTC's broad investigative prerogatives are sweeping and the protections for CID recipients are minimal. An FTC CID need only be reasonably relevant to its stated investigative purpose. *See F.T.C. v. Church & Dwight Co., Inc.*, 665 F.3d 1312, 1318 (D.C. Cir. 2011) ("[I]n light of the broad deference we afford the investigating agency, it is essentially the respondent's burden to show that the information is irrelevant."). *Contra* Fed. R. Civ. P. 26(b)(1); *see also United States v. Cross Senior Care, Inc., LLC*, No. 8:19-MC-8-T-33TGW, 2019 WL 11502849, at *8 (M.D. Fla. Nov. 6, 2019), *report and recommendation adopted*, No. 8:19-MC-008-T-33TGW, 2019 WL 11502798 (M.D. Fla. Dec. 18, 2019), *aff'd*, 831 F. App'x 944 (11th Cir. 2020) ("This [general federal CID] standard is considerably broader than the permissible scope of discovery under Rule 26(b)"). Under this legal regime, Media Matters has few grounds for resisting the unlawful CID other than petitioning this court for redress.

Finally, Plaintiff's speech has already been chilled by Defendants' conduct, confirming that Defendants' conduct would deter a person of ordinary firmness from engaging in protected speech. *See Hartley*, 918 F. Supp. 2d at 53; *Cooksey*, 721 F.3d at 236 (finding plaintiff had

---

[25] *A Brief Overview of the Federal Trade Commission's Investigative, Law Enforcement, and Rulemaking Authority*, FTC (Revised, May 2021), https://perma.cc/37DL-NMSX.

"sufficiently shown that he has experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board"); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020) (holding ongoing and future government investigations have "penalize[d] and chill[ed] speech"). Again, Media Matters has already refrained from engaging in certain journalistic activities in the face of this campaign of retaliation by government actors. The participation of a federal agency in this campaign has magnified its capacity to stifle Media Matters' speech. Dimiero Declaration at ¶¶ 19-27; Padera Declaration at ¶¶ 16-17.

> ### iii. The FTC's retaliatory actions are causally linked to Plaintiff's constitutionally protected activities.

The FTC issued its CID because of Media Matters' constitutionally protected speech. To the establish the requisite causal link, Plaintiffs like Media Matters "are not required to come forward with . . . 'the so-called smoking gun,'" *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006) (quoting *Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003)), which courts recognize is "rarely available" to prove something so "protean . . . as an actor's motive or intent." *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012); *Kiernan v. Town of Southampton*, 734 F. App'x 37, 43 (2d Cir. 2018) (similar). Indeed, although the government's statements about its own motivation can be telling, as they are here, *see Hawkins v. Dist. of Columbia*, 923 F. Supp. 2d 128, 143 (D.D.C. 2013), "direct evidence of retaliatory animus is not required." *Goodwin v. Dist. of Columbia*, 579 F. Supp. 3d 159, 174 (D.D.C. 2022).

Evidence sufficient to show causation can take many forms. A plaintiff can, for example, point to suspicious timing linking protected speech and government action, *Johnson v. Dist. of Columbia*, 726 F. Supp. 3d 8, 30 (D.D.C. 2024), *reconsideration denied*, No. CV 20-2944 (RC), 2024 WL 3858547 (D.D.C. Aug. 19, 2024); demonstrate that the government's justification for its action is pretextual, *Goodwin*, 579 F. Supp. 3d at 175; or show that the government's reasoning

for its action has changed over time, *Black Lives Matter Dist. of Columbia v. Trump*, 544 F. Supp. 3d 15, 46 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). At bottom, a court need not suspend disbelief in analyzing causation—where common sense "suggests that there may be more to this story," *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 104 (D.D.C. 2012), the court can and should acknowledge as much. That is especially true where, as here, the alleged retaliation is part of a broader "campaign" targeting the plaintiff. *Lewis v. Gov't of the Dist. of Columbia*, 161 F. Supp. 3d 15, 29 (D.D.C. 2015) (plaintiff properly pleaded causation where, despite nine months between protected speech and termination, she had alleged a series of smaller, intervening instances of retaliatory conduct).

