## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr>
<td>
MEDIA MATTERS FOR AMERICA,<br>
P.O. Box 44811<br>
Washington, DC 20026<br><br>
   <i>Plaintiff</i>,<br><br>
  v.<br><br>
FEDERAL TRADE COMMISSION; ANDREW<br>
N. FERGUSON, in his official capacity as<br>
Chairman of the Federal Trade Commission;<br>
MARK R. MEADOR, in his official capacity as<br>
Commissioner of the Federal Trade Commission;<br>
MELISSA ANN HOLYOAK, in her official<br>
capacity as Commissioner of the Federal Trade<br>
Commission; JOHN DOE 1, in their official<br>
capacity as Commissioner of the Federal Trade<br>
Commission; and JOHN DOE 2, in their official<br>
capacity as Commissioner of the Federal Trade<br>
Commission,<br>
600 Pennsylvania Ave. NW<br>
Washington, DC 20580<br><br>
   <i>Defendants.</i>
</td>
<td>
Civil Case No. 25-1959
</td>
</tr>
</table>

## DECLARATION OF BENJAMIN DIMIERO IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Benjamin Dimiero, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Editor-in-Chief of Media Matters for America ("Media Matters").

3. I live in, and work from, the District of Columbia.

4.      Media Matters is a web-based, not-for-profit, 501(c)(3) research and information center dedicated to comprehensively monitoring, analyzing, and correcting misinformation in U.S. media.

5.      I first joined Media Matters as an intern in 2007. After becoming a full-time staff member in 2008, I worked in both communications and writing roles, and then became head of the investigative research team in 2015. In 2016, I became the editorial director, where I oversaw the full-time editing team and several members of our senior writing staff. In 2023, I became the Editor-in-Chief of Media Matters, and in that role I oversee the entire Editorial Department.

6.      As Editor-in Chief, I am the last set of eyes for my team of senior writing staff, which includes setting processes for review and timing of articles, and outlining priorities for research and writing. I also help set the general editorial direction and priorities for the organization, including stories and topics we do or do not pursue.

7.      Our editorial team, consistent with the organization's mission, is focused on researching and writing articles to expose misinformation in the media. Like the rest of the organization, we adhere to our internal guidelines for news coverage, which reflect ordinary journalistic standards.

8.      Our work documents extremism—including white nationalism, antisemitism, and Islamophobia—in the public square, including from public figures and officials.

9.      Our editorial team consists of eight editors, reporters, and writers.

10.     Along with other Media Matters reporters, writers, and researchers, senior investigative reporter Eric Hananoki has written multiple articles about X Corp., its owner Elon Musk, and the social media site X, formerly known as Twitter. These articles have often focused

on the appearance of corporate advertisements alongside white nationalist, antisemitic, and

extremist content posted on X. Those articles include:

- *Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers,* Media Matters for America (Feb. 10, 2023).[1]

- *Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers,* Media Matters for America (June 8, 2023).[2]

- *Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group,* Media Matters for America (June 22, 2023).[3]

- *Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account,* Media Matters for America (July 27, 2023).[4]

- *Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool,* Media Matters for America (Aug. 8, 2023).[5]

- *X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands,* Media Matters for America (Aug. 11, 2023).[6]

- *Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account,* Media Matters for America (Aug. 16, 2023).[7]

---

[1] Available at https://www.medimnatters.org/twitter/under-elon-rnusk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

[2] Available at https://www.mediarnatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

[3] Available at https://www.mediamatters.org/twitter/dish-samsung-wall-street-joumal-and-others- are-advertising-twitter-account-leading-white.

[4] Available at https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

[5] Available at https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

[6] Available at https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

[7] Available at https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hider-account.

