IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION, et al.,

*Defendants*.

Civil Action No. 25-1959 (SLS)

**DEFENDANTS' OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

    I.    The Commission's Investigative and Enforcement Authority ......................... 3

    II.   The Commission's Advertising Boycott Investigation Underlying
         the Issuance of CID to Media Matters ........................................................... 6

    III.  Media Matters' Petition to Quash the CID ..................................................... 8

    IV.  Media Matters' Complaint and Motion for Preliminary Injunction ............... 9

LEGAL STANDARDS ....................................................................................................... 10

ARGUMENT ....................................................................................................................... 11

    I.    Media Matters Cannot Show a Substantial Likelihood of Success
        on the Merits ................................................................................................... 11

        A.    The Court Lacks Subject Matter Jurisdiction Because
              Congress Channeled Media Matters' Claims Into the FTC
              Act's Exclusive Judicial-Review Scheme ................................................ 11

              1.    The FTC Act Creates a Comprehensive and Exclusive
                    Review Scheme ................................................................................ 12

              2.    Media Matters' Claims Fall Within the FTC Act's
                    Review Scheme ................................................................................ 14

              3.    The *Axon* Exception for Constitutional Challenges to
                    an Agency's Structure Is Inapplicable ........................................... 17

        B.    Media Matters' Complaint Fails to Identify a Cognizable
              Cause of Action ...................................................................................... 19

              1.    Media Matters Has No Statutory Cause of Action ......................... 19

              2.    Media Matters Has No Cause of Action Under Either
                    the First or Fourth Amendments .................................................... 22

        C.    Media Matters Is Not Likely to Prevail on Its First
              Amendment Retaliation Claim ................................................................ 24

i

1. Media Matters Cannot Demonstrate the Requisite
Causal Connection Between Its Speech and the CID ................................... 25

    a. The Media Matters CID Is Part of a Broader
Investigation into an Area of Significant
Interest for the Commission ........................................................ 25

    b. No Indicia of Retaliation Are Present ........................................... 30

2. Media Matters Also Has Not Demonstrated That the
CID Had a Sufficient Chilling Effect ............................................. 36

D. Media Matters Is Not Likely to Prevail on Its Claim That the
CID Is Excessively Broad ...................................................................... 38

II. Media Matters Cannot Show That It Will Suffer Irreparable Harm
If the Administrative Process Continues ........................................................ 41

III. The Balance of Equities and the Public Interest Weigh Against an
Injunction .................................................................................................. 44

CONCLUSION ............................................................................................................ 45

## <u>TABLE OF AUTHORITIES</u>

CASES

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ............................................................... 19

*Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) ........................................................... 20

*Am. Med. Ass'n v. FTC*, 638 F.2d 443 (2nd Cir. 1980) ................................................ 6

*Arch Coal, Inc. v. Acosta*, 888 F.3d 493 (D.C. Cir. 2018) ..................................... 12, 14

*Archer v. Chisholm*, 870 F.3d 603 (7th Cir. 2017) ...................................................... 36

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ....................................................... 24, 36

*Associated Press v. United States*, 326 U.S. 1 (1945) .................................................. 27

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ................................................... passim

*Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332 (10th Cir. 1984) ................................................................................................................ 23

*Bellion Spirits, LLC v. United States*, 7 F.4th 1201 (D.C. Cir. 2021) ........................ 20

*Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016) ............................................................. 15

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................ 21

*Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874 (8th Cir. 1977) ................................................................................................................ 22, 23

*Bowles v. Russell*, 551 U.S. 205 (2007) ........................................................................ 11

*Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000) ............................................ 36

*Bush v. Lucas*, 462 U.S. 367 (1983) ............................................................................. 23

*CFPB v. Future Income Payments, LLC*, 252 F. Supp. 3d 961, 970 (C.D. Cal. 2017) ...................................................................................................... 4, 16

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ........................................................ 11

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 973 F.3d 121 (D.C. Cir. 2020) .......................................................................... 22, 23, 24

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) ................................................................................... 31, 37, 38

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) ........................................................ 37

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798 (D.C. Cir. 2006) ............................................................................... 22

*Davis v. Passman*, 442 U.S. 228 (1979) ....................................................................... 19

*ECM BioFilms, Inc. v. FTC*, 851 F.3d 599 (6th Cir. 2017) .......................................... 6

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) ............................................... 11, 12, 14, 15

*Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950) ..................................... 22

*Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551 (D.C. Cir. 2023) ................................................................................11, 12, 14

*Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, (9th Cir. 1975) ............................................ 5

*Floersheim v. Engman*, 494 F.2d 949 (D.C. Cir. 1973) ...................... 20

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ......................................................................................... 15

*FTC v. Church & Dwight Co.*, 665 F.3d 1312 (D.C. Cir. 2011) .................... 4

*FTC v. Claire Furnace Co.*, 274 U.S. 160 (1927) .......................... 23

*FTC v. Invention Submission Corp.*, Misc. No. 89-272, 1991 WL 47104 (D.D.C. Feb. 14, 1991) ................................................... 4

*FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001) ...................... 4, 5

*FTC v. Match Grp., Inc.*, No. 1:22-mc-54, 2023 WL 3181351 (D.D.C. May 1, 2023) ............................................................ 4

*FTC v. Match Grp., Inc.*, No. 1:22-mc-54, 2024 WL 1509180 (D.D.C. Mar. 12, 2024), *report and recommendation adopted*, 2025 WL 1734765 (D.D.C. June 23, 2025) ..................................... 4

*FTC v. Owens-Corning Fiberglass Corp.*, 626 F.2d 966 (D.C. Cir. 1980) .......................................................................................... 4

*FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232 (1980).................. 21, 42, 44

*FTC v. Superior Ct. Law. Ass'n*, 493 U.S. 411 (1990)......................... 27

*Gen. Fin. Corp. v. FTC*, 700 F.2d 366 (7th Cir. 1983)................ 19, 20, 21, 24

*Hartman v. Moore*, 547 U.S. 250 (2006) ................................... 36

*Howfield, Inc. v. United States*, 409 F.2d 694 (9th Cir. 1969) ................ 23

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) ................. 10

*Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115 (D.D.C. 2002) .......................................................................................... 39

*In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006) ...................................................................................... 40

*In the Matter of Omnicom Group, Inc. And Interpublic Group of Companies, Inc.*, FTC File No. 251-0049 (June 23, 2025)................ 26

*J.T.H. v. Missouri Dep't of Soc. Servs. Children's Div.*, 39 F.4th 489 (8th Cir. 2022) ................................................................... 36

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015)........................... 12, 15, 16

*Jolley v. United States*, No. 21-5181, 2024 WL 1521633 (D.C. Cir. Apr. 9, 2024) ......................................................................... 17

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020) ........................... 10

*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) ................................... 40

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748
   (10th Cir. 2024) ................................................................................................. 17

*Lewis v. Gov't of the D.C.*, 161 F. Supp. 3d 15 (D.D.C. 2015) ........................ 32

*Lifeline, Inc. v. Bakari*, 107 F. Supp. 3d 38 (D.D.C. 2015) ............................. 11

*Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*,
   No. 23-5096, 2023 WL 7294839 (D.C. Cir. May 25, 2023) ..................... 17, 18

*Maryland v. King*, 567 U.S. 1301 (2012) .......................................................... 44

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d
   1441 (D.C. Cir. 1985) ........................................................................................ 19

*Media Matters for Am. v. Bailey*, No. 24-cv-147 (APM), 2024 WL
   3924573 (D.D.C. Aug. 23, 2024) ................................................................ passim

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) ......... 30, 32, 36

*Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024) .......... 30, 37

*Morris & Dickson Co. v. Whitaker*, 360 F. Supp. 3d 434 (W.D. La.
   2018) .................................................................................................................... 44

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ................................................ 24, 25, 33

*Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000) ..................................... 6

*Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946) .................. 39

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ........................... 22

*Petroleum Exploration, Inc. v. Pub. Serv. Comm'n*, 304 U.S. 209
   (1938) ................................................................................................................... 42

*POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015) ......................... 6

*Rehberg v. Paulk*, 611 F.3d 828 (11th Cir. 2010) ............................................ 36

*Reisman v. Caplin*, 375 U.S. 440 (1964) ........................................................... 23

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety
   Comm'n*, 324 F.3d 726 (D.C. Cir. 2003) ......................................................... 22

*Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974) ................ 42

*RICU LLC v. United States Dep't of Health & Hum. Servs.*, 22
   F.4th 1031 (D.C. Cir. 2022) .............................................................................. 11

*Schieber v. United States*, 77 F.4th 806 (D.C. Cir. 2023) ............................... 20

*Shoen v. Shoen*, 48 F.3d 412 (9th Cir. 1995) ................................................... 40

*Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022) ........................................... 10, 44

*Sivella v. Twp. of Lyndhurst*, No. 20-2342, 2021 WL 3356934 (3d
   Cir. Aug. 3, 2011) ............................................................................................... 37

*Skelly Oil Co. v. Phillips Petrol. Co.,* 339 U.S. 667 (1950) ........................................11

*Sledge v. District of Columbia*, 869 F. Supp. 2d 140 (D.D.C. 2012) ........................... 23

*Soundboard Ass'n v. FTC*, 888 F.3d 1261 (D.C. Cir. 2018) ...................................... 21

*Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024) .................................................. 10

*Thompson v. Hall*, 426 F. App'x 855 (11th Cir. 2011) ............................................... 36

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ....................................11, 13, 14

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) .............................................. 23

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ................................................. 19, 22

*Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022) .............................................. 43

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ....................................... 3, 39, 40

*United States v. Witmer*, 835 F. Supp. 208 (M.D. Pa. 1993) .................................... 4, 16

*Veteran Command, LLC v. United States*, No. 21-5207, 2022 WL
  566466 (D.C. Cir. Feb. 22, 2022) .....................................................................11

*Wearly v. FTC*, 616 F.2d 662 (3d Cir. 1980) ........................................................... 23

*Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609
  (1973) ................................................................................................................ 5

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) .......................................................... 37

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................ 10

*XYZ Law Firm v. FTC*, 525 F. Supp. 1235 (N.D. Ga. 1981) ....................................... 5

*Zigler v. Abbasi*, 582 U.S. 120 (2017) ....................................................... 22, 23, 24

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ................................................. 39, 40

## STATUTES

15 U.S.C. § 44 ............................................................................................................ 5

15 U.S.C. § 45 ................................................................................................... passim

15 U.S.C. § 46 ............................................................................................................ 3

15 U.S.C. § 53(b) ................................................................................................... 6, 21

15 U.S.C. § 57b-1 ............................................................................................... passim

28 U.S.C. § 1291 ....................................................................................................... 6

28 U.S.C. § 1331 .......................................................................................................11

28 U.S.C. § 2201 ...................................................................................................... 20

28 U.S.C. § 2412 ...................................................................................................... 42

5 U.S.C. § 557 ......................................................................................................... 13

5 U.S.C. § 702 ......................................................................................................... 19

5 U.S.C. § 703 ................................................................................................ 20

5 U.S.C. § 704 ............................................................................. 1, 19, 20, 22

5 U.S.C. §§ 701-706 ..................................................................................... 20

**RULES**

16 C.F.R. § 2.1 ............................................................................................ 3, 16

16 C.F.R. § 2.3 ................................................................................................. 7

16 C.F.R. § 2.4 .......................................................................................... 3, 4, 16

16 C.F.R. § 2.7 ............................................................................................... 16

16 C.F.R. §§ 3.52–3.54 ................................................................................. 13

**MISCELLANEOUS**

Andrew N. Ferguson, *Concurring Statement of Commissioner
   Andrew N. Ferguson, FTC v. 1661, Inc. d/b/a GOAT Matter
   Number 2223016*, FTC (Dec. 2, 2024) ............................................. 29, 33

