**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, | |
| *Plaintiff*, | |
| v. | Civil Case No. 25-1959 |
| FEDERAL TRADE COMMISSION, et al., | |
| *Defendants.* | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 3

I.    The FTC's Threshold Objections Lack Merit................................................ 3

      A.    The FTC Act Does Not Deprive This Court of Jurisdiction. ................. 4

            a.    The FTC Act Does Not Provide a Comprehensive Review Process
                  for Plaintiff's Claims.................................................................. 4

            b.    Media Matters' Claims Are Not of the Type Congress Intended To
                  Be Reviewed Within the FTC Act's Statutory Structure............ 5

      B.    Media Matters Can Invoke an Equitable Cause of Action for its First
            Amendment Claims. .......................................................................... 8

II.   Plaintiff Is Likely to Prevail on its Claim That the FTC Retaliated Against its
      Constitutionally Protected Activities in Violation of the First Amendment................... 11

      A.    Strong Circumstantial Evidence Establishes the Causal Link Between
            Media Matters' Protected Advocacy and the FTC CID........................ 11

      B.    The CID Chills Media Matters' Ongoing Speech................................. 17

III.  Plaintiff Is Also Likely to Prevail on its Claim the FTC's CID Violates the First
      and Fourth Amendments...................................................................... 19

IV.   Plaintiff Will Suffer Irreparable Harm Absent an Injunction Against the FTC's
      CID and the Ongoing Investigation of Media Matters. ...................................... 21

V.    The Balance of Equities and Public Interest Weigh in Favor of an Injunction. .............. 24

CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Americans for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)............................................................................................23

*Aref v. Lynch*,
   833 F.3d 242 .....................................................................................................17

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015)............................................................................................8

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023)...........................................................................4, 5, 6, 7, 8

*Bebo v. SEC*,
   799 F.3d 765 (7th Cir. 2015) ..............................................................................8

*Branzburg v. Hayes*,
   408 U.S. 665 (1972)..........................................................................................19

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ............................................................................9

*Clark v. Libr. of Cong.*,
   750 F.2d 89 (D.C. Cir. 1984).............................................................................17

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*,
   973 F.3d 121 (D.C. Cir. 2020)............................................................................9

*Cones v. Shalala*,
   199 F.3d 512 (D.C. Cir. 2000)..........................................................................14

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012)................................................................................................4

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010)............................................................................................8

*FTC. v. Claire Furnace Co.*,
   274 U.S. 160 (1927)..........................................................................................10

*FTC v. Standard Oil Co.*,
   449 U.S. 232 (1980)..........................................................................................10

*FTC v. Super. Ct. Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) .................................................................................................15

*Goodwin v. Dist. of Columbia*,
  579 F. Supp. 3d 159 (D.D.C. 2022) ...............................................................11, 14

*Hartman v. Moore*,
  547 U.S. 250 (2006) ...........................................................................................18, 19

*Hutira v. Islamic Republic of Iran*,
  211 F. Supp. 2d 115 (D.D.C. 2002) ........................................................................19

*Jenner & Block LLP v. U.S. Dep't of Just.*,
  No. 25-916 (JDB), 2025 WL 1482021 (D.D.C. May 23, 2025) .............................17

*Johnson v. Dist. of Columbia*,
  726 F. Supp. 3d 8 (D.D.C. 2024) ............................................................................11

*Major League Baseball v. Crist*,
  331 F.3d 1177 (11th Cir. 2003) ..............................................................................20

*McNary v. Haitian Refugee Ctr., Inc.*,
  498 U.S. 479 (1991) ...................................................................................................8

*Media Matters for Am. v. Bailey*,
  No. 24-CV-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024) ............11, 12, 23

*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025) ...............................................................................19

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) .................................................................................................25

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010) .................................................................................................17

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) .................................................................................................16

*Nat'l Fed'n of the Blind v. FTC*,
  420 F.3d 331 (4th Cir. 2005) ..................................................................................17

*Palko v. Connecticut*,
  302 U.S. 319 (1937) .................................................................................................25

*Reisman v. Caplin*,
  375 U.S. 440 (1964) .................................................................................................10

*Reps. Comm. for Freedom of the Press v. AT&T*,
    59 F.2d 1030 (D.C. Cir. 1978) ..................................................................................19

*Shoen v. Shoen*,
    5 F.3d 1289 (9th Cir.1993) ......................................................................................19

*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019) ...................................................................................10

*Sullivan v. Murphy*,
    478 F.2d 938 (D.C. Cir. 1973) ...................................................................................8

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994)..............................................................................................4, 6

*Turner v. U.S. Agency for Glob. Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) .........................................................................10

*United States v. Powell*,
    379 U.S. 48 (1964)...................................................................................................21

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.*,
    156 F.3d 535 (4th Cir. 1998) ...................................................................................16

*Vetcher v. Sessions*,
    316 F. Supp. 3d 70 (D.D.C. 2018) .............................................................................8

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017)..............................................................................................8, 9

*Zorn v. City of Marion*,
    774 F. Supp. 3d 1279 (D. Kan. 2025) ......................................................................13

*Zurcher v. Stanford Daily*,
    436 U.S. 547 (1978)................................................................................................20

**Statutes**

15 U.S.C. § 45(b) ..............................................................................................................5

15 U.S.C. § 57b-1(e) ........................................................................................................4

**Regulations**

16 C.F.R. § 2.10 ................................................................................................................5

## INTRODUCTION

After this Court halted two civil investigative demands ("CIDs") issued to Media Matters, the Federal Trade Commission ("FTC") jumped in and issued its own, comparable CID. All three CIDs focused on Media Matters' reporting concerning content moderation and advertising on social media sites. All have some degree of substantive overlap. And all were issued by entities whose personnel and associates have publicly criticized Media Matters. This Court has found that the first two CIDs were likely retaliatory, yet the FTC would have this Court believe that its CID is different. It proclaims that its CID is part of a broader investigation into a possible conspiracy to engage in an advertiser boycott relating to media platforms.

