**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MEDIA MATTERS FOR AMERICA,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION, *et al.*,

*Defendants*.

Civil Action No. 25-1959 (SLS)
Judge Sparkle L. Sooknanan

**MEMORANDUM OPINION**

Speech on matters of public concern is the heartland of the First Amendment. The principle that public issues should be debated freely has long been woven into the very fabric of who we are as a Nation. Without it, our democracy stands on shaky ground. It should alarm all Americans when the Government retaliates against individuals or organizations for engaging in constitutionally protected public debate. And that alarm should ring even louder when the Government retaliates against those engaged in newsgathering and reporting.

This case presents a straightforward First Amendment violation. Media Matters for America is a nonprofit media company that is over two decades old. In November 2023, it ran a story reporting that as a result of Elon Musk's acquisition of Twitter (now "X"), advertisements on the social media platform were appearing next to antisemitic posts and other offensive content. Mr. Musk immediately promised to file "a thermonuclear lawsuit against Media Matters." And he followed through. In the weeks and months that followed, X Corp. and its subsidiaries sued Media Matters all over the world, at least until a federal district court preliminarily enjoined this aggressive litigation strategy. Meanwhile, seemingly at the behest of Steven Miller, the current White House Deputy Chief of Staff, the Missouri and Texas Attorneys General issued civil

investigative demands (CIDs) to Media Matters, both of which were preliminarily enjoined in this Court as likely being retaliatory in violation of the First Amendment.

But these court victories did not end the fight for Media Matters. Now the Federal Trade Commission (FTC) has taken up the cause. After Andrew Ferguson took on his new role as the Chairman of the FTC, the agency issued a sweeping CID to Media Matters, purportedly to investigate an advertiser boycott concerning social media platforms. That CID should have come as no surprise. Before President Trump selected him to head the FTC, Mr. Ferguson appeared on Steve Bannon's podcast, where he said that it is "really important that the FTC take investigative steps in the new administration under President Trump" because "progressives" and others who are "fighting "disinformation" were "not going to give up just because of the election." One of his supporters, Mike Davis, who urged President Trump to nominate him to the role, made several public comments about Media Matters, including that Mr. Musk should "nuke" the media company. And after taking the reins, Chairman Ferguson brought on several senior staffers at the FTC who previously made public comments about Media Matters.

Media Matters brought this lawsuit to challenge the FTC's CID, alleging that it is retaliatory in violation of the First Amendment and that it is overbroad in violation of the Fourth and First Amendments. Before the Court is a motion seeking preliminary injunctive relief from the CID. The Court agrees that a preliminary injunction is warranted.

The FTC claims that this Court should look the other way because it lacks the authority to hear this lawsuit. It is wrong. Relying on *Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994), the FTC argues that Congress precluded federal court jurisdiction to hear challenges to the FTC's CIDs because it channeled those claims elsewhere in the Federal Trade Commission Act (FTC Act). But the FTC Act does no such thing. Although it gives the FTC the authority to bring

a lawsuit in federal district court to enforce a CID if the recipient fails to comply, it says nothing about claims by recipients of CIDs wishing to challenge them. According to the FTC, a recipient of a CID that violates the First Amendment may only challenge that CID if the FTC chooses to bring suit itself. It is hard to believe that Congress intended such a result. Nothing in the FTC Act suggests that Congress meant to declare open season on journalists by allowing a retaliatory FTC to decide if and when its retaliation will be reviewed by a federal court.

The FTC also argues that Media Matters may not bring constitutional claims to challenge the agency's actions. It takes the broad stance that the Administrative Procedure Act (APA) provides the exclusive remedy for judicial review of agency conduct, preventing federal courts from hearing even constitutional claims. But nothing in the APA suggests Congress meant to foreclose equitable relief for constitutional violations that have been challenged without reliance on the APA. Perhaps that is why courts in this District have routinely allowed equitable constitutional claims to proceed even when plaintiffs could not sue under the APA.

On the merits, the Court finds that Media Matters is likely to succeed on its First Amendment retaliation claim, which is all it needs at this stage. Media Matters engaged in quintessential First Amendment activity when it published an online article criticizing Mr. Musk and X. And the Court finds that the FTC's expansive CID is a retaliatory act. There can be no doubt that such a CID would deter a reporter of ordinary firmness from speaking again. Indeed, the FTC's CID has had its intended effect. Because of the CID, Media Matters has decided against pursuing certain stories about the FTC, Chairman Ferguson, and Mr. Musk. Finally, given the comments by Chairman Ferguson and his colleagues about Media Matters, the timing of the CID, and evidence of pretext, Media Matters is likely to show that retaliatory animus was the but-for

cause of the FTC's CID. Because the other equitable factors also favor Media Matters, the Court grants a preliminary injunction in its favor.

## BACKGROUND

### A. Statutory Background

"Congress created the Federal Trade Commission in 1914 to regulate the use of 'unfair methods of competition in commerce.'" *Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 72 (D.D.C. 2024) (quoting *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 966 (D.C. Cir. 1985)). The FTC "administers the FTC Act, which prohibits the use of 'unfair methods of competition' and, since 1938, 'unfair or deceptive acts or practices in or affecting commerce.'" *Id.* (quoting 15 U.S.C. § 45(a)(1)). The statute gives the FTC "the ability to investigate violations of the FTC Act" using various tools, including the issuance of civil investigative demands (CIDs). *Id.* (citing 15 U.S.C. § 57b-1(b)). And when someone fails to comply with a CID, the FTC "may file . . . in [a] district court of the United States . . . a petition for an order of such court for the enforcement" of the CID. 15 U.S.C. § 57b-1(e).

### B. Factual Background

"The following facts are alleged in the Complaint or drawn from declarations in the record that are not disputed in relevant part, except where otherwise noted." *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 415 (D.D.C. 2020).

Media Matters is a "not-for-profit research center and media watchdog." Compl. ¶ 22, ECF No. 1. For more than two decades, it has been "dedicated to monitoring and correcting misinformation in U.S. media." *Id.* ¶ 29. It has about eighty employees, "including [forty-five] reporters, writers, and researchers, to whom it provides a far-reaching platform from which they can reach the public." *Id.* ¶ 30. In recent years, Media Matters has helped document instances of "white nationalism, antisemitism, and neo-Nazi rhetoric" in the public square. *Id.* ¶ 4.

The events leading to this lawsuit date back to the end of 2022, when Elon Musk purchased Twitter, which he renamed "X." *Id.* ¶ 5. According to Media Matters, Mr. Musk "gutted its content moderation teams and its policies on misinformation and violent content in the name of promoting 'free speech.'" *Id.* Media Matters alleges that this resulted in a surge of "extremist and racist rhetoric" on X. *Id.* ¶ 32. Less than a month after Mr. Musk acquired X, the Brookings Institute reported that the platform saw "a nearly 500% increase in use of the N-word in the 12-hour window immediately following the shift of ownership to [Mr.] Musk," *id.* (quoting Rashawn Ray & Joy Anyanwu, *Why is Elon Musk's Twitter takeover increasing hate speech?*, Brookings (Nov. 23, 2022), https://perma.cc/KPW7-K6LC), and that "use of the word 'Jew' increased fivefold" "within the first week of his ownership," *id.*

In February 2023, Media Matters began publishing articles about "the juxtaposition of advertisements alongside hateful content on X." *Id.* ¶ 37. And it published one such article by Eric Hananoki on November 16, 2023. *See id.*; *see also id.* ¶ 7 (identifying Mr. Hananoki as the author). That article went viral after stating: "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content." *Id.* ¶ 37 (quoting Compl., Ex. A., ECF No. 1-1). "The article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users containing such content." *Id.*

Mr. Musk responded on November 18, 2023, by promising to file "a thermonuclear lawsuit against Media Matters." *Id.* ¶ 38 (quoting Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 am), https://perma.cc/X4HN-PLJ4). He claimed that "activist groups like Media Matters . . . try to use their influence to attack our revenue streams by deceiving advertisers on X." *Id.* ¶ 39 (quoting Elon Musk (@elonmusk), X (Nov. 18, 2023, 2:01 am), https://perma.cc/X4HN-PLJ4). As he saw it,

Media Matters had "'manipulate[d]' advertisers and the public by 'curat[ing]' and 'contriv[ing]' in order to 'find a rare instance of ads serving next to the content they chose to follow.'" *Id.* ¶ 39.

The next day, on November 19, 2023, Stephen Miller, the current White House Deputy Chief of Staff, in response to a post on X about the Media Matters article, stated that "[f]raud is both a civil and criminal violation" and that "[t]here are 2 dozen+ conservative state Attorneys General." *Id.* ¶ 40 (quoting Stephen Miller (@StephenM), X (May 17, 2022, 11:12 am), https://perma.cc/5X5H-5QLN). Just a few hours later, Missouri Attorney General Andrew Bailey replied to Mr. Miller's post: "My team is looking into this matter." *Id.* ¶ 41 (quoting Attorney General Andrew Bailey (@AGAndrewBailey), X (Nov. 19, 2023, 4:46pm), https://perma.cc/J463-656K). And the next day, on November 20, 2023, Texas Attorney General Ken Paxton "announced that he was launching an investigation into Media Matters, purportedly under Texas's Deceptive Trade Practices Act." *Id.* ¶ 42. That same day, Mr. Musk's X Corp. sued Media Matters and Mr. Hananoki in the United States District Court for the Northern District of Texas. *See id.* ¶ 45 (citing *X Corp. v. Media Matters for Am.*, No. 4:23-cv-1175 (N.D. Tex Nov. 20, 2023), ECF No. 1).[1] And in the "weeks and months" that followed, "X Corp., through its international subsidiaries, filed suits in Ireland and Singapore." *Id.* ¶ 46.

Media Matters also began receiving CIDs from state attorneys general. The Texas Attorney General issued a CID to Media Matters on November 21, 2023. *See id.* ¶ 43. It demanded that Media Matters "produce an array of materials in both Media Matters' and [Mr.] Hananoki's possession since January 1, 2022, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers," and other

---

[1] Media Matters alleged that the date of X. Corp.'s complaint was November 11, 2023, but the Court recognizes that as a typo given the docket says November 20, 2023.

materials. *Id.* (citing Compl., Ex. B, ECF No. 1-2). The Missouri Attorney General followed suit on March 25, 2024, issuing a CID seeking records from Media Matters. *Id.* ¶ 44 (citing Compl., Ex. C, ECF No. 1-3).