Here, multiple factors justify the inference that the FTC issued the CID because of government disapproval of Plaintiff's reporting on Musk and its public advocacy in favor of content moderation: (1) comments from key officials concerning Media Matters and the suspicious timing of the CID; (2) the connections between the substance of the FTC's CID and prior state AG CIDs and the conduct they sought to deter; (3) the lack of a legal basis for an FTC investigation into Media Matters; and (4) the FTC's decision to investigate Media Matters while apparently declining to investigate many others—including allies of the administration—that have also publicly called on persons and entities to cease doing business with certain companies.

*First*, the CID's timing suggests that it was issued due to Plaintiff's speech. Just as in *Lewis*, the FTC's CID is the most recent in a "campaign" of retaliatory actions, 161 F. Supp. 3d at 29, all of which this Court should consider in its analysis of suspicious timing. The FTC's CID comes on the heels of failed state level investigations that, as this Court concluded, were likely initiated in retaliation for Plaintiff's speech. Indeed, in November 2024, while *Paxton* was before the D.C. Circuit, Ferguson gave interviews on conservative media outlets in which he discussed "Big Tech

collusion" and "internet censorship." *Compare* Compl. ¶ 61 n.66 *with* Exhibit A to Declaration of Stephen P. Anthony ("Ex. A"), FTC CID (dated May 20) at 1. Just a week later, Ferguson pointed to X's lawsuit against Media Matters as evidence that so-called advertiser boycotts should be investigated by the FTC.[26]

Events surrounding Ferguson's elevation to FTC Chairman in January 2025 make the temporal connection even clearer. Ferguson hired Schweppe, Simonson, and Denton to work with him at the agency. In doing so, Ferguson hired aides who have supported Musk's litigation, publicly criticized Media Matters, and claimed that conservative voices were being stifled by social media companies' content-moderation efforts. *See* Compl. ¶ 70. In February 2025, Ferguson launched an investigation into "tech [platform] censorship."[27] *See De Novo Legal*, 905 F. Supp. 2d at 104 ("the abrupt fashion in which the plaintiff was terminated" one month after protected speech, without more, suggested causal connection). Two months later, in April 2025, Ferguson revealed the motivation for the FTC's investigation in baldly viewpoint-based terms, stating that "platforms [can] engage in censorship—whether on their own initiative, in collusion with each other, or at the behest of *left-wing* public officials, regulators, advertisers, *or other DNC interest groups*."[28] By May, Ferguson's FTC had issued a CID to Media Matters—a group that Ferguson's allies-turned-FTC employees have repeatedly called a "left-wing" entity employing "a number of

---

[26] Andrew N. Ferguson, *Concurring Statement of Commissioner Andrew N. Ferguson, FTC v. 1661, Inc. d/b/a GOAT Matter Number 2223016*, FTC (Dec. 2, 2024), https://perma.cc/DV55-N5WY.

[27] Press Release, *Federal Trade Commission Launches Inquiry on Tech Censorship*, FTC (Feb. 20, 2025), https://perma.cc/5AZB-G94M.

[28] *Transcript: FTC Chairman Andrew Ferguson Keynote*, Promarket (Apr. 17, 2025), https://perma.cc/R8FT-4LLJ (emphasis added).

stupid and resentful Democrats."[29] *See* Ex. A, FTC CID. This timeline reveals the connection between the retaliatory State AG investigations, Ferguson's appointment as Chairman, and the *third* governmental assault on Media Matters in response to its advocacy for content moderation.

*Second*, the substance of the FTC's CID suggests strongly that it was issued because of Media Matters' reporting, including its articles concerning content moderation (or lack thereof) on X and other social media sites. Specification 5 of the FTC CID makes the connection most obvious—it demands any and all documents produced by Media Matters in "any litigation between Media Matters and X Corp. related to advertiser boycotts since 2023." Ex. A, FTC CID at 1. Specification 7 similarly points to the exact content from the Hananoki article that started this saga, requiring Media Matters to produce "all documents relating to the effect on advertisers of the presence on any media platform of harmful, hateful, misleading, unsafe, or otherwise undesirable content." *Id.* at 2. Specifications 8 through 12 are likewise tied to the Hananoki article, seeking information on potential third party responses to Media Matters' reporting on the placement of advertisements on X alongside hate speech. *See id.*