- *X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11,* Media Matters for America (Sept. 11, 2023).[8]

- *X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates,* Media Matters for America (Sept. 12, 2023).[9]

- *X is placing ads for the NFL on prominent white nationalist accounts,* Media Matters for America (Sept. 27, 2023).[10]

- *X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts,* Media Matters for America (Oct. 12, 2023).[11]

- *Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing,* Media Matters for America (Nov. 13, 2023).[12]

- *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content,* Media Matters for America (Nov. 16, 2023) (the "November 16 article" or "Nov. 16 Article").[13]

- *X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags,* Media Matters for America (Nov. 17, 2023).[14]

11.      Mr. Hananoki authored 11 of the 14 articles referenced above, including the article

published on November 16, 2023. The November 16 article, in addition to reporting on the

---

[8] Available at https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

[9] Available at https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

[10] Available at https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

[11] Available at https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

[12] Available at https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

[13] Available at https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

[14] Available at https://www .mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

appearance of advertisements alongside extremist content, commented on Mr. Musk's then-recent endorsement of an antisemitic conspiracy theory.

12.    While Media Matters and Mr. Hananoki reported extensively on these topics, many other sources likewise reported on X's persistent placement of advertisements next to extremist content.[15]

13.    My approval for the publication of two accurate articles about major brands appearing next to pro-Nazi and extremist content on X published on November 16 and 17, 2023 led to years of backlash from Elon Musk and affiliated government entities. Because Musk—the wealthiest person on the planet—took issue with our truthful reporting, we have been faced with: a civil lawsuit in Texas, international lawsuits in Ireland and Singapore, the threat of an international lawsuit in the UK, state investigations in Texas and Missouri, and now an investigation by a federal agency. These various legal actions against Media Matters have all been based on differing legal theories, but they have shared one key element: all have targeted Media Matters for its journalism.  The FTC's CID represents the third time a government entity has come after Media Matters for exercising its constitutional rights—and like the instances of retribution before it, it does so without identifying any actual wrongful conduct on Media Matters' part.

---

[15] *See, e.g.*, Faiz Siddiqui, "Amazon, Uber ads appear on Twitter pages of white nationalists restored by Musk," The Washington Post (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/; Jon Porter, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," The Verge (Dec. 7, 2022), https://www.theverge.com/2022/l2/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists; Jonathan Shannan, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," The Kansas City Star (Oct. 10, 2023), https://www.kansascity.com/news/politics-government/article280309284.html; Shannon Thaler, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," The N.Y. Post (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

14.     On November 20, 2023, X Corp. filed suit against Media Matters and Media Matters' employee Eric Hananoki, complaining about two articles written by Mr. Hananoki and published by Media Matters on November 16 and 17, 2023.

15.     On November 21, 2023, the Texas Attorney General issued a civil investigative demand that commanded Media Matters to produce documents and communications about Media Matters' general operations, research and reporting, communications with possible sources at X and its advertisers, and other sensitive materials. In response, Media Matters filed a lawsuit against the Texas AG on January 17, 2024, shortly thereafter moving for preliminary relief from the Texas CID. The federal district court in D.C. granted Media Matters' motion and the D.C. Circuit affirmed that decision on May 30, 2025.

16.     On March 25, 2024, the Missouri Attorney General issued a civil investigative demand largely identical to the Texas CID and preemptively filed an enforcement action in Missouri state court the next day. Media Matters then amended its suit in D.C. to add the Missouri AG as a defendant and sought preliminary relief against the Missouri AG's CID as well. After the district court granted Media Matters' motion for a preliminary injunction, the Missouri AG agreed to drop its suit and investigation in exchange for a settlement under which it admitted that the AG's office had not uncovered evidence of Media Matters violating Missouri state law.

17.     Additionally, during this time, X Corp. subsidiaries filed suit against Media Matters in Ireland and Singapore, with Musk publicly stating "we are suing them in every country that they operate," although Media Matters only operates in the United States. X Corp.'s UK subsidiary also sent Media Matters a demand letter citing the November 16 article and threatening defamation litigation.

18.     On May 20, 2025, the Federal Trade Commission ("FTC") issued a civil investigative demand to Media Matters seeking, among other things, documents and

communications regarding our research, reporting, and editorial process and efforts related to X Corp., advertisers, and several other Musk-related entities and sweeps in almost the entirety of our journalistic work.