FTC & DOJ Statement of Interest, *Texas v. BlackRock, Inc.*, 6:24-
   cv-437-JDK (E.D. Tex. May 22, 2025) ................................................... 27

Interim Staff Report of the Committee on the Judiciary, U.S. House
   of Representatives, *GARM's Harm: How the World's Biggest
   Brands Seek to Control Speech* (July 10, 2024) ..................................... 29

Kate Conger, Kenneth P. Vogel and Theodore Schleifer, *Regulators
   Are Investigating Whether Media Matters Colluded With
   Advertisers* (The New York Times May 22, 2025) ................................... 42

Liam Reilly, *FTC probes Media Matters' exchanges with ad
   groups, stoking fears of retribution* (CNN May 22, 2025) ..................... 42

Order Denying Petition to Quash Civil Investigative Demand, *In
   the Matter of Civil Investigative Demand to Media Matters for
   America Dated May 20, 2025*, FTC Dkt. No. 251-0061 (July 25,
   2025) ................................................................................................... passim

Statement of Interest of the United States, *Children's Health Def. v.
   WP Co.*, No. 1:23-cv-2735-TJK (D.D.C. July 11, 2025) ......................... 27

# INTRODUCTION

Media Matters' preliminary injunction motion is profoundly misconceived both procedurally and substantively. To begin, the Court lacks subject matter jurisdiction because the Federal Trade Commission Act (FTC Act) sets forth a comprehensive and exclusive scheme for judicial review of agency actions. That scheme allows Media Matters to raise objections to the FTC's Civil Investigative Demand (CID) only in a Commission action to enforce the CID. Because Congress established an exclusive path for judicial review of those issues, this Court lacks jurisdiction to hear Media Matters' claims.

In addition, Media Matters lacks a cognizable cause of action. The Administrative Procedure Act (APA) provides a cause of action to challenge only "final" agency actions. 5 U.S.C. § 704. Media Matters challenges no such final actions by the FTC. Nor does the Constitution provide a cause of action in this case. Where Congress has provided adequate statutory means for a person's claims and remedies concerning agency action, as it has done in the APA, a court may not create an implied, duplicative constitutional cause of action that evades the statutory limits.

All of this is quite sensible. The CID imposes no legal obligations on Media Matters unless and until the FTC seeks to enforce it in district court. All of Media Matters' claims can and should be addressed in that enforcement action, rather than at the current preliminary stage when the CID remains fluid and subject to discussion among the parties.

As for the substance, Media Matters' account of its supposed targeting by the FTC is entirely mistaken. In reality, the CID that it received from the FTC is one of *seventeen* outstanding CIDs from a broad investigation into an area of significant interest for the Commission: advertiser boycotts that may violate the antitrust laws. These CIDs have been directed to a variety of entities, including several organizations similar to Media Matters. The notion that Media Matters is being singled out for its speech cannot withstand scrutiny.

This becomes particularly clear when comparing this case with Media Matters' litigation against two state Attorneys General (which Media Matters seeks to rely on). Even assuming those cases were correctly decided, they bear no relation to this case. For example, in its lawsuit against the Missouri Attorney General, Media Matters alleged (1) an immediate reaction to a Media Matters article (2) by a law enforcement official who expressly and repeatedly criticized Media Matters against the backdrop of (3) significant evidence that the justification for the CID was pretextual and (4) a pattern of highly unorthodox enforcement. Here, (1) the challenged CID was issued a year and a half after the article that Media Matters alleges was the subject of the retaliation; (2) Media Matters does not identify a single time that Chairman Ferguson has ever *mentioned* Media Matters, much less singled it out as an object of scorn; (3) Media Matters has no evidence that the CID's justification is pretextual; and (4) there are no allegations of unorthodox enforcement. In sum, Media Matters has no likelihood of prevailing on its retaliation claim.

Media Matters fares no better with its cursory argument that the CID violates the First and Fourth Amendments by virtue of its breadth. Media Matters cites no on-point authority in support of its position and does not even attempt to identify—as it must—any specific privileged document that the CID would require it to disclose. Ultimately, the only appropriate forum to address Media Matters' argument is an action to enforce the CID, because only then will it become clear whether the parties actually dispute any documents.

In short, Media Matters has not come close to showing a likelihood of success on the merits. And it also loses on the equitable prongs of the preliminary injunction analysis. It cannot show irreparable harm because many of its purported injuries are self-inflicted, and none can be traced to the CID. And the public interest would be harmed by interfering with an investigation into potentially unlawful advertising boycotts.

# BACKGROUND

## I.      The Commission's Investigative and Enforcement Authority

Section 5 of the FTC Act prohibits "persons, partnerships, or corporations" from engaging in "unfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a). Congress "empowered and directed" the Commission "to prevent" these anticompetitive practices, *id*. § 45(a)(2), and thus authorized the agency "to investigate … any person, partnership, or corporation engaged in or whose business affects commerce." *Id*. § 46(a); *see* 16 C.F.R. § 2.1 (how Commission investigations are initiated), § 2.4 (the Commission "encourages the just and speedy resolution of investigations," and "will … employ compulsory process when in the public interest"). To fulfill this "continuing duty," the Commission "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 639, 642-43 (1950).

To aid the agency in conducting its investigations, Section 20 of the FTC Act authorizes the Commission to issue investigative demands to "any person" who may have "any information" relevant to potential violations of the laws enforced by the Commission, including agency regulations. 15 U.S.C. § 57b-1. CID recipients may petition the Commission to set aside or modify the CID. *Id*. § 57b-1(f). The Commission may compel compliance with a CID only by filing a petition for enforcement in a federal district court, and any resulting enforcement order may be appealed. *Id*. §§ 57b-1(e), (h).

Prior to any judicial enforcement petition, however, recipients of a CID usually engage in back-and-forth discussions with Commission staff regarding the scope, production timeline, and even the legal basis for the CID. *See* 16 C.F.R. § 2.4 ("The Commission encourages cooperation in its investigations."). Indeed, the Commission's Rules of Practice call for "all parties to engage

in meaningful discussions with staff to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought." *Id.*

If those discussions fail to resolve the differences between the CID recipient and Commission staff, the Commission may authorize an enforcement action where the parties can advance their respective arguments before a district court. *See, e.g.*, *FTC v. Invention Submission Corp.*, Misc. No. 89-272, 1991 WL 47104 (D.D.C. Feb. 14, 1991), *aff'd*, 965 F.2d 1086 (D.C. Cir. 1992). The issues that a CID enforcement action can resolve—in the district court and ultimately on appeal—span a wide range, from routine discovery disputes, *see, e.g.*, *FTC v. Match Grp., Inc.*, No. 1:22-mc-54, 2023 WL 3181351 (D.D.C. May 1, 2023) (motions to seal and for discovery), to claims of trade secrets and attorney-client privilege or work-product protection, *see, e.g.*, *FTC v. Owens-Corning Fiberglass Corp.*, 626 F.2d 966 (D.C. Cir. 1980); *FTC v. Match Grp., Inc.*, No. 1:22-mc-54, 2024 WL 1509180 (D.D.C. Mar. 12, 2024), *report and recommendation adopted*, 2025 WL 1734765 (D.D.C. June 23, 2025), to issues of statutory construction, *see, e.g.*, *FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001), and whether the scope of the investigation prompting the CID was properly authorized by a Commission resolution, *see, e.g.*, *FTC v. Church & Dwight Co.*, 665 F.3d 1312 (D.C. Cir. 2011). Likewise, constitutional challenges to an agency CID may be adjudicated in an enforcement action. *See, e.g.*, *CFPB v. Future Income Payments, LLC*, 252 F. Supp. 3d 961, 970 (C.D. Cal. 2017), *vacated in part on other grounds*, No. 8:17-cv-00303, 2018 WL 7502720 (C.D. Cal. Dec. 18, 2018);[1] *United States v. Witmer*, 835 F. Supp. 208 (M.D. Pa. 1993).

---

[1] The district court's constitutional ruling in that case was vacated not because the district court was precluded from hearing the constitutional challenge, but because the CFPB no longer sought to enforce the CID and moved to have the ruling vacated. *See Future Income Payments*, 2018 WL 7502720, at *1.

The scope of the Commission's authority to investigate and to issue CIDs under Section 20 is broader than its enforcement authority under Section 5 of the FTC Act.[2] The D.C. Circuit has consistently held that administrative agencies are accorded "wide latitude in asserting their power to investigate by subpoena," and that "an individual may not normally resist an administrative subpoena on the ground that an agency lacks regulatory jurisdiction if the subpoena is issued at the investigative stage." *Ken Roberts Co*., 276 F.3d at 586 (internal quotation marks and citations omitted). Indeed, an agency's "jurisdiction to determine whether it has jurisdiction is as essential to its effective operation as is a court's like power." *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973); *accord Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 434 (9th Cir. 1975) ("[E]ach independent regulatory administrative agency has the power to obtain the facts requisite to determining whether it has jurisdiction over the matter sought to be investigated."). *See, e.g.*, *XYZ Law Firm v. FTC*, 525 F. Supp. 1235, 1237-38 (N.D. Ga. 1981) (rejecting argument that FTC could not investigate a target for potential violations of the Fair Debt Collection Practices Act because the target contended it fell under that statute's exemption for attorneys). Moreover, by its own terms, Section 20 applies to "any person," and the term "person" is defined in Section 20 to mean "any natural person, partnership, corporation, association, *or other legal entity*, including any person acting under color or authority of State law." 15 U.S.C. § 57b-1(a)(6) (emphasis added). The term "other legal entity" in Section 20 is sufficiently broad to encompass, for example, nonprofit corporations. *See supra* note 2.

---

[2] Enforcement under Section 5—which applies to "persons, partnerships, or corporations," 15 U.S.C. § 45(b)—may be limited, for example, by Section 4 of the FTC Act, which provides in relevant part that the term "corporation" shall be deemed to include any company "without shares of capital or capital stock or certificates of interest, except partnerships, which is organized to carry on business for its own profit or that of its members." *Id*. § 44.

If, after concluding an investigation, the Commission has "reason to believe" that a violation of law has occurred, or is about to occur, and that a law enforcement action is in the public interest, the agency may either commence an internal administrative proceeding or file an action in a federal district court to adjudicate the alleged violations. 15 U.S.C. §§ 45(b), 53(b). In either case, review is available in a court of appeals, including for constitutional issues. *Id.* § 45(b); 28 U.S.C. § 1291; *see, e.g.*, *POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015) (First Amendment challenges to advertising restrictions); *ECM BioFilms, Inc. v. FTC*, 851 F.3d 599 (6th Cir. 2017) (First and Fifth Amendment challenges); *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000) (First Amendment challenge to corrective advertising requirements); *Am. Med. Ass'n v. FTC*, 638 F.2d 443 (2nd Cir. 1980) (First Amendment freedom of association challenge).