But as the FTC aptly put it, "[s]ometimes the obvious explanation is the correct one," PI Resp. 32, and far too many factors make it clear that the FTC has no legitimate motive to issue the CID. Start with the FTC's stated justification for the CID. The agency claims that the CID is part of an investigation into a potential advertiser-boycott conspiracy, but it never explains why it believes Media Matters would have any meaningful, relevant evidence. The FTC has not asserted that Media Matters is a purchaser of advertisements on media platforms. Nor does the FTC claim that Media Matters has otherwise participated in any advertiser boycott conspiracy. To the contrary, when pressed to offer some basis for suspecting Media Matters of any wrongdoing, the FTC merely states that it "absolutely is not limited to issuing CIDs to entities it believes to have violated the antitrust laws." PI Resp. 35. To support its CID, the FTC suggests—again, with no evident basis—that *other* entities may have engaged in an advertiser boycott conspiracy and that those entities may have relied on Media Matters' work when doing so. But even if that were true, the FTC never explains why Media Matters would have any documents confirming the existence of such a conspiracy consisting of other entities, nor does it explain why it chose to issue a 20-specification CID to Media Matters that intrudes into all aspects of its journalistic and advocacy-

1

related operations.

The obvious explanation is that the CID has nothing to do with any legitimate antitrust investigation. As explained in Media Matters' opening brief, multiple factors—the CID's breadth and content, its timing, a slew of vitriolic comments against Media Matters by FTC officials and allies, and the FTC's decision not to investigate conservative-leaning organizations who have publicly called for the same type of boycotts of companies who engaged in speech they disfavor— makes clear that the CID was issued because the FTC disapproves of Media Matters' speech.

The FTC unsurprisingly tries to sidestep the merits, dedicating a large portion of its brief to a jurisdictional argument and a procedural one, both of which fail. First, the FTC argues that, under *Thunder Basin v. Reich*, the relevant statute provides a review process for FTC CIDs that implicitly precludes this Court's jurisdiction over Media Matters' claims. But under *Thunder Basin*, a statutory scheme may preclude district court jurisdiction only if it is comprehensive (e.g., when it provides for quasi-judicial proceedings before an impartial administrative reviewer whose decisions may be appealed to a federal court of appeals). Here, the statutory process applicable to FTC CIDs is not a review scheme at all, much less a comprehensive one. It simply allows for the FTC to eventually bring an affirmative suit in district court, where Media Matters, down the line, can object to the CID as a defense. The FTC cites no case in which that type of "review scheme" has been found to preclude district court jurisdiction. Additionally, *Thunder Basin* does not apply when the statutory review scheme does not provide for meaningful judicial review, including when it cannot remedy a here-and-now injury. Media Matters is suffering an ongoing injury each day the retaliatory and unconstitutional CID remains in effect. The possibility that Media Matters can someday challenge the CID when (or if) the FTC eventually decides to go into court does nothing to rectify the injury it is suffering today.

The FTC also argues, incorrectly, that there is no implied cause of action for First Amendment claims against government agencies, and that Media Matters must instead bring a claim under the Administrative Procedure Act ("APA") if and when the FTC engages in some "final agency action" that is subject to APA review. The Supreme Court, however, has repeatedly confirmed that a party may rely on an implied cause of action when it seeks equitable relief against unconstitutional government actions. The cases on which the FTC relies relate to damages actions against government officials in their individual capacities (i.e., *Bivens* claims), not claims for injunctive relief. Additionally, the FTC's position would insulate many unconstitutional agency actions from judicial review. If a party were forced to rely on the APA to bring any challenge to unconstitutional agency actions, then there would be no remedy whenever an agency takes an action that is unconstitutional but does not fit the formal definition of "final agency action." That is not the law.

Media Matters has the right to seek, and this Court has jurisdiction to provide, relief against the FTC's attempt to harass and retaliate against Media Matters for engaging in protected speech that the FTC disfavors. The Court should grant the motion for a preliminary injunction.

## ARGUMENT

### I.      The FTC's Threshold Objections Lack Merit.

The FTC is wrong to assert that this Court cannot address Media Matters' claims. First, the FTC argues that, under *Thunder Basin*, the FTC Act's "review process" for FTC CIDs precludes this Court's jurisdiction. Second, the FTC argues that there is no implied cause of action for Media Matters' First Amendment challenge, and that Media Matters must rely on the APA instead. Both arguments fail.

A.     **The FTC Act Does Not Deprive This Court of Jurisdiction.**

The Supreme Court applies a two-part test to determine whether Congress has implicitly stripped a district court of jurisdiction through the creation of a statutory review scheme. First, a court considers whether the agency's enabling statute provides a "comprehensive review process" for a plaintiff's claims. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). If the answer is yes, a court determines whether the plaintiff's claim is "of the type Congress intended to be reviewed within th[e] statutory structure." *Id.*, at 186. The FTC's argument fails at each step.

a.     **The FTC Act Does Not Provide a Comprehensive Review Process for Plaintiff's Claims.**

The "typical[]" comprehensive review scheme that may preclude district court jurisdiction is one that provides for "review in a court of appeals following the agency's own review process," where "[t]he agency effectively fills in for the district court, with the court of appeals providing judicial review." *Axon*, 598 U.S. at 185. Indeed, that has been the review scheme at issue in every case Media Matters could locate in which the Supreme Court has found that an agency review scheme was exclusive of district court jurisdiction. *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) (Civil Service Reform Act permits review first by the Merit Systems Protection Board and then appeal to the Federal Circuit); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–08 (1994) (Federal Mine Safety and Health Amendments Act permits review by the Federal Mine Safety and Health Review Commission, with appeal to a federal court of appeals).

Here, for FTC CIDs, the FTC Act provides no review process at all, much less a comprehensive one. It allows the *FTC*, at *its* discretion, to bring suit in a federal district court to enforce a CID, where Media Matters may then file an answer in which it raises its objections to the CID. *See* 15 U.S.C. § 57b-1(e). Media Matters does not get to promptly challenge the CID before an impartial agency reviewer and, if necessary, appeal the reviewer's decision to federal

4

court. *See* PI Resp. 12 (*Thunder Basin* applies to "a statutory scheme of *administrative* and judicial review" (emphasis added)). Indeed, Media Matters has no say at all over when its challenge reaches federal court. If the FTC Act were to preclude jurisdiction here, Media Matters' only choice—in the face of unlawful federal retaliation—would be to wait and see if the FTC brings a CID enforcement action. That is not a review process. The FTC cites no case in which a court has found that this type of review scheme can preclude district court jurisdiction under *Thunder Basin*.[1]

Defendants assert that, in the FTC's principal adjudicatory process—which does not apply to FTC CIDs like the one issued to Media Matters—entities are given several procedural protections, such as the right to "present evidence." PI Resp. 13 (citing 15 U.S.C. § 45(b)). But even assuming that particular adjudicatory process is comprehensive, it says nothing about the very different process applicable to the FTC's CID here—which, again, is no review process at all. The FTC Act thus provides no comprehensive review process for the FTC's CID against Media Matters, and therefore that Act cannot preclude this Court's jurisdiction under *Thunder Basin*.