Media Matters challenged those state CIDs in this Court. It filed a complaint against the Texas Attorney General on January 17, 2024. *See Media Matters for Am. v. Paxton*, No. 24-cv-147, ECF No. 1. And the Court preliminarily enjoined the Texas CID on April 12, 2024, concluding that Media Matters was likely to succeed on the merits of its First Amendment retaliation claim. *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024); *see also* Compl. ¶ 50. Media Matters "amended its suit" after receiving the Missouri CID to name the Missouri Attorney General as a defendant. Compl. ¶ 51. And the Court again granted a preliminary injunction on August 23, 2024, concluding that the Missouri CID likely amounted to First Amendment retaliation. *See Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024). Media Matters and the Missouri Attorney General ultimately settled their dispute in February 2025. *See* Mot. Dismiss Case, *Media Matters for Am. v. Paxton*, No. 24-7141 (D.C. Cir. Feb. 11, 2025), ECF No. 2100004; *see also* Pl.'s Unopposed Mot. Dismiss Claims Against Andrew Bailey, *Media Matters for Am. v. Paxton*, No. 24-cv-147 (D.D.C. Feb. 13, 2025), ECF No. 89. And on May 30, 2025, the D.C. Circuit affirmed the district court's preliminary injunction as to the Texas Attorney General, holding that Media Matters had "demonstrated a likelihood of success on the merits of [its] First Amendment retaliation claim." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025); *see also* Compl. ¶ 50.

While the litigation about the state CIDs was ongoing, Media Matters also sued X Corp. in the United States District Court for the Northern District of California. *See* Compl., *Media Matters for Am. v. X. Corp.*, No. 25-cv-2397, ECF No. 1 (Mar. 10, 2025); *see also* Compl. ¶ 52.

It challenged X Corp.'s global litigation campaign as violating the forum selection clause in its terms of service. *See* Compl. ¶ 52. And on April 10, 2025, the district court granted Media Matters' motion for a preliminary injunction in part, recognizing that "it seems almost certain that the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights." *Media Matters for Am. v. X Corp.*, No. 25-cv-2397, 2025 WL 1084715, at *1 (N.D. Cal. Apr. 10, 2025); *see also* Compl. ¶ 52.

These preliminary injunctions did not end the controversy. On December 10, 2024, President-elect Trump announced that he would name Andrew Ferguson to be the next Chairman of the FTC. Compl. ¶ 65. This choice came after Mr. Musk "spent at least $288 million to help elect President Trump and other Republican candidates in the 2024 election cycle." *Id.* ¶ 54. It also followed an X post by a fellow donor, Marc Andreesen, stating that "[t]he orchestrated advertiser boycott against X and popular podcasts must end immediately" because "[c]onspiracy in restraint of trade is a prosecutable crime." *Id.* ¶ 57. Mr. Ferguson had responded to Mr. Andreesen's post with the comment that "[a]ntitrust enforcers should take this seriously." *Id.* ¶ 58. And according to a "leaked memo" that the Defendants do not seem to contest, *see* Compl. ¶ 59, when Mr. Ferguson was only a candidate for the FTC Chairman position, he also stated that he had a "track record of standing up to . . . the radical left" and insisted that he would "[i]nvestigate . . . advertiser boycotts," *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/A56K-Q4YM. Mr. Ferguson had also appeared on Steve Bannon's podcast, where he said that "'progressives' who are 'fighting "disinformation"' were 'not going to give up just because of the election,' so 'it's really important that the FTC take investigative steps in the new administration under President Trump.'" Compl. ¶ 61 (quoting Andrew Ferguson,

*Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM]*, Bannon's War Room (Nov. 30, 2024), https://perma.cc/ASE8-RZNJ); *see also* Notice of Tr., Ex. A at 3, ECF No. 32-1. One of Mr. Ferguson's supporters was Mike Davis, who wrote on X that "Donald Trump should nominate digital freedom fighter Andrew Ferguson to chair FTC." *Id.* ¶ 63 (Mike Davis (@mrddmia), X (Dec. 7, 2024, 2:09 pm), https://perma.cc/V9XL-J7UX).

Mr. Davis has made many comments about Media Matters throughout this controversy. On December 1, 2022, Mr. Davis posted on X that Mr. Musk "should nuke @MMFA [Media Matters' account] and all staff accounts" because "[t]hey're a cancer to free speech." *Id.* ¶ 64 (quoting Mike Davis (@mrddmia), X (Dec. 1, 2022, 11:54am), https://perma.cc/VVD5-NAR5). Later, on November 10, 2023, he solicited money to help push back against Media Matters: "If you want to help @Article3Project build our (growing) list of leftists to throw in the DC gulag with @MMFA's @ehananoki and @MattGertz, please donate here." *Id.* (quoting Mike Davis (@mrddmia), X (Nov. 10, 2023, 1:53 pm), https://perma.cc/L8E8-ZSJF). And he cheered on Mr. Musk's eventual lawsuits against Media Matters, writing that "[a]dvertiser boycotts are highly effective tactics leftists use to cow media executives to destroy free speech—and control the political narrative. @MMFA is the driving force behind conservative media getting crushed—and conservative voices silenced. Cheers to @ElonMusk." *Id.* (quoting Mike Davis (@mrddmia), X (Nov. 29, 2023, 5:42 pm), https://perma.cc/G88S-YC3U). Mr. Davis "is now an outside adviser to the Trump administration." *Id.* ¶ 71 (quoting Dave Michaels, *How Trump's FTC Chairman Is Bringing a MAGA Approach to Antitrust Enforcement*, WSJ (Mar. 12, 2025), https://www.wsj.com/politics/policy/how-trumps-ftc-chairman-is-bringing-a-maga-approach-to-antitrust-enforcement-66b286d5).

When Mr. Ferguson became Chairman of the FTC, he "brought in several senior staffers" who had previously made comments about Media Matters. *Id.* ¶ 70. Joe Simonson, the FTC's Director of Public Affairs, had posted on X in May 2024 that "Media Matters employed a number of stupid and resentful Democrats who went to like American University and didn't have the emotional stability to work as an assistant press aide for a House member." *Id.* ¶ 70 (quoting Joe Gabriel Simonson (@SaysSimonson), X (May 23, 2024), https://perma.cc/8CTX-HPS7). Jon Schweppe, a Senior Policy Advisor to Chairman Ferguson, had said in June 2023 that "Media Matters wants to weaponize powerful institutions to censor conservatives," *id.* (quoting Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/), before celebrating one of Mr. Musk's lawsuits against Media Matters, which he called the "scum of the earth," *id.* (quoting Jon Schweppe (@JonSchweppe), X (Nov. 20, 2023), https://perma.cc/25YT-DQ7T). And Jake Denton, the FTC's Chief Technology Officer, had stated in June 2023 that Media Matters was "an organization devoted to pressuring companies into silencing conservative voices." *Id.* (quoting Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/).

That brings us to this lawsuit. On May 20, 2025, the FTC issued a CID to Media Matters. *Id.* ¶ 73. The CID included many broad demands, including but not limited to the following:

- Provide all documents that Media Matters either produced or received in discovery in any litigation between Media Matters and X Corp. related to advertiser boycotts since 2023.

- Provide all documents relating to other entities that purport to track, categorize, monitor, analyze, evaluate, or rate news, media, sources, platforms, outlets, websites, or other content publisher entities for "brand suitability," "reliability," "misinformation," "hate speech," "false" or "deceptive" content, or similar categories.
- Provide all documents relating to advertisers working with publishers and/or platforms to address harmful, hateful, misleading, unsafe, or otherwise undesirable media environments.
- Provide all documents relating to efforts by any person to create or advance brand safety tools.
- Provide documents and data sufficient to show the methodology by which Media Matters evaluates or categorizes any news, media, sources, platforms, outlets, websites, or other content publisher entities.
- Provide all documents relating to any complaints that Media Matters received related to its activities, programs, or policies, including but not limited to complaints regarding Media Matters' decision to apply any label, rating, or categorization to any news, media, sources, outlets, platforms, websites, or other content publisher entities.
- Provide all documents, including correspondence, relating to Media Matters working with ad tech, technology, or developer companies or social media platforms to develop or advance any of Media Matters' programs, policies, or objectives, including but not limited to any agreements between Media Matters and these companies.
- Provide each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report regularly prepared by or for Media Matters on any periodic basis. For each such statement, budget, or report, state how often it is prepared, and identify the employees responsible for its preparation.

Compl., Ex. D at 2–4, ECF No. 1-4. The CID defined "Media Matters" to mean "Media Matters for America, together with its successors, predecessors, divisions, wholly- or partially-owned subsidiaries, committees, working groups, alliances, affiliates, and partnerships, whether domestic or foreign; and all the directors, officers, employees, consultants, agents, and representatives of the foregoing." *Id.* at 4. The field of the CID entitled "Subject of Investigation" said "See attached." *Id.* at 1. And the only attachment mentioning anything about a "Scope of Investigation" was a 2022 FTC resolution directing that "any and all compulsory processes available" to the FTC should "be used in connection with any inquiry" meant to "investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in inviting, initiating, participating in, or

facilitating collusion or coordination . . . in violation of Section 5 of the Federal Trade Commission Act . . . or any other statutes or rules enforced by the Commission." *Id.* at 20.

Over a month later, on July 7, 2025, after Media Matters had filed this lawsuit, the FTC clarified in a letter to Media Matters why it had issued the CID. *See* Pl.'s Mot. Prelim. Inj., Ex. B, ECF No. 22-4. It stated that the subject of the investigation was:

> To determine whether any natural persons, partnerships, corporations, associations, or other legal entities have engaged in or are engaging in unfair, anticompetitive, collusive, or exclusionary acts or practices—including inviting, participating in, or facilitating boycotts or other collusion or coordination—to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or Section 5 of the FTC Act, 15 U.S.C. § 45, as amended, or any other statutes or rules enforced by the Commission, and to determine the appropriate action or remedy.