Even aside from Media Matters' reporting on X, the CID seeks exhaustive information on broad, recurring themes in Media Matters' reporting more generally. *See* Ex. A, FTC CID at 2-3 (the CID seeks, for example, materials concerning the "methodology" Media Matters uses to "evaluate[] or categorize[] any news, media . . . or other content publisher entities"). This is particularly concerning against the backdrop of threats to Media Matters as a journalistic organization by Ferguson allies such as Mike Davis, who sees existing suits against Media Matters

---

[29] Joe Gabriel Simonson (@SaysSimonson), X (May 23, 2024, 7:04 pm), https://perma.cc/8CTX-HPS7.

as an opportunity to "air [Media Matters'] dirty laundry."[30] The sweeping nature of the CID suggests a fishing expedition in hopes of doing just that.

The evidence does not stop there. Specification 6, for example, demands information concerning misinformation and extremist content, presumably to peer into the research underlying Plaintiff's reporting on content moderation. *See* Ex. A, FTC CID at 1–2, Spec. 6 (seeking "all documents relating to other entities that purport to track, categorize, monitor, analyze, evaluate or rate news, media, sources, platforms, outlets, websites, or other content publisher entities for" among other things "'misinformation,' 'hate speech,' 'false or deceptive content,' or similar categories."). Specification 15 goes so far as to demand information on Plaintiff's journalistic sources, requesting "all communications between Media Matters and any other person" on "any request for Media Matters to label any news, media, sources, outlets, platforms, websites, or other content publisher entities for 'brand suitability,' 'reliability,' 'misinformation,' 'hate speech,' 'false' or 'deceptive' content, or similar categories." *See id.* at 2–3. What is more, these sweeping demands cover the very same content-moderation-as-conservative-censorship claims that this Court considered evidence of retaliation in both *Paxton* and *Bailey*. *Paxton*, 732 F. Supp. 3d at 28 (reference to Media Matters as a "radical anti-free speech . . . organization" was evidence of causation); *Bailey*, 2024 WL 3924573, at *15 (evidence of causation included assertion that what "[Media Matters] really want to do is . . . silence conservative voices").

*Third*, the lack of a plausible justification for the FTC's investigation into Plaintiff suggests that the CID was issued based on an improper motive. The law is well settled that nonprofits "fall outside the scope of the [FTC]'s jurisdiction." *Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 334

---

[30] Jason Cohen, *'Compelling': Legal experts Say Elon Musk's X Has A Good Case Against Media Matters*, Daily Caller (Nov. 21, 2023), https://dailycaller.com/2023/11/21/compelling-legal-experts-say-elon-musks-x-has-a-good-case-against-media-matters/.

(4th Cir. 2005); *see also* 15 U.S.C. §§ 44–45 (limiting scope of FTC's enforcement authority to entities that are "organized to carry on business for [their] own profit or that of [their] members"). In other words, the FTC has issued a CID that infringes on Media Matters' constitutionally protected activities even though the FTC *cannot enforce the antitrust laws against the organization*. That calls into question the CID's generic statement that the FTC is investigating "facilitat[ion] [of] collusion or coordination in any way with any other market participant." Ex. A, FTC CID at 19. And even that stated justification is vague and thus does not give Media Matters the "fair notice as to the nature of the [agency]'s investigation" to which it is entitled.[31] *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017).

Additionally, at no point has the FTC identified a credible factual basis for suspecting that Media Matters has violated any antitrust law. The FTC has referred to no evidence suggesting that Media Matters orchestrated a conspiracy among competitors in a relevant market in order to, say, collectively boycott any particular entity. FTC personnel, and their allies, have merely taken issue with Media Matters' *public reporting* and *public advocacy*. A vague investigation into Media Matters' plainly protected First Amendment activities is, as one former Commissioner has noted, "bizarr[e]."[32] Additionally, as a legal matter, it is unsettled whether even a hypothetical collective advertiser boycott would violate the antitrust laws, further undermining the FTC's stated rationale for issuing the CID. *See N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982) (a

---

[31] The FTC's recent attempt to supplement the description of the alleged violation is insufficient; it constitutes a tacit acknowledgement that the original CID failed to comply with the FTC Act; and it provides additional evidence that the FTC's investigation is pretextual. *See* note 21, *supra*.