19.     Though we recently achieved legal victories against the state CIDs, the prospect of relaxing Media Matters' posture on research and reporting about government entities like state AGs or federal agencies or speaking about the government retaliation and litigation—free from unlawful and retaliatory government investigations—was stymied by the FTC's CID.  The timing of the FTC's CID, issued just a few days before our legal victories against the state CIDs, felt to us like a recommitment from Musk's allies of their mission to punish Media Matters for its news coverage.

20.     The aforementioned successive investigations have dramatically changed my team's editorial processes and have had a negative impact on morale. Most recently, concern about the FTC investigation has exacerbated the culture of fear of government retaliation—beginning with the Texas CID almost two years ago—against Media Matters for the research and reporting performed by its staff. In the past, Media Matters has been comfortable writing about issues within the FTC's purview, and our work has led to action on those issues from the agency after we reach out. In the current environment, we would not be comfortable communicating with the agency even if we had a very obvious example of a newsworthy event in which they might have previously taken interest. In the current legal environment, we would not even feel comfortable publishing research underlying such an event. For example, without the investigation, Media Matters would likely have looked into reporting about Andrew Ferguson's merger requirements for Omnicom and IPG, which placed unprecedented limitations on their speech in a transparent attempt to aid media platforms, like  X, with limited content moderation efforts.

21.     Furthermore, because of the FTC CID, we have refrained from reporting on the FTC's relationship with right-wing media or Musk's relationship with the FTC, as we would have in the past. We have also refrained from publishing research related to right-wing media's long-running list of companies that they have boycotted or celebrated damaging financially in light of Ferguson's claims about advertising boycotts. We have even refrained from reporting on our own story of the FTC's investigation into Media Matters out of fear of retaliation, also turning down a number of media requests for information and appearances on various shows and outlets about a wide range of topics related to the investigation. We also turned down a high-profile interview that was unrelated to the FTC but was about right-wing content creators, deciding that the risk of engaging with the subject matter was too high in the wake of the FTC's CID. In the past, we likely would have written about a federal agency pressuring companies to adopt policies favored by the Administration or about Media Matters' experience of being subject to a government investigation because of our speech. Such fears about FTC reporting did not exist in the past. For example, during the first Trump Administration, Mr. Hananoki repeatedly wrote about subjects that were within the scope of the FTC's work. Now, any reference to the FTC or commissioners must be approved by senior staff and the legal team, burdening an already cumbersome editing process.

22.     Since the Texas CID was issued, our team has almost entirely ceased reporting on public events involving Musk. As one of just many examples, recently, X's artificial-intelligence chatbot, Grok, began to spew antisemitic tropes shortly following Musk's statement that he "improve[d]" the chatbot, and that users "should notice a difference when [they] ask [it] questions."[16] This type of story and its implications on right-wing media is normally our bread-

---

[16] Lisa Hagen, et al., *Elon Musk's AI chatbot, Grok, started calling itself 'MechaHitler,'* NPR (July 9, 2025), https://perma.cc/YB6Z-6924.

and-butter reporting, but because of the ongoing campaign of retribution against us from entities hoping to curry favor with Musk, we refrained from reporting on it. The reality is that my team has become so accustomed to self-censorship, and the culture of fear at Media Matters following the campaign of retribution has become so pervasive, that it has become second nature for Media Matters staff to avoid issues pertaining to the Administration or its allies who overlap with the various retaliatory lawsuits Media Matters is facing.

23.     There is a general sense among our organization that we must tread very lightly, and be careful not to cross lines that would jeopardize our work or our employees' safety. This heightened need for internal scrutiny and risk calculation is not due to any concerns with the fairness or accuracy of our reporting, but rather because of a worry that certain reporting could make us a target for further retaliation. Even where Media Matters has not abandoned stories due to the FTC investigation, it has caused our reporters to self-censor and has changed the way we conduct our investigative journalism out of fear of provoking additional legal action against us as individuals or against Media Matters.