## II.     The Commission's Advertising Boycott Investigation Underlying the Issuance of CID to Media Matters

According to the Complaint's allegations, Media Matters is a nonprofit organization dedicated to monitoring, analyzing, and correcting "misinformation" in the U.S. media. ECF_1 ¶ 4. Media Matters alleges that it employs reporters, researchers, and writers to publish articles that are often critical of public figures in the U.S. media, and "has played a key role in documenting extremism … in the public square." *Id*. One of Media Matters' articles, dated November 16, 2023, "reported that X was permitting advertisements to be placed next to pro-Nazi or other extremist content." *Id*. ¶ 8. X is the social media platform formerly known as Twitter. Media Matters alleges that a "spike in hateful rhetoric on X" led many advertisers to "promptly cease[] advertising on X." *Id*. ¶ 33.

Media Matters alleges that the FTC has "opened an investigation to harass Media Matters in retaliation for its journalism." ECF_1 ¶ 13.[3] In connection with that investigation, "the FTC issued a CID to Media Matters dated May 20, 2025." *Id*. ¶ 14.

The suggestion that the FTC issued the CID in retaliation for Media Matters' journalism is categorically false. In reality, it is one of *seventeen* currently outstanding CIDs issued as part of the Commission's investigation into whether any person or entity has engaged or is engaging in unfair, anticompetitive, collusive, or exclusionary acts or practices in connection with an alleged advertising boycott in violation of the antitrust laws.[4] Specifically, the Commission is investigating whether persons or entities have conspired to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act and Section 5 of the FTC Act, under the guise of promoting "brand suitability" and "brand safety" against "misinformation." *See* ECF_22-4 (Anthony Decl., Exh. B) at 2 (the "Subject of the Investigation").[5] One element of that

---

[3] The Commission "does not initiate an investigation or take other action when the alleged violation of law is merely a matter of private controversy and does not tend adversely to affect the public." 16 C.F.R. § 2.3.

[4] *See* Order Denying Petition to Quash Civil Investigative Demand, *In the Matter of Civil Investigative Demand to Media Matters for America Dated May 20, 2025*, FTC Dkt. No. 251-0061 (July 25, 2025) (hereinafter, "PTQ Order"), at 1.

[5] A full description of the Commission's investigation, as provided in the amended CID to Media Matters, reads as follows:

> To determine whether any natural persons, partnerships, corporations, associations, or other legal entities have engaged in or are engaging in unfair, anticompetitive, collusive, or exclusionary acts or practices – including inviting, participating in, or facilitating boycotts or other collusion or coordination – to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or Section 5 of the FTC Act, 15 U.S.C. § 45, as amended, or any other statutes or rules enforced by the Commission, and to determine the appropriate action or remedy.

ECF_22-4 (Anthony Decl., Exh. B), at 2.

investigation involves examining whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not "brand suitable" or not "brand safe" to coordinate the placement of ads. The Commission has issued CIDs to multiple advertising agencies as well as entities that the Commission has reason to believe promulgated such lists of "unsuitable" or "unsafe" outlets used to coordinate ad placement. These entities include several advertising trade associations, brand safety/suitability rating organizations, and policy/advocacy groups such as Media Matters.

The CID to Media Matters seeks information pertaining to Media Matters' organizational structure; documents it has produced or received in certain litigation; documents pertaining to the relationship between online platforms and advertisers, including documents discussing rating systems, harmful or undesirable content, and brand safety tools for online advertising; the methodology by which Media Matters evaluates or categorizes content publisher entities; complaints that Media Matters has received pertaining to its programs; and Media Matters' financial information. *See generally* ECF_22-3 (Anthony Decl., Exh. A), at 3-5. The CID seeks documents created between January 1, 2019 and today. *Id*. at 8.

## III.    **Media Matters' Petition to Quash the CID**

In Media Matters' petition to quash, *see supra* note 4, Media Matters challenged the CID on the grounds that (1) it fails to identify the nature of the conduct under investigation or how it relates to Media Matters; (2) compliance with the CID would violate Media Matters' First Amendment rights; (3) the Commission lacks the authority under the FTC Act to enforce the antitrust laws against nonprofits like Media Matters; (4) the CID is overly broad and unduly burdensome; and (5) the CID is vague and ambiguous. PTQ Order at 1.

On July 25, 2025, by a 2-0 vote with Commissioner Meador recused, the Commission denied Media Matters' petition. *See supra* note 4. The Commission held that its Omnibus

Resolution accompanying the CID provided adequate notice of the scope of the investigation, and even if it did not, any doubt was laid to rest by the July 7 modification to the CID (ECF_22-4), which provided additional detail about the nature of the investigation and gave Media Matters ample notice of the nature of the alleged illegal conduct under investigation. PTQ Order at 3-6. As to Media Matters' First Amendment challenge, concerning Specifications 6 through 17 (inclusive), the Commission held that Media Matters failed to show that the requested information was intended to be disseminated to the public as news, and thus failed to show that First Amendment privilege was applicable. *Id.* at 6-8. The Commission also explained that whether the Commission has enforcement authority over Media Matters as a nonprofit entity is irrelevant to the Commission's broader authority to investigate and issue a CID to "any person" under Section 20 of the FTC Act. *Id.* at 8-9. Lastly, after a review of the CID, the Commission concluded that it is neither overly broad and unduly burdensome nor vague or ambiguous. *Id.* at 9-12. The Commission thus set August 27, 2025, as the new date for Media Matters to comply with the CID. *Id.* at 13.

## IV.    Media Matters' Complaint and Motion for Preliminary Injunction

Media Matters filed this action on June 23, 2025, claiming that defendants violated Media Matters' First Amendment rights by "launching an investigation and serving a burdensome CID in retaliation for Plaintiff's speech, press, and associational activities." ECF_1 ¶ 96. It also claims that the Commission's CID "violates Plaintiff's First and Fourth Amendment rights by unreasonably requiring it to turn over sensitive and privileged materials." *Id.* ¶ 107. Media Matters seeks a declaration that the Commission's CID constitutes a retaliatory action and violates its First and Fourth Amendment rights, as well as an injunction prohibiting the Commission "from initiating any action to enforce the CID or further investigating Plaintiff." *Id.* at 40.

9

On July 14, 2025, Media Matters filed the instant motion for "a preliminary injunction preventing Defendants from enforcing or implementing its civil investigative demand dated May 20, 2025." ECF_22 (Pl.'s Mot. for Prelim. Inj.) at 1. It claims to be suffering substantial harms "due to the CID's existence alone," and that "it will continue to suffer them even if the FTC does not seek to enforce the CID in federal court." ECF_22-1 (Pl.'s Mem. in Supp. of Mot.) at 34. Media Matters apparently does not seek a preliminary injunction against any other component of the Commission's ongoing investigation.

## LEGAL STANDARDS

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Thus, "a plaintiff seeking a preliminary injunction must make a *clear showing* that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id.* at 346 (quoting *Winter*, 555 U.S. at 20, 22) (emphasis added). "The balance of the equities and the public interest 'merge when, as here, the Government is the opposing party.'" *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)). Thus, "[w]hen a private party seeks injunctive relief against the government," the Court must "weigh[] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (internal quotation marks and citation omitted).

## ARGUMENT

I.   **MEDIA MATTERS CANNOT SHOW A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

Media Matters cannot establish that it is likely to succeed on the merits in this case because (a) this Court lacks subject-matter jurisdiction over Media Matters' claims, (b) Media Matters lacks a cognizable cause of action, and (c) its claims fail on the merits.

### A.   The Court Lacks Subject-Matter Jurisdiction Because Congress Channeled Media Matters' Claims Into the FTC Act's Exclusive Judicial-Review Scheme

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). This prerequisite must be satisfied regardless of the relief sought. *Skelly Oil Co. v. Phillips Petrol. Co.,* 339 U.S. 667, 671 (1950). Thus, the lack of subject matter jurisdiction precludes even consideration of a motion for a preliminary injunction. *RICU LLC v. United States Dep't of Health & Hum. Servs.*, 22 F.4th 1031, 1039 (D.C. Cir. 2022); *see, e.g.*, *Veteran Command, LLC v. United States*, No. 21-5207, 2022 WL 566466, *1 (D.C. Cir. Feb. 22, 2022) (district court correctly denied motion for preliminary injunction based on lack of subject matter jurisdiction); *Lifeline, Inc. v. Bakari*, 107 F. Supp. 3d 38, 39 (D.D.C. 2015) (motion for preliminary injunction denied as moot because plaintiff failed to establish subject matter jurisdiction). This Court lacks subject-matter jurisdiction to entertain Media Matters' claims and thus cannot grant an injunction.

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007). Ordinarily, district courts may hear challenges to federal agency actions "arising under" federal law, pursuant to, for example, the general federal question statute, 28 U.S.C. § 1331. "Congress, though, may substitute for that district court authority an alternative scheme of review." *Axon Enter., Inc. v. FTC*, 598 U.S.

175, 185 (2023); *accord Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 558 (D.C. Cir. 2023). *See, e.g.*, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994); *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012). "The method Congress typically chooses is the one used in … the FTC Act: review in a court of appeals following the agency's own review process." *Axon*, 598 U.S. at 185. "The agency effectively fills in for the district court, with the court of appeals providing judicial review." *Id*. Congress's "creation of such a review scheme for agency action *divests* district courts of their ordinary jurisdiction over the covered cases." *Id*. (emphasis added). This principle applies equally to constitutional challenges to agency action. *Id*.; *accord Elgin*, 567 U.S. at 10; *Jarkesy v. SEC*, 803 F.3d 9, 19 (D.C. Cir. 2015).

The D.C. Circuit has articulated a two-part test for applying these principles: Congress is deemed to have intended "that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (quoting *Jarkesy*, 803 F.3d at 15). The Supreme Court has reaffirmed the validity of this analytical framework. *See Axon*, 598 U.S. at 185-86. Both of these conditions are met here.

### 1. The FTC Act Creates a Comprehensive and Exclusive Review Scheme.

"Congress need not expressly deem a statutory regime to be exclusive for it to satisfy step one." *Ahuja*, 62 F.4th at 558 (citing *Elgin*, 567 U.S. at 10-12); *see Axon*, 598 U.S. at 185 (statutory schemes for agency review "generally" are "exclusive") (cleaned up). "Congress's intent to displace district court jurisdiction may be 'implied'—for instance, by the comprehensive nature of the statutory system of review and Congress's purpose in enacting it." *Ahuja*, 62 F.4th at 558 (citing *Elgin*, 567 U.S. at 12).

As the Supreme Court recognized in *Axon*, Congress created just such an exclusive review scheme in the FTC Act. 598 U.S. at 185. The FTC Act includes several provisions setting forth exclusive mechanisms for judicial review that reflect Congress's judgment precluding alternative actions such as this. Most relevant here, the statute confers on the Commission authority to issue CIDs in its investigations, but does not make those CIDs self-enforcing. *See* 15 U.S.C. § 57b-1(e). Instead, the statute authorizes the FTC to bring a separate enforcement action in district court, where the parties can litigate a range of legal issues concerning the CID, including the kinds of objections that Media Matters seeks to raise here. Congress thus channeled issues concerning the validity, scope, and enforceability of FTC CIDs into an enforcement action, precluding efforts (such as this one by Media Matters) to impede preemptively the Commission's ongoing investigations.