      **b.**     **Media Matters' Claims Are Not of the Type Congress Intended To Be Reviewed Within the FTC Act's Statutory Structure.**

Even if the FTC could pass the first part of the *Thunder Basin* test, it fails the second: Media Matters' claims are not "of the type Congress intended to be reviewed" exclusively through a hypothetical CID enforcement action. At this stage of the *Thunder Basin* analysis, a court must consider: (i) whether "precluding district court jurisdiction foreclose[s] all meaningful judicial revie' of the claim," (ii) whether "the claim [is] wholly collateral to [the] statute's review provisions," and (iii) whether the claim falls "outside the [relevant tribunal]'s expertise." *Axon*,

---

[1] The FTC does not even contend that the petition to quash process established by regulation, *see* 16 C.F.R. § 2.10, is a statutory scheme that could preclude this Court's jurisdiction over Media Matters' claims.

598 U.S. at 186 (internal citation and quotation marks omitted). The Court can "presume that Congress does not intend to limit jurisdiction" even when the "factors point in different directions." *Id.* "The ultimate question is how best to understand what Congress has done." *Id.* Here, the factors confirm that Congress did not intend to preclude this Court's jurisdiction over Media Matters' claims.

*First*, "precluding district court jurisdiction" here would "foreclose all meaningful judicial review" of Media Matters' First Amendment claims. *Axon*, 598 U.S. at 186 (quotation marks omitted). Media Matters is suffering injuries "here-and-now" due to the very *existence* of an unconstitutional CID, and those injuries will remain each day that the CID is in effect. *See infra* at II.B. But any review under the administrative "review process"—when the FTC finally files a CID enforcement action, Media Matters may file a responsive pleading —would come only after Media Matters has been "subject[]," for an extended period of time, "to an illegitimate" CID. *Id.* at 191. Indeed, the FTC could deliberately hold off on filing suit knowing that the CID's very presence is inflicting reputational and financial injuries on Media Matters. *See supra* at IV; Mem. Supp. PI Mot. ("PI Mem.") 15–18, 31–34; Dimiero Decl. ¶¶ 19–31; Millican Decl. ¶¶ 13–15; Padera Decl. ¶¶ 15–25. Thus, any relief in a potential enforcement action cannot meaningfully address Media Matters' injuries in light of "the interaction between [those injuries] and the timing of review." *Axon*, 598 U.S. at 191.

*Axon* is instructive. There, the plaintiffs argued that they were being subject to illegitimate agency proceedings. *Id*. at 182. The Supreme Court found that the agency review scheme did not provide for meaningful judicial review for that claim because it would provide a "remedy" only "when [judicial] review kicks in," at which point the plaintiffs would have already suffered injuries from "being subjected to unconstitutional agency authority." *Id.* at 191 (internal quotations

6

omitted). The Supreme Court explained that, even if plaintiffs ultimately prevailed in the administrative review scheme, the injury would have already been inflicted. *See id.* at 191. So too here. Even if the FTC eventually were to bring a petition to enforce, and even if Media Matters were to successfully defeat it, the injury would have already been inflicted. Media Matters would have suffered constitutional, operational, and financial injuries from the prolonged existence of an unconstitutional CID. Media Matters' injury stems from being "subject[] to [the CID] irrespective of" whether it ever produces a single document. *Id.* at 192. A potential enforcement action by the FTC in which Media Matters can challenge the CID as a defense therefore does not provide for meaningful judicial review.

*Second*, Media Matters' claims are "wholly collateral to [the] statute's review provisions." A potential enforcement action would answer the question whether Media Matters should be required to comply with the CID, whereas, here, Media Matters is "challenging the [FTC's] power to [issue the CID] at all." *Id.* at 192. Media Matters' First Amendment "claim[] do[es] not relate to the" objective "of [an] enforcement action[]"—requiring document productions—but rather the CID's issuance and existence. *Id.* at 193. This case therefore does not raise "the sorts of procedural or evidentiary matters" that a court would "resolve[] on its way to a merits decision" on a petition for enforcement (e.g., relevance and burden of the CID requests), and so this case has "nothing to do with the enforcement-related matters" that would come up in that type of enforcement action. *Id.* This case is thus wholly collateral to the FTC Act's CID enforcement process.

*Finally*, the third *Thunder Basin* factor—expertise—is at most a wash. The agency has no special expertise on First Amendment matters. And although a district court in a potential enforcement action *may* have First Amendment expertise, the Supreme Court has already noted that courts can "presume that Congress does not intend to limit jurisdiction" even when the

*Thunder Basin* "factors point in different directions." *Axon*, 598 U.S. at 186. A party's "ability to receive meaningful judicial review [is the] 'most critical' factor in [a] Thunder Basin analysis," *See Vetcher v. Sessions*, 316 F. Supp. 3d 70, 77 (D.D.C. 2018) (citing *Bebo v. SEC*, 799 F.3d 765, 774 (7th Cir. 2015)), and as explained above, a hypothetical, future enforcement action provides no meaningful avenue for judicial review of a CID that is harming Media Matters today. It "is most unlikely that Congress intended to foreclose" all "meaningful judicial review" of Media Matters' First Amendment claim. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991).

Accordingly, on balance, the *Thunder Basin* factors confirm that the process under which the FTC can seek to enforce its CID does not preclude this Court's jurisdiction over Media Matters' First Amendment claims.

### B.    Media Matters Can Invoke an Equitable Cause of Action for its First Amendment Claims.

Defendants are wrong in arguing that Media Matters cannot invoke an equitable cause of action for its First Amendment challenge to the CID, but rather must proceed under the APA. The Supreme Court has recognized an "implied private right of action directly under the Constitution" to enforce compliance with "particular constitutional provisions." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by . . . federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England"); *Sullivan v. Murphy*, 478 F.2d 938, 966 (D.C. Cir. 1973) ("Assuming a determination of constitutional violations, it is undeniable that the Federal courts having subject matter jurisdiction also have broad equitable power to remedy and obviate all traces of the constitutional wrong."). In response, the FTC argues that private rights of action must be created by Congress, *see* PI Resp. 22–23, but it relies on a line of cases—such as *Ziglar*

*v. Abbasi*, 582 U.S. 120 (2017)—that speak to private rights of action for *damages* against government officials in their individual capacities (i.e., Bivens claims), *see Ziglar*, 582 U.S. at 121 ("caution must be exercised with respect to damages actions implied to enforce the Constitution itself"). Media Matters, by contrast, seeks only equitable relief, and it undoubtedly has an implied cause of action to seek that type of relief against the government. *See supra* at 8.