*Id.* at 1. And the Defendants put a finer point on this in their Opposition, stating that they are "investigating whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not 'brand suitable' or not 'brand safe,' to coordinate the placement of ads." Defs.' Opp'n Mot. Prelim. Inj (Defs.' Opp'n) at 28, ECF No. 27 (quoting Order Den. Pet. to Quash Civ. Investigative Demand at 2, *In the Matter of Civ. Investigative Demand to Media Matters for America Dated May 20, 2025*, FTC Dkt. No. 251-0061 (July 25, 2025)). They say that they have accordingly issued CIDs to entities "that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement," including Media Matters. *Id.*

Media Matters claims that the FTC's CID has chilled its First Amendment activity. Compl. ¶ 84. And it has presented several declarations to support this argument. According to one declarant, "the prospect of relaxing Media Matters' posture on research and reporting about government entities" after winning legal victories against the state CIDs "was stymied by the FTC's CID." Dimiero Decl. ¶ 19, ECF No. 22-6; *see also* Padera Decl. ¶ 17 (similar),

ECF No. 22-8. "For example, without the investigation, Media Matters would likely have looked into reporting about Andrew Ferguson's merger requirements for Omnicom and IPG, which placed unprecedented limitations on their speech in a transparent attempt to aid media platforms, like X, with limited content moderation efforts." Dimiero Decl. ¶ 20. The declarant also identified particular stories that Media Matters would have pursued but for the FTC CID. *See id.* ¶ 21. Another declarant stated that the FTC's CID is "driving additional costs" and that it has caused "retention challenges" for Media Matters. Padera Decl. ¶ 22. Finally, a third declarant attested that the FTC's CID resulted in Media Matters being "removed from coalition communications" "about FTC actions." Millican Decl. ¶ 13, ECF No. 22-7.

### C. Procedural Background

Media Matters filed a Complaint in this Court on June 23, 2025, bringing two claims against the FTC and some of its officers. *See* Compl. ¶¶ 95–110. First, it alleged that the Defendants "violated, and continue to violate," Media Matters' "First Amendment rights by launching an investigation and serving a burdensome CID in retaliation for [Media Matters'] speech." *Id.* ¶ 96. And second, it alleged that the Defendants' "issuance of the overbroad and retaliatory CID violates [Media Matters'] First and Fourth Amendment rights by unreasonably requiring it to turn over sensitive and privileged materials, including those that impinge upon their association with other organizations." *Id.* ¶ 107. On July 14, 2025, Media Matters filed a Motion for Preliminary Injunction. *See* Pl.'s Mot. Prelim. Inj., ECF No. 22. This motion is fully briefed and ripe for review. *See* Defs.' Opp'n; Pl.'s Reply Supp. Mot. Prelim. Inj., ECF No. 28; Pl.'s Suppl. Mem., ECF No. 31; Defs.' Mem., ECF No. 33.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. And a plaintiff "need only establish a likelihood of success on the merits of one claim to obtain . . . injunctive relief." *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 218 (D.D.C. 2020).

## DISCUSSION

The Court finds that Media Matters is likely to succeed on the merits of its First Amendment retaliation claim, that it has shown irreparable injury, and that the balance of equities and the public interest favor injunctive relief. The Court therefore grants Media Matters the preliminary injunction it seeks.

### A. Likelihood of Success on the Merits

#### 1. Preclusion

The Defendants raise two threshold arguments. They first argue that the Court lacks subject matter jurisdiction because the FTC Act precludes this lawsuit. *See* Defs.' Opp'n at 11–18. "A special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)); *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("The merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." (cleaned up)). "District courts may ordinarily hear those challenges by way of 28 U.S.C. § 1331's grant of jurisdiction for claims 'arising under' federal law." *Id.* "Congress, though, may substitute for that district court authority an alternative scheme of review." *Id.* It may do so "explicitly, providing in so many words that district court jurisdiction will yield," or "implicitly, by specifying a different method to resolve claims about agency action." *Id.*

"Under *Thunder Basin*'s framework, courts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (cleaned up).

**a. Fairly Discernible**

Courts first ask whether it is "fairly discernible in the statutory scheme" that Congress intended to provide an exclusive channel to review. *Id.* The Defendants argue that the FTC Act reflects such an intent. *See* Defs.' Opp'n at 13. More specifically, they identify statutory language authorizing the FTC to enforce a CID in federal district court "[w]henever any person fails to comply with any civil investigative demand duly served upon him . . . , or whenever satisfactory copying or reproduction of material requested pursuant to the demand cannot be accomplished and such person refuses to surrender such material." 15 U.S.C. § 57b-1(e). And they point out that the recipient of an agency CID may raise constitutional challenges during an enforcement proceeding. *See, e.g.*, *United States v. Witmer*, 835 F. Supp. 208, 224 (M.D. Penn. 1993) ("Witmer and Kelly argue that the issuance of the CIDs during the pendency of a grand jury investigation into the same conduct unduly burdens their Fifth Amendment rights and is fundamentally unfair."). They argue that "Congress thus channeled issues concerning the validity, scope, and enforceability of FTC CIDs into an enforcement action, precluding efforts . . . to impede preemptively the Commission's ongoing investigations." Defs.' Opp'n at 13.

The first problem with this argument is that it is highly unusual to apply *Thunder Basin* to preclude claims brought in federal court on the basis that a statute channels those claims to a later federal court proceeding. *Thunder Basin* itself suggests it should apply only to statutes that channel

claims to an administrative proceeding, which is perhaps followed by federal court review. *See, e.g.*, *Thunder Basin*, 510 U.S. at 207 ("In cases involving delayed judicial review of final agency actions, we shall find that Congress has allocated initial review to an administrative body where such intent is fairly discernible in the statutory scheme." (cleaned up)); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) ("Provisions for agency review do not restrict judicial review unless the statutory scheme displays a fairly discernible intent to limit jurisdiction[.]" (cleaned up)); *Arch Coal, Inc.*, 888 F.3d at 498 ("Under *Thunder Basin*'s framework, courts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of *administrative and* judicial review when . . . such intent is fairly discernible in the statutory scheme[.]" (emphasis added) (cleaned up)); *see also Elgin v. Dep't of the Treasury*, 567 U.S. 1, 8 (2012) ("We begin with the appropriate standard for determining whether a statutory scheme of *administrative and* judicial review provides the exclusive means of review for constitutional claims." (emphasis added)). In describing *Thunder Basin*, the Supreme Court has even said that "Congress typically chooses" to implicitly substitute district court jurisdiction with an alternative scheme of review by providing for "review in a court of appeals following the agency's own review process." *Axon*, 598 U.S. at 185; *see also id.* ("The agency effectively fills in for the district court, with the court of appeals providing judicial review."). And the Defendants have not directed the Court to any case applying *Thunder Basin* to preclude claims because a statute channels those claims directly to a federal court.

The Court has identified a line of cases applying *Thunder Basin*'s precursor, *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), to find preclusion where a statute channels certain claims to enforcement actions in federal court. *See Nat'l Ass'n of Home Builders v. U.S. EPA*, 731 F. Supp. 2d 50, 54–56 (D.D.C. 2010) ("Courts have routinely held that the [Clean

Water Act] precludes 'pre-enforcement review' of agency actions taken under its authority." (collecting cases)); *see also Maryland v. U.S. Dep't of Agric.*, No. 25-cv-748, 2025 U.S. Dist. LEXIS 63362, at *58 (D. Md. Apr. 1, 2025) ("[I]n the claim-channeling line of authority, *Block* does not represent some independent analytical framework separate and apart from *Thunder Basin*, but rather is a precursor decision to *Thunder Basin*, as *Thunder Basin* itself suggests."). *Block* taught that "the presumption favoring judicial review" is overcome "whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" 467 U.S. at 351 (quoting *Data Processing Serv. v. Camp*, 397 U.S. 150, 157 (1970)). And *Thunder Basin* then adopted that "fairly discernible" language. *See* 510 U.S. at 207, 216 (citing *Block*, 467 U.S. at 351). So the Court will treat this line of cases as informing the first prong of *Thunder Basin*.[2]

The primary case is *Hoffman Group, Inc. v. EPA*, 902 F.2d 567 (7th Cir. 1990), which held that a federal district court lacked jurisdiction to hear a challenge to an EPA compliance order because the Clean Water Act (CWA) "impliedly precluded judicial review" of such an order "except in an enforcement proceeding" brought by the EPA. *Id.* at 569 (citing *Block*, 467 U.S. at 349). Understanding this holding requires some background. "Congress provided [the] EPA with a choice of procedures for enforcing the [CWA]." *S. Pines Assocs. v. United States*, 912 F.2d 713, 715 (4th Cir. 1990). The first two options come from Section 309(a)(3) of the CWA, which permits the EPA to "either issue an order requiring [a] person to comply with [the Act]" or "bring a civil action" where it finds a violation of the Act. *Id.* (quoting 33 U.S.C. § 1319(a)(3)). And a third option comes from Section 309(g), which provides that the EPA "may also assess

[2] Neither party briefed *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), or the line of cases beginning with *Hoffman Group, Inc. v. EPA*, 902 F.2d 567 (7th Cir. 1990). At oral argument, the Court identified these cases and requested supplemental briefing.

administrative penalties against those who violate the Act or a permit issued under the Act." *Id.* (citing 33 U.S.C. § 1319(g)). When the EPA takes this third route, "the violator is entitled to a hearing before the agency," *id.* (citing 33 U.S.C. § 1319(g)(2)), and the order "assessing administrative penalties [is] subject to judicial review," *id.* (citing 33 U.S.C. § 1319(g)(8)). In *Hoffman*, the Seventh Circuit largely relied on two aspects of this statutory structure to conclude that Congress intended to preclude district court challenges to EPA compliance orders, and several circuits have followed suit. *See, e.g.*, *S. Pines Assocs.*, 912 F.2d at 715; *S. Ohio Coal Co. v. Off. of Surface Mining, Reclamation & Enf't*, 20 F.3d 1418, 1427 (6th Cir. 1994); *Laguna Gatuna, Inc. v. Browner*, 58 F.3d 564, 566 (10th Cir. 1995); *see also Rueth v. EPA*, 13 F.3d 227, 230 (7th Cir. 1993). But neither of these features is present in the FTC Act. *See infra*, at 18–21.