[32] Suzanne Vranica and Dana Mattioli, *FTC Seeks Information From Top Advertising Agencies as Part of Ad-Boycott Probe*, WSJ (June 9, 2025), https://www.wsj.com/business/media/ftc-seeks-information-from-top-advertising-agencies-as-part-of-ad-boycott-probe-9c98ad82.

collective "boycott clearly involve[s] constitutionally protected activity" when the participants seek "to bring about political, social, and economic change").

*Fourth*, the Court can infer that the FTC's CID was driven by an improper purpose based on the FTC's decision to investigate Media Matters, but not others who have likewise called on people to cease doing business with certain corporations. For example, in 2021, multiple Republican elected officials and media figures called for boycotts of digital platforms, including Twitter, Facebook, and Amazon in response to President Trump being banned from social media.[33] Ferguson's Senior Advisor Jon Schweppe co-authored a report stating that the "GOP c[ould] win again and save America," by "[b]oycott[ing] left-wing shows and platforms, and mak[ing] and promot[ing] [thei]r own."[34] By 2023, Schweppe was seeing his advice in action, cheering as anti-LGBTQ+ boycotts of Target and Budweiser campaigns "start[ed] to take a real toll"[35] on those companies. "[I]t warms the heart to see these companies' stock prices crash and burn,"[36] Schweppe remarked. Relatedly, a Daily Wire host likewise noted, in response to the Target and Budweiser campaigns, that "they'll pay a price" and that the "campaign" against those companies "is making progress."[37] He continued: "Let's keep it going" and separately noted that though people "can't boycott every woke company" they can "[p]ick a few strategic targets" and "[m]ake them pay dearly." *Id.* Furthermore, Mike Davis, longtime friend and ally of Ferguson, has done similar work.

---

[33] Jim Turner, *Florida GOP Lawmakers Target Big Tech After Trump Social Media Ban*, WUSF (Jan. 26, 2021), https://perma.cc/2LGJ-MN6C.

[34] Terry Schilling et al., *MAGA After 2020: How the GOP Can Win Again and Save America*, Am. Principles Proj. (June 2021), https://perma.cc/FAL8-HGQ5.

[35] Jon Schweppe, *Grassroots Boycotts Against Woke Corporations Are Working*, Newsweek (May 31, 2023), https://perma.cc/7VJR-5ST8.

[36] *Id.*

[37] Katie Jerkovich, *'First Bud Light And Now Target': Matt Walsh Goes Viral With Tweet About Making 'Pride' Toxic For Brands*, The Daily Wire (May 24, 2023), https://perma.cc/7H49-2E32.

For example, in 2024, Davis's Article III Project launched a petition calling on advertisers like U-Haul and Consumer Cellular to stop advertising on Joy Reid's MSNBC show, citing her statements about the assassination attempt on President Trump.[38] Davis specifically cited Reid's "spew[ing of]" what Davis considered "hate and divisive rhetoric."[39]

There is no indication, however, that the FTC has launched an investigation into any of that conduct, even though it is analogous to the conduct that supposedly sparked the FTC's investigation into Media Matters. For the FTC to stand silent in the face of such overt calls for boycotts by right-leaning voices, while going after Media Matters, further supports the inference that the FTC's stated justification for investigating Media Matters is pretextual and conceals viewpoint discrimination. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) ("A plaintiff can establish pretext masking a discriminatory motive by presenting 'evidence suggesting that "[the defendant] treated other [parties] . . . more favorably in the same factual circumstances.'") (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008)).

Accordingly, multiple factors—*i.e.*, the CID's timing, substance, alleged basis, and selective targeting—all confirm that the CID was issued not because of any legitimate investigate purpose, but rather to accomplish what the State AGs could not: silencing Media Matters in retaliation for its protected speech.

### b.    Plaintiff is likely to establish that the FTC's CID violates both the First and Fourth Amendments to the U.S. Constitution.