24.     Writers have expressed concern about their ability to conduct meaningful investigations that could inform future publications, given concerns that legal proceedings will prevent us from publishing their work and that their notes and emails could be subject to search by hostile agencies like the FTC.

25.     In particular, Mr. Hananoki has expressed that, under normal circumstances, he would have looked into reporting about the FTC and Ferguson's connections to public officials and media figures with controversial backgrounds. Those reporting areas would have included: Ferguson's close connections to a commentator whom Media Matters has frequently written about and has a history of "violent threats" and incendiary rhetoric against perceived enemies of Trump;

Ferguson's praise of a commentator "who courted and interacted with white nationalists and posted videos espousing racist conspiracy theories"; and Ferguson's hiring of a contributor to the controversial Project 2025. However, because of the FTC's investigation of Media Matters, he has not done so and has instead self-censored. Additionally, although in the past he communicated with the FTC for comments and clarification on reporting when the topics came within its purview, he would not do so now given the current legal environment.

26.    The knowledge that both Ferguson and his affiliates may hold resentment towards Media Matters and are attempting to curry favor with Musk based on our previous reporting only further heightens our writers' concerns about this investigation, makes them more wary that these individuals may obtain access to their communication and research, and makes them fearful that Ferguson and his affiliates will use their power as a way to retaliate against them and Media Matters.

27.    Writers, including Mr. Hananoki, have also expressed concerns about communicating with me or other journalists out of fear that our internal communications or ideas for potential future articles would be subject to the ongoing CID and will have to be turned over to the Federal Trade Commission, particularly given the overbroad CID and its requests for "documents" about "misinformation" and "hate speech," among other topics, which cover a significant amount of our reporting work. Mr. Hananoki has also had to scale back communications with other journalists outside of Media Matters out of fear that their messages, emails, or any other correspondence could expose their colleagues to the same kinds of risks Media Matters journalists are now facing.

28.    Media Matters writers, including Mr. Hananoki, have had to spend significant time working on matters relating to the FTC's investigation, including at the expense of their ordinary

investigative work. For example, since the FTC issued the CID, Mr. Hananoki has not published anything, nor has he been able to spend any time on his reporting beat. I have spent—and continue to spend—an inordinate amount of time on the ongoing lawsuits and investigations Media Matters is facing.

29.     The public threats against Media Matters from allies of Musk and the Trump Administration have also contributed to safety concerns against Media Matters staff, including members of my team. These increased safety concerns have added to the culture of fear at Media Matters, and operate as a serious distraction from our work, further harming our ability to produce reporting and journalism on political extremism in the United States media.

30.     Media Matters' leadership and members of the editorial team have also been forced to take a larger role in the organization's collective publishing decisions since the Texas CID was issued. In particular, I have been in communication much more than usual with leadership about what we should and should not publish. This has significantly slowed down our editorial and publication process, as we must work with leadership to assess whether publishing new articles will hurt Media Matters' position in ongoing legal proceedings and/or potentially trigger new ones. After Media Matters received the FTC's CID, I instructed my staff to flag any piece that references the FTC in some way so that we can discuss it with legal. In my more than 17 years at Media Matters, I have not seen the organization in this posture before.

31.     In my professional judgment, an injunction against the FTC's CID can help mitigate several of the journalistic harms inflicted upon Media Matters by that CID and by the related, retaliatory investigations and litigations initiated by other parties. I believe that an injunction here would signal that the judicial system will shield journalists and civil society more broadly from investigations that are launched in retaliation to protected speech, which can assure journalists at

Media Matters that they can safely proceed with their research and reporting activities about topics involving the FTC. Additionally, an injunction would relieve the concerns many Media Matters employees have about the financial burden these retaliatory lawsuits are placing on the organization and its continued viability—harms that, I believe, are the very goal of the retaliatory litigations and investigations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____
7/13/2025

Signed by:

*Benjamin Dimiero*
A0EB854EBE2840E...
Benjamin Dimiero