That legislative choice—to provide an exclusive judicial review mechanism for CIDs by requiring the FTC to bring an enforcement action in district court—is consistent with the FTC Act's broader structure, which allocates investigative and administrative authority to the Commission and creates specific avenues for judicial review, thereby precluding other avenues for collaterally attacking the Commission's actions. For example, in addition to CID-enforcement actions, the statute also provides for direct review in the courts of appeals following Commission adjudication of claims in administrative proceedings, thereby precluding district court actions seeking to interfere with those proceedings. It allows respondents to present evidence and to challenge the charges against them at a hearing before an administrative law judge. 15 U.S.C. § 45(b). Respondents can appeal any adverse administrative law judge decision to the Commission. *See* 5 U.S.C. § 557(b); 16 C.F.R. §§ 3.52–3.54. And the Commission's final cease-and-desist orders are subject to direct judicial review in a court of appeals. 15 U.S.C. § 45(b). The FTC Act expressly confers on the courts of appeals "exclusive" jurisdiction to review the

Commission's final orders. *Id*. § 45(d). Like the statute's creation of separate authority for the Commission to seek judicial enforcement of its CIDs, this direct review provision confirms that Congress established exclusive paths to judicial review. And the FTC Act is not alone in creating exclusive judicial review mechanisms, limiting the authority of federal courts to interfere in ongoing administrative investigations or adjudications. *See, e.g.*, *Axon*, 598 U.S. at 185 (the Federal Trade Commission Act and the Exchange Act, 15 U.S.C. § 78u-3(a)); *Thunder Basin*, 510 U.S. at 207-16 (the Mine Act, 30 U.S.C. §§ 814-816, 826); *Arch Coal*, 888 F.3d at 496–500 (the Black Lung Benefits Act, 33 U.S.C. §§ 921, 932).

In addition to the statutory authorization for the FTC to bring enforcement actions in district court, the FTC Act also provides for district court (not administrative) adjudication in two other circumstances. *See* 15 U.S.C. §§ 45(*l*), 45(m) (actions for civil penalties). Congress's authorization of district court review for certain types of claims "demonstrates that Congress knew how to provide alternative forums for judicial review based on the nature of a[] … claim," but that it "intended no such exception" for all other claims. *Elgin*, 567 U.S. at 13; *see Arch Coal*, 888 F.3d at 499-500 (statute's express grant of district court jurisdiction "in only two narrow circumstances" "leaves no role for district court review of [other claims]").

### 2. Media Matters' Claims Fall Within the FTC Act's Review Scheme.

The second condition for divesting district courts of jurisdiction—that the litigant's claims be of the type that Congress intended to be reviewed within the statutory structure, *Arch Coal*, 888 F.3d at 498—is also met here. The Supreme Court has identified "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Axon*, 598 U.S. at 186. A litigant seeking to avoid a statutory mechanism for judicial review must demonstrate that (1) precluding district court jurisdiction would "foreclose all meaningful judicial review" of the litigant's claim; (2) the claim at issue is "wholly collateral" to the statutory review provisions; and

14

(3) the claim is "outside the agency's expertise." *Id*. (quoting *Thunder Basin*, 510 U.S. at 212-13); *accord Ahuja*, 62 F.4th at 560; *Arch Coal*, 888 F.3d at 500. "A claim will be found to fall outside the scope of" the statutory scheme "in only [the] limited circumstances" when *all* the *Thunder Basin* conditions are satisfied. *Arch Coal*, 888 F.3d at 500; *see also Axon*, 598 U.S. at 186 ("When the answer to all three questions is yes, 'we presume that Congress does not intend to limit jurisdiction.'") (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010)).

Media Matters' claims do not fall outside the FTC Act's review scheme because they satisfy none of those requirements—much less all three. *First*, meaningful judicial review of Media Matters' claims is provided for within the FTC Act. Media Matters' claims pertain entirely to whether the Commission's investigation and issuance of the CID violate the First and Fourth Amendments. *See* ECF_1 ¶¶ 95-110. Media Matters' complaint seeks to enjoin enforcement of the CID and continuation of the investigation, *Id*. at 40, while its instant motion seeks only "a preliminary injunction preventing Defendants from enforcing or implementing" the CID. ECF_22 at 1. There is no doubt that, should the Commission decide to enforce the CID, Media Matters can raise all of its constitutional claims before the district court hearing the CID enforcement action.

Any district court that hears the CID enforcement case will be "fully competent to adjudicate" Media Matters' claims. *Elgin*, 567 U.S. at 17. Indeed, even facial constitutional challenges to agency actions (and even more so, Media Matters' as-applied claims) should be routed via the statutory review scheme, "so long as a court can eventually pass upon the challenge." *Jarkesy*, 803 F.3d at 18 (citing *Elgin*). Meaningful judicial review of Media Matters' claims here— which is "the most important factor in the *Thunder Basin* analysis," *Bennett v. SEC*, 844 F.3d 174, 183 n.7 (4th Cir. 2016)—is thus plainly available.

*Second*, Media Matters' constitutional claims are not "wholly collateral" to the FTC Act's review scheme. *Axon*, 598 U.S. at 186. Media Matters claims that the Commission's investigation prompting the issuance of the CID was launched for improper purposes (*i.e.*, retaliation against Media Matters for its journalistic activities), and that the CID calls for information and materials that are privileged under the First and Fourth Amendments. ECF_1 ¶ ¶ 95-110. Media Matters' claims are thus at the heart of the Commission's authorizing statute and its own regulations: Section 5 of the FTC Act, 15 U.S.C. § 45, concerning the power of the Commission to investigate and prevent anticompetitive practices; Section 20, 15 U.S.C. § 57b-1, concerning the use of CIDs in such investigations; Rule 2.1 of the Commission's Rules of Practice, 16 C.F.R. § 2.1, concerning how such investigations are originated and the Commission's delegation of authority to its Bureau of Competition staff to initiate investigations into potentially anticompetitive practices; Rule 2.4, 16 C.F.R. § 2.4, concerning the Commission's "investigational policy" of "just and speedy resolution of investigations" and use of compulsory process, including CIDs, when "in the public interest"; and Rule 2.7, 16 C.F.R. § 2.7, concerning the circumstances for use, and proper scope and content, of CIDs.

Media Matters' claims, on their face, "concern (what [Media Matters] perceives to be) substantive or procedural deficiencies in the Commission's [law] enforcement" investigation. *Jarkesy*, 803 F.3d at 22. Like plaintiff's claims in *Jarkesy*, Media Matters' "constitutional claims are the vehicle by which [Media Matters] seek[s] to reverse" the Commission's decisions to initiate the investigation into a potentially anticompetitive advertising boycott and to issue the CID to Media Matters seeking information relevant to that investigation. *Id*. at 23. Media Matters' constitutional claims are defenses to the Commission's CID enforcement petition, and Media Matters can raise them if the FTC enforces the CID. They are not "wholly collateral" to such an enforcement petition; they are part and parcel of it. *See* 15 U.S.C. § 57b-1(h) (district court's

jurisdiction to hear CID enforcement petitions). Constitutional objections are routine in CID enforcement cases. *See, e.g.*, *Future Income Payments*, *supra*, 252 F. Supp. at 970; *Witmer*, 835 F. Supp. 208 (M.D. Pa. 1993). "Congress did not intend the framing of a constitutional challenge … to grant a district court jurisdiction over an otherwise non-collateral claim." *Jarkesy*, 803 F.3d at 24.

*Third*, Media Matters' claims are quintessentially the types of claims that fall within the agency's expertise because they all concern the construction and application of the Commission's authorizing statute and its own regulations and enforcement policy—*i.e.*, whether the FTC Act authorizes the Commission's investigation and the CID, and whether the investigation and CID conform with the Commission's internal rules and enforcement policies.

In sum, because Congress created an exclusive judicial review scheme in the FTC Act, and because Media Matters' claims fall squarely within that scheme, this Court lacks subject-matter jurisdiction to hear Media Matters' claims. Media Matters cannot prevail on the merits of its claims in the absence of jurisdiction, and therefore is not entitled to a preliminary injunction.

### 3. The *Axon* Exception for Constitutional Challenges to an Agency's Structure Is Inapplicable.

"*Axon* recognized a narrow exception to Congress's prescribed path for judicial review of agency action for facial challenges to the constitutional structure of administrative agencies' ability to operate." *Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, No. 23-5096, 2023 WL 7294839, *11 (D.C. Cir. May 25, 2023) (per curiam); *accord Jolley v. United States*, No. 21-5181, 2024 WL 1521633, at *4 (D.C. Cir. Apr. 9, 2024) (per curiam) (*Axon* concerned claims that went "to the structure or very existence of an agency"); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 758 (10th Cir. 2024) (*Axon* concerned "constitutionality of those agencies' structure"). In *Axon*, the respondent in an administrative proceeding before the Commission brought a freestanding action against the agency, asserting facial constitutional challenges to the

Commission's core administrative process. *Axon*, 598 U.S. at 183. Axon claimed that the Commission's "ALJs could not constitutionally exercise governmental authority because of their dual-layer protection from removal," and that "the combination of prosecutorial and adjudicative functions in the Commission renders all of its enforcement actions unconstitutional." *Id*.

The Supreme Court held that these claims—"fundamental, even existential" challenges to the very structure of administrative agencies—were not precluded by the review scheme in the FTC Act. *Axon*, 598 U.S. at 180. The Court was careful to note, however, the "extraordinary" nature of Axon's "far-reaching constitutional claims," *id*. at 180, 185, challenging a "fundamental aspect of the Commission's structure," *id*. at 182, and going "to the core of the [Commission's] existence," *id*. at 189. The Court emphasized that Axon's challenges "[were] not to any specific substantive decision—say, to fining a company (*Thunder Basin*) or firing an employee (*Elgin*). Nor [were] they to the commonplace procedures agencies use to make such a decision." *Id*. Rather, the plaintiff in *Axon* claimed "that an agency is wielding authority unconstitutionally in all or a broad swath of its work." *Id*. Such claims could be adjudicated in district court collaterally to an ongoing agency proceeding. But the Court cautioned: "Nothing we say today portends newfound enthusiasm for interlocutory review." *Id*. at 192.

Media Matters' claims here bear no resemblance to those raised in *Axon*. Media Matters has brought a routine as-applied challenge to a Commission investigation and CID. Nothing in Media Matters' complaint attacks the structure of the Commission as an administrative agency or jeopardizes its very existence. *Axon* therefore does not apply. *See Loma Linda-Inland Consortium*, 2023 WL 7294839 at *11 ("[n]othing in *Axon* holds that every 'nonfrivolous' constitutional objection to every agency proceeding …, especially fact-bound as-applied claims to a particular exercise of agency jurisdiction, can bypass the congressional scheme established for judicial review").

## B.    Media Matters' Complaint Fails to Identify a Cognizable Cause of Action

Even if this Court had subject-matter jurisdiction, no injunction should be granted because the claims here fail as a matter of law and Media Matters is thus unlikely to prevail on the merits. "Whether [Media Matters' claims] are claims 'upon which relief can be granted' depends in part on whether there is a cause of action that permits [Media Matters] to invoke the power of the court to redress the violations of law that [Media Matters] claims the FTC has committed." *Trudeau v. FTC*, 456 F.3d 178, 188 (D.C. Cir. 2006) (citing *Davis v. Passman,* 442 U.S. 228, 239-240 & n.18 (1979)). Media Matters does not invoke a cognizable cause of action for its claims.

An alleged violation of law, standing alone, is not enough for judicial review. Media Matters can secure relief in federal court only if a source of law grants it a "cause of action." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Media Matters invokes the general federal-question jurisdictional statute, 28 U.S.C. § 1331, and asserts that its claims "arise under the First and Fourth Amendments of the U.S. Constitution." ECF_1 ¶ 18. But when the United States or one of its agencies is the subject of a lawsuit concerning an allegedly adverse administrative action, "[t]he jurisdiction of the federal courts to review administrative action is codified in the Administrative Procedure Act." *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 372 (7th Cir. 1983). Here, Media Matters is challenging administrative agency actions (the initiation of an investigation and issuance of a CID), which therefore implicates the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 704. None of these sources of law, however, provides Media Matters with a viable cause of action.