Additionally, contrary to the FTC's argument, the APA does not preclude parties from relying on the longstanding equitable cause of action to vindicate constitutional rights. *Cf. Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (the "APA . . . does not repeal the review of ultra vires actions"). The FTC cites nothing in the APA's text suggesting that it precludes the historical, equitable cause of action for constitutional challenges. Nor does it cite any binding authority indicating that a statute necessarily (and implicitly) precludes that type of cause of action whenever the statute generally touches on the subject matter at issue. Instead, once again, the FTC relies on inapplicable case law. For example, it cites to *Commitee on Judiciary of United States House of Representatives v. McGahn*, where the D.C. Circuit expressed skepticism towards implying a cause of action for Congressional committees to "*enforce a subpoena*" when there was already a specific statutory cause of action to that effect. 973 F.3d 121, 123 (D.C. Cir. 2020) (emphasis added), *reh'g en banc granted*, *judgment vacated* (Oct. 15, 2020). That case did not concern a general statute like the APA or the longstanding implied cause of action to enforce a *constitutional* right.

Furthermore, the FTC's argument, if accepted, could insulate many constitutional violations from judicial review. Agency actions may still be unconstitutional and harm private parties even if they do not formally constitute "final agency actions" under the APA, and absent an implied cause of action for constitutional claims, those agency actions could escape judicial

review altogether. That would be inconsistent with the principle that Congress generally does not intend to preclude all judicial review of constitutional violations. *See supra* at 6. The APA does not preclude Media Matters from relying on an equitable cause of action here. *See Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019) (although "the APA is the general mechanism by which to challenge final agency action," that "does not mean the APA forecloses other causes of action"); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 372 (D.D.C. 2020) (rejecting an attempt to invoke the APA to deny jurisdiction over First Amendment claims).

The FTC also appears to argue that the FTC's statutory right to file an action to enforce the CID precludes Media Matters from relying on an implied cause of action here. *See* PI Resp. 23. But the cases the FTC cites involved situations where the plaintiffs would have suffered no harm if they waited to challenge the relevant subpoenas in an enforcement action. *See*, *e.g.*, *FTC. v. Claire Furnace Co.*, 274 U.S. 160, 168–174 (1927) ("[u]ntil the Attorney General" institutes "proceedings for a mandamus" to enforce the subpoenas at issue, "the [petitioners] cannot suffer"); *Reisman v. Caplin*, 375 U.S. 440, 449 (the plaintiffs "would suffer no injury while testing the" subpoena in an enforcement proceeding) (1964). Here, by contrast, Media Matters is suffering an ongoing harm from the mere existence of the CID. *See infra* at II.B.

In sum, Media Matters can invoke an equitable cause of action to raise its First Amendment challenge, and *Thunder Basin* does not preclude this Court's jurisdiction to hear that challenge.[2]

---

[2] The FTC also argues that its CID does not constitute a "final agency action," and is thus not reviewable, under the APA. Media Matters, however, brings no claims under the APA, and the FTC cites to no case law indicating that the "final agency action" requirement applies to equitable causes of action. That is why *FTC v. Standard Oil Co.*, 449 U.S. 232 (1980), is irrelevant here. That case merely held that an FTC administrative "complaint . . . is not 'final agency action' under . . . the APA." *Id.* at 246.

II.    **Plaintiff Is Likely to Prevail on its Claim That the FTC Retaliated Against its Constitutionally Protected Activities in Violation of the First Amendment.**

Turning to the merits, Defendants mistakenly argue that (1) this case is meaningfully distinct from *Bailey* and *Paxton* and (2) Media Matters has not sufficiently shown that the CID has had a chilling effect. The Court should reject both arguments.

A.    **Strong Circumstantial Evidence Establishes the Causal Link Between Media Matters' Protected Advocacy and the FTC CID.**

Ignoring the wealth of case law that circumstantial evidence can establish causation, Defendants repeatedly demand a smoking gun, such as an admission from Chairman Ferguson that this investigation constitutes political retaliation. But that type of evidence is not necessary, nor should it be. *See Goodwin v. Dist. of Columbia*, 579 F. Supp. 3d 159, 174 (D.D.C. 2022). Most officials know not to say the quiet part out loud, and if circumstantial evidence were found insufficient for a retaliation claim, scores of First Amendment violations could go unchecked.

Here, there is ample circumstantial evidence that the FTC issued the CID because decisionmakers at the agency disapproved of Media Matters' reporting and advocacy. This evidence includes suspicious timing, statements of animosity by FTC decisionmakers, pretextual reasoning for the FTC's investigation, and the FTC's decision not to investigate other entities that engaged in conduct similar to that which supposedly prompted its CID to Media Matters and other entities. *See, e.g.*, *Media Matters for Am. v. Bailey*, No. 24-CV-147 (APM), 2024 WL 3924573, at *14 (D.D.C. Aug. 23, 2024) (considering Bailey's "consistent characterize[ation] [of] Media Matters in ideological terms" and the obviously pretextual reason for the investigation).

**Suspicious Timing & Decisionmaker Statements**. The timing of the FTC's CID and statements from key decisionmakers sufficiently support the inference of causation. *See Johnson v. Dist. of Columbia*, 726 F. Supp. 3d 8, 30 (D.D.C. 2024), *reconsideration denied*, No. CV 20-2944 (RC), 2024 WL 3858547 (D.D.C. Aug. 19, 2024) (a plaintiff may point to suspicious timing

11

linking protected speech and government action to prove causation). The FTC issued its CID while the *Paxton* appeal was still pending, just months after Attorney General Bailey settled his suit, and amidst a flurry of statements from Chairman Ferguson himself pledging to take on so-called "advertiser boycotts" as FTC chair, including heralding Musk as a "free speech champion" facing an "advertiser boycott" and citing to X Corp.'s litigation in urging the FTC to investigate "dangers to free speech on Big Tech platforms," namely X.[3] That timing is suggestive of an intent to continue Paxton's and Bailey's punishment of Media Matters for its content moderation advocacy.