*First*, the Seventh Circuit zeroed in on the two options presented in Section 309(a)(3). *See Hoffman*, 902 F.2d at 569. It said that the statutory language showed that the EPA could either "issue a compliance order" *or* "file suit for enforcement" when faced with a violation of the CWA. *Id.* "A compliance order is a document served on the violator, setting forth the nature of the violation and specifying a time for compliance with the Act." *S. Pines Assocs.*, 912 F.2d at 715 (citing 33 U.S.C. § 1319(a)(5)(A)). It "does not alter [the recipient's] obligations under the Act," and as should be clear from Section 309(a)(3), the "EPA can bring a suit whether or not it issues an order[.]" *Id.* at 716 n.3. Accordingly, deciding to issue a compliance order can be seen as an attempt "to negotiate a solution rather than to institute civil proceedings immediately." *Id.*; *see also Rueth*, 13 F.3d at 230 n.2 ("[F]orcing the agency into litigation before it completes its wetlands delineation and permitting process will frustrate the statutory scheme that allows the agency to resolve violations in a flexible manner without judicial interference." (quoting *Howell v. U.S. Army Corps of Eng'rs*, 794 F. Supp. 1072, 1075 (D.N.M. 1992)). This more flexible option makes sense

because "[t]he objective of the CWA is 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," *S. Pines Assocs.*, 912 F.2d at 715 (quoting 33 U.S.C. § 1251), so Congress understandably "intended to allow [the] EPA to act and address environmental problems quickly without becoming immediately entangled in litigation," *id.* at 716. As the Seventh Circuit saw it, allowing the recipient of a compliance order to immediately bring a challenge in federal court "would eliminate this choice." *Hoffman*, 902 F.2d at 569.

But the FTC Act provides no alternative option when the FTC finds someone has violated the terms of one of its CIDs. It only allows the FTC to "file . . . in [a] district court of the United States . . . a petition for an order of such court for the enforcement of this section." 15 U.S.C. § 57b-1(e). Allowing the recipient of a CID to bring a pre-enforcement challenge in district court therefore removes no statutorily provided tool from the FTC's toolbox.

*Hoffman* muddies this distinction by saying that the CWA allows the EPA to "seek to enforce" its compliance orders "in a federal district court." 902 F.2d at 568 (citing 33 U.S.C. § 1319(b)). This seems to collapse the EPA's options for handling a CWA violation into a single option for responding to a compliance order violation—federal court enforcement. On this view, the FTC appears to be in the same boat, left to handle CID violations with federal court enforcement actions alone. *See* 15 U.S.C. § 57b-1(e). But *Hoffman* used materially imprecise language. 33 U.S.C. § 1319(b) does not allow the EPA to enforce its compliance orders. After all, those compliance orders do "not alter [the recipient's] obligations under the [CWA]." *S. Pines Assocs.*, 912 F.2d at 716 n.3. Instead, 33 U.S.C. § 1319(b) allows the EPA "to commence a civil action" "for any violation for which [it] is authorized to issue a compliance order." *Id.* In other words, the civil action is not enforcing the compliance order, it is enforcing the CWA. *See also id.* § 1319(a)(3) (allowing the EPA to enforce violations of the CWA by bringing "a civil action in

accordance with *subsection (b)* of this section"). And the EPA has several options when faced with CWA violations. *See supra*, at 17–18. But the FTC Act permits federal court enforcement actions for violations of the CID itself. *See* 15 U.S.C. § 57b-1(e) ("Whenever any person fails to comply with any *civil investigative demand* duly served upon him under this section, . . . the Commission . . . may file . . . a petition for an order of [a district court] for the enforcement of this section."). And it provides only one way to respond to such a violation. *See id.*

The Defendants insist that the FTC's CIDs create no legal obligations on the recipient until enforcement because they are not self-executing. *See* Defs.' Opp'n at 42 ("Commission CIDs are not self-executing, and Media Matters was under no legal obligation to comply—unless and until the Commission later sought and secured a court order enforcing the CID."); *see also* Motions Hr'g (Aug. 13, 2025), Rough Tr. at 27:14–17 ("[I]t's not self-enforcing. So the obligation doesn't arise until the enforcement action."). But whether something is self-executing is a distinct question from whether it creates legal obligations. *See, e.g.*, *Sluss v. U.S. Dep't of Just.*, 898 F.3d 1242, 1249 (D.C. Cir. 2018) ("Non-self executing treaties are much like federal statutes that do not supply a private cause of action. Although both are enactments that create legal obligations, plaintiffs cannot bring claims under either."); *Lewis v. Mich. Sec'y of State*, No. 24-cv-13249, 2024 U.S. Dist. LEXIS 229172, at *7 (E.D. Mich. Dec. 18, 2024) ("[T]hat order is not a source of federal legal obligation, so it is not a basis for suit in a federal court. Nor is the state court order self-executing."); *see also In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 514 (S.D. W. Va. 2014) ("[T]he court found that the DOJ-issued CID *triggered a duty* to preserve evidence that [was owed] to the DOJ[.]" (emphasis added) (cleaned up)). Indeed, it is unclear what exactly an FTC enforcement action would be enforcing if the CID created no legal obligations. *See* Rough Tr. at 26:4–7 (responding to the Court asking, "So you think in the absence of the CID

there's some authority that would have required them to provide the requested information?" with "Oh, no, Your Honor"). While *Hoffman* might have been comfortable discerning a congressional intent to preclude pre-enforcement district court challenges to EPA compliance orders creating no new obligations, this Court declines to do the same for FTC CIDs making new demands on their recipients.

*Second*, the Seventh Circuit contrasted the CWA's statutory silence about judicial review of compliance orders with the language allowing for judicial review of administrative penalties. *See Hoffman*, 902 F.2d at 569. It reasoned that by expressly providing for judicial review of one enforcement option, Congress impliedly foreclosed the same for the other enforcement option. *See id.*; *see also Rueth*, 13 F.3d at 230 ("Additionally, we noted that an alleged violator can obtain judicial review if the EPA seeks to assess administrative penalties which Congress chose to make subject to judicial review."). But again, the FTC Act provides the FTC with no similar administrative enforcement option for CID violations, let alone one followed by judicial review. *See* 15 U.S.C. § 57b-1(e). It would therefore make little sense to read a preclusive intent into Section 57b-1(e)'s silence about judicial review for pre-enforcement actions.[3]

---

[3] Even if there were no meaningful distinction between this case and *Hoffman*, the persuasive force of that opinion has been greatly dulled by the Supreme Court. In *Sackett v. EPA*, 566 U.S. 120 (2012), the Court held that the CWA does not preclude review of APA challenges to EPA compliance orders. *See id.* at 128–31. It rejected the logic of *Hoffman* without naming it, reasoning that (1) the choice presented in Section 309(a)(3) could have been intended for any number of reasons other than creating a non-judicially reviewable option and (2) the express provision for judicial review of administrative penalties should not be read to imply the absence of judicial review for compliance orders because the CWA is "long and complicated." *Id.* at 128–29. It is true that *Sackett* relied in part on the presumption of judicial reviewability inherent in the APA, *see id.*, which does not apply to Media Matters' non-APA claims. But that does not change the fact that it was unimpressed by the very arguments advanced in *Hoffman*. For that reason, the Court would be wary of applying *Hoffman*'s reasoning after *Sackett*.

Moving beyond the *Hoffman* line of cases, the Court sees nothing in the FTC Act's structure to suggest that Congress meant to preclude district court review of challenges to CIDs. The Defendants argue that Congress demonstrated that it knew how to provide for district court review in different parts of the statute, implying that it purposefully chose not to allow for district court review of pre-enforcement actions in 15 U.S.C. § 57b-1(e). *See* Defs.' Opp'n at 14 (citing 15 U.S.C. §§ 45(l), 45(m)). But the provisions they cite merely allow the *Government* to file an action in district court. *See* 15 U.S.C. § 45(l) ("[A] civil penalty . . . may be recovered in a civil action brought by the Attorney General of the United States."); *id.* § 45(m)(1)(A) ("The Commission may commence a civil action to recover a civil penalty in a district court of the United States[.]"); *id.* § 45(m)(1)(B) ("[T]he Commission may commence a civil action to obtain a civil penalty in a district court of the United States[.]"); *see also id.* § 45(m)(2) (allowing for judicial review "[u]pon request of any party to such an action *against* such defendant[.]"). So they say nothing about Congressional intent with respect to district court lawsuits by regulated parties.

If anything, *Thunder Basin* itself suggests that the Court should *not* read 15 U.S.C. § 57b-1(e) to impliedly preclude pre-enforcement challenges. When discussing the statutory scheme in that case, the Supreme Court highlighted that the statute expressly authorized the Secretary of Labor to enforce a violation of an order in federal district court and that the text said nothing about a recipient bringing an action in district court. *See* 510 U.S. at 209. But *Thunder Basin* read this silence to imply that Congress meant to preclude pre-enforcement actions only because the statute allowed the regulated party to "complain to the Commission and then to the court of appeals." *Id.* Media Matters has no such alternative recourse, so the Court doubts that Congress meant to close the courthouse doors to CID recipients altogether.

**b. Type of Claim**

Even if the Defendants were correct about the first *Thunder Basin* prong, Media Matters' First Amendment retaliation claim is not "of the type Congress intended to be reviewed within [the] statutory structure," *Arch Coal, Inc.*, 888 F.3d at 498 (cleaned up). The Supreme Court has identified three factors to help run this analysis:

> First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim wholly collateral to the statute's review provisions? And last, is the claim outside the agency's expertise? When the answer to all three questions is yes, we presume that Congress does not intend to limit jurisdiction. But the same conclusion might follow if the factors point in different directions. The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question. The first . . . factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review. The second and third reflect in related ways the point of special review provisions—to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to.

*Axon*, 598 U.S. at 186 (cleaned up). It is hard to see how the second and third factors can favor the Defendants since they do not seek "to give the agency a heightened role," *id.*, and instead seek to channel claims to a later federal court proceeding. But the core problem for the Defendants comes from the first factor.[4] They even appeared to concede as much at oral argument. *See* Motions Hr'g (Aug. 13, 2025), Rough Tr. at 34:8–11 (responding to the Court saying, "What I hear you saying is there is no meaningful judicial review, but [C]ongress made that decision," with "Yes, Your Honor").