Media Matters is likely to establish that the FTC's intrusive CID violates both the First and Fourth Amendments. This CID—which is broader than the Texas CID that the D.C. Circuit called

---

[38] *Sign Petition Demanding Boycott of Joy Reid's Advertisers*, Art. III Proj., https://perma.cc/X4CG-KCEY.

[39] The Article III Project (A3P) (@Article3Project), X (Aug. 8, 2024, 4:46 pm), https://perma.cc/4QCX-6Q5N.

"sweeping"—seeks documents for a six-year timeframe and touches upon nearly every part of Media Matters' operations. It asks for, among other things, all correspondence, research, analyses, documents, and data in Media Matters' possession relating to the content moderation that Ferguson and allies on the right have been opposed to from the start. *See* Ex A, FTC CID at 2–3 (multiple specifications covering any and all documents surrounding "brand suitability," "reliability," "misinformation," "hate speech," "'false' or 'deceptive' content," or "similar categories").

The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Likewise, the First Amendment provides Media Matters a privilege against disclosure of materials that would chill its constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). Because these twin constitutional guarantees overlap, where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)) (emphasis added).

The FTC has shown no such "scrupulous exactitude" in its CID. Far from it. Without any showing of cause or jurisdiction, the FTC has demanded that Plaintiff produce a broad set of documents that implicate its core First Amendment rights. The First Amendment "provides journalists with a qualified privilege against compelled disclosure of information obtained through their news gathering activities." *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 118 (D.D.C. 2002) (collecting cases). Media Matters' compliance with the FTC's CID would require it to disclose its finances, editorial process, newsgathering activities, affiliations with likeminded entities that monitor extremist content, and other material that is protected from disclosure by the First Amendment. Compelling the disclosure of these materials "poses a serious threat to the

vitality of the newsgathering process," *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995), which could "substantially undercut the public policy favoring the free flow of information to the public," *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980).

Defendants may not "rummage at large in newspaper files or [] intrude into or [] deter normal editorial and publication decisions" through their search. *Zurcher*, 436 U.S. at 566. In *Zurcher*, the officers lacked "any occasion or opportunity," *id.*, for such rummaging because a judicially approved search warrant provided the necessary "exactitude" regarding the "First Amendment interests [that] would be endangered by the search," *id.* at 565. Defendants have not satisfied any such standard here, yet they nonetheless seek clearly protected materials. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (quashing "broad, invalid subpoenas demanding that the paper reveal its sources [and] disclose its reporters' notes"); *see also Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946) (holding that to be enforceable, a CID must be reasonable in the "nature, purposes and scope of the inquiry").

The CID is not "carefully tailored to avoid unnecessary interference with protected activities." *Pebble Ltd. P'ship v. Env't Prot. Agency*, 310 F.R.D. 575, 582 (D. Alaska 2015) (quashing subpoena). It seeks nearly every piece of information related in any way to content moderation (and other topics), spanning a timeframe of more than six years. Compl. ¶¶ 75–81. It stretches key terms far past their logical definitions, for instance, defining "Media Matters" as encompassing all of its "successors, predecessors, divisions, wholly- or partially-owned subsidiaries, committees, working groups, alliances, affiliates, and partnerships, whether domestic or foreign; and all the directors, officers, employees, consultants, agents, and representatives of the foregoing." Ex. A, FTC CID at 5; *see also* Ex. C, Media Matters' Pet. to Quash FTC CID at 11 (defining "Document" with similar breadth, *supra* n.11).

Fundamentally, the FTC's investigation is targeted at speech and press activities that are afforded broad constitutional protection. Such "unrestricted power of search and seizure [can] be an instrument for stifling liberty of expression." *Marcus v. Search Warrants of Prop. at 104 East Tenth St.*, 367 U.S. 717, 729 (1961).

***

Accordingly, Media Matters is likely to prevail on its claim that the FTC engaged in retaliatory conduct in violation of the First Amendment and that the CID amounts to an unlawful fishing expedition in violation of the First and Fourth Amendments.