### 1.    Media Matters Has No Statutory Cause of Action.

The APA does not supply Media Matters with the requisite cause of action in this case. Notably, Media Matters does not even claim otherwise.

Generally, the APA provides "a generic cause of action in favor of persons aggrieved by agency action." *Trudeau*, 456 F.3d at 188 (quoting *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985)). Indeed, the APA provides the "exclusive" means for judicial review of agency conduct; Media Matters "may not bypass the specific method that Congress has provided for reviewing adverse agency action simply by suing the agency in federal district court under [28 U.S.C. §] 1331." *Gen. Fin.*, 700 F.2d at 368 (citing 5 U.S.C. §§ 703, 704).

The APA's judicial-review provisions, 5 U.S.C. §§ 701-706, "create a right of review," *Schieber v. United States*, 77 F.4th 806, 813 (D.C. Cir. 2023), but the review is limited to either (1) "[a]gency action made reviewable by statute," or (2) "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1208 (D.C. Cir. 2021). Here, Media Matters challenges the FTC's issuance of a CID, which is not an action "made reviewable by statute." 5 U.S.C. § 704. Indeed, as explained above, the statute bars review of that preliminary step, and requires challenges to await an action by the FTC to enforce the CID. The only statute that substantively pertains to the claims here is the FTC Act, and "[n]o district court action for a declaratory judgment is authorized by the Federal Trade Commission Act." *Floersheim v. Engman*, 494 F.2d 949, 954 (D.C. Cir. 1973).[6]

Thus, Media Matters' claims would be reviewable under the APA only if Media Matters (a) challenged a "final" Commission action; and (b) had "no other adequate remedy in a court." 5 U.S.C. § 704. Media Matters satisfies neither requisite. To begin, "two conditions must be

---

[6] Nor does the Declaratory Judgment Act (DJA) provide a cause of action. The DJA permits a federal court to "declare the rights and other legal relations of" the parties only "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). The DJA does not itself "provide a cause of action," because the "availability of declaratory relief presupposes the existence of a judicially remediable right." *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (internal quotation marks and citations omitted).

satisfied" for an agency action to be "final" for APA purposes: "First, the action must mark the consummation of the agency's decisionmaking process," in the sense that "it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted); *accord Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018).

The only Commission action that Media Matters challenges is the agency's investigation into potentially anticompetitive advertising boycotts and the FTC's issuance of the CID to Media Matters in aid of that investigation. But those preliminary steps do not satisfy *Bennett*'s finality conditions. An ongoing investigation is not "the consummation of the agency's decisionmaking process," *Bennett*, 520 U.S. at 178; it is scarcely the beginning of that process. The Commission has not yet decided whether to proceed against anyone for any violations that might be uncovered by the investigation, and indeed many Commission investigations do not result in an enforcement case.

Further, as the Supreme Court has long held, even if the Commission initiates proceedings to redress violations of the FTC Act—whether in court under Section 13(b), 15 U.S.C. § 53(b), or administratively under Section 5, *id.* § 45—even the filing or issuance of a complaint is not a "final" agency decision for purposes of APA review. *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980). The Court has cautioned that judicial review "before adjudication concludes" is likely to interfere with "the proper functioning of the agency," and thus "should not be a means of turning prosecutor into defendant." *Id.* at 242-43. A complaint merely initiates the process of fixing the rights and obligations of the parties, and only the final judgment of that adjudicatory process would mark the point when plaintiffs' rights or obligations can be said to "have been determined." *Bennett*, 520 U.S. at 178. Until then, no "legal consequences will flow." *Id.*

If the agency's filing or issuance of a formal complaint is not a final, reviewable action, then *a fortiori* the mere investigation to determine whether to file or issue a complaint cannot possibly be final. *See, e.g.*, *Gen. Fin.*, 700 F.2d at 368 (Commission's issuance of investigatory subpoenas deemed not final agency action, notwithstanding agency's denial of petitions to quash the subpoenas); *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 875 (8th Cir. 1977) (same).

Absent final agency action, "there is no doubt that [Media Matters] would lack a cause of action under the APA." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003); *accord Trudeau*, 456 F.3d at 188 (Section 704 of the APA "'limits causes of action under the APA' to 'final agency action'") (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 799 (D.C. Cir. 2006)).

Media Matters also cannot show that it has "no other adequate remedy in a court." 5 U.S.C. § 704. The existence of an adequate remedy is "an element of the cause of action created by the APA." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017). Media Matters plainly would have an adequate remedy if and when the Commission petitions for enforcement of the CID; until then, Media Matters has no legal obligation to comply with the CID. Should the FTC bring an action to enforce the CID, Media Matters will be able to raise in that case all the claims and arguments it advances here. Media Matters' ready opportunity for a court hearing in the CID enforcement proceeding fully "satisfies the requirements of due process." *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 598 (1950). And it defeats any effort to rely on the APA for a cause of action—an effort that, again, Media Matters has not even undertaken in its motion.

### 2. Media Matters Has No Cause of Action Under Either the First or Fourth Amendments.

Media Matters also cannot rely on the First or Fourth Amendments for a viable cause of action in this case. "When a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute,

separation-of-powers principles are or should be central to the analysis." *Zigler v. Abbasi*, 582 U.S. 120, 135 (2017); *accord Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 973 F.3d 121, 123 (D.C. Cir. 2020). The key question in whether to infer such a cause of action is, as the Supreme Court put it, "'who should decide,' … Congress or the courts?" *Zigler*, 582 U.S. at 135 (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). "The answer most often will be Congress." *Zigler*, 582 U.S. at 135. "Private rights of action to enforce federal law must be created by Congress." *Sledge v. District of Columbia*, 869 F. Supp. 2d 140, 143 (D.D.C. 2012) (Bates, J.) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)).

Significantly, where Congress has supplied a specific, adequate means for challenging and remedying agency action, no other cause of action (including a constitutional one) should be judicially implied for challenging and remedying that same action. In *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927), for instance, the Supreme Court dismissed plaintiffs' challenge to Commission subpoenas for lack of jurisdiction. The Court held that Congress, in providing in the FTC Act a "method of enforcing" those subpoenas, intended to impose certain prerequisites to any judicial review of Commission subpoenas, which the district court effectively "dispensed with" when entertaining plaintiffs' lawsuit. *Id.*; *see also Reisman v. Caplin*, 375 U.S. 440, 446 (1964) (no cause of action to challenge IRS administrative summons where IRS statute provided for enforcement solely through court action that would "afford[] a judicial determination of the challenges to the summons.").

The D.C. Circuit too has rejected an implied cause of action where it "would conflict with" "Congress's carefully drafted" "statutory limitations on civil suits." *McGahn*, 973 F.3d at 123. The other courts of appeals passing on the question agree. *See Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334-35 (10th Cir. 1984); *Wearly v. FTC*, 616 F.2d 662, 665 (3d Cir. 1980);

*Am. Motors Corp. v. FTC*, 601 F.2d 1329, 1332, 1335-37 (6th Cir. 1979); *Blue Ribbon Quality Meats*, 560 F.2d at 876; *Howfield, Inc. v. United States*, 409 F.2d 694, 697 (9th Cir. 1969).

As discussed above, Congress has, by enacting the APA, provided for a cause of action to challenge the conduct of administrative agencies. And Congress intended the APA to be the "exclusive" means of reviewing such challenges. *Gen. Fin.*, 700 F.2d at 368. The reasons for such "exclusivity" are obvious: If invoking the Constitution directly as the source of their cause of action were enough for plaintiffs to circumvent APA requirements like the finality of agency action and absence of an adequate remedy, those congressionally mandated limits on judicial review would be a dead letter. Moreover, the decision by a court to provide for an *unbounded* cause of action would be contrary to Congress's expressed intent in the APA. *See McGahn*, 973 F.3d at 123.

Here, Media Matters can bring the exact same claims (that the Commission's actions contravene Media Matters' constitutional rights), seeking the same remedies, as defenses to an action in district court to enforce the CID. But Media Matters' complaint fails to satisfy the APA's review conditions, so Congress's evident intent is to *not* provide a cause of action for Media Matters' claims. And the FTC has not brought an action to enforce the CID, so Media Matters' objections are premature. Because Congress has supplied "[t]he answer" to whether a cause of action should be implied, *Zigler*, 582 U.S. at 135, Media Matters' First and Fourth Amendments causes of action also fail.

**C.    Media Matters Is Not Likely to Prevail on Its First Amendment Retaliation Claim.**

Media Matters asserts that it received the CID because "powerful government actors disapprove of its journalism." ECF_22-1 at 1. To prevail on this retaliation claim, Media Matters must show (1) that it "engaged in conduct protected under the First Amendment," (2) that the FTC "took some retaliatory action sufficient to deter a person of ordinary firmness in [Media Matters'] position from speaking again," and (3) that there is "a causal link between the exercise of a

constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up); *see Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (explaining that there must be "a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury") (cleaned up).

As to the first of those prongs, the FTC does not dispute that Media Matters engages in some protected First Amendment conduct. But as shown below, Media Matters fails at each of the other two prongs: it cannot show the necessary causal link between its protected speech and the CID, and it cannot show that the CID caused a sufficient chilling effect.

### 1. Media Matters Cannot Demonstrate the Requisite Causal Connection Between Its Speech and the CID.

To address the causal link prong of the retaliation analysis Media Matters must demonstrate at a minimum that the CID "would not have been [issued] absent the retaliatory motive." *Nieves*, 587 U.S. at 399.[7] It does not come close to doing so.

### a. The Media Matters CID Is Part of a Broader Investigation into an Area of Significant Interest for the Commission.

Far from being singled out for its speech, Media Matters is just one of nearly two dozen CID recipients in a broad investigation of advertiser boycotts. In fact, Media Matters' own allegations show that the CID is part of a legitimate and bona fide inquiry into this important topic.

---

[7] Media Matters should be required to make a more demanding showing: that there was no objectively reasonable basis for the CID. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *Nieves*, 587 U.S. at 1723-24. The logic applies here too. Judge Mehta considered the issue at length in *Bailey* and ultimately decided against imposing an objective basis standard, at least in part for case-specific reasons. *Media Matters for Am. v. Bailey*, No. 24-cv-147 (APM), 2024 WL 3924573, at *12-13 (D.D.C. Aug. 23, 2024). This Court need not confront the issue because, as shown below, Media Matters cannot satisfy even a "but-for" standard.