Defendants make much of an alleged "temporal gap" between the FTC CID's issuance in May 2025 and the "precipitating events" of the Texas and Missouri AG investigations, which occurred in 2023. PI Resp. 32. That argument ignores the ongoing retaliatory efforts against Media Matters during that time, which Plaintiff described in its complaint and opening brief. And any delay in federal involvement can hardly be called a "gap," given that Chairman Ferguson was not put in charge of the agency until January 20, 2025. In reality, this investigation was likely a top priority if the FTC was able to draft, authorize, and issue the CID within the *first four months* of the new administration.

Defendants' related assertion that the sequence of events throughout a "campaign of retaliation" must come from the same sovereign also has no basis in law. Indeed, coordination between Paxton and Bailey was considered in their causation analyses, even though Missouri and Texas are separate sovereigns. *Bailey*, 2024 WL 3924573, at *15. In any event, retaliation coming from different governmental entities does not somehow insulate both from retaliation claims. *See*

---

[3] *FTC v. 1661, Inc. d/b/a GOAT*, FTC (Ferguson, A., concurring) (Dec. 2, 2024), https://perma.cc/DV55-N5WY; *see also FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/VJK3-JAHJ; *Transcript: FTC Chairman Andrew Ferguson Keynote*, Promarket (Apr. 17, 2025), https://perma.cc/R8FT-4LLJ (emphasis added).

*Zorn v. City of Marion*, 774 F. Supp. 3d 1279, 1325 (D. Kan. 2025) (county sheriff and city police chief coordinated investigation into nonexistent crime by reporter, and First Amendment claim survived against each).

At a high level, Defendants urge this Court to believe that Media Matters' timing allegations are only suggestive of causation if they work like a relay race: each entity passes the baton immediately after its attempt to punish Media Matters with a burdensome CID fails. Not only is this linear timing not a requirement under the law, it is not how any of the prior retaliatory acts worked: Musk filed suit against Media Matters in November 2023, *X Corp. v. Media Matters for Am.*, No. 4:23-cv-1175 (N.D. Tex Nov. 11, 2023), ECF No. 1; followed right after by Paxton's CID; Media Matters sued Paxton in January 2024, *Media Matters for Am. v. Paxton*, No. 1:24-cv-00147 (D.D.C. Jan. 18, 2024), ECF No. 1; the ruling on that preliminary injunction was still pending when Bailey issued his CID in March 2024, *see Paxton* at ECF No. 4 (plaintiff's motion for preliminary injunction); Paxton's investigation was enjoined a month later, *Paxton* at ECF No. 70; and he filed for appeal, *Paxton* at ECF No. 74; while the Paxton appeal was pending, Bailey both lost, *Media Matters for Am. v. Bailey*, No. 24-cv-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024), ECF No. 90 (order granting plaintiff's motion for preliminary injunction) and settled his suit with Media Matters, *Media Matters for Am. v. Bailey*, No. 24-7141, Doc. No. 2100004-A at 3 (D.C. Cir. Feb. 11, 2025); and all the while, Musk has threatened action in at least four jurisdictions (ultimately filing in three, *see* Compl. ¶ 9) and continued X's litigation against Media Matters in the Northern District of Texas. From the beginning, this has been an assault from all sides. The FTC's decision to join the fray while Paxton's appeal was still pending, after months of statements by FTC officials about "censorship" by media watchdogs like Media Matters, and a

mere four months after Ferguson assumed the chairmanship, surely constitutes circumstantial evidence of causation.

Meanwhile, the rhetorical campaign against Media Matters has been buoyed by individuals such as Mike Davis, a friend of Chairman Ferguson who has "work[ed] with"[4] Ferguson on antitrust issues (while calling on Musk to "nuke" Media Matters),[5] and FTC aides who have vocally supported Musk's litigation, publicly attacked Media Matters, and all but announced their animating concern that content moderation stifles conservative viewpoints. *See* Compl. ¶¶ 63–64, 70–71; *see also Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000) (plaintiff can establish an improper "motivation" behind a decision based on a non-decisionmaker's "discriminatory intent" if that person "was . . . involved in the decisionmaking process" or "participated in the adverse decision" (internal quotation marks omitted)).

**Pretextual Reasoning.** The lack of any basis for the FTC's CID underscores that it was likely issued for an improper purpose. *See Goodwin*, 579 F. Supp. 3d at 175 ("reasonable inference" of causation permitted when defendants provide no plausible "non-retaliatory motive").

According to the FTC, this investigation pertains to "collusion and coordination" *among advertisers* (i.e., so-called advertiser boycotts).[6] The FTC, however, has never stated that Media Matters is an advertiser. Nor does Media Matters create the sort of "brand safety tools" or "advertising rating systems" the FTC's CID specifications ask about. Media Matters is a non-profit

---

[4] Bannon's War Room, *Episode 4337: Frontline Federal Leftist Judges* (Mar. 14, 2025), https://perma.cc/6P89-3G68.

[5] Indeed, Davis's opinions give important context to this retaliation claim, as he spoke on a panel with Ferguson focused on this same idea of content moderation as "Big Tech Censorship" just the month before Ferguson started this investigation. *See* Dep't of Justice, The Antitrust Division Hosts a Big-Tech Censorship Forum, https://www.youtube.com/watch?v=RPPgJ-xkjWo (April 3, 2025), https://www.youtube.com/watch?v=RPPgJ-xkjWo.

[6] *See* Compl., Ex. A (FTC CID) at 5–6; Compl., Ex. C (Media Matter's Petition to Quash) at 4-6; PI Resp. 29 (discussing July 7 CID modification).

media watchdog that monitors and reports on extremist content online to educate the public. When pushed to offer some basis for suspecting Media Matters of wrongdoing, the FTC virtually admits it has none. *See* PI Resp. 35 (noting only that the FTC can still issue CIDs to those who have done nothing wrong). Even if the FTC can issue CIDs to entities suspected of no wrongdoing if the FTC has "reason to believe" those entities possess information relevant to a potential antitrust violation, the FTC has made no showing that Media Matters would have such information, and there is no reason to think it would. The alleged possibility that Media Matters' public reporting and advocacy inspired potential antitrust violations does not mean Media Matters possesses any information concerning those violations. To grant the FTC such a "generous test" for exercising its investigatory power could subject every media outlet in the country—from the New York Times to Fox News—to a CID each time the FTC suspects antitrust conduct was inspired by or somehow related to their reporting.