Reading the FTC Act to preclude Media Matters' claims—at least its First Amendment retaliation claim—would "foreclose all meaningful judicial review." *Id.* The D.C. Circuit has

---

[4] As an aside, the third factor's explicit reference to agency expertise reinforces the fact that the Supreme Court intended *Thunder Basin* preclusion to apply to claim-channeling to *agencies*—not federal courts.

already held that Media Matters' similar First Amendment injuries caused by the Texas CID were "ongoing," such that it could not "get meaningful redress by challenging the CID later." *Media Matters for Am.*, 138 F.4th at 583; *see also Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, No. 23-5096, 2023 U.S. App. LEXIS 13064, at *40–41 (D.C. Cir. May 25, 2023) (Rao, J., dissenting) (arguing the first factor was met even where eventual review was guaranteed because "[t]he Consortium maintains the NLRB's assertion of jurisdiction violates the First Amendment, a here-and-now constitutional injury that cannot be remedied through appellate review of an ultimate order by the Board"). To be clear, the Court does not give special solicitude to First Amendment claims that are guaranteed to be heard eventually. *See LabMD, Inc. v. FTC*, 776 F.3d 1275, 1280 (11th Cir. 2015) (rejecting such an argument). It merely notes that letting the alleged retaliator decide whether a First Amendment retaliation claim will ever be heard would not provide meaningful relief to those suffering from ongoing concrete injuries because of that retaliation. Returning to the "ultimate question" presented by the three factors, *Axon*, 598 U.S. at 186, the Court doubts that Congress intended such an absurd result, and nothing in the FTC Act suggests that to be the case. Perhaps the FTC wishes to argue that Media Matters is suffering from no concrete harm. But the D.C. Circuit has already foreclosed that argument. *See Media Matters for Am.*, 138 F.4th at 580.

For similar reasons, even if 15 U.S.C. § 57b-1(e) could be read to evince a congressional intent to preclude pre-enforcement challenges to FTC CIDs, the Court would not find preclusion in this particular case. One need look no further than *Rueth v. U.S. EPA* to see why. *See* 13 F.3d at 231. There, the Seventh Circuit reaffirmed its earlier holding from *Hoffman* that the CWA impliedly precluded a pre-enforcement claim. *See Rueth*, 13 F.3d at 229–30. And it acknowledged that it was leaving the plaintiff "somewhat in limbo until such time as the EPA

seeks to enforce the compliance order or assess administrative penalties." *Id.* at 230. But it warned that if "the EPA or the Corps of Engineers . . . completely overextend[ed] their authority," the Court would "not hesitate to intervene in pre-enforcement activity." *Id.* at 231. Media Matters claims that the FTC has done just that, so it follows that the FTC Act should not deny Media Matters its day in court.

**2. Cause of Action**

The Defendants' second threshold argument is that "Media Matters does not invoke a cognizable cause of action for its claims." Defs.' Opp'n at 19; *see also Trudeau v. FTC*, 456 F.3d 178, 188 (D.C. Cir. 2006) ("Whether these are claims 'upon which relief can be granted' depends in part on whether there is a cause of action that permits [the plaintiff] to invoke the power of the court to redress the violations of law that he claims the FTC has committed."). But the Court is not convinced, at least not when it comes to the First Amendment retaliation claim. *See A.B.-B.*, 548 F. Supp. 3d at 218 ("Plaintiffs need only establish a likelihood of success on the merits of one claim to obtain the injunctive relief that they seek.").

The Supreme Court has suggested that plaintiffs have "an implied private right of action directly under the Constitution to challenge governmental action" when seeking equitable relief. *Free Enter. Fund*, 561 U.S. at 491 n.2. When the Government tried to argue that certain petitioners lacked a private right of action to enforce the Appointments Clause and separation-of-powers principles, the Court demanded that it provide a reason or cite an authority for why "an Appointments Clause or separation-of-powers claim should be treated differently than every other constitutional claim." *Id.* And the Defendants have similarly provided no reason for why First Amendment claims should be treated differently.

Even absent a textual hook, "[t]he ability to sue to enjoin unconstitutional actions by . . . federal officers . . . reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q Rev. 345 (1956)); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution[.]").

The Defendants invoke a series of cases to support the proposition that Media Matters "cannot rely on the First or Fourth Amendments for a viable cause of action in this case." Defs.' Opp'n at 22–24 (collecting cases). But two of those cases addressed whether a plaintiff had a *statutory* private right of action. *See Sledge v. District of Columbia*, 869 F. Supp. 2d 140, 143 (D.D.C. 2012) (evaluating "whether § 1981 as amended implies a private right of action"); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) ("The question of the existence of a statutory cause of action is, of course, one of statutory construction."). And another was a *Bivens* case that implicitly recognized the availability of injunctive relief. *See Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (saying it is not "damages or nothing" since the "detainees may seek injunctive relief").

The only case they cite discussing equitable relief under an implied constitutional cause of action is *Committee on the Judiciary of the United States House of Representatives v. McGahn*, 973 F.3d 121 (2020). There, the D.C. Circuit held that a congressional committee lacked a cause of action to enforce a subpoena. *See id.* at 123. First, it imported the reasoning of *Ziglar*—a *Bivens* case—to hold that the committee lacked an implied cause of action under Article I to seek equitable

relief because "Congress has *declined* to authorize lawsuits like the Committee's twice over." *McGahn*, 973 F.3d at 123. Second, it held that the court could not "exercise its 'traditional equitable powers' to grant relief," *id.* (quoting *Ziglar*, 582 U.S. at 133), in part because "those equitable powers remain 'subject to express and implied statutory limitations,'" *id.* (quoting *Armstrong*, 575 U.S. at 327). The upshot of these two holdings seems to be that Congress may expressly or impliedly displace by statute both an implied constitutional cause of action and the traditional equitable cause of action to enforce the Constitution. The Defendants argue that Congress did just that as to constitutional claims brought against agencies when it enacted the APA. *See* Defs.' Opp'n at 24. But there are a few problems with this argument.

*First*, *McGahn* is not binding on this Court. The judgment in that case was vacated pending en banc review, *see Comm. on the Judiciary of the U.S. House of Representatives*, No. 19-5331, 2020 U.S. App. LEXIS 32573, at *5–6 (D.C. Cir. Oct. 15, 2020) (per curiam), and the opinion was later vacated as well, *see Comm. on the Judiciary of the U.S. House of Representatives*, No. 19-5331, 2021 U.S. App. LEXIS 20759, at *1 (D.C. Cir. July 13, 2021) (per curiam), after one side filed a consent motion for vacatur "to remove any doubt that th[e] opinion is not the binding law of this Circuit," Consent Mot. Vacate Panel Op. at 3, *Comm. on the Judiciary of the U.S. House of Representatives*, No. 19-5331, 2021 U.S. App. LEXIS 20759, at *1 (D.C. Cir. July 13, 2021) (per curiam), ECF No. 1902017. The vacated opinion is therefore non-binding. *See Save Our Cumberland Mountains, Inc. v. Lujan*, 963 F.2d 1541, 1548 (D.C. Cir. 1992) ("The *Two-acres* opinion, we bear in mind, was vacated in anticipation of this court's en banc rehearing. We look to that opinion, accordingly, for the soundness of its reasoning and not as binding precedent."); *see also Comm. on the Judiciary of the U.S. House of Representatives*, No. 19-5331, 968 F.3d 755, 778 (D.C. Cir. 2020) (en banc) (saying "panel opinions . . . have been vacated by the order granting

the Committee's petition for rehearing *en banc*" even though those orders referred only to judgments, suggesting vacatur of an opinion may be superfluous where the judgment is vacated pending en banc review).

*Second*, *McGahn* is not persuasive. None of the cases it cited supported the proposition that Congress "should decide" whether a party may "assert an implied cause of action under the Constitution" for equitable claims. 973 F.3d at 123 (cleaned up); *see, e.g.*, *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333–34 (2020) (deciding whether there is a *statutory* cause of action); *Hernandez v. Mesa*, 589 U.S. 93, 98–103 (deciding whether to extend *Bivens*); *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264–65 (2018) (deciding whether to extend a private right of action under the Alien Tort Statute for international law violations); *Ziglar*, 582 U.S. at 135–37 (deciding whether to extend *Bivens*); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."). And it reads *Armstrong* more broadly than is required in light of its actual holding. *See McGahn*, 973 F.3d at 123. More specifically, it points to language from *Armstrong* saying that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327; *see also McGahn*, 973 F.3d at 123. But *Armstrong* cited *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996), which merely held that a statutory remedial scheme to enforce a "*statutorily* created right" should not be circumvented by the traditional availability of injunctive relief, *id.* at 74 (emphasis added). And *Armstrong* itself held only that a statute "implicitly preclude[d] private enforcement" of a *statutory* right and that the respondents could not "circumvent Congress's exclusion of private enforcement." 575 U.S. at 328.

*Third*, even if *McGahn* is right about Congress having the power to extinguish an implied constitutional cause of action and the traditional equitable cause of action, nothing in the APA suggests it meant to do this. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (saying an APA limitation on judicial review "serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review"). Courts in this District routinely allow constitutional claims in equity to proceed where relief under the APA is foreclosed. *See, e.g.*, *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 372–73 (D.D.C. 2020) (rejecting the argument that the APA cause of action "forecloses any equitable cause of action" and allowing the plaintiff to "advance her claim for equitable relief directly under the First Amendment" even though her "APA claims are precluded by the CSRA"); *All. for Nat. Health, USA v. United States*, No. 24-cv-2989, 2025 U.S. Dist. LEXIS 134565, at *15 (D.D.C. July 15, 2025) (holding plaintiffs "may proceed with . . . an implied equitable cause of action challenging [an agency action] under the Fifth Amendment" event though they "cannot challenge the [action] under the APA because it is not final agency action"). The Court joins that chorus.

The Defendants also cite another line of cases to argue that "where Congress has supplied a specific, adequate means for challenging and remedying agency action, no other cause of action (including a constitutional one) should be judicially implied for challenging and remedying that same action." Defs.' Opp'n at 23–24 (collecting cases). The idea seems to be that the FTC Act provides an adequate means for challenging the FTC's CID. *See id.* at 24 ("Media Matters can bring the exact same claims . . . as defenses to an action in district court to enforce the CID.").

They first cite *FTC v. Claire Furnace Company*, 274 U.S. 160 (1927), which held that a bill of equity challenging FTC notices demanding monthly reports as exceeding the FTC's powers "should have been dismissed for want of equity," *id.* at 174. The Court reasoned that "[u]ntil the

Attorney General acts" to enforce the notices, "the defendants cannot suffer, and, when he does act, they can promptly answer and have full opportunity to contest the legality of any prejudicial proceeding against them," making this an adequate remedy at law. *Id.* They also cite *Reisman v. Caplin*, 375 U.S. 440 (1964), which similarly held that a complaint seeking to enjoin the enforcement of a summons issued by the Internal Revenue Service should have been dismissed "for want of equity," *id.* at 443, because "the summons was only enforceable if the [Internal Revenue Service] sought relief in federal court" and "a party only faced coercive penalties if it refused to comply with a court order or did not challenge the summons in good faith," *Media Matters for Am.*, 138 F.4th at 582–83 (citing *Reisman*, 375 U.S. at 445–47); *see also Reisman*, 375 U.S. at 449 ("It follows that with a stay order a witness would suffer no injury while testing the summons.").