## II.    Plaintiff will suffer irreparable harm absent an injunction against the CID.

The CID and the associated investigation have caused—and are causing—Media Matters ongoing irreparable constitutional injury, economic loss, and associational and reputational harm. The injuries Media Matters has faced, and continues to face, are amplified by the cascade of other lawsuits and investigations prompted by Musk and his allies since Media Matters reported on the placement of advertisements on X alongside extremist content. Media Matters' injuries easily satisfy the requirements for emergency relief: irreparable harm that is "certain and great, . . . actual . . . not theoretical," and "of such imminence that there is a clear and present need for equitable relief." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Ashland Oil, Inc. v. FTC*, 409 F.Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir.1976)).

To start, the FTC's CID has caused Plaintiff the "loss of First Amendment freedoms," which, even if lost only for "minimal periods of time, constitute[] irreparable injury." *Cigar Ass'n of Am. v. U.S. FDA*, 317 F. Supp. 3d 555, 562 (D.D.C. 2018) (cleaned up); *see also Bailey v. Fed. Bureau of Prisons*, No. 24-1219 (PLF), 2024 WL 3219207, at *9 (D.D.C. June 28, 2024) (irreparable harm can be established by showing that "First Amendment freedoms are actually" or "imminently will be" lost).

In *Paxton*, the D.C. Circuit held that this Court properly concluded that Media Matters incurred "irreparable harm" when it "suffer[ed] from" the Texas AG's "campaign of retaliation" and subsequently resorted to "self-censorship." *Paxton*, 138 F.4th at 570. Although Plaintiff secured an injunction against the Texas AG CID, it is now suffering the same harms due to the FTC's comparable (but even broader) CID. And "every moment's continuance" of the FTC's investigation into Plaintiff's newsgathering and demand for journalistic materials "amounts to a flagrant, indefensible, and continuing violation of the First Amendment." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714-15 (1971) (Black, J., concurring). As a result of these constitutional injuries, "there is a presumed availability of federal equitable relief." *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998); *see Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (noting even "a *prospective* violation of a constitutional right constitutes irreparable injury") (emphasis added).

Further, the FTC's CID has caused Media Matters associational and reputational harm. Because harm to "reputation or goodwill is not easily measurable in monetary terms," this Court "typically view[s it] as irreparable." *Xiaomi Corp. v. Dep't of Def.*, No. 21-280 (RC), 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (cleaned up). Groups and key allies that previously worked closely with Media Matters have pulled back on, or entirely ceased, communications and engagement with Media Matters, likely fearful that their communications with Media Matters may be turned over to government officials. Millican Declaration at ¶ 14. These concerns are understandable given the FTC's request for Media Matters' communications with third parties. Millican Declaration at ¶ 14. The number of persons and organizations directly asking Media Matters to participate in group efforts, such as sign-on letters, has dropped noticeably since the investigations began. Millican Declaration at ¶ 15. Media Matters has also been shut out of industry

events, including an online disinformation coalition earlier this year, and fewer organizations have asked Media Matters to serve as principals in campaigns, contribute research, or participate in initiatives. Millican Declaration at ¶ 15.

Media Matters has also turned down media requests for information, appearances, and interviews. Dimiero Declaration at ¶ 21. Writers employed by Media Matters have also expressed concerns about communicating with each other, their directors, and journalists outside of Media Matters out of fear that their internal communications or ideas for potential future articles would be subject to the ongoing CID. Dimiero Declaration at ¶ 27. These are concrete and present harms resulting from the FTC's investigation. *Paxton*, 138 F.4th at 581 (that "Media Matters reasonably altered its behavior to avoid creating evidence or materials that it would be forced to turn over if the CID were enforced . . . suffice to establish injury in fact"); *see also Paxton*, 732 F. Supp. 3d at 25 (listing similar associational and reputational harms that evidenced a cognizable injury).

Additionally, the federal investigation has impacted Media Matters' finances. Padera Declaration at ¶ 22. Media Matters has refrained from, or delayed participating in, development meetings it otherwise would participate in while the federal investigation is pending. Padera Declaration at ¶ 22. The costs of Media Matters' legal defense against the FTC's CID on top of the other various CIDs and lawsuits have financially affected Media Matters' operations and forced it to reduce its workforce. Padera Declaration at ¶ 22. Media Matters is concerned that the unanticipated FTC CID will drive an additional reduction in workforce due to its costs. Padera Declaration at ¶ 22. This, in turn, has drastically reduced Media Matters' research and reporting capabilities. Padera Declaration at ¶ 22. And Media Matters' senior leaders have had to devote a large majority of their time to focusing on responding to the investigations and lawsuits rather than

their ordinary professional responsibilities, including much-needed development and fundraising efforts. Padera Declaration at ¶ 23.