As Media Matters recounts, Chairman Ferguson has a longstanding record of being concerned with issues of content moderation and advertiser boycotts. ECF_22-1 at 11.[8] In fact, this has been an area of interest for the entire Commission. As Media Matters again notes, ECF_22-1 at 12, in February of this year the Commission launched a public inquiry into tech censorship. *See* FTC, *Federal Trade Commission Launches Inquiry on Tech Censorship* (Feb. 20, 2025); FTC, *Request for Public Comment Regarding Technology Platform Censorship*. One of the questions on which the FTC sought comment from the public is whether the tech platforms' adverse actions were "made possible by a lack of competition." *Id.* at 3. The Commission asked, in particular, whether platforms have "funded or collaborated with organizations, for-profit or non-profit, that advocated for or enabled censorship" and whether "such activities, *such as advertising boycotts*, [were] designed to facilitate collusion on censorship." *Id.*

Another example of the Commission's interest in this area is its recent action to resolve antitrust concerns related to the acquisition of one large advertising agency (IPG) by another (Omnicom). *See* Decision and Analysis of Agreement Containing Consent Orders to Aid Public Comment, *In the Matter of Omnicom Group, Inc. And Interpublic Group of Companies, Inc.*, FTC File No. 251-0049 (June 23, 2025). The Commission has alleged "that advertising agencies have coordinated—including through industry associations—on decisions not to advertise on certain websites and applications." FTC Press Release, *FTC Prevents Anticompetitive Coordination in Global Advertising Merger* (June 23, 2025); *see* Complaint, *In re Omnicom, supra*, ¶ 17. Such coordination may "reduce ad revenues for particular media publishers, forcing those publishers to

---

[8] Media Matters casts vague aspersions on the idea of investigating advertiser boycotts by putting the phrase "advertiser boycotts" in quotes and referring pejoratively to "*so-called* 'advertiser boycotts.'" *Id.* (emphasis added). But substantively, the most Media Matters can bring itself to say is that it is "unsettled" whether an advertiser boycott would violate the antitrust laws. ECF_22-1 at 26. And the FTC is entitled to investigate conduct that might or might not violate the law.

reduce the quality and quantity of products they can feasibly offer to their own downstream consumers." *Id*. ¶ 15. Accordingly, the Commission agreed to resolve its complaint against Omnicom only based on a proposed consent order that imposes restrictions that prevent Omnicom from engaging in collusion or coordination to direct advertising away from media publishers based on the publishers' political or ideological viewpoints. *See* Decision, *In re Omnicom, supra*, at 3. As the Director of the FTC's Bureau of Competition explained: "Coordination among advertising agencies to suppress advertising spending on publications with disfavored political or ideological viewpoints threatens to distort not only competition between ad agencies, but also public discussion and debate. The FTC's action today prevents unlawful coordination that targets specific or political viewpoints while preserving individual advertisers' ability to choose where their ads are placed." *FTC Prevents Anticompetitive Coordination in Global Advertising Merger, supra*, at 1.

The FTC is not alone in having these concerns. Only two weeks ago, the Department of Justice "urge[d] the Court to reject [the] suggestion that the antitrust laws play no part in protecting viewpoint competition in news markets." Statement of Interest of the United States, *Children's Health Def. v. WP Co.*, No. 1:23-cv-2735-TJK (D.D.C. July 11, 2025), at 2. That case involves an alleged group boycott in which major news organizations are accused of coordinating to exclude rival publishers from access to major digital platforms, based on those rivals' reporting on controversial issues like COVID-19 and current political events. *Id*. Relying on longstanding Supreme Court precedent, the Government noted that "the antitrust laws apply equally to news organizations as to any other type of commerce." *Id.* at 5-6 (citing *Associated Press v. United States*, 326 U.S. 1, 6-7 (1945)). Thus, "it is critical that the Sherman Act's prohibitions apply fully when restraints of trade limit non-price features such as the type or quality of information that may compete in the marketplace for ideas." *Id*. at 5. The antitrust agencies also emphasized recently in

a joint statement of interest that restraints of trade remain illegal under the antitrust laws even if combined with non-economic objectives. FTC & DOJ Statement of Interest, *Texas v. BlackRock, Inc.*, 6:24-cv-437-JDK (E.D. Tex. May 22, 2025), at 3. As the agencies noted, "[s]ocial justifications proffered for a restraint of trade do not make it any less unlawful." *Id.* (quoting *FTC v. Superior Ct. Law. Ass'n*, 493 U.S. 411, 424 (1990)) (cleaned up).

The CID issued to Media Matters is part of a broader investigation into similar group boycotts in the advertising industry. In particular, it is one of *seventeen* still outstanding CIDs issued pursuant to the agency's investigation into whether various entities have conspired to "withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act … and Section 5 of the FTC Act," under the guise of promoting "brand suitability" and "brand safety" against "misinformation." ECF_22-4 at 5, 6. In particular, the Commission "is investigating whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not 'brand suitable' or not 'brand safe,' to coordinate the placement of ads." PTQ Order at 2. Accordingly, the Commission has issued CIDs both to advertising agencies and to other entities that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement. *Id.* The entities receiving CIDs include several advertising trade associations, several brand safety/suitability rating organizations, and several policy/advocacy groups—such as Media Matters.

In other words, not only did numerous other entities receive CIDs as part of this investigation, but several entities *in the same category as Media Matters* received CIDs. This refutes Media Matters' contention that animus can be inferred from the FTC's purported failure to investigate other similarly situated entities. ECF_22-1 at 27-28. It also makes for a striking contrast

with *Bailey*, where Judge Mehta observed that the defendant "conceded that it is rare, if not unprecedented, for a Missouri Attorney General to investigate a media organization for the content of its journalism," and found that many other news outlets published similar stories to the one published by Media Matters without receiving a CID from the Missouri AG. *Bailey*, 2024 WL 3924573, at *13-14.

The purpose of the investigation was reflected in the Omnibus Resolution accompanying the CID, which explained that it authorized the issuance of CIDs pertaining to "collusion or coordination." ECF_22-3 at 20. It was further reflected in the July 7 modification to the CID, which specified that the investigation pertained to "unfair, anticompetitive, collusive or exclusionary acts or practices—including inviting, participating in, or facilitating boycotts or other collusion or coordination—to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers." ECF_22-4 at 2.[9]

The CID's specifications are also consistent with the investigation's purpose. For example, Media Matters insists (ECF_22-1 at 24) that the purported connection to its reporting is particularly evident in Specification 5. But that specification seeks documents produced by Media Matters in "any litigation between Media Matters and X Corp. *related to advertiser boycotts* since 2023." ECF_22-3 at 3 (emphasis added). This is a natural and obvious request in an investigation *regarding advertiser boycotts*, particularly given that—as Media Matters recognizes (ECF_22-1 at

---

[9] Media Matters offers a panoply of cursory and unexplained objections to the modification letter—including that it was somehow "belated," that it "still falls short" in some unspecified way, and that it somehow constitutes "additional evidence of the pretextual nature" of the investigation. ECF_22-1 at 14 n.21. In reality, the modification letter reflects only FTC's eagerness to ensure that CID recipients are given ample notice of the nature of the investigation, as well as its commitment to go above and beyond in complying with all applicable requirements.

11)—Chairman Ferguson had previously expressed the concern that X might have been a victim of an unlawful advertiser boycott. Concurring Statement of Commissioner Andrew N. Ferguson, *FTC v. 1661, Inc. d/b/a GOAT*, FTC No. 2223016 (Dec. 2, 2024). The Judiciary Committee of the House of Representatives reached a similar conclusion after a lengthy investigation. *See* Interim Staff Report of the Committee on the Judiciary, U.S. House of Representatives, *GARM's Harm: How the World's Biggest Brands Seek to Control Speech* (July 10, 2024) at 2 (noting that the Global Alliance for Responsible Media, or GARM, "has undertaken various actions to eliminate the monetization, and in effect existence, of certain voices online," that GARM's actions may have violated Section 1 of the Sherman Act, which prohibits certain group boycotts, and that GARM's potentially unlawful actions included targeting Twitter and Elon Musk); *id.* at 12-17 (discussing evidence that "GARM members colluded to cut Twitter's revenue after Elon Musk's acquisition").

Similarly, other specifications ask about harmful content, brand safety tools, advertising rating systems, and other pertinent issues. ECF_22-3 at 4. Try as it might, Media Matters cannot and does not identify a single specification that does not flow naturally from the investigation's stated purpose. Nor can it demonstrate that any of the specifications are connected in any way to a specific Media Matters article (by contrast, both the Texas and the Missouri CID's expressly referenced a single article). *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 10-11 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025); *Bailey*, 2024 WL 3924573, at *3.

In short, Media Matters' narrative regarding the CID is profoundly mistaken. Far from being driven by animus toward Media Matters' speech, the CID is a small part of a broader investigation into an area of significant interest for the Commission.

### b. No Indicia of Retaliation Are Present.

While Media Matters tries to lump the FTC investigation in with the State AG investigations, the decisions in those cases actually offer no support for its position. Judge Mehta's

*Bailey* decision offers the most detailed discussion of the purported evidence of retaliation in those cases.[10] And regardless of whether Judge Mehta accurately evaluated the evidence as to the Missouri AG, applying his framework here makes it apparent that Media Matters' evidence is not just inadequate, but nonexistent.

*Timing.* Judge Mehta reasoned that the investigation in *Bailey* was retaliatory in large part because of the timing of the Missouri AG's investigation. A quick summary of the timeline pertaining to the State AG investigations might be helpful here: A Media Matters article regarding X appeared on November 16, 2023; Elon Musk criticized the article and threatened to sue Media Matters two days later; the day after that, the Missouri AG announced that his team was looking into the matter; the day after that, X sued Media Matters, and the Texas AG announced an investigation into Media Matters; and the day after that, the Texas AG issued a CID to Media Matters (with the similar Missouri CID following a few months later, in March of 2024). *See* ECF_1 ¶¶ 37-45. According to Judge Mehta, this timing suggested that Missouri's investigation "began with a political bent." *Bailey*, 2024 WL 3924573, at *14.

The situation here is radically different. As noted, the purported precipitating events took place in November 2023. The FTC CID was issued in May 2025—approximately *one and a half years* later. This by itself should be fatal to Media Matters' claim. After all, "[a] lengthy time lapse … negates any inference" of a causal connection between the protected activity and the alleged

---

[10] The decisions in the *Paxton* matter are less helpful because the defendant did not dispute retaliatory motive, so this Court and the D.C. Circuit had no need to address the issue. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 572 (D.C. Cir. 2025) ("Paxton did not dispute that the investigation and CID were retaliatory."). That said, to the extent those decisions address the retaliation question, they do so in terms that are broadly similar to those in *Bailey*. *See id.* at 580 (noting that district court considered evidence including "(1) the … press release establishing that Paxton opened the investigation in response to Media Matters' reporting; (2) his description of Media Matters as a 'radical anti-free speech' and 'radical left-wing organization'; and (3) his encouragement of other state attorneys general to investigate Media Matters").

adverse action. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) (internal quotation marks and citation omitted). Indeed, even "a nine month lapse," which is much shorter than the lapse in this case, "created a very close question as to causal connection" at the motion to dismiss stage. *Id.* at 501 (cleaned up). The significantly longer lapse in this case should decisively defeat any inference of a causal connection. At any rate, it certainly does not cut in *favor* of Media Matters' position.

Media Matters tries to paper over this temporal gap by suggesting (ECF_22-1 at 22) that the FTC's CID is the culmination of the harassment campaign purportedly waged by the Texas and Missouri AGs. But the case it cites for support involved a series of actions *by the same entity*, not independent action taken by a different sovereign. *See Lewis v. Gov't of the D.C.*, 161 F. Supp. 3d 15, 29 (D.D.C. 2015). Media Matters cites no cases in which a one-and-a-half-year gap between the purported provocation and the purported retaliation has been tolerated simply because other independent entities purportedly engaged in retaliatory actions in the interim. Nor does Media Matters point to any evidence of coordination between the FTC and the State AGs—indeed, it does not even allege that there was any *communication* between the FTC and the State AGs regarding Media Matters. (By contrast, the Missouri AG "admitted to coordinating with [the Texas AG] from the outset." *Bailey*, 2024 WL 3924573, at *12.)