Additionally, the general campaign against "advertiser boycotts"—which the FTC boasts has led to several other CIDs—is a politically motivated response to protected speech. What the Commission and Chairman Ferguson label as "advertiser boycotts" are not the concern of antitrust laws. Antitrust laws are concerned with agreements between competitors not to do business with a certain entity that are driven by *financial motives*, particularly to seek economic advantage. *See FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 414 (1990).

Chairman Ferguson, however, has made clear that, in targeting what he calls "advertiser boycotts," he is *actually* concerned about content moderation advocacy (i.e., protected speech) and independent economic decisions made by advertisers who do not want their ads appearing next to extremist content (i.e., lawful business decisions). He has made his animus toward content moderation and so-called "advertiser boycotts" known through his pre-appointment pledge to

"fight wokeness" by "investigat[ing] and "prosecut[ing] advertiser boycotts;"[7] his public rebuke of advertisers apprehensive that ads on X would be run alongside extremist context, Compl. ¶¶ 57–58; his public laments that online platform "censorship" is fueled by "left wing public officials . . . or other DNC interest groups;"[8] and his discussion of "Big Tech collusion" and "internet censorship" on conservative media outlets. *Compare* Compl. ¶ 61 n.66 *with* Exhibit A to Anthony Decl. ("Ex. A"), FTC CID (dated May 20) at 1. This well-documented record confirms that Commissioner Ferguson and the FTC—under his leadership—acted with retaliatory intent toward Media Matters as one of the entities leading the reporting he so strongly condemns.

And even assuming, *arguendo*, that there was some agreement to abstain from purchasing advertisements on certain platforms, the FTC has not shown that that would violate any antitrust law, further underscoring that the "advertiser boycott" investigation is not based on a legitimate antitrust concern. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982); *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541 n.2 (4th Cir. 1998) (*Claiborne* "[held] that politically motivated boycott was not subject to antitrust laws"). The Supreme Court has been clear that the antitrust laws cannot prohibit boycotts where, without intent of financial gain, "[s]peech itself . . . [is] used to further the aims of the boycott." *Claiborne Hardware Co.*, 458 U.S. at 909. Even if boycott facilitators act "through social pressure and the 'threat' of social ostracism," "[s]peech does not lose its protected character . . . , simply because it may embarrass others or coerce them into action." *Id.* at 909–10. Finally, the advertising decisions of the entities that the FTC is supposedly targeting through other CIDs are protected under the First Amendment. *See*, *e.g.*,

---

[7]  *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/VJK3-JAHJ.

[8]  *Transcript: FTC Chairman Andrew Ferguson Keynote*, Promarket (Apr. 17, 2025), https://perma.cc/R8FT-4LLJ (emphasis added).

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010). Put simply, the FTC is dragging entities through the investigative process based on an untenable antitrust theory.[9] That is evidence of pretext.

That the FTC issued CIDs to several "entities in the same category as Media Matters," PI Resp. 28–29, demonstrates the breadth of the First Amendment violation, not its absence. If the FTC is targeting other entities simply because they engaged in speech of the same kind as Media Matters, those CIDs are no more constitutionally sound than the CID challenged here. Additionally, when the FTC chose to investigate certain entities pursuant to its purported "advertiser boycott" investigation, the FTC did not open an investigation into conservative-leaning parties that called for boycotts, including the Daily Wire, which called for boycotts of Target and Budweiser, and Republican officials, who called for boycotts of Twitter, Facebook, and Amazon for banning President Trump from their sites. *See* PI Mem. 27–28.

Accordingly, multiple factors confirm that the FTC likely issued a CID to Media Matters for no legitimate purpose, but rather to penalize Media Matters for its journalism.

### B.    The CID Chills Media Matters' Ongoing Speech.

Media Matters has established that the CID has had a chilling effect. Demonstrating that an action is "sufficient to deter a person of ordinary firmness in [Plaintiff's] position from speaking again," *Aref v. Lynch*, 833 F.3d 242, 258, is "not a high" standard to clear. *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 25-916 (JDB), 2025 WL 1482021, at *7 n.7 (D.D.C. May 23, 2025). Here, Media Matters is "suffer[ing] a present, objective harm," namely "an objective chill of [their] First Amendment rights" due to a government-issued CID. *Clark v. Libr. of Cong.*, 750 F.2d 89, 93

---

[9] It is well-established law that the FTC does not have the authority to bring an enforcement against nonprofits, like Media Matters. *Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 334, (4th Cir. 2005).

(D.C. Cir. 1984) (finding employee's claim for alleged objective chill of First Amendment rights due to retaliatory investigation justiciable). Media Matters has come forward with evidence showing that its speech has already been chilled, and that any objective party in its position would have been chilled. *See* PI Mem. at 20–21; Millican Decl. ¶¶ 13–15. The FTC does not address the case law holding that the mere "*threat* of invoking legal sanctions and other means of coercion, persuasion, and intimidation" would deter protected speech. PI Mem. at 19–20.

Defendants argue that, because Media Matters posited that the FTC "lacks statutory authority to enforce violations of the FTC Act against Media Matters," Media Matters "cannot assert that it faces a risk of enforcement based on its protected activity." PI Resp. 37. But given the retaliatory nature of the CID, Media Matters is justified in its concern that the FTC could still try to bring an impermissible enforcement action. For example, in its Order denying Plaintiff's Petition to Quash, the FTC said that it "does not concede that it lacks enforcement authority over Media Matters."[10] *See* FTC Order Denying Motion to Quash 8 n.11. More importantly, the process *is* the punishment. Media Matters has already had to spend, and continues to spend, resources on its response to the FTC's CID, and its reputation and journalism have been impacted. By issuing the CID, the FTC has initiated a monthslong process meant to keep Media Matters under the government's thumb.

Finally, the FTC asserts, in passing, that a retaliatory investigation cannot violate the First Amendment. *See* PI Resp. 36. That argument fails. *First*, the cases on which Defendants rely do not support their conclusion. For example, Defendants cite to *Hartman v. Moore*, but there, the

---

[10] That the FTC cannot substantively enforce the antitrust laws against nonprofits, as the agency itself points out, is another reason why the CID was likely not issued for any legitimate antitrust purpose. What is more, and as discussed *supra*, the FTC purports to be investigating collusion among advertisers, not media watchdog groups, which makes an investigation of Media Matters a poor and circuitous vehicle for any information related to that conduct.