But the D.C. Circuit already explained that *Reisman* does not control when it comes to retaliatory CIDs because the recipients of such CIDs "are suffering ongoing injuries due to the campaign of retaliation against them." *Media Matters for Am.*, 138 F.4th at 583; *see also Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1178 (9th Cir. 2022) ("This case is different from *Reisman* because it involves the First Amendment, under which a chilling effect on speech can itself be the harm."). And nothing in *Claire Furnace Company* suggests the result should be any different here. Just like *Reisman*, that case "did not concern First Amendment retaliation," *Media Matters for Am.*, 138 F.4th at 583, and it relied on the premise that the "defendants [could not] suffer" pending enforcement, *Claire Furnace Co.*, 274 U.S. at 174. So the D.C. Circuit's distinction as to *Reisman* applies with equal force to *Claire Furnace Company*, rendering the FTC Act's enforcement provision an inadequate remedy at law, *cf. Bailey*, 2024 U.S. Dist. LEXIS 151291, at *25–26 (D.D.C. Aug. 23, 2024) (declining to apply *Reisman* specifically on the question of whether there

is an adequate remedy at law in part because the case "involve[d] the First Amendment, under which a chilling effect on speech can itself be the harm" (cleaned up)). The Defendants' reliance on out-of-circuit cases applying *Reisman* outside of the First Amendment retaliation context does not change that. *See* Defs.' Opp'n at 23–24 (collecting cases).

**3. Retaliation**

Turning to the merits of the claims before the Court, Media Matters first alleges that the "Defendants violated, and continue to violate, [its] First Amendment rights by launching an investigation and serving a burdensome CID in retaliation for [Media Matters'] speech, press, and associational activities." Compl. ¶ 96. "[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To prevail on a retaliation claim, a plaintiff must show: "(1) he engaged in conduct protected under the First Amendment; (2) the defendants took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 844 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up). At this preliminary stage, Media Matters has demonstrated that it is likely to show all three elements, so the Court finds that it is likely to succeed on the merits of this claim.

**a. Protected Activity**

Media Matters engaged in protected activities under the First Amendment. "[T]he underlying incident that precipitated [its] claim involved [its] news reporting on a public figure and alleged political extremism on a popular social media platform." *Media Matters for Am.*, 138 F.4th at 584. And this "reporting on public issues [is a] quintessential First Amendment activit[y]." *Id.* (citing *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues

occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (cleaned up)); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."); *Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.")). It is no surprise, then, that the Defendants concede this point. *See* Defs.' Opp'n at 25 ("[T]he FTC does not dispute that Media Matters engages in some protected First Amendment conduct.").

**b. Retaliatory Act**

Media Matters is also likely to show that the Defendants took a retaliatory action sufficient to deter a person of ordinary firmness in Media Matters' position from speaking again. This is because the FTC issued a sweeping and burdensome CID calling for sensitive materials. *See White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000) (holding an "investigation by . . . HUD officials" "more than meets" the standard requiring an act that "would chill or silence a person of ordinary firmness from future First Amendment activities" where the defendants "directed the plaintiffs under threat of subpoena to produce all their publications regarding [a certain] project, minutes of relevant meetings, correspondence with other organizations, and the names, addresses, and telephone numbers of persons who were involved in or had witnessed the alleged discriminatory conduct"); *Cooksey v. Futrell*, 721 F.3d 226, 236–37 (4th Cir. 2013) (holding "[a] person of ordinary firmness would surely feel a chilling effect" where an official told the plaintiff "that he

and his website were under investigation and that the State Board does have the statutory authority to seek an injunction[.]" (cleaned up)).[5]

This is especially true where, as here, "[t]he CID seeks" "a reporter's resource materials." *Media Matters for Am.*, 732 F. Supp. 3d at 28 (cleaned up); *cf. United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980) ("The compelled production of a reporter's resource materials can constitute a significant intrusion . . . [that] may substantially undercut the public policy in favor of the free flow of information to the public[.]"); *Shoen v. Shoen*, 48 F.3d 412, 415–16 (9th Cir. 1995) (recognizing the compelled "disclosure of research materials poses a serious threat to the vitality of the newsgathering process"). A reporter of ordinary firmness would be wary of speaking again if she had to reveal the materials requested by this fishing expedition of a CID. *See, e.g.*, Compl., Ex. D at 2, ECF No. 1-4 ("Provide all analyses or studies that Media Matters conducted, sponsored, or commissioned relating to advertising on social media or digital advertising platforms, including but not limited to any financial analyses or studies, and all data sets and code that would be necessary to replicate the analysis."); *id.* ("Provide documents sufficient to show the methodology by which Media Matters evaluates or categorizes any news, media, sources, platforms, outlets, websites, or other content publisher entities."); *id.* at 2–3 ("Provide all communications between Media Matters and any other person regarding any request for Media Matters to label any news,

---

[5] At oral argument, the Defendants acknowledged the breadth of the CID but urged the Court to overlook that scope because CID recipients are encouraged to meet and confer with the FTC in order to narrow the original demand. *See, e.g.*, Motions Hr'g (Aug. 13, 2025), Rough Tr. at 46:20–24 ("So, again, this is not unusual for a CID to use broad language. It is a request for relevant information. Determining that relevance, determining that scope, is exactly what both the meet-and-confer process and the ultimate enforcement proceeding in district court are for."). The Court declines to consider a hypothetical narrowed CID instead of the actual demand issued to Media Matters. And more broadly, it is troubled by the Defendants' suggestion that the federal Government routinely issues civil investigative demands it knows to be overbroad with the goal of later narrowing those demands presumably in exchange for compliance.

media, sources, outlets, platforms, websites, or other content publisher entities for 'brand suitability,' 'reliability,' 'misinformation,' 'hate speech,' 'false' or 'deceptive' content, or similar categories, regardless of whether the request was fulfilled."); *id.* at 3 ("Provide all documents, including correspondence, relating to Media Matters working with ad tech, technology, or developer companies or social media platforms to develop or advance any of [Media Matters'] programs, policies, or objectives, including but not limited to any agreements between Media Matters and these companies."); *id.* ("Provide each financial statement . . . prepared by or for Media Matters on any periodic basis."); *see also id.* at 4 (defining "Media Matters" to mean "Media Matters for America, together with its successors, predecessors, divisions, wholly- or partially-owned subsidiaries, committees, working groups, alliances, affiliates, and partnerships, whether domestic or foreign; and all the directors, officers, employees, consultants, agents, and representatives of the foregoing. Identify by name, address, and phone number, each agent or consultant.").

And the fact that the CID is enforceable in federal court, *see* 15 U.S.C. § 49, also bolsters the conclusion that someone of ordinary firmness would be deterred from speaking. *See Media Matters for Am.*, 732 F. Supp. 3d at 28 (saying "possible judicial intervention to enforce the CID" is part of what makes the "Plaintiffs' claim of chilled expression objectively reasonable"); *cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (holding "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" "may sufficiently inhibit the circulation of publications to warrant injunctive relief"); *Playboy Enters. Inc. v. Meese*, 639 F. Supp. 581, 585 (D.D.C. 1986) (similar).

Finally, "while a plaintiff's actual response to a defendant's conduct is not dispositive, it 'provides some evidence of the tendency of that conduct to chill First Amendment activity.'"

*Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). And Media Matters has demonstrated that the FTC's CID chilled its activity. One declarant has sworn that "the prospect of relaxing Media Matters' posture on research and reporting about government entities" after winning legal victories against the state CIDs "was stymied by the FTC's CID." Dimiero Decl. ¶ 19; *see also* Padera Decl. ¶ 17 (similar). "For example, without the investigation, Media Matters would likely have looked into reporting about Andrew Ferguson's merger requirements for Omnicom and IPG, which placed unprecedented limitations on their speech in a transparent attempt to aid media platforms, like X, with limited content moderation efforts." Dimiero Decl. ¶ 20. The declarant even identified particular stories that Media Matters would have pursued but for the FTC CID:

> Furthermore, because of the FTC CID, we have refrained from reporting on the FTC's relationship with right-wing media or Musk's relationship with the FTC, as we would have in the past. We have also refrained from publishing research related to right-wing media's long-running list of companies that they have boycotted or celebrated damaging financially in light of Ferguson's claims about advertising boycotts. We have even refrained from reporting on our own story of the FTC's investigation into Media Matters out of fear of retaliation, also turning down a number of media requests for information and appearances on various shows and outlets about a wide range of topics related to the investigation. We also turned down a high-profile interview that was unrelated to the FTC but was about right-wing content creators, deciding that the risk of engaging with the subject matter was too high in the wake of the FTC's CID. In the past, we likely would have written about a federal agency pressuring companies to adopt policies favored by the Administration or about Media Matters' experience of being subject to a government investigation because of our speech. Such fears about FTC reporting did not exist in the past. For example, during the first Trump Administration, Mr. Hananoki repeatedly wrote about subjects that were within the scope of the FTC's work. Now, any reference to the FTC or commissioners must be approved by senior staff and the legal team, burdening an already cumbersome editing process.

*Id.* ¶ 21. It is therefore clear that "Media Matters has . . . pointed to . . . harm that it has incurred *as a result of the CID*," despite the Defendants' protests on this point. Defs.' Opp'n at 37.