Media Matters has suffered substantial harms because of the FTC's CID. And it has suffered these harms due to the CID's existence alone; it will continue to suffer them even if the FTC does not seek to enforce the CID in federal court. Media Matters' constitutional, financial, and associational injuries stem the existence of a governmental investigative demand hanging over Media Matters like a Damoclean sword. As it did in *Paxton*, Media Matters has alleged "present, concrete, and objective harms" that currently "adversely affect[] [its] newsgathering activities and media business operations." *Paxton*, 138 F.4th at 579. Then as now, the relevant "campaign of retaliation [against Media Matters] is ongoing." *Id*. at 580.

## III.    The remaining equitable factors strongly favor granting preliminary relief.

The remaining equitable factors—which merge when a movant seeks to enjoin the government—favor Media Matters. *See Fla. EB5 Invs.*, 443 F. Supp. 3d at 13. The Court must balance the "competing claims of injury and . . . consider the effect on each party [and the public] of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)). Here, these factors overwhelmingly favor relief.

Both "factors [are] established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456, 471 (D. Md. 2011)); *see Karem*, 960 F.3d at 668 ("enforcement of an unconstitutional law is always contrary to the public interest") (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). "The public's interest in protecting First Amendment rights" is beyond dispute: "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional" state action. *Pursuing Am.'s Greatness*, 831 F.3d at

511–12. That interest is heightened where, as here, First Amendment protections serve both Media Matters and the general public; "[a]n untrammeled press is a vital source of public information, and an informed public is the essence of working democracy." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (cleaned up).

Granting relief will ensure that Media Matters may continue to participate in the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth*, 354 U.S. at 484, and further serves the public interest against government fishing expeditions, *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc); *see Klayman v. Obama*, 142 F. Supp. 3d 172, 196 (D.D.C. 2015) ("Given . . . that plaintiffs are likely to succeed on the merits of their Fourth amendment claim, the public interest weighs heavily in their favor.").

In contrast, granting preliminary relief will not harm Defendants. Because the FTC's investigation lacks a legitimate basis, Defendants lack a legitimate interest in continuing it. Defendants "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021) (collecting cases). "If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quoting *Giovani Carandola, Ltd. v. Bason*, 147 F. Supp. 2d 383, 395 (M.D.N.C. 2001)); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding there is "substantial public interest" in ensuring that the government "abide[s]" by the law) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994))).

The strong public interest in assuring that journalists can report on important matters unencumbered by political pressure requires entry of a preliminary injunction.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiff's motion for a preliminary

injunction.

Dated: July 14, 2025

Respectfully submitted,

/s/ Stephen P. Anthony

Stephen P. Anthony (D.C. Bar No. 426536)
Ryan K. Quillian (D.C. Bar No. 994846)\***
Dana A. Remus (D.C. Bar No. 90015315)\*
Kuntal V. Cholera (D.C. Bar No. 1031523)\***
Brenden J. Cline (D.C. Bar No. 1021317)\*
Brigid P. Larkin (D.C. Bar No. 1780668)\*
Alezeh Z. Rauf (D.C. Bar No. 1643291)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

Justin A. Nelson (D.C. Bar No. 490347)
Matthew Behncke\**
Alexandra Foulkes Grafton\***
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
(713) 651-9366

Katherine M. Peaslee\***
SUSMAN GODFREY L.L.P.
401 Union Street, Suite #3000
Seattle, WA 98101
(206) 516-3880

\*Admission pending
\*\* *Pro hac vice* application forthcoming
\*\*\*Admitted *pro hac vice*

*Counsel for Plaintiff Media Matters for America*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendants in accordance with Federal Rule of Civil Procedure 5(a).

/s/ Stephen P. Anthony
Stephen P. Anthony