In any event, even if the State AG investigations are taken into account, the timing does not support Media Matters' theory. Again, the state CIDs were both issued by March of 2024, well over a year before the FTC issued its CID. Nor can there be any argument that the FTC CID was somehow pegged to the resolution of the State AG litigation, as the D.C. Circuit decision on the Texas CID was issued *after* the FTC CID. Sometimes the obvious explanation is the correct one: the FTC CID was issued pursuant to the FTC's independent investigation and is not connected to Musk's threats against Media Matters *or* to the State AGs' investigations of Media Matters.

**Statements by Defendant.** Judge Mehta also relied heavily on the Missouri AG's criticism of Media Matters. According to Judge Mehta, the "Defendant consistently characterized Media Matters in ideological terms," including by "refer[ring] [to them] as 'radicals' and ... progressive tyrants masquerading as a news outlet.'" *Bailey*, 2024 WL 3924573, at *14. In a similar vein, the D.C. Circuit pointed to the Texas AG's description of Media Matters as a "radical," "anti-free speech," "left-wing" group. *Paxton*, 138 F.4th at 580.

Once again, the contrast could not be starker. Remarkably, Media Matters points to no example of Chairman Ferguson even *referring to*—let alone criticizing—Media Matters.[11] As noted above, they point instead to Chairman Ferguson's record of *concern about advertiser boycotts*, which only confirms the legitimacy and seriousness of the underlying investigation.[12]

It is also notable that Media Matters' brief does not even mention any Commissioners other than Chairman Ferguson. But while Chairman Ferguson signed the CID, he could only do so "pursuant to a Commission resolution." 15 U.S.C. § 57b-1(i). And ex post, the entire Commission has in effect ratified the CID by denying Media Matters' petition to quash (on a 2-0 vote, with Commissioner Meador recused). PTQ Order at 13. At a minimum, the key role played by other Commissioners further complicates Media Matters' allegations of retaliation. *See Nieves*, 587 U.S. at 500.

---

[11] Media Matters incorrectly asserts (ECF_22-1 at 23) that Chairman Ferguson has "pointed to X's lawsuit against Media Matters as evidence that so-called advertiser boycotts should be investigated by the FTC." In reality, Chairman Ferguson was pointing to a lawsuit by X against other entities. Andrew N. Ferguson, *Concurring Statement of Commissioner Andrew N. Ferguson, FTC v. 1661, Inc. d/b/a GOAT Matter Number 2223016*, FTC (Dec. 2, 2024), https://perma.cc/DV55-N5WY.

[12] Media Matters also points (ECF_22-1 at 12) to a single comment which purportedly suggests that Chairman Ferguson views the problem of advertiser boycotts at least in part in ideological terms. This is a red herring, as the statement in question was quite general and therefore does not meaningfully support the showing that Media Matters must make: namely that the CID was driven by animus toward Media Matters' speech in particular.

Once again, Media Matters' efforts to plug this gap fall short. It focuses primarily on statements made by certain FTC staffers prior to joining the FTC. ECF_22-1 at 12-13. But none is a decisionmaker for issuing a CID, so their statements are irrelevant. Indeed, Media Matters does not even allege that any of those staffers were actually involved in the decision to issue the CID, nor does it cite any authority suggesting that the purported animus of a subordinate should be attributed to the decisionmaker for purposes of a retaliation claim. Media Matters goes so far as to extensively quote (ECF_22-1 at 6-7) a "well known friend" of Andrew Ferguson who has *never* worked at the FTC. This argument moves beyond unpersuasive to absurd. To demonstrate retaliation, Media Matters must show that a decisionmaker—in this case, Chairman Ferguson—acted on the basis of animus. Media Matters' paltry evidence is not adequate to the task. *See Bailey*, 2024 WL 3924573, at *15 (concluding that a "reasonable factfinder is likely to interpret *Defendants' words* as targeting Media Matters … for its protected First Amendment activities" (emphasis added)). The public statements of people he happens to know reveal nothing about the decisionmaker's rationale for a course of action. A contrary holding would make it unlawful for a law-enforcement official to investigate any entity whose speech has been condemned by a person with whom the law-enforcement official is acquainted.

**Pretext.** Judge Mehta also concluded that "a neutral factfinder likely would find that Defendant Bailey's proffered nonretaliatory explanation for the investigation of Media Matters is pretext." *Id.* at *15-17. At bottom, Judge Mehta was not persuaded by the Missouri AG's assertion that his investigation pertained to fraudulent solicitation of donations from Missourians by Media Matters. *Id.* And he found that a declarant both "overs[old]" and "selective[ly] quot[ed]" the relevant evidence, "undermin[ing] the credibility of his representations" and further supporting a pretext finding. *Id.* at *17.

Nothing remotely similar is at play here. As explained above, the Commission is conducting a broad investigation into advertiser boycotts, and Media Matters is one of seventeen organizations to receive a CID pursuant to that investigation. Nothing about this set of facts indicates pretext.

Again, Media Matters' contentions to the contrary are unpersuasive. Its primary argument is that (1) as a nonprofit, it is outside of FTC's enforcement jurisdiction and (2) in any event, FTC has not provided evidence that "Media Matters has violated any antitrust law." ECF_22-1 at 25-26. None of this moves the needle.

As to the first point, about nonprofits, the Commission explained in its ruling on the petition to quash that Media Matters is conflating the Commission's *enforcement authority* with its much broader *investigatory authority*. The latter extends to any "person," 15 U.S.C. § 57b-1(c)(1), and the statutory definition of "person" encompasses nonprofit organizations. *See id.* § 57b-1(a)(6) (defining "person" as "any natural person, partnership, corporation, association, or *other legal entity*, including any person acting under color or authority of State law") (emphasis added). Thus, the Commission was entirely within its rights to issue a CID to Media Matters even if it does not possess ultimate enforcement authority over it.

As to the second point, regarding whether there is evidence that Media Matters has violated the antitrust law, Media Matters once again fails to appreciate the proper scope of the Commission's investigatory authority. The Commission absolutely is *not* limited to issuing CIDs to entities it believes to have violated the antitrust laws. Instead, the question is whether the "Commission has reason to believe that [the recipient] may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce … or to antitrust violations." 15 U.S.C. § 57b-

1(c)(1). Media Matters has not and cannot demonstrate that it is not a proper CID recipient under that generous test. As a result, its pretext argument founders as well.

*Unorthodox conduct.* Finally, Judge Mehta emphasized what he viewed as the Missouri AG's "unorthodox approach to enforcing the CID," which included filing an enforcement action before Media Matters even received the CID (an approach that, according to Judge Mehta, was not permitted by Missouri law), as well as strategically amending the petition in the enforcement suit in what Judge Mehta took to be an attempt to force the federal courts to abstain. *Bailey*, 2024 WL 3924573, at *17-18. All of this served as "more proof that retaliation for protected expression was likely [defendant's] true motive for investigating Media Matters." *Id.* at *18.

Media Matters does not allege anything similar here. The Commission fully abided by its regular procedures in issuing the CID, and this distinction further highlights the enormous factual gap between this case and *Bailey*.

*       *       *

In sum, the CID was issued to Media Matters as part of a broader investigation into the legitimate and important subject of advertiser boycotts, and Media Matters has identified no meaningful evidence that its issuance was retaliatory.

### 2. Media Matters Also Has Not Demonstrated That the CID Had a Sufficient Chilling Effect.

Media Matters must also demonstrate that the CID is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258. Media Matters fails to make this showing for several reasons.

To begin, there is significant question whether a retaliatory *investigation* claim is even cognizable. The Supreme Court has expressly left the question open, *Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006), and the D.C. Circuit did not have to address it in *Paxton* because the defendant waived the issue by not raising it in the trial court, 138 F.4th at 584-85. Meanwhile, several other

Courts of Appeals have suggested that such claims should *not* be recognized. *Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010) ("We are also inclined to agree with the government that … retaliatory animus does not create a distinct constitutional tort."), *aff'd*, 566 U.S. 356 (2012); *Breaux v. City of Garland*, 205 F.3d 150, 157-61 (5th Cir. 2000); *Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam) ("Such allegations do not establish a constitutional violation."); *see also J.T.H. v. Missouri Dep't of Soc. Servs. Children's Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("After all, we have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country, which have either rejected the possibility outright or concluded, like we do today, that the law is still in flux."); *Sivella v. Twp. of Lyndhurst*, No. 20-2342, 2021 WL 3356934 (3d Cir. Aug. 3, 2011). Accordingly, this Court should reject this claim on this ground alone. At any rate, these cases—by raising the question whether an investigation can even in principle constitute a constitutional wrong—certainly suggest that it is unlikely that any particular investigation is a sufficiently grave threat to chill a person of reasonable firmness.

Furthermore, as discussed in the irreparable harm section below, it is far from clear whether Media Matters has actually pointed to any harm that it has incurred *as a result of the CID* (as opposed to other investigations and litigation, its own decision to publicize the CID, or the FTC's underlying investigation which Media Matters is not seeking to preliminarily enjoin). Media Matters' own argument is that the FTC lacks statutory authority to enforce violations of the FTC Act against Media Matters. ECF_22-1 at 25-26. By that logic, Media Matters cannot assert that it faces a risk of enforcement *based on its protected activity.* That distinguishes this case from the decisions Media Matters cites in support of its assertion that an investigation can sufficiently chill protected speech, as well as from the State AG cases. *See Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013); *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000); *Paxton*, 732 F. Supp. 3d at 28

(noting that the Texas AG could seek "civil penalties of up to $10,000 per violation of the underlying Texas statute"); *Bailey*, 2024 WL 3924573, at *11 (noting that the Court had already resolved the issue in *Paxton*).

Finally, Media Matters points to its own reaction to the CID. Even setting aside the question (noted above) of whether the reaction was actually driven *by the CID*, this is not sufficient. Courts have adopted an objective test precisely to ensure that the outcome in any given case will not be driven by the vagaries of how firm-minded a particular plaintiff is. *Constantine*, 411 F.3d at 500 (explaining that "a subjective standard would expose public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight"). Accordingly, while evidence of Media Matters' own response has some relevance, it should not be accorded dispositive weight. *See id.* (explaining that "the plaintiff's actual response ... is not dispositive"). Media Matters therefore fails this prong of the retaliation test as well.

**D.    Media Matters Is Not Likely to Prevail on Its Claim That the CID Is Excessively Broad.**

Count II of Media Matters' Complaint asserts that the Commission's issuance of the CID violates Media Matters' First and Fourth Amendment rights by requiring it to turn over sensitive and privileged materials. ECF_1 ¶ 107. Media Matters devotes less than three pages to this argument in seeking an injunction, and cites no authority that would support an injunction on this theory.

In any event, the terms of the CID itself refute this claim. The Commission does not seek and has not demanded any information subject to a privilege. Media Matters points to no specific information that would be both responsive and privileged. And any disputes over privilege (and other objections) can be resolved in a proper forum. In the ordinary course of enforcement proceedings, Media Matters will have ample opportunity to assert a privilege over any responsive

material it believes is protected by the Constitution. This Court cannot and should not adjudicate those fact-specific claims in this pre-enforcement challenge to the CID.

1.      The Constitution does not prohibit a CID that covers a broad range of information. And there is no categorical First Amendment privilege against complying with an otherwise lawful investigative demand by a federal agency charged by Congress with enforcing the antitrust laws. That law-enforcement mission requires the FTC to collect relevant, responsive information from a wide range of sources to identify violations of federal statutes. Indeed, the Commission's authority to seek information in the course of its investigations is "analogous to the Grand Jury." *Morton Salt Co.*, 338 U.S. at 642-43.