Supreme Court noted only that the issue of whether "a retaliatory investigation" would constitute "a distinct constitutional violation [was] not before [the Court]," which does not resolve whether retaliatory investigation claims are viable. 547 U.S. 250, 262 n.9 (2006). The other cases are either not binding on this Court, concern retaliatory investigations related to *Bivens* claims (irrelevant here), or both. *See* PI Resp. at 37 (collecting cases). *Second*, although "the D.C. Circuit did not have to address [this question] in *Paxton*," PI Resp. 36, the Court did so anyway. The *Paxton* Court held that "'all investigative techniques are subject to abuse and can conceivably be used to oppress citizens and groups,' and that bad faith use of investigative techniques can abridge journalists' First Amendment rights." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025) (quoting *Reps. Comm. for Freedom of the Press v. AT&T*, 59 F.2d 1030, 1064 (D.C. Cir. 1978)). The D.C. Circuit went on to state that "official harassment [of the press] places a special burden on information-gathering, for in such cases the ultimate, though tacit, design is to obstruct rather than to investigate, and the official action is proscriptive rather than observatory in character." *Id.*; *see also Branzburg v. Hayes*, 408 U.S. 665, 707 (1972) ("[N]ews gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment.").

### III.    Plaintiff Is Also Likely to Prevail on its Claim the FTC's CID Violates the First and Fourth Amendments.

The First Amendment provides journalists a "qualified privilege against compelled disclosure of information obtained through their news gathering activities." *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 118 (D.D.C. 2002). This First Amendment privilege for journalism safeguards "society's interest in protecting the integrity of the news-gathering process, and in ensuring the free flow of information to the public." *Shoen v. Shoen,* 5 F.3d 1289, 1292 (9th Cir.1993) (internal citations omitted).

19

The FTC's CID tramples on this qualified privilege and violates Media Matters' First Amendment rights. It requires extensive disclosure of Media Matters' protected newsgathering activities, including its editorial content, affiliations with other entities tracking extremist content, and nearly all documents and communications related to Media Matters' reporting on content moderation, among other material protected by the First Amendment. The FTC's argument that the CID does not explicitly request that Media Matters "reveal its sources" or "disclose reporters' notes" is disingenuous where the specifications are so sweeping that they implicate that type of information and where particular specifications undoubtedly target that information. *See, e.g.*, Specification No. 15 (requesting "all communications" between Media Matters and "any other person"—i.e., sources and partner organizations—regarding requests to label platforms for "reliability" or "hate speech").

Further, the Fourth Amendment constrains agencies' authority to issue administrative subpoenas. *See Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) ("The Fourth Amendment has been held to limit the scope of investigatory power exercised by federal and state agencies."). In fact, the demands of the Fourth Amendment are heightened when the First Amendment is involved: where materials requested by an administrative subpoena "*may* be protected by the First Amendment," the Fourth Amendment is applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978).

Defendants do not even attempt to show how they have met the high standard of "scrupulous exactitude," arguing instead that there is simply no "categorical First Amendment privilege" against complying with a CID. Even if that were true, Defendants must tailor their CID—again, with scrupulous exactitude—to target materials that are not privileged. They cannot

issue an all-encompassing CID that touches on all aspects of a news organization's operations, and then justify it by claiming that the CID may also cover certain unprivileged materials.

Additionally, a government document request must have a "legitimate purpose," the request must be "relevant to that purpose," and neither can be driven by an improper motive. *United States v. Powell*, 379 U.S. 48, 57 (1964). The FTC's overbroad CID not only demands that Plaintiff produce a broad set of documents that violate its First Amendment rights, but the overwhelming indicia of retaliation animating the CID, *see supra* at II.A., support the inference that this CID was issued with an improper motive, in violation of the Fourth Amendment.

## IV. Plaintiff Will Suffer Irreparable Harm Absent an Injunction Against the FTC's CID and the Ongoing Investigation of Media Matters.

Finally, Media Matters has faced, and continues to face, irreparable harm in the form of constitutional injury, economic loss, and grave reputational harm, all stemming directly from the FTC's retaliatory CID. Media Matters has submitted three declarations detailing how the CID has meaningfully amplified the effects of the prior retaliatory CIDs. *See* Dimiero Decl. ¶¶ 19–31; Millican Decl. ¶¶ 13–15; Padera Decl. ¶¶ 16–25. Its journalists are justifiably reluctant to publish certain stories out of fear of further retribution. *See* Dimiero Decl. ¶¶ 22–23. It has lost staff due to the campaign of retaliation, and may continue to lose staff if the pall cast by the FTC's CID remains. *See* Padera Decl. ¶ 22. External entities are hesitant to work with Media Matters because of retaliatory investigative demands like the FTC's CID. *See* Millican Decl. ¶¶ 13–15. Media Matters officials, however, have stated that, based on their experience, they believe an injunction against the CID can help. *See* Dimiero Decl. ¶ 31; Padera Decl. ¶ 25. It can signal to Media Matters' employees and external stakeholders that the federal judiciary will not tolerate unlawful retaliation by government entities. Thus, the FTC CID is imposing real and irreparable harms that can be remedied by a preliminary injunction in this case.

21

In response, the FTC argues that Media Matters' harms are "largely self-inflicted." PI Resp. 41 (emphasis omitted). According to the agency, it was "Media Matters' decision to publicize the Commission's investigation and demand for information"—not the retaliatory investigation itself—that caused Media Matters (potentially existential[11]) harms. *Id.* This argument is absurd. Media Matters—a news company whose mission is to report on significant public events—is not obligated to keep the FTC's retaliatory campaign a secret in order to help the FTC contain the damage. Indeed, the FTC's argument calls for a second layer of censorship: not only must Media Matters cease its reporting on advertisements on social media sites, now the FTC is trying to stop reporting on an unlawful FTC CID.

In any event, the FTC's presumption that the CID could have remained a secret is incorrect. Media Matters employees surely would have learned of the CID. And the CID would have been made public whenever Media Matters attempted to protect itself, whether through a petition to quash or in an enforcement action. The FTC states that Media Matters could (1) comply with the CID or (2) "do nothing." PI Resp. at 42. Neither of these options could stave off the harm—in fact, both compound it. The first option would result in Media Matters turning over protected information, effectively collaborating with the government to violate Media Matters' own First Amendment rights. And the FTC's (bizarre) second suggestion could lead, in practice, to a lawsuit that would ultimately publicize the details of the CID anyway.[12] Such a suit would force Media

---

[11] Kenneth P. Vogel et al., *Under Siege from Trump and Musk, a Top Liberal Group Falls Into Crisis*, The New York Times (July 25, 2025), https://www.nytimes.com/2025/07/25/us/politics/media-matters-musk-crisis.html.