The Defendants' main counterargument on the retaliatory act element is that "there is a significant question whether a retaliatory *investigation* claim is even cognizable." *Id.* at 36. And they point to out-of-circuit cases holding state and local actors were protected by qualified immunity because retaliatory criminal investigations were not clearly violative of the First Amendment. *See Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017) (holding defendants are protected by qualified immunity where they allegedly engaged in a retaliatory criminal investigation because the plaintiff's asserted right was not "clearly established" given Supreme Court precedent stated that "the first amendment does not protect statements made as part of one's job" and the plaintiff's purportedly protected "activities were part of her job as a public employee" (cleaned up)); *Rehberg v. Paulk*, 611 F.3d 828, 850–51 (11th Cir. 2010) ("But even if we assume Rehberg has stated a constitutional violation by alleging that Hodges and Paulk initiated an investigation and issued subpoenas in retaliation for Rehberg's exercise of First Amendment rights, Hodges and Paulk still receive qualified immunity because Rehberg's right to be free from a retaliatory investigation is not clearly established."); *Thompson v. Hall*, 426 F. App'x 855, 859 (11th Cir. 2011) (per curiam) ("Defendants Sheriff Hall and Deputy Utsey are entitled to qualified immunity insofar as Plaintiffs have alleged they carried out an investigation in 2005 in retaliation for Plaintiff Daniel Thompson's comments at the town hall meeting."); *J.T.H. v. Missouri Dep't of Soc. Servs. Children's Div.*, 39 F.4th 489, 493 (8th Cir. 2022) (holding "the complaint falls short of establishing that Cook violated a clearly established right" because "we have never recognized a retaliatory-investigation claim of this kind"); *see also Sivella v. Twp. Of Lyndhurst*, No. 20-2342, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2011) ("We . . . conclude that . . . when [the mayor] sent a letter requesting the initiation of an investigation of no-show municipal jobs by the Township

Chief of Police, allegedly in retaliation for Sivella's protected speech, it was not clearly established that such an adverse action amounted to a First Amendment violation.").

But the standard for qualified immunity is higher than what is required for preliminary injunctive relief. *Compare Hedgpeth v. Rahim*, 893 F.3d 802, 806 (D.C. Cir. 2018) ("Although the Supreme Court's decisions do not require a case directly on point for a right to be clearly established for purposes of qualified immunity, existing precedent must have placed the statutory or constitutional question beyond debate." (cleaned up)), *with Elec. Privacy Info. Ctr. v. U.S. DOC*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("One showing a plaintiff must make to obtain a preliminary injunction is a substantial likelihood of success on the merits." (cleaned up)). Indeed, the Ninth Circuit simultaneously held that it is not "clearly established that a retaliatory investigation per se violates the First Amendment" *and* that "[t]he scope and manner of the investigation" in *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), "violated plaintiffs' First Amendment rights." *Moore v. Garnand*, 83 F.4th 743, 752–53 (9th Cir. 2023) (cleaned up).

The Defendants also cite language from three out-of-circuit opinions unrelated to qualified immunity. *See* Defs.' Opp'n at 37. But the first case merely held that a retaliatory investigation did not amount to an adverse employment action under the First Amendment retaliation test for public employees—a test that is not at issue here. *See Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000) ("[I]nvestigating alleged violations of departmental policies and making purportedly false accusations are not adverse employment actions."). And it even acknowledged that such an investigation could have a chilling effect. *See id.* at 157 ("This court has declined to expand the list of actionable actions, noting that some things are not actionable even though they have the effect of chilling the exercise of free speech" "to ensure that § 1983 does not enmesh federal courts in relatively trivial matters." (cleaned up)).

It is true that the second and third cases squarely held that "a criminal investigation *in and of itself* does not implicate a federal constitutional right." *Thompson*, 426 F. App'x at 858 (emphasis added) (cleaned up); *Rehberg*, 611 F.3d at 850 n.24 (same). But that language does not foreclose the possibility that certain investigatory acts may cross the line when they come with particularly adverse consequences. *Cf. Evans v. City of Chicago*, No. 16-cv-7665, 2017 U.S. Dist. LEXIS 71814, at *17 (N.D. Ill. May 11, 2017) (recognizing that the Supreme Court in *Hartman v. Moore*, 547 U.S. 250 (2006), "alluded . . . to the idea that the adverse consequences of a retaliatory investigation might theoretically justify recognizing a retaliatory investigation as a deprivation" (cleaned up)); *see also Rehberg*, 611 F.3d at 850 n.23 (carefully pointing out that the plaintiff "does not allege he incurred any expenses in the investigation stage"). And the FTC's CID has had plenty of knock-on effects according to Media Matters' declarants; it is "driving additional costs," Padera Decl. ¶ 22, it has caused "retention challenges," *id.*, and it has resulted in Media Matters being "removed from coalition communications" "about FTC actions," Millican Decl. ¶ 14. It is hard to imagine any media company *not* being chilled by this sweeping and sensitive CID. The Court is therefore unpersuaded that these non-binding opinions render Media Matters unlikely to succeed on the merits of their retaliation claim.

The Defendants' argument is further undercut by D.C. Circuit precedent new and old. In *Media Matters for America v. Paxton*, the Texas Attorney General had forfeited the argument that "a retaliatory investigation is not a cognizable claim," so the Court did not address it head-on. 138 F.4th at 584. But when discussing Media Matters' injury-in-fact for standing purposes, the Court quoted broad non-standing language from a prior opinion: "In distinguishing between 'good faith' and 'bad faith' investigations, this court has explained that 'all investigative techniques are subject to abuse and can conceivably be used to oppress citizens and groups,'

and that bad faith use of investigative techniques can abridge journalists' First Amendment rights." *Id.* at 580 (quoting *Reps. Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1064 (D.C. Cir. 1978)). It explained that "the First Amendment 'protect[s] [information-gathering] activities from official harassment,' and that 'official harassment [of the press] places a *special* burden on information-gathering, for *in such cases the ultimate, though tacit, design is to obstruct rather than to investigate, and the official action is proscriptive rather than observatory in character*.'" *Id.* (emphasis in original) (quoting *Reps. Comm. for Freedom of the Press*, 593 F.2d at 1064). The older D.C. Circuit opinion pulled no punches, stating that "there can be no doubt that, as a general proposition," the issuance of subpoenas "not in furtherance of Bona fide felony investigations, but in order to harass plaintiffs in their journalistic information-gathering activities," "would constitute an abridgement of a journalist's First Amendment rights." *Reps. Comm. for Freedom of the Press*, 593 F.2d at 1064; *see also Branzburg v. Hayes*, 408 U.S. 665, 707–08 (1972) ("[N]ews gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment."); *United States v. Morton Salt Co.*, 338 U.S. 632, 642 (1950) (saying an agency's "power of inquisition" is "analogous to the Grand Jury"). So the Court sees no reason why the FTC's CID cannot amount to a sufficient retaliatory act as a matter of law.

**c. Causation**

Finally, "[t]o establish causal link, it is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Media Matters for Am.*, 732 F. Supp. 3d. at 28 (cleaned up). "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the

retaliatory motive." *Id.* (cleaned up); *see also Hartman*, 547 U.S. at 256 ("[W]e have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution."). "In assessing whether this causal element is met, courts have . . . given weight to circumstantial evidence such as a proximity in time between the protected speech and the adverse action, the defendant's expression of opposition to the protected speech, and evidence that the defendant proffered false or pretextual explanations for the adverse action." *Bailey*, 2024 WL 3924573, at *15 (quoting *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022)). "[D]irect evidence of retaliatory animus is not required[.]" *Goodwin v. District of Columbia*, 579 F. Supp. 3d 159, 174 (D.D.C. 2022) (cleaned up). Media Matters is likely to show that retaliatory animus was the but-for cause of the FTC's CID for three reasons.

*First*, Chairman Ferguson and his colleagues have made comments characterizing Media Matters and this investigative push "in ideological terms." *Bailey*, 2024 WL 3924573, at *14. According to a "leaked memo" provided by Media Matters and uncontested by the Defendants, Compl. ¶ 59, before he was chosen as the FTC Chairman, Mr. Ferguson bolstered his candidacy by arguing that he had a "track record of standing up to . . . the radical left" and insisting that he would "[i]nvestigate . . . advertiser boycotts," *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/A56K-Q4YM. And in a podcast appearance in November 2024, he stated that "'progressives' who are 'fighting "disinformation"' were 'not going to give up just because of the election,' so 'it's really important that the FTC take investigative steps in the new administration under President Trump.'" Compl. ¶ 61 (quoting Andrew Ferguson, *Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM]*, Bannon's War Room (Nov. 30, 2024), https://perma.cc/ASE8-RZNJ); *see also* Notice of Tr., Ex. A at 3. These comments indicate at a minimum that Chairman Ferguson saw the FTC's investigation as having a partisan bent.

And Chairman Ferguson's colleagues have been even more pointed when discussing Media Matters specifically. *Cf. Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000) (considering a non-decisionmaker's "discriminatory intent" because she was not divorced from "the decisionmaking process" or "the adverse decision" (cleaned up)). For example, Mike Davis, "an outside adviser to the Trump administration," Compl. ¶ 71 (quoting Dave Michaels, *How Trump's FTC Chairman Is Bringing a MAGA Approach to Antitrust Enforcement*, WSJ (Mar. 12, 2025), https://www.wsj.com/politics/policy/how-trumps-ftc-chairman-is-bringing-a-maga-approach-to-antitrust-enforcement-66b286d5), and someone who advocated for Chairman Ferguson to be chosen as the FTC Commissioner, *see* Compl. ¶¶ 63–64, suggested that Mr. Musk "should nuke @MMFA [Media Matters' account] and all staff accounts," *id.* ¶ 64 (quoting Mike Davis (@mrddmia), X (Dec. 1, 2022, 11:54am), https://perma.cc/VVD5-NAR5). He also posted that "[i]f you want to help @Article3Project build our (growing) list of leftists to throw in the DC gulag with @MMFA's @ehananoki and @MattGertz, please donate here." *Id.* (quoting Mike Davis (@mrddmia), X (Nov. 10, 2023, 1:53 pm), https://perma.cc/L8E8-ZSJF). And he cheered on Mr. Musk's eventual lawsuits against Media Matters, writing that "[a]dvertiser boycotts are highly effective tactics leftists use to cow media executives to destroy free speech—and control the political narrative. @MMFA is the driving force behind conservative media getting crushed—and conservative voices silenced. Cheers to @ElonMusk." *Id.* (quoting Mike Davis (@mrddmia), X (Nov. 29, 2023, 5:42 pm), https://perma.cc/G88S-YC3U).