Privilege claims must be applied on a fact-specific basis. And the proper forum to raise those concerns—as explained above—is an enforcement proceeding in district court. This Court cannot make privilege determination on an abstract basis. And there is no support in the Constitution or the governing case law for the argument that any privilege precludes the FTC from issuing a CID altogether. Media Matters has offered no basis for this Court to conclude that *all* potentially responsive information is categorically privileged. Indeed, Media Matters has not sought to demonstrate that a relevant privilege protects *any* particular information from disclosure.

2.      Media Matters has not pointed to any authority that would support a preemptive injunction to prohibit the ordinary process for litigating the CID. Indeed, the cases cited by Media Matters refute the argument. The Court in *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946) (*see* ECF_22-1 at 29), confirmed that the Constitution does not confer the kind of "absolute or universal immunity" that Media Matters seeks here. 327 U.S. at 208. And even where a search warrant is at issue (not an administrative CID, as here), the Framers "did not forbid warrants where the press was involved, did not require special showings that subpoenas would be impractical, and did not insist that the owner of the place to be searched, if connected with the

press, must be shown to be implicated in the offense being investigated." *Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978) (*see* ECF_22-1 at 29).

Media Matters gestures to a "qualified privilege" of journalists "against compelled disclosure of information obtained through their news gathering activities." ECF_22-1 at 29 (quoting *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 118 (D.D.C. 2002) (discussing qualified privilege in context of discovery in civil action)). But the motion and declarations make no effort to demonstrate that the privilege applies here. First, there is reason to doubt whether any such privilege even exists. The D.C. Circuit has rejected a reporter's claimed constitutional privilege in grand-jury proceedings. *See In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145–49 (D.C. Cir. 2006). And an FTC investigation is "analogous to the Grand Jury." *Morton Salt*, 338 U.S. at 642–43. Even if such a privilege were available, there is no basis at this stage in this case to assert it, and Media Matters makes no serious attempt to do so.

**3.**       In any event, the FTC has not sought to compel disclosure of privileged information, nor does the CID threaten constitutionally protected interests. Media Matters' failure to identify any language in the CID describing information that could be privileged is fatal to its argument. Nothing in the CID demands that Media Matters "reveal its sources, disclose its reporters' notes, and reveal information about anyone who visited [its] website." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (*see* ECF_220-1 at 30). Thus, the CID poses no "threat to the vitality of the newsgathering process." *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (quoted in ECF_22-1 at 29-30). Nor is there any concern that the FTC might "'rummage at large in newspaper files or [] intrude into or [] deter normal editorial and publication decisions' through their search." ECF_22-1 at 30 (quoting *Zurcher*, 436 U.S. at 566). Indeed, that argument fails at the outset because *there is no search*.

The Commission's CID remains at an initial stage, subject to ongoing discussions between Media Matters and FTC staff, and only subject to judicial compulsion if and when the FTC seeks to enforce its terms in court. At that point, if Media Matters can identify any responsive information subject to a privilege, there will be an opportunity to seek judicial review of such a claim before disclosure is compelled. Any such claim of privilege is premature at this stage. And Media Matters has failed to identify any constitutional infirmity in the CID that would support an injunction.

## II.    MEDIA MATTERS CANNOT SHOW THAT IT WILL SUFFER IRREPARABLE HARM IF THE ADMINISTRATIVE PROCESS CONTINUES.

Media Matters' motion also fails because it cannot show that it will suffer irreparable harm from the denial of an injunction. Media Matters claims "constitutional injury, economic loss, and associational and reputational harm" purportedly caused by the Commission's "CID and the associated investigation." ECF_22-1 at 31. But, aside from citations to general legal principles and references to other investigations, like those of the attorneys general of Texas and Missouri, Media Matters proffers no factual support at all for its claim that its purported irreparable harm is traceable to any Commission action. *See id*. at 31-34. On the contrary, the harms that Media Matters alleges are largely *self-inflicted*, brought about by Media Matters' decision to publicize the Commission's investigation and demand for information. *See id*. at 32 (claiming that key allies have pulled back on, or ceased, communications with Media Matters, "likely fearful their communications … may be turned over to government officials"); *id*. at 33 (citing Media Matters' employees' "fear that their internal communications or ideas for potential future articles would be subject to the ongoing CID").

The CID at issue is nonpublic, as is the underlying investigation. Media Matters, upon receipt of the CID, could have complied with it as originally drafted or engaged with the Commission's staff to modify it appropriately to address any concerns it may have—as it did with regard to one aspect of the CID (the stated subject of the investigation), which led to the

Commission's amending the CID, *see* ECF_22-4 (Anthony Decl., Exh. B). Media Matters could have taken either tack while keeping the investigation and CID nonpublic, thereby avoiding the alleged harms that Media Matters now claims.

Media Matters also could have done nothing. As discussed above, Commission CIDs are not self-executing, and Media Matters was under no legal obligation to comply—unless and until the Commission later sought and secured a court order enforcing the CID. This too would have kept the Commission's investigation and CID nonpublic, and thus avoided the purportedly irreparable harms that Media Matters now claims.

Instead, Media Matters chose to disclose to news outlets the existence of the investigation and the CID through statements by its president, Angelo Carusone. *See, e.g.*, Kate Conger, Kenneth P. Vogel and Theodore Schleifer, *Regulators Are Investigating Whether Media Matters Colluded With Advertisers* (The New York Times May 22, 2025) (quoting statement of Media Matters' president concerning the Commission's investigation and CID); Liam Reilly, *FTC probes Media Matters' exchanges with ad groups, stoking fears of retribution* (CNN May 22, 2025) (same). Thus, to the extent that Media Matters has suffered from the loss of cooperation with key allies or from purported privacy concerns by its employees in light of the Commission's investigation and CID, *see* ECF_22-1 at 32-33, those harms were the direct result of Media Matters' own conduct in disclosing the existence of the investigation and CID and cannot be deemed irreparable for purposes of a preliminary injunction.[13]

---

[13] The "costs of Media Matters' legal defense against the FTC's CID," ECF_22-1 at 33, do not constitute irreparable harm, both because any loss of money can be readily addressed at the conclusion of any proceedings against Media Matters (including via the application of the Equal Access to Justice Act, 28 U.S.C. § 2412), and because "the expense and annoyance of litigation is 'part of the social burden of living under government.'" *Standard Oil*, 449 U.S. at 244 (quoting *Petroleum Exploration, Inc. v. Pub. Serv. Comm'n*, 304 U.S. 209, 222 (1938)). Indeed, "even substantial and unrecoupable cost[] does not constitute irreparable injury." *Id*. (quoting *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974)).

Indeed, the very declarations appended to Media Matters' motion demonstrate the absence of irreparable harm reasonably traceable to any Commission action. For example, the declaration of Benjamin Dimiero, editor-in-chief of Media Matters, cites various Media Matters articles (all from 2023) as the principal reason for "a backlash from Elon Musk and affiliated government entities." ECF_22-6 at 3-5. The declaration lists various private legal actions and government investigations taken against Media Matters, in the U.S. and abroad, including the Commission's investigation. *Id*. at 5. But the causal connection between those news articles and the investigation here is, as discussed above, tenuous at best. The Commission's CID was issued nearly 18 months after the publication of those articles in 2023. And the FTC's CID—by Media Matters' own admission—was issued *before* Media Matters' litigation against the state attorneys general was resolved and thus, contrary to Media Matters' assertion (*id*. ¶ 19), hardly evidences "a recommitment … to punish Media Matters for its new coverage." *Id*.

Mr. Dimiero and others also aver various means of self-censorship and privacy concerns as related to the various legal actions and investigations facing Media Matters. *See* ECF_22-6 at 8-11; ECF_22-8 (Declaration of Cynthia Padera, COO of Media Matters) ¶¶ 16-19. But these statements of generalized harms do not evidence a sufficient causal connection to any particular Commission action. *Compare Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1175 (9th Cir. 2022) ("Twitter's claim that its ability to freely make content decisions 'is impeded' is vague and refers only to a general possibility of retaliation. It is not a claim about the chilling effect of the specific investigation at hand."), *with Bailey*, 2024 WL 3924573, at *14-15 (detailing the various actions and statements of the Missouri Attorney General specifically "targeting Media Matters not for legitimate law enforcement purposes but instead for its protected First Amendment activities").

Likewise, the declaration of Julie Millican, Vice President of Media Matters, documents various associational and reputational harms following government investigations, *see* ECF_22-7

¶ ¶ 13-15 (averring loss of cooperation and information-sharing with third parties), but those are *self-inflicted* harms, arising not from the Commission actions but from Media Matters' decision to make public the Commission's investigation and CID. Indeed, even to the extent they can be attributed to the Commission's investigation, those harms would not constitute irreparable harm that can be redressed by the preliminary injunction sought by Media Matters—which does not seek a halt to the investigation itself (but only to the enforcement of the CID). *See* ECF_22 at 1.

## III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION.

Finally, the balance of equities and the public interest—viewed together because this action involves the Government, *Singh*, 56 F.4th at 107—weigh decisively against an injunction.

The Commission is statutorily charged with preventing "unfair methods of competition" that may harm the public. *See* 15 U.S.C. § 45(a)(2). The investigation underlying the Media Matters CID concerns potentially anticompetitive advertising boycotts, *see supra* note 5, which may lead to harm to the public in the form of increased prices, diminished choice and quality, and impeded innovation. A preliminary injunction would therefore interfere with the Commission's enforcement efforts and result in the type of delay that Congress sought to avoid by authorizing the Commission to halt or *prevent* such anticompetitive conduct. *Id.*; *see Standard Oil*, 449 U.S. at 242 (Judicial review of the Commission's reasons for a non-final action "would delay resolution of the ultimate question whether the Act was violated."). *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (citation omitted). *See also Morris & Dickson Co. v. Whitaker*, 360 F. Supp. 3d 434, 450-51 (W.D. La. 2018) (enjoining administrative proceedings "would effectively derail the administrative process for the time required for judicial review of the constitutional claim," which would inhibit agencies' ability "to do what [Congress] created them to do—enforce Acts of Congress").

On the other hand, as discussed above, Media Matters will suffer no irreparable, non-self-inflicted harm that would outweigh the interests of the Commission and the public. Thus, the balance of equities and the public interest also weigh against a preliminary injunction.

## CONCLUSION

For the reasons set forth above, the motion for preliminary injunction should be denied.

Dated: July 28, 2025
        Washington, D.C.

|  | Respectfully submitted, |
|---|---|
| OF COUNSEL: | LUCAS CROSLOW (D.C. Bar #1048342)<br>*General Counsel* |
| DANIEL GUARNERA<br>*Director* | H. THOMAS BYRON III (D.C. Bar #442856)<br>*Deputy General Counsel* |
| KELSE MOEN<br>*Deputy Director* | ALEX POTAPOV (D.C. Bar #998355)<br>*Deputy General Counsel* |
| Geoffrey Green<br>*Assistant Director* | /s/  Imad Abyad |
| BUREAU OF COMPETITION | IMAD D. ABYAD (D.C. Bar #456392)<br>*Attorney* |
|  | FEDERAL TRADE COMMISSION<br>600 Pennsylvania Ave., N.W.<br>Washington, DC 20580<br>(202) 326-3579<br>iabyad@ftc.gov |
|  | *Attorneys for the Defendants* |