[12] The FTC frames an enforcement suit as a possibility, rather than a certainty. *See* PI Resp., 42 ("Commission CIDs are not self-executing, and Media Matters was under no obligation to comply—*unless* and until the Commission later sought and secured a court order enforcing a CID.") (emphasis added). To be sure, the FTC could technically opt not to litigate against Media Matters, but the CID's existence still hangs over Media Matters like a Damoclean sword, and Media Matters is suffering several injuries as a result. *See supra* at II.B.

Matters into a defensive posture while continuing to suffer financially during litigation, and forcing it further into isolation as peers fear for their own organizations' futures.

At any rate, keeping the FTC's CID and investigation from Media Matters' partners would have posed practical and ethical problems. To work in good faith with partners, such as the numerous groups that have steered away from Media Matters for purposes of self-preservation, Media Matters must disclose potential risks to them.[13] This is especially true here, where those entities could face the risk of possibly becoming the subject of a federal investigation themselves. Disclosing the investigation was not a self-inflicted harm, but a key part of working with like-minded partners. *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) ("Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'").

The FTC contends that Media Matters has "proffer[ed] no factual support" for its claim that the agency's actions have caused it irreparable harm. Not so. Media Matters has offered abundant evidence of a causal connection between the FTC's retaliatory CID and investigation and Media Matters' protected speech and press activities. *See supra* at II.A. The FTC's claim that Media Matters' harms stem from the broader retaliatory campaign, and cannot be traced to FTC's CID in particular, is equally false. As a threshold matter, the FTC should not be spared from an injunction on the ground that it is simply one among many government officials targeting Media Matters in retaliation for its protected speech. *See Bailey*, 2024 WL 3924573, at *12 (D.D.C. Aug. 23, 2024) (rejecting an identical attempt to disaggregate First Amendment harm). Regardless,

---

[13] *See, e.g.*, Society of Professional Journalists, SPJ Code of Ethics, https://perma.cc/4UD2-9BER (last visited Aug. 4, 2025) (describing ethical obligation to disclose conflicts of interest).

although it is true that Media Matters has suffered injuries from the broad, ongoing campaign targeted at Media Matters, it has submitted a number of declarations explaining how the FTC's CID in particular has meaningfully contributed to those harms. For example, Media Matters lost its role as a research partner and was removed from communications with a coalition of organizations seeking to reduce harm online—a mission that is core to Media Matters' work. Millican Decl. ¶ 14. Additionally, several Media Matters officials have explained that the FTC CID has nullified many of the benefits from the preliminary injunctions against the unlawful Texas and Missouri CIDs by demonstrating that the unlawful retaliatory campaign continues.[14]

Media Matters has established that the FTC CID has meaningfully contributed to the series of harms that Media Matters has suffered for years now because powerful government actors disapprove of its journalism. Media Matters has thus established irreparable harm warranting emergency relief.

## V.    The Balance of Equities and Public Interest Weigh in Favor of an Injunction.

The FTC argues that the agency's mandate "to halt or prevent . . . anticompetitive conduct" weighs more heavily than Media Matters' financial and associational harms. PI Resp. 44–45. But the FTC's investigation does nothing to crack down on potentially unfair methods of competition—and even if it did, that rationale would not outweigh Media Matters' (and the public's) First Amendment rights to free speech and press activities.

For one, by its own admission, the FTC is affirmatively *not* seeking to prevent any potentially anticompetitive conduct by Media Matters. Order Denying PTQ at 2 (the "Commission

---

[14] The FTC argues that Media Matters is not seeking an injunction against the broader investigation into Media Matters, which could likewise inflict harms on Media Matters. The CID, however, is the tip of the spear. It demands a series of materials from Media Matters itself, and is a form of legal process that the FTC could try to enforce in court. That CID thus imposes unique harms. To the extent the FTC's investigation results in other attempts at compulsory process that likewise harm Media Matters, Media Matters may consider seeking emergency relief against those as well.

is investigating whether online *advertisers and/or advertising agencies* have [entered into] unlawful[] agree[ment]"). In fact, the FTC cannot bring an enforcement action against Media Matters because of the organization's nonprofit status. Compl., Ex. C (Petition to Quash) at 7–10.

Even if the FTC *were* attempting to prevent potentially anticompetitive conduct, its interest in doing so would not outweigh Media Matters' harms in the absence of an injunction. In addition to suffering financial and associational harm, Media Matters is suffering and will continue to suffer a constitutional injury of the first order: a violation of its right to free speech and press activities under the First Amendment. But it is not only Media Matters that suffers from the abridgment of rights under the First Amendment—it is the whole of society. In a liberal democracy, there is no greater public interest than the one in free speech. *See Palko v. Connecticut*, 302 U.S. 319, 327 (1937) (abrogated on other grounds by *Benton v. Maryland*, 302 U.S. 319 (1937)) (characterizing First Amendment as "the matrix, the indispensable condition, of nearly every other form of freedom"); *see also Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 252 (1974) ("[A] free press is a condition of a free society.").

The balance of equities and the public interest thus weigh in favor of an injunction.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiff's motion for a preliminary injunction.

Dated: August 5, 2025

Respectfully submitted,
/s/ Stephen P. Anthony

Stephen P. Anthony (D.C. Bar No. 426536)
Ryan K. Quillian (D.C. Bar No. 994846)***
Dana A. Remus (D.C. Bar No. 90015315)*
Kuntal V. Cholera (D.C. Bar No. 1031523)***
Brenden J. Cline (D.C. Bar No. 1021317)*
Brigid P. Larkin (D.C. Bar No. 1780668)*
Sarah Leadem**
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

Justin A. Nelson (D.C. Bar No. 490347)
Matthew Behncke**
Alexandra Foulkes Grafton***
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
(713) 651-9366

Katherine M. Peaslee***
SUSMAN GODFREY L.L.P.
401 Union Street, Suite #3000
Seattle, WA 98101
(206) 516-3880

*Admission pending
** *Pro hac vice* application forthcoming
***Admitted *pro hac vice*

*Counsel for Plaintiff Media Matters for America*

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendants in accordance with Federal Rule of Civil Procedure 5(a).

/s/ Stephen P. Anthony
Stephen P. Anthony