Several of Chairman Ferguson's senior staffers at the FTC were brought on after criticizing Media Matters in ideological terms as well. Joe Simonson posted in May 2024 that "Media Matters employed a number of stupid and resentful Democrats who went to like American University and didn't have the emotional stability to work as an assistant press aide for a House member." *Id.* ¶ 70

(quoting Joe Gabriel Simonson (@SaysSimonson), X (May 23, 2024), https://perma.cc/8CTX-HPS7). Jon Schweppe said in June 2023 that "Media Matters wants to weaponize powerful institutions to censor conservatives," *id.* (quoting Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/), before celebrating one of Mr. Musk's lawsuits against Media Matters, which he called the "scum of the earth," *id.* (quoting Jon Schweppe (@JonSchweppe), X (Nov. 20, 2023), https://perma.cc/25YT-DQ7T). And Jake Denton stated in June 2023 that Media Matters was "an organization devoted to pressuring companies into silencing conservative voices." *Id.* (quoting Jason Cohen, *'Deeply Flawed' and 'Laughable': Experts Slam Study Finding Facebook Does Not Censor Conservatives*, Daily Caller (June 19, 2023), https://dailycaller.com/2023/06/19/deeply-flawed-laughable-experts-slam-study-finding-facebook-censor-conservatives/). These are precisely the sorts of comments that courts in this District have considered as evidence of retaliatory intent. *See Bailey*, 2024 WL 3924573, at *14 (cataloguing comments that Media Matters was a "political activist organization" that wants to "silence conservative voices"); *Media Matters for Am.*, 732 F. Supp. 3d at 28 (highlighting comments that Media Matters was a "radical anti-free speech" and "radical left-wing organization"). And, contrary to what the Defendants report, these individuals are not just people who Chairman Ferguson "happens to know." Defs.' Opp'n at 34. They are instead FTC staffers he "brought in" who ultimately report to him. Compl. ¶ 70.

*Second*, the timing suggests the CID was motivated by retaliatory animus for a couple reasons. The first is that it was issued on the heels of other failed attempts to seek retribution. A court in this District preliminarily enjoined the Texas CID in April 2024, *see Media Matters for*

*Am.*, 732 F. Supp. 3d 1, and the Missouri CID in August 2024, *see Bailey*, 2024 WL 3924573. The D.C. Circuit dismissed the appeal of the injunction against the Missouri CID in February 2025. *Media Matters for Am. v. Paxton*, No. 24-7141, ECF No. 2100627. And Mr. Musk's worldwide lawsuits were largely preliminarily enjoined in April 2025. *See X Corp.*, 2025 WL 1084715, at *1 ("[I]t seems almost certain that the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights[.]"). It stands to reason that the FTC issued an additional CID while the D.C. Circuit was still considering whether to affirm the preliminary injunction of the Texas CID because it wanted to continue the years' long pressure campaign against Media Matters by Mr. Musk and his political allies. Perhaps the Defendants will establish otherwise later in these proceedings. But at this stage, the record certainly supports that inference.

There is another reason that timing indicates retaliatory animus. Chairman Ferguson wasted no time after taking office to initiate this investigation. President-elect Trump announced on December 10, 2024, that he had chosen Mr. Ferguson to be the Chairman of the FTC. Compl. ¶ 65. He became the Chairman in January 2025. Pl.'s Mot. Prelim. Inj. at 23. And he announced an investigation into "tech [platform] censorship" the very next month, in February 2025, *id.* (citing Press Release, *Federal Trade Commission Launches Inquiry on Tech Censorship*, FTC (Feb. 20, 2025), https://perma.cc/5AZB-G94M), and issued the CID to Media Matters by May 2025, Compl. ¶ 14. This fast-moving investigation—when combined with the above statements from Chairman Ferguson and his colleagues—suggests that he was chomping at the bit to "take investigative steps in the new administration under President Trump" to make "progressives" like Media Matters "give up." Compl. ¶ 61 (quoting Andrew Ferguson, *Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM]*, Bannon's War Room (Nov. 30, 2024),

https://perma.cc/ASE8-RZNJ); *see also* Notice of Tr., Ex. A at 3. The Defendants argue that timing cuts against Media Matters because the FTC CID was issued about a year and a half after the November 2023 incident with Mr. Musk. *See* Defs.' Opp'n at 31. But this misses the point. Chairman Ferguson only gained the reigns to the FTC in January 2025. *See* Pl.'s Mot. Prelim. Inj. at 23. And counting from *that* date, it becomes clear that he acted with expedition in issuing a CID to Media Matters.

*Third*, "there is evidence from which a neutral factfinder likely would find" that the Defendants' "proffered nonretaliatory explanation for the investigation of Media Matters is pretext." *Bailey*, 2024 WL 3924573, at *15. The Defendants offer no declaration explaining why they have decided to investigate Media Matters. *See* Defs.' Opp'n; *see also Media Matters for Am.*, 732 F. Supp. 3d at 29 ("Notably, he has not submitted a sworn declaration that explains his reasons for opening the investigation."). Nor did the CID itself offer an explanation. *See* Compl., Ex. D. ECF No. 1-4; *see also* 15 U.S.C. § 57b-1(c)(2) ("Each [CID] shall state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation."). Instead, the field titled "Subject of Investigation" just says: "See attached." Compl., Ex. D. But the attachments merely include the specific demands, definitions of terms used in the demands, directions for complying with the demands, a template certification of compliance, and a copy of a 2022 FTC resolution directing that "all compulsory processes available to it be used in connection with any inquiry" investigating whether someone has engaged in "collusion or coordination in any way with any other market participant . . . in violation of Section 5 of the [FTC] Act." *Id.* The Defendants waited until July 7, 2025, after Media Matters commenced this lawsuit, to offer something resembling an explanation in a letter sent to

Media Matters. *See* Pl.'s Mot. Prelim. Inj., Ex. B, ECF No. 22-4. The late-breaking nature of this explanation cuts in favor of finding pretext.

And the Defendants' ultimate explanation does not inspire confidence that they acted in good faith. They summarize their reasons for issuing the CID in their Opposition:

> The CID issued to Media Matters is part of a broader investigation into similar group boycotts in the advertising industry. In particular, it is one of seventeen still outstanding CIDs issued pursuant to the agency's investigation into whether various entities have conspired to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act . . . and Section 5 of the FTC Act, under the guise of promoting "brand suitability" and "brand safety" against "misinformation." In particular, the Commission is investigating whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not "brand suitable" or not "brand safe," to coordinate the placement of ads. Accordingly, the Commission has issued CIDs both to advertising agencies and to other entities that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement. The entities receiving CIDs include several advertising trade associations, several brand safety/suitability rating organizations, and several policy/advocacy groups—such as Media Matters.

Defs.' Opp'n at 28 (cleaned up). But they never explain *why* they have "reason to believe" that Media Matters has "information relating to the use of . . . lists to coordinate ad placement." *Id.* So the "record is utterly devoid of evidence to support such a claim." *Media Matters for Am.*, 138 F.4th at 585.

Nor does the sweeping scope of the FTC's CID square with the proffered reason. The FTC claims that it believes Media Matters has information about the use of "brand suitable" or "brand safe" lists to "coordinate ad placement." *See* Defs.' Opp'n at 28. And the CID does include some demands that would help the FTC secure that information. *See, e.g.*, Compl., Ex. D at 3 ("Provide all documents relating to other entities that purport to track . . . news, media, sources, platforms, outlets, websites, or other content publisher entities for 'brand suitability,' 'reliability,' 'misinformation,' 'hate speech,' 'false' or 'deceptive' content, or similar categories."); *id.* at 4

("Provide all documents relating to efforts by any person to create or advance brand safety tools."). But it also includes other demands that go well beyond the investigation's purported scope. *See, e.g.*, *id.* at 5 ("Provide each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report regularly prepared by or for Media Matters on any periodic basis. For each such statement, budget, or report, state how often it is prepared, and identify the employees responsible for its preparation."); *id.* at 3 ("Provide all documents that Media Matters either produced or received in discovery in any litigation between Media Matters and X Corp. related to advertiser boycotts since 2023). As a whole, then, the scope of the CID suggests pretext on the part of the FTC, which is fatal to the Defendants' causation arguments.

**B. Irreparable Injury**

Having established likelihood of success on the merits, Media Matters must next demonstrate an irreparable injury. This requirement is easily met. "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Media Matters for Am.*, 138 F.4th at 585 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). And Media Matters is "suffering from a campaign of retaliation against [it] in response to [its] exercise of [its] First Amendment rights," which is "an irreparable injury." *Id.* (citing *Cate v. Oldham*, 707 F.2d 1176, 1188–89 (11th Cir. 1983)). The Defendants contest Media Matters' other asserted injuries—reputational harm, financial harm, and self-censorship—as being self-inflicted. *See* Defs.' Opp'n at 41–44. But they do not respond to the argument that the First Amendment injury itself is irreparable, thereby conceding it. *See* LCvR 7(b); *Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) ("[Local Rule 7(b)] is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments,

the court may treat the unaddressed arguments as conceded." (cleaned up)); *cf., e.g.*, *Parham v. District of Columbia*, 648 F. Supp. 3d 99, 106 (D.D.C. 2022) ("Defendants conceded these preliminary injunction factors by failing to respond to Plaintiffs' arguments whatsoever in its opposition papers."), *vacated on other grounds*, No. 22-cv-2481, 2023 WL 10151420 (D.D.C. May 15, 2023); *Endo Par Innovation Co. v. Becerra*, No. 24-cv-999, 2024 U.S. Dist. LEXIS 104947, at *12 (D.D.C. May 1, 2024) (saying this concession rule applies with particular force when a plaintiff "need only demonstrate a likelihood of success on the merits" instead of "an absolute certainty of success" (cleaned up)).

**C. Balance of Equities and the Public Interest**

Finally, Media Matters has shown that the balance of the equities and the public interest weigh in its favor. "It is well settled that the balance of equities and public interest factors merge if the government is the opposing party." *Media Matters for Am.*, 138 F.4th at 585 (*citing Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)). "In other words, '[w]hen a private party seeks injunctive relief against the government,'" the Court "must 'weigh[] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined.'" *Id.* (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022)). "[E]nforcement of an unconstitutional [action] is always contrary to the public interest." *Karem*, 960 F.3d at 668; *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[The Government] is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." (cleaned up)). And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional [action]." *Pursuing*

*Am.'s Greatness*, 831 F.3d at 511. So these factors favor Media Matters, as it has shown a likelihood of success on the merits of its First Amendment retaliation claim.

**CONCLUSION**

For the foregoing reasons, the Court grants Media Matters' Motion for Preliminary Injunction, ECF No. 22.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: August 15, 2025