IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA,

*Plaintiff*,

v.

Civil Action No. 25-1959 (SLS)

FEDERAL TRADE COMMISSION, et al.,

*Defendants*.

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION............................................................................................................1

BACKGROUND ..........................................................................................................2

A.    The Commission's Advertising Boycott Investigation and the CID to Media
      Matters ..............................................................................................................2

B.    Media Matters' Response to the CID..................................................................5

C.    Media Matters' Complaint and Motion for Preliminary Injunction ..................6

LEGAL STANDARD ...................................................................................................7

ARGUMENT ...............................................................................................................8

I.    The Court Must Dismiss Media Matters' Pre-Enforcement Challenge for Lack
      of Subject-Matter Jurisdiction.................................................................................8

      A.    An Unbroken Line of Appellate Precedent Rejects Pre-Enforcement
            Challenges to Agency Subpoenas and CIDs.............................................. 8

      B.    *Thunder-Basin*'s Claim-Channeling Doctrine Precludes Jurisdiction
            Over Media Matters' Pre-Enforcement Challenge. ................................. 10

            1.    Congress's Preclusive Intent is "Fairly Discernable" in
                  the FTC Act...................................................................................10

            2.    Media Matters' Claims Are Squarely "Of the Type" Congress
                  Intended to Be Reviewed Through the Exclusive Statutory
                  Mechanism. ...................................................................................13

II.   The Court Should Dismiss Media Matters' First Amendment Retaliation Claim
      (Count I).................................................................................................................17

      A.    Media Matters Lacks an Implied Equitable Cause of Action. ............................ 18

      B.    Media Matters Failed to Exhaust its Retaliation Claim. ..................................... 19

      C.    Media Matters Fails to State a First Amendment Retaliation Claim.................... 22

            1.    Media Matters Fails to Allege a Causal Link. .........................................22

                  a.    The Commission acted for nonretaliatory reasons. ...........................24

                  b.    Media Matters' allegations of retaliation fail as a matter
                        of law. ......................................................................................25

2.      Media Matters Fails to Allege That the CID Had the Requisite Chilling Effect.................................................................................34

3.      Media Matters' "Retaliatory Investigation" Claim is Not Cognizable. ...............................................................................................35

III.    The Court Should Dismiss Media Matters' First and Fourth Amendment "Improper Investigation" Claim (Count II). .......................................................36

**CONCLUSION** ..........................................................................................................39

ii

## TABLE OF AUTHORITIES

**CASES**

*Albra v. Bd. of Trs. of Miami Dade Coll.*,
296 F. Supp. 3d 181 (D.D.C. 2018) ................................................................. 7

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......................................................................................... 18

*Al-Quraan v. 4115 8th St. NW, LLC*,
113 F. Supp. 3d 367 (D.D.C. 2015) ............................................................. 7, 8

*Am. Fed'n Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ........................................................................ 14

*Am. Motors Corp. v. FTC*,
601 F.2d 1329 (6th Cir. 1979) ........................................................................... 9

*Anheuser-Busch, Inc. v. FTC*,
359 F.2d 487 (8th Cir. 1966) ............................................................................. 9

*Arch Coal, Inc. v. Acosta*,
888 F.3d 493 (D.C. Cir. 2018) ........................................................................ 10

*Archer v. Chisholm*,
870 F.3d 603 (7th Cir. 2017) ........................................................................... 36

*Aref v. Holder*,
774 F. Supp. 2d 147 (D.D.C. 2011) ................................................................ 23

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ................................................................... 22, 34

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .................................................................................... 18, 19

*Ass'n of Nat'l Advertisers, Inc. v. FTC*,
627 F.2d 1151 (D.C. Cir. 1979) ...................................................................... 29

*Associated Container Transp. (Australia) Ltd. v. United States*,
705 F.2d 53 (2d Cir. 1983) .............................................................................. 34

*Atl. Richfield Co. v. FTC*,
546 F.2d 646 (5th Cir. 1977) ............................................................................. 9

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ...................................................... 12, 13, 14, 15, 16, 17

*Bd. of Dental Exam'rs of Ala. v. FTC*,
519 F. Supp. 3d 1033 (N.D. Ala. 2022) ......................................................... 21

*Beacon Theaters, Inc. v. Westover*,
359 U.S. 500 (1959) .......................................................................................... 18

*Belle Fourche Pipeline Co. v. United States*,
751 F.2d 332 (10th Cir. 1984)...................................................................................... 9

*Blue Ribbon Quality Meats, Inc. v. FTC*,
560 F.2d 874 (8th Cir. 1977).................................................................................. 9, 31

*Carr v. Saul*,
593 U.S. 83 (2021) .................................................................................................. 20, 21

*Colson v. Grohman*,
174 F.3d 498 (5th Cir. 1999).......................................................................................... 36

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005).......................................................................................... 26

*DeVillier v. Texas*,
601 U.S. 285 (2024) ........................................................................................................ 19

*Fed. Law Enf't Officers Ass'n v. Ahuja*,
62 F.4th 551 (D.C. Cir. 2023) ....................................................................................... 12

*Forest Guardians v. U.S. Forest Serv.*,
641 F.3d 423 (10th Cir. 2011)........................................................................................ 20

*FTC v. Cement Inst.*,
333 U.S. 683 (1948) ........................................................................................................ 28

*FTC v. Cinderella Career & Finishing Sch., Inc.*,
404 F.2d 1308 (D.C. Cir. 1968) ..................................................................................... 34

*FTC v. Claire Furnace Co.*,
274 U.S. 160 (1927) ................................................................................. 8, 16, 18, 19, 37

*FTC v. Complete Merch. Sols., LLC*,
No. 2:19-cv-00996, 2020 WL 2059847 (D. Utah Apr. 28, 2020)............................... 22

*FTC v. Facebook, Inc.*,
581 F. Supp. 3d 34 (D.D.C. 2022) ................................................................................ 28

*FTC v. Invention Submission Corp.*,
965 F.2d 1086 (D.C. Cir. 1992) ..................................................................................... 30

*FTC v. Invention Submission Corp.*,
No. 89-mc-272, 1991 WL 47104 (D.D.C. Feb. 14, 1991) ......................................... 22

*FTC v. O'Connell Assocs.*,
828 F. Supp. 165 (E.D.N.Y. 1993)................................................................................ 22

*FTC v. Standard Am., Inc.*,
306 F.2d 231 (3d Cir. 1962)........................................................................................... 39

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ........................................................................................................ 39

*FTC v. Texaco, Inc.*,
555 F.2d 862 (D.C. Cir. 1977) ..................................................... 23, 31, 32, 33, 34, 38, 39

iv

*FTC v. XCast Labs, Inc.*,
No. 21-mc-1026, 2021 WL 6297885 (C.D. Cal. Dec. 9, 2021) ........................................ 16, 22

*Gen. Fin. Corp. v. FTC*,
700 F.2d 366 (7th Cir. 1983) ................................................................................. 9, 11, 18, 37

*Genuine Parts Co. v. FTC*,
445 F.2d 1382 (5th Cir. 1971) ...................................................................................... 31

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........................................................................................ 19

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) ...................................................................................................... 23

*Gonzalez v. Walgreen Co.*,
140 F.4th 663 (5th Cir. 2025) ...................................................................................... 26

*Google LLC v. United States*,
No. 23-mc-67, 2025 WL 778150 (D.D.C. Feb. 25, 2025) .......................................... 38

*Gov't Emps., AFL-CIO v. Loy*,
367 F.3d 932 (D.C. Cir. 2004) ..................................................................................... 14

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ...................................................................................................... 19

*Gustave-Schmidt v. Chao*,
360 F. Supp. 2d 105 (D.D.C. 2004) ............................................................................. 26

*Hamilton v. Geithner*,
666 F.3d 1344 (D.C. Cir. 2012) ................................................................................... 26

*Harris v. Wackenhut Servs., Inc.*,
648 F. Supp. 2d 53 (D.D.C. 2009) ............................................................................... 30

*Hartman v. Moore*,
547 U.S. 250 (2006) ............................................................................................. 23, 34, 35

*Hill v. U.S. Dep't of Interior*,
699 F. Supp. 3d 1, (D.D.C. 2023) ................................................................................. 7

*In re Architect of Capitol Emp. Disp.*,
No. 23-2334, 2024 WL 3359515 (D.D.C. July 10, 2024) ........................................... 30

*In re Grand Jury Procs.*,
220 F.3d 568 (7th Cir. 2000) ....................................................................................... 37

*In re Grand Jury Procs.*,
486 F.2d 85 (3d Cir. 1973) ........................................................................................... 38

*In re Grand Jury Subpoena, Judith Miller*,
438 F.3d 1141 (D.C. Cir. 2006) ................................................................................... 38

*J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*,
39 F.4th 489 (8th Cir. 2022) ........................................................................................ 36

*Jeong Seon Han v. Lynch*,
   223 F. Supp. 3d 95 (D.D.C. 2016) .................................................................... 7

*John Doe Co. v. CFPB*,
   849 F.3d 1129 (D.C. Cir. 2017) ...................................................................... 12

*Johnson v. Interstate Mgmt. Co.*,
   849 F.3d 1093 (D.C. Cir. 2017) ...................................................................... 19

*LabMD, Inc. v. FTC*,
   776 F.3d 1275 (11th Cir. 2015) ................................................................. 14, 15

*Lipsman v. Sec'y of Army*,
   257 F. Supp. 2d 3 (D.D.C. 2003) ..................................................................... 7

*Lucas v. Dist. of Columbia*,
   683 F. Supp. 2d 16 (D.D.C. 2010) ................................................................... 8

*Media Matters for Am. v. Bailey*,
   No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024) ............................. 23, 27

*Media Matters for Am. v. FTC*,
   No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ................................. 24, 27, 28, 29

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) ................................................................. 15, 35

*Minter v. Dist. of Columbia*,
   809 F.3d 66 (D.C. Cir. 2015) ........................................................................ 27

*Moore v. Garnand*,
   83 F.4th 743 (9th Cir. 2023) ........................................................................ 35

*Nat'l Ass'n Immigr. Judges v. Owen*,
   139 F.4th 293 (4th Cir. 2025) ...................................................................... 14

*Nat'l Taxpayers Union v. SSA*,
   376 F.3d 239 (4th Cir. 2004) ....................................................................... 14

*Nieves v. Bartlett*,
   587 U.S. 391 (2019) ......................................................................... 22, 23, 28

*Nuclear Info. & Res. Serv. v. NRC*,
   509 F.3d 562 (D.C. Cir. 2007) ................................................................. 28, 29

*Patten v. Dist. of Columbia*,
   9 F.4th 921 (D.C. Cir. 2021) ........................................................................ 12

*Perry v. Schwarzenegger,*
   591 F.3d 1147 (9th Cir. 2010) ...................................................................... 38

*Rancho Vista del Mar v. United States*,
   640 F. Supp. 3d 112 (D.D.C. 2022) ................................................................. 8

*Rehberg v. Paulk*,
   611 F.3d 828 (11th Cir. 2010) ...................................................................... 36

vi

*Reisman v. Caplin*,
375 U.S. 440 (1964) ................................................................................. 9, 10, 18

*Reps. Comm. for Freedom of Press v. AT&T Co.*,
593 F.2d 1030 (D.C. Cir. 1978) ...................................................................... 35, 38

*SEC v. Blackfoot Bituminous, Inc.*,
622 F.2d 512 (10th Cir. 1980) ............................................................................. 32

*SEC v. McGoff*,
647 F.2d 185 (D.C. Cir. 1981) ............................................................................. 38

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ............................................................................................. 16

*Sivella v. Twp. of Lyndhurst*,
No. 20-2342, 2021 WL 3356934 (3d Cir. Aug. 3, 2011)....................................... 36

*Taylor v. Solis*,
571 F.3d 1313 (D.C. Cir. 2009) ........................................................................... 27

*Thompson v. Hall*,
426 F. App'x 855 (11th Cir. 2011)........................................................................ 36

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .............................................................. 8, 10, 14, 15, 16

*Traffic Jam Events, LLC v. FTC*,
No. 21-60947, 2025 WL 1904566 (5th Cir. July 10, 2025)................................... 21

*Trump v. Hawaii*,
585 U.S. 667 (2018) ............................................................................................. 23

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
231 F.3d 20 (D.C. Cir. 2000) ................................................................................. 7

*United States v. Biden*,
729 F. Supp. 3d 410 (D. Del. 2024) ..................................................................... 30

*United States v. Fokker Servs.*
*B.V.*, 818 F.3d 733 (D.C. Cir. 2016).................................................................... 23

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ............................................................... 21, 32, 33, 38

*United States v. Rundo*,
108 F.4th 792 (9th Cir. 2024)............................................................................... 27

*United Steelworkers of Am. v. Marshall*,
647 F.2d 1189 (D.C. Cir. 1980) ........................................................................... 29

*Waggel v. George Wash. Univ.*,
957 F.3d 1364 (D.C. Cir. 2020) ........................................................................... 29

*Wearly v. FTC*,
616 F.2d 662 (3d Cir. 1980)............................................................................. 9, 18

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ....................................................................... 36

*Youssef v. Lynch*,
    144 F. Supp. 3d 70 (D.D.C. 2015) ............................................................... 29

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ..................................................................................... 19

*Zorn v. City of Marion*,
    774 F. Supp. 3d 1279 (D. Kan. 2025) ......................................................... 26

## RULES

Fed. R. Civ. P. 12(b)(1)................................................................................... 1

Fed. R. Civ. P. 12(b)(6)................................................................................... 1

## STATUTES

15 U.S.C. § 45 ............................................................................................... 12

15 U.S.C. § 57b-1 ................................................... 10, 13, 16, 17, 20, 31, 32

## REGULATIONS

16 C.F.R. § 2.4 ......................................................................................... 10, 11

16 C.F.R. § 2.7 ......................................................................................... 10, 11

16 C.F.R. § 2.10 ............................................................................................. 11

## REGULATORY MATERIALS

*In re Feb. 11, 2014 CID Issued to Ziegler Supersys., Inc.*,
    157 F.T.C. 1880 (2014) ................................................................................ 16

Order Denying Petition to Quash,
    *In re Civil Investigative Demand to Media Matters for Am.
    Dated May 20, 2025*, FTC No. 251-0061 (July 25, 2025) ....................... 3, 4, 5, 6, 16

## OTHER AUTHORITIES

Appellee's Br., *Media Matters for Am. v. FTC*,
    No. 25-5302 (D.C. Cir. Feb. 17, 2026) .................................................. 25, 26

Attachment to Global Disinformation Index's Petition to Quash,
    FTC File No. 251-0061 (Sept. 17, 2025) ..................................................... 25

Br. U.S. Amicus Curiae, *First Choice Women's Res. Ctrs., Inc. v.
    Platkin*,
    No. 24-781 (U.S. Aug. 28, 2025) ................................................................. 15

*FTC v. Cigna Grp.*,
    No. 1:25-mc-00004, Dkt.1-2 (D.D.C. Jan. 15, 2025)................................... 31

Motion to Quash CID Ex. P, *In re Police Protective Fund*,
    157 F.T.C. 1913 (2014) ................................................................................................ 31

*NewsGuard Techs., Inc. v. FTC*,
    No. 1:26-cv-0353, Dkt.11-18 (D.D.C. Feb. 11, 2026) ............................................... 32

*NewsGuard Techs., Inc. v. FTC*,
    No. 1:26-cv-0353, ECF No. 21 (D.D.C. Feb. 26, 2026) ............................................ 25

Petiton to Quash CID Ex. 1, *In re Lexium Int'l, LLC*,
    162 F.T.C. 1212 (2016). ............................................................................................. 31

Petition to Quash, *NewsGuard Techs., Inc. v. FTC*,
    No. 1:26-cv-0353, ECF No. 26-2 (D.D.C. Jan. 16, 2026).......................................... 21

**INTRODUCTION**

The Federal Trade Commission has launched a broad investigation into an area of significant concern for the agency and the public: potentially unlawful advertising boycotts. As part of this investigation, the FTC issued a number of civil investigative demands (CIDs), including one directed to plaintiff Media Matters for America. Media Matters has sued, alleging that the CID constitutes retaliation and an improper investigation in violation of the First and Fourth Amendments. The Court should dismiss the complaint for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and failure to state a claim, Fed. R. Civ. P. 12(b)(6).

To begin, the Court lacks subject-matter jurisdiction over pre-enforcement challenges like this. For nearly a century, an uninterrupted line of cases from the Supreme Court and courts of appeals has rejected pre-enforcement challenges to federal agency CIDs and subpoenas. In keeping with that precedent, the FTC Act's review scheme channels Media Matters' type of claim to enforcement proceedings initiated by the FTC, rather than collateral lawsuits like this one. Enforcement actions under the FTC Act provide meaningful judicial review of any proper objection to FTC CIDs, while effectuating Congress's intent that such claims be heard on a well-developed factual record with narrowed issues.

Each of Media Matters' claims fails for additional reasons as well. As to its First Amendment retaliation claim (Count I), Media Matters cannot overcome two threshold obstacles. Media Matters lacks an implied cause of action, under either the First Amendment or the FTC Act, to bring this claim. And in any event, it did not exhaust the claim by raising it in an administrative proceeding before the FTC, as it was required to do. Even if Media Matters could surmount these obstacles, its conclusory assertions fail to state a claim on the merits. Media Matters' allegations of retaliation contravene well-established principles of First Amendment law, particularly in light

of the presumption of regularity that attaches to government action. Media Matters disregards undisputed facts showing the CID's proper purpose—including that it was one part of a broader investigation involving a number of entities that did not publish the 2023 article criticizing Elon Musk and X—and instead relies on a hodgepodge of impermissible inferences. That is insufficient to state a cognizable claim.

Count II is a makeweight claim that, because the CID supposedly seeks information protected by a First Amendment privilege, it is improperly broad in violation of the Fourth Amendment. Count II fails for multiple reasons, not least because the lack of an implied cause of action that dooms Count I is equally fatal to Count II. Moreover, it is premature to consider privilege in the abstract before any disputes have crystallized in a CID enforcement action. In addition, Media Matters fails to identify any particular documents that would be protected by a journalist's privilege, even if such a privilege were available. Instead, its allegations boil down to an ordinary claim of overbreadth, which fails in the absence of any allegations about how responding to the CID impacts Media Matters' operations.

The Court should dismiss Media Matters' complaint with prejudice.

## BACKGROUND

### A.    The Commission's Advertising Boycott Investigation and the CID to Media Matters

Media Matters alleges that it "is a nonprofit organization dedicated to monitoring, analyzing, and correcting misinformation in the U.S. media." Complaint, Dkt.1 ¶ 4 ("Compl."). According to the complaint, Media Matters employs reporters, researchers, and writers to publish articles that are often critical of public figures in the U.S. media, and "has played a key role in documenting extremism . . . in the public square." *Id.*

2

X is the social media platform formerly known as Twitter, which Elon Musk purchased in late 2022. *Id.* ¶ 5.  Media Matters alleges that, after purchasing the platform, Mr. Musk "gutted its content moderation teams and its policies on misinformation and violent content," causing major advertisers to "respond[] by suspending their advertising campaigns on X." *Id.*; *see also id.* ¶ 33. Media Matters published articles focusing on the placement of advertisements alongside "extremist content" on X. *Id.* ¶ 7.  One such article, dated November 16, 2023, "reported that X was permitting advertisements to be placed next to pro-Nazi or other extremist content." *Id.* ¶ 8.

Media Matters alleges that, in retaliation for the November 2023 article, the FTC "opened an investigation to harass Media Matters in retaliation for its journalism." *Id.* ¶ 13.  In connection with that investigation, "the FTC issued a CID to Media Matters dated May 20, 2025." *Id.* ¶ 14.

The CID issued to Media Matters is one of more than a dozen other CIDs that were issued as part of the Commission's investigation into whether any person or entity has engaged or is engaging in unfair, anticompetitive, collusive, or exclusionary acts or practices in connection with an alleged advertising boycott in violation of the antitrust laws. *See* Order Denying Petition to Quash, *In re Civil Investigative Demand to Media Matters for Am. Dated May 20, 2025*, FTC No. 251-0061, at 1 (July 25, 2025) ("PTQ Order").  Specifically, the Commission's investigation examines "whether entities have conspired to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of [the antitrust laws], under the guise of promoting 'brand suitability' and 'brand safety' against 'misinformation.'" *Id.* at 2; s*ee* Dkt.22-4 (Anthony Decl. Ex. B), at 2 ("Subject of the Investigation").[1]  One element of that investigation involves examining whether online

---

[1] A full description of the Commission's investigation, as provided in the amended CID to Media Matters, reads as follows:

advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not "brand suitable" or not "brand safe" to coordinate the placement of ads.  PTQ Order at 2.  The Commission issued CIDs "to multiple advertising agencies" as well as to other entities that the Commission had reason to believe would possess information regarding the use of such lists of "unsuitable" or "unsafe" outlets to coordinate ad placement.  *Id.*  "These entities include several advertising trade associations, brand safety/suitability rating organizations, and policy/advocacy groups such as Media Matters." *Id.*

The CID to Media Matters seeks information pertaining to Media Matters' organizational structure; documents it has produced or received in certain litigation regarding alleged advertising boycotts; documents pertaining to the relationship between online platforms and advertisers, including documents discussing rating systems, harmful or undesirable content, and brand safety tools for online advertising; the methodology by which Media Matters evaluates or categorizes content publisher entities; complaints that Media Matters has received pertaining to its programs; and Media Matters' financial information.  *See generally* Dkt.22-3 (Anthony Decl. Ex. A), at 3-5.

---

To determine whether any natural persons, partnerships, corporations, associations, or other legal entities have engaged in or are engaging in unfair, anticompetitive, collusive, or exclusionary acts or practices – including inviting, participating in, or facilitating boycotts or other collusion or coordination – to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or Section 5 of the FTC Act, 15 U.S.C. § 45, as amended, or any other statutes or rules enforced by the Commission, and to determine the appropriate action or remedy.

Dkt.22-4 (Anthony Decl. Ex. B), at 2.

**B.     Media Matters' Response to the CID**

On June 18, 2025, Media Matters filed a petition to quash with the Commission arguing that the CID should be quashed in its entirety because (1) it does not adequately specify the conduct under investigation or a connection to Media Matters; "(2) compliance with the CID would violate Media Matters' First Amendment rights"; (3) the Commission lacks authority to enforce the antitrust laws against nonprofits like Media Matters; "(4) the CID is overly broad and unduly burdensome"; and "(5) the CID is vague." PTQ Order at 1, 3. The petition to quash did not include a retaliation argument. *See generally* Petition to Quash, Dkt.22-5 (Anthony Decl. Ex. C). The petition was preceded by at least three meet-and-confer sessions with FTC staff in which Media Matters raised several of the grounds above. *See id.* Ex. 2, at 40-43 (Statement of Counsel Pursuant to 16 C.F.R. § 2.10(a)(2)). Again, however, Media Matters did not purport to have raised any retaliation objection in its discussions with FTC staff. *See id.*

On July 25, 2025, by a 2-0 vote with Commissioner Meador recused, the Commission denied Media Matters' petition. *See* PTQ Order at 1, 13. The Commission held that its Omnibus Resolution accompanying the CID provided adequate notice of the scope of the investigation, and, in any event, any potential doubt was dispelled by the July 7 modification to the CID (Dkt.22-4), which provided additional detail about the nature of the investigation and gave Media Matters ample notice of the nature of the alleged illegal conduct under investigation. PTQ Order at 3-6. As to Media Matters' First Amendment challenge, concerning Specifications 6 through 17, the Commission held that Media Matters failed to show that the requested information was intended to be disseminated to the public as news, and thus failed to show that First Amendment privilege was applicable. *Id.* at 6-8. The Commission also explained that whether the Commission has enforcement authority over Media Matters as a nonprofit entity is irrelevant to the Commission's

broader authority to investigate and issue a CID to "any person" under Section 20 of the FTC Act. *Id.* at 8-9.  Lastly, after a review of the CID, the Commission concluded that it is neither overly broad and unduly burdensome nor vague or ambiguous. *Id*. at 9-12.  The Commission set August 27, 2025, as the new date for Media Matters to comply with the CID. *Id.* at 13.

C.    **Media Matters' Complaint and Motion for Preliminary Injunction**

Media Matters filed this action on June 23, 2025, claiming that Defendants violated Media Matters' First Amendment rights by "launching an investigation and serving a burdensome CID in retaliation for Plaintiff's speech, press, and associational activities."  Compl. ¶ 96 (Count I).  Media Matters also claims that the Commission's CID "violates Plaintiff's First and Fourth Amendment rights by unreasonably requiring it to turn over sensitive and privileged materials." *Id.* ¶ 107 (Count II).  Media Matters seeks a declaration that the Commission's CID constitutes a retaliatory action and violates its First and Fourth Amendment rights, as well as an injunction prohibiting the Commission "from initiating any action to enforce the CID or further investigating Plaintiff in violation of its constitutional rights." *Id.* at 40.

On July 14, 2025, Media Matters filed a motion for "a preliminary injunction preventing Defendants from enforcing or implementing its civil investigative demand dated May 20, 2025." Dkt.22 (Pl.'s Mot. for Prelim. Inj.) at 1.  Media Matters claimed that it was suffering substantial harms "due to the CID's existence alone," and that "it will continue to suffer them even if the FTC does not seek to enforce the CID in federal court."  Dkt.22-1 (Pl.'s Mem. in Supp. of Mot.) at 34. Media Matters did not seek a preliminary injunction against any other component of the Commission's ongoing investigation.  Following oral argument, on August 15, 2025, the Court granted Media Matters' motion and entered an order enjoining Defendants from "implementing or enforcing the Civil Investigative Demand served by the Federal Trade Commission to Media

Matters on May 20, 2025, and modified on July 7, 2025." Dkt.35 ("PI Order"). Defendants appealed the Court's preliminary injunction order, and that appeal remains pending.

## LEGAL STANDARD

Defendants move to dismiss the complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6).

"When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must demonstrate that the court indeed has subject-matter jurisdiction to hear his claims." *Hill v. U.S. Dep't of Interior*, 699 F. Supp. 3d 1, 12 (D.D.C. 2023), *aff'd*, 151 F.4th 420 (D.C. Cir. 2025) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000)). "Absent subject matter jurisdiction over a case, the court must dismiss it." *Albra v. Bd. of Trs. of Miami Dade Coll.*, 296 F. Supp. 3d 181, 185 (D.D.C. 2018). "When ruling on a Rule 12(b)(1) motion, the court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (quoting *Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015)). "However, those factual allegations receive 'closer scrutiny' than they would in the Rule 12(b)(6) context." *Id.* "Moreover, the court is not limited to the allegations contained in the complaint" but "may consider materials outside the pleadings." *Lipsman v. Sec'y of Army*, 257 F. Supp. 2d 3, 6 (D.D.C. 2003).

"A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint." *Al-Quraan v. 4115 8th St. NW, LLC*, 113 F. Supp. 3d 367, 369 (D.D.C. 2015) (citing *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). "To survive a motion to dismiss, a complaint must

7

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While a court must construe the complaint "liberally in the plaintiff's favor, accepting as true all of the factual allegations" alleged in the complaint, it need not "accept legal conclusions cast in the form of factual allegations." *Lucas v. Dist. of Columbia*, 683 F. Supp. 2d 16, 18 (D.D.C. 2010) (cleaned up).  In addition to the facts alleged in the complaint, the Court may "consider[] materials attached to the complaint, documents incorporated by reference, and judicially noticeable materials, including government records" like agency documents.  *Rancho Vista del Mar v. United States*, 640 F. Supp. 3d 112, 117 n.1 (D.D.C. 2022) (citing *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)).

## ARGUMENT

I.    **THE COURT MUST DISMISS MEDIA MATTERS' PRE-ENFORCEMENT CHALLENGE FOR LACK OF SUBJECT-MATTER JURISDICTION.**

This Court lacks subject-matter jurisdiction over Media Matters' lawsuit—and thus must dismiss it under Rule 12(b)(1).  A nearly century-long, uninterrupted line of cases from the Supreme Court and appellate courts has consistently rejected pre-enforcement challenges to federal agency CIDs and subpoenas.  That caselaw is consistent with the claim-channeling framework of *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), because Congress placed the exclusive mechanism for reviewing Media Matters' objections in a district court enforcement action brought by the Commission under the FTC Act.

A.    **An Unbroken Line of Appellate Precedent Rejects Pre-Enforcement Challenges to Agency Subpoenas and CIDs.**

For nearly a century, the Supreme Court and courts of appeals have consistently held that disputes about federal CIDs or subpoenas should be resolved in an enforcement action.  *See FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *see also Reisman v. Caplin*, 375 U.S. 440, 443

8

(1964) (upholding dismissal of pre-enforcement challenge to IRS summons).  Relying on *Claire Furnace* and *Reisman*, courts of appeals have unanimously rejected pre-enforcement challenges to FTC and other federal agency CIDs and subpoenas.  *See Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) (a plaintiff "must wait till the government sues . . . since that is the method of judicial review of FTC investigations that Congress has prescribed"); *see also, e.g.*, *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334-35 (10th Cir. 1984) (recognizing there is no cognizable injury where a subpoena recipient has an opportunity to present defenses in an enforcement proceeding); *Wearly v. FTC*, 616 F.2d 662, 668 (3d Cir. 1980); *Am. Motors Corp. v. FTC*, 601 F.2d 1329, 1335-37 (6th Cir. 1979); *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876-77 (8th Cir. 1977); *Atl. Richfield Co. v. FTC*, 546 F.2d 646, 651 (5th Cir. 1977); *Anheuser-Busch, Inc. v. FTC*, 359 F.2d 487, 490-91 (8th Cir. 1966) (Blackmun, J.).

These cases have a common thread: recipients of agency CIDs or subpoenas are not entitled to equitable relief in a pre-enforcement posture because they have an adequate remedy at law: challenging the CID or subpoena in an enforcement action.  *E.g.*, *Atl. Richfield*, 546 F.2d at 649.  And this doctrine serves important purposes.  On the one hand, it protects CID and subpoena recipients by ensuring that they face no legal penalty until they have had an opportunity to raise their objections in an enforcement action in federal court.  *See Gen. Fin. Corp.*, 700 F.2d at 368-69.  On the other, it ensures that agencies are able to conduct investigations as directed by Congress, allows the parties to narrow and potentially resolve any disputes prior to litigation, and prevents litigants from dragging courts into abstract legal disagreements without the specific factual context presented in an enforcement action.

This precedent alone requires the dismissal of Media Matters' claims.  Pre-enforcement challenges to agency CIDs and subpoenas have *never* been available, even when plaintiffs raise

constitutional objections.  *See Reisman*, 375 U.S. at 444-45.  This Court lacks jurisdiction to entertain Media Matters' constitutional objections as well.

> **B.**  ***Thunder-Basin*'s Claim-Channeling Doctrine Precludes Jurisdiction Over Media Matters' Pre-Enforcement Challenge.**

*Claire Furnace*, *Reisman*, and their progeny confirm that district courts should not entertain pre-enforcement challenges to FTC CIDs.  It is unsurprising, then, that this is precisely the outcome Congress directed in the FTC Act.

In *Thunder Basin*, the Supreme Court explained that Congress may establish a statutory scheme that channels judicial review into an exclusive jurisdictional mechanism, divesting district courts of their ordinary federal-question jurisdiction.  510 U.S. at 218.  Under *Thunder Basin*'s framework, a statute channels review when (1) a preclusive intent is "fairly discernible in the statutory scheme," and (2) "the litigant's claims are of the type Congress intended to be reviewed within the statutory structure."  *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (cleaned up).  This framework effectuates Congress's objective of directing certain challenges to agency actions "to a single review process," streamlining investigations and enforcement proceedings.  *Thunder Basin*, 510 U.S. at 211.  Here, both prongs of the *Thunder Basin* claim-channeling framework are straightforwardly satisfied.

> **1.  Congress's Preclusive Intent is "Fairly Discernable" in the FTC Act.**

The FTC Act and its implementing regulations create an interdependent scheme to protect CID recipients.  The scheme allows recipients to petition the Commission to quash the CID, 15 U.S.C. § 57b-1(f); discuss and negotiate the CID with FTC staff to resolve or narrow disputes, 16 C.F.R. §§ 2.4, 2.7(k); and obtain judicial review of the CID, including any objections, when the FTC seeks to enforce it, 15 U.S.C. § 57b-1(h).  CIDs are not self-executing, and recipients face no

penalties for noncompliance until the court rules in an enforcement action.  *See Gen. Fin. Corp.*, 700 F.2d at 368-69.

The scheme also protects the integrity of FTC investigations.  Before the FTC brings an enforcement action, the FTC's Rules of Practice contemplate that CID recipients will "engage in meaningful discussions with staff," meet and confer "to address and attempt to resolve all issues," and only then file a petition to quash.  16 C.F.R. §§ 2.4, 2.7(k), 2.10.  This administrative process allows the parties to narrow disputed issues without unnecessarily embroiling district courts in broad legal disputes that lack a well-developed factual record.

Media Matters' "improper investigation" claim (Count II) is a prime example.  Media Matters claims the CID violates the First and Fourth Amendments because it is overbroad and requires the production of "sensitive and privileged materials."  Compl. ¶ 107.  But as explained further below, it is premature to evaluate that claim now, before any dispute has crystallized regarding *any* particular document (let alone a potentially privileged document).  And if one of Media Matters' constitutional objections to the CID should be considered in an enforcement proceeding, surely the other one should be as well.  Allowing piecemeal, claim-splitting challenges would vitiate Congress's statutory scheme and subvert judicial economy.  The only way to avoid that counterproductive outcome is to wait for the Commission to complete its administrative process by assessing whether any disputes between the parties remain and, if so, whether they justify bringing an enforcement action (which may not be warranted, for example, if the Commission obtains all the necessary information from another CID recipient).

Congress's choice to provide an exclusive review mechanism for CIDs is confirmed by the FTC Act's broader structure, which provides a detailed framework for review.  For example, the Commission's final cease-and-desist orders are subject to review only in the courts of appeals.  *See*

11

15 U.S.C. § 45(b). The "comprehensive nature" of these review provisions confirms Congress's preclusive intent. *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 558 (D.C. Cir. 2023).

The fact that the FTC Act channels CID objections to an enforcement action in district court instead of appellate review of an administrative proceeding does not change this conclusion. Nothing in the Constitution or the Supreme Court's reasoning in *Thunder Basin* precludes Congress from channeling review to district courts, and the Supreme Court has never suggested that preclusion is appropriate only when judicial review in an appellate court follows an agency's administrative decision. In *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 185 (2023), the Supreme Court explained that a "special statutory review scheme" may channel certain claims and preclude collateral challenges. The *Axon* Court referred to an "alternative scheme of review" or "a different method to resolve claims about agency action." *Id.* Thus, while Congress "typically chooses" agency administrative proceedings followed by review in a court of appeals, *id.*, Congress is free to choose other methods as well, and sometimes does so, *see John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (per curiam) (denying injunction pending appeal in pre-enforcement challenge to CID, relying on *Thunder Basin* to conclude that district court lacked jurisdiction because CFPB statute channeled constitutional CID challenges to an enforcement action). Indeed, the case for claim-channeling is *clearer* when review is in district court. *Patten v. Dist. of Columbia*, 9 F.4th 921, 927-28 (D.C. Cir. 2021) ("the case for exclusivity here is even stronger than it was in *Thunder Basin* and *Elgin* [*v. Dep't of Treasury*, 567 U.S. 1 (2012),]" because the statutory "scheme channels claims into the district court"). Congress's adoption of such a scheme in the FTC Act is sensible because, as described above, pre-enforcement challenges to federal CIDs and subpoenas have never been available.

Moreover, Media Matters *did* have the chance to raise its retaliation claim administratively. It had numerous meet-and-confer opportunities, where it never raised the retaliation issue. It then filed a petition to quash, where it could have made a retaliation argument but declined to do so. *See* 15 U.S.C. § 57b-1(f)(2) (explaining that petitions "may be based upon . . . any *constitutional* or other legal right or privilege" (emphasis added)). In other words, an administrative proceeding *was* available here; Media Matters simply declined to use it to raise its retaliation claim.[2]

### 2.    Media Matters' Claims Are Squarely "Of the Type" Congress Intended to Be Reviewed Through the Exclusive Statutory Mechanism.

*Thunder Basin* identified three factors that must be considered in evaluating its second prong: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to the statute's review provisions"; and (3) whether the claim is "outside the agency's expertise." *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212-13) (cleaned up). Here, the answer to all three questions is no. Media Matters' constitutional arguments—claiming retaliation against a 2023 article and a privilege against disclosure—are nothing like the "structural constitutional claims" that contested the Commission's "power to proceed at all" in *Axon*, 598 U.S. at 191-92. Rather, Media Matters' claims challenge a discrete agency action and implicates issues on which the FTC has considerable expertise.

**1. Meaningful judicial review.** Precluding Media Matters' pre-enforcement challenge would not foreclose meaningful judicial review because all objections, including First Amendment claims, can be raised and resolved in a CID enforcement action in federal court. *See* 15 U.S.C. § 57b-1(h). Indeed, as discussed above, this is how federal agency CIDs and subpoenas have

---

[2] As discussed below, this failure to exhaust is an independent reason to dismiss Count I.

always been reviewed, and numerous courts, including the Supreme Court, hold that this traditional mechanism provides meaningful review.

Media Matters alleges that it is suffering ongoing harm as a result of the CID.  Compl. ¶¶ 82-94.  But nothing in *Thunder Basin*'s framework turns on whether the plaintiff is suffering ongoing harm.  *See, e.g.*, *Nat'l Ass'n Immigr. Judges v. Owen*, 139 F.4th 293, 312 (4th Cir. 2025) ("Plaintiffs cannot avoid" claim channeling under *Thunder Basin* "by merely alleging an irreparable injury.").  To the contrary, channeling schemes often *presume* that such harm will exist. As the Supreme Court observed in *Axon*, exclusive review schemes often "require parties to wait before appealing, even when doing so subjects them to 'significant burdens.'"  598 U.S. at 191-92.  *Thunder Basin* similarly presupposes the possibility of harms from "delayed judicial review," 510 U.S. at 207, even when such harms are irreparable and "onerous," *id.* at 205, 218.  And although this channeling scheme commits the timing of judicial review to the FTC's discretion, that only means that the Commission can choose *not to enforce* the CID, and Media Matters will suffer no legal penalty.  That choice is part of the statutory design and further underscores why Congress did not permit pre-enforcement litigation before the controversy is concrete and the agency has decided to enforce the CID.  Notably, *Thunder Basin* itself rejected a pre-enforcement challenge, forcing the plaintiff to await enforcement by the agency.  *See id.* at 207-09.

That Media Matters raises a retaliation claim makes no difference.  Courts have frequently applied *Thunder Basin* claim-channeling in First Amendment cases, even where the plaintiffs allege ongoing harms.  *See Am. Fed'n Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755-56 (D.C. Cir. 2019); *Am. Fed'n Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 936-37 (D.C. Cir. 2004); *see also LabMD, Inc. v. FTC*, 776 F.3d 1275, 1280 (11th Cir. 2015); *Nat'l Taxpayers Union v. SSA*, 376 F.3d 239, 244 (4th Cir. 2004).  Indeed, the Eleventh Circuit explicitly rejected the argument

14

that a First Amendment retaliation claim should be "treated differently than other constitutional claims under *Thunder Basin*." *LabMD*, 776 F.3d at 1280. More generally, the Supreme Court has repeatedly applied claim-channeling to constitutional claims, including in *Thunder Basin* itself. *See* 510 U.S. at 205.

Media Matters points to the D.C. Circuit's decision in *Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025), to suggest that its alleged ongoing injuries justify this Court's pre-enforcement intervention. *E.g.*, Compl. ¶¶ 1-2, 11. But *Paxton* is inapposite to the claim-channeling question, for the straightforward reason that it involved a CID issued by a *state* official and did not implicate any federal statutory scheme. As a result, the *Thunder Basin* framework—which addresses "challenges to *federal* agency action," *Axon*, 598 U.S. at 185 (emphasis added)—simply did not apply. And Congress had good reason to channel issues about federal agency CIDs to enforcement proceedings while permitting Section 1983 suits (as in *Paxton*) to challenge state CIDs. Doing so ensures that in both situations recipients can present their constitutional claims in a federal forum before legal penalties accrue. *See* Br. U.S. Amicus Curiae at 25, *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-781 (U.S. Aug. 28, 2025).

**2. Collateralism.** Under *Thunder Basin*, a claim is not of the type Congress intended to be subject to channeling if it is "wholly collateral to a statute's review provisions." 510 U.S. at 212 (cleaned up). Media Matters' constitutional claims are in no way collateral to the FTC Act's provisions requiring judicial review in an enforcement proceeding. Unlike in *Axon*, Media Matters challenges something "particular about how [the FTC's] power was wielded"—namely, the issuance of the CID—not the Commission's "power generally." *Axon*, 598 U.S. at 193. As Media Matters' complaint makes clear, its challenge also implicates "procedural or evidentiary matters" that "relate to the subject of the enforcement action," *id.*, such as the adequacy of the agency's

15

explanation for the CID, the breadth of the CID, and the relevance of the various specifications to the goals of the investigation. Compl. ¶¶ 15, 75-77; *see also FTC v. XCast Labs, Inc.*, No. 21-mc-1026, 2021 WL 6297885, at \*4-5 (C.D. Cal. Dec. 9, 2021) (addressing burden objection in CID enforcement proceeding). And courts routinely address constitutional issues in CID enforcement actions. *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 208-09 (2020). Media Matters' challenge, therefore, directly "relate[s] to the subject of [an] enforcement action[]." *Axon*, 598 U.S. at 193.

**3. Competence.** *Axon* asks whether a claim is "outside the agency's expertise." 598 U.S. at 186 (quotation omitted). This inquiry is not demanding: In *Thunder Basin*, the Court found this factor satisfied after noting that the agency had "addressed constitutional questions in previous enforcement proceedings" and the "statutory and constitutional claims [could] be meaningfully addressed" in a subsequent proceeding in federal court. 510 U.S. at 215. Both considerations are true here.

The Commission possesses the authority and experience to decide constitutional objections to CIDs. *See* 15 U.S.C. § 57b-1(f)(2); PTQ Order at 6-8 (addressing First Amendment privilege claim); *In re Feb. 11, 2014 CID Issued to Ziegler Supersys., Inc.*, 157 F.T.C. 1880, 1887-88 (2014) (same). Likewise, disputes about whether CIDs have been properly issued, or whether they are overbroad or seek privileged information, raise "considerations of agency policy" in which the FTC has "competence and expertise." *Axon*, 598 U.S. at 194 (cleaned up). The FTC routinely issues CIDs and has considerable experience negotiating with recipients over CIDs' scope and breadth, alongside expertise in its own administrative process, i.e., conducting meet-and-confer negotiations and evaluating petitions to quash before deciding whether, and on what grounds, to bring an enforcement action in district court. *See Claire Furnace*, 274 U.S. at 174 (recognizing

16

the significance of the "exercise [of] . . . discretion" in "examining" FTC subpoenas, determining which requests are "pertinent and lawful," and "designating the inquiries to enforce" "before asking the court to adjudge forfeitures"). As detailed above, the Commission has authority to consider any objections, including constitutional arguments, in a petition to quash, and undeniably has the authority to limit or modify (or quash altogether) a CID on any ground. Media Matters' constitutional claims, therefore, are "intertwined with or embedded in" the FTC's expertise. *Axon*, 598 U.S. at 195. And Media Matters may present those claims, and any other proper objections, in a CID enforcement action. 15 U.S.C. § 57b-1(h).

*       *       *

The unbroken line of cases following *Claire Furnace* and *Reisman*, and *Thunder Basin*'s claim-channeling framework, make clear that this Court lacks subject-matter jurisdiction to hear Media Matters' pre-enforcement challenge. Accordingly, the Court must dismiss the action under Federal Rule of Civil Procedure 12(b)(1).[3]

## II.    THE COURT SHOULD DISMISS MEDIA MATTERS' FIRST AMENDMENT RETALIATION CLAIM (COUNT I).

Even if this Court had jurisdiction, it should dismiss Media Matters' retaliation theory (Count I) for failure to state a claim. First, Media Matters lacks an implied cause of action to obtain the equitable relief it seeks. Second, Media Matters failed to exhaust the retaliation issue before the Commission, as the FTC Act and case law require. Even if the Court reaches the merits

---

[3] The Court's preliminary injunction decision does not alter the result. As to the threshold issues, the Commission did not raise (and therefore this Court did not address) Media Matters' failure to exhaust the retaliation issue, which is independently dispositive of Count I. And the Commission has amplified the arguments why the Court should hold that *Thunder Basin* claim channeling applies, including *John Doe*'s and *Patten*'s affirmation that constitutional challenges may be channeled to a district court, and the cases confirming that *Thunder Basin* applies to allegations of ongoing First Amendment harm. *See supra* Section I.B.2. The Court should consider these issues afresh and grant the motion to dismiss.

17

of Count I, Media Matters fares no better.  As a matter of law, Media Matters fails to allege a causal connection between its November 2023 article and the FTC's CID, and it fails to allege that the CID had the requisite chilling effect.  Accordingly, Media Matters fails to state a claim on Count I, and the Court should dismiss it under Rule 12(b)(6).

### A.  Media Matters Lacks an Implied Equitable Cause of Action.

Media Matters lacks a cause of action for its First Amendment claim.  Since the complaint does not allege a cause of action under the Administrative Procedure Act, Media Matters must rely on an implied equitable cause of action under either the FTC Act or the First Amendment.  But neither route supplies a basis for this claim.

Media Matters seeks equitable relief for its retaliation claim.  It is axiomatic that an injunction, like any equitable remedy, is only available when legal remedies are inadequate. *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 509 (1959).  But Media Matters has an adequate remedy at law—a CID enforcement action under the FTC Act.  A district court will address any proper objection in an enforcement action and Media Matters faces no legal penalty unless the court orders enforcement.  *See Gen. Fin. Corp.*, 700 F.2d at 368-69.  For that reason, *Reisman*, *Claire Furnace*, and their progeny consistently hold that pre-enforcement CID and subpoena challenges must be dismissed "for want of equity."  *Reisman*, 375 U.S. at 443; *see also Claire Furnace*, 274 U.S. at 174; *Wearly*, 616 F.2d at 665.  More broadly, the right to seek relief "in equity" for alleged constitutional violations "is subject to express and implied statutory limitations."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).  And "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).  Here, Congress provided a statutory method of review—a CID enforcement action—as the sole remedy for CID recipients

18

and thereby precluded others. *See generally Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097 (D.C. Cir. 2017) ("[S]ince *Cort v. Ash*, [422 U.S. 66 (1975),] the Supreme Court has been very hostile to implied [statutory] causes of action.").

Media Matters' bid for an implied cause of action under the First Amendment is likewise unsuccessful. The "ability to sue to enjoin unconstitutional actions by state and federal officials is the creation of courts of equity": it is "a judge-made remedy," not based on an "implied right of action contained in the" Constitution. *Armstrong*, 575 U.S. at 327; *see DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("Constitutional rights do not typically come with a built-in cause of action."); *see also, e.g.*, *Glob. Health Council v. Trump*, 153 F.4th 1, 15-16 (D.C. Cir. 2025). As above, such equitable remedies are only available when there is no adequate remedy at law, which is untrue of the FTC Act's CID enforcement mechanism. This principle keeps with the Supreme Court's limitation on the "traditional equitable powers" of the federal courts, *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017), which restricts those powers to relief that was "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Pre-enforcement injunctions against agency CIDs and subpoenas were not available at equity. *E.g.*, *Claire Furnace*, 274 U.S. at 174. So too here. The Court should decline to find an implied equitable cause of action and, on that basis, dismiss Media Matters' retaliation claim.

### B.     Media Matters Failed to Exhaust its Retaliation Claim.

Alternatively, the Court should dismiss Count I because Media Matters failed to raise a First Amendment retaliation claim before the Commission. Its 16-page petition to quash said nothing about retaliation. Its only First Amendment claim was a two-paragraph assertion that a newsgathering privilege shields it from answering the CID. Dkt.22-5 at 7-8. Media Matters also does not claim to have raised retaliation in its meet-and-confer discussions with FTC staff. *Id.* Ex.

19

2, at 40-43 (statement of counsel required by 16 C.F.R. § 2.10(a)(2)).  Instead, Media Matters raised the retaliation theory for the first time in this collateral lawsuit, where it featured as "Count I" in its complaint.  That is precisely what the administrative exhaustion requirement is meant to prevent—particularly where FTC staff and the Commission could have applied their considerable experience with CIDs (and this investigation) to address Media Matters' retaliation concerns in the first instance.

"Administrative review schemes commonly require parties to give the agency an opportunity to address an issue before seeking judicial review of that question."  *Carr v. Saul*, 593 U.S. 83, 88 (2021).  Consistent with this general practice, the FTC Act's review scheme demands that CID recipients present all their objections in a petition to quash.  *See* 15 U.S.C. § 57b-1(f)(2) ("Such petition shall specify *each ground* upon which the petitioner relies . . . ." (emphasis added)); 16 C.F.R. § 2.10(a)(1) (petitions "shall set forth *all assertions* of protected status *or other factual and legal objections* to the [CID], including *all* appropriate arguments . . . ." (emphasis added)).  This administrative exhaustion requirement prevents gamesmanship, protects agency authority, and promotes judicial efficiency.  *See Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 431 n.6 (10th Cir. 2011) (per curiam).

Even when a statute or regulation does not expressly require exhaustion, courts may impose an exhaustion requirement "based on an analogy to the rule that appellate courts will not consider arguments not raised before trial courts."  *Carr*, 593 U.S. at 88 (cleaned up).  In determining whether to require exhaustion, courts consider:

> (1) whether the agency proceedings were adversarial or inquisitorial, in particular "whether claimants bear the responsibility to develop issues for adjudicators' consideration"; (2) "that agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise"; and (3) that "this Court has consistently recognized a futility exception to exhaustion requirements."

20

*Traffic Jam Events, LLC v. FTC*, No. 21-60947, 2025 WL 1904566, at \*2 (5th Cir. July 10, 2025) (quoting *Carr*, 593 U.S. at 88-89, 92-93).

Here, even setting aside the express exhaustion requirements discussed above, the statutory and regulatory scheme governing petitions to quash comfortably satisfies *Carr*'s factors for requiring administrative exhaustion. First, petitions to quash are clearly adversarial. The petition must include "all appropriate arguments, affidavits, and other supporting documentation," 16 C.F.R. § 2.10(a)(1) FTC staff may submit a "factual and legal response" to the petition, *id.* § 2.10(a)(4); and the Commission issues an order in which it may quash or modify the CID, *id.* § 2.10(c). Second, this is not an *Axon*-like structural constitutional challenge where the agency has no special expertise. *Cf. Carr*, 593 U.S. at 93. The retaliation claim here is limited to a single CID, and the Commission routinely addresses constitutional objections (as it did with Media Matters' First Amendment privilege argument) in ruling on petitions to quash.[4] Third, raising the retaliation issue in Media Matters' petition would not have been futile, as the Commission was empowered to quash or modify the CID based on any proper objection. 16 C.F.R. § 2.10(c); *see Bd. of Dental Exam'rs of Ala. v. FTC*, 519 F. Supp. 3d 1033, 1043-44 (N.D. Ala. 2022) (rejecting futility argument for petition to quash an FTC CID). Tellingly, another CID recipient in the same investigation *did* raise a retaliation claim before the Commission. Petition to Quash, *NewsGuard Techs., Inc. v. FTC*, No. 1:26-cv-0353, ECF No. 26-2, at 7-14 (D.D.C. Jan. 16, 2026).

Unsurprisingly, courts have repeatedly confirmed that challenges to FTC investigations are subject to an exhaustion requirement. *See, e.g.*, *United States v. Morton Salt Co.*, 338 U.S. 632, 653-54 (1950) (requiring exhaustion of objections to FTC compliance reports); *FTC v. O'Connell*

---

[4] PTQ Order at 6-8 (addressing First Amendment privilege claim); *see also, e.g.*, *Ziegler Supersys., Inc.*, 157 F.T.C. at 1887-88.

*Assocs.*, 828 F. Supp. 165, 168 (E.D.N.Y. 1993) ("It is also well settled that this exhaustion requirement applies to FTC investigatory proceedings."); *FTC v. Invention Submission Corp.*, No. 89-mc-272, 1991 WL 47104, at *2 n.12 (D.D.C. Feb. 14, 1991), *aff'd*, 965 F.2d 1086 (D.C. Cir. 1992) (refusing to consider arguments that a CID recipient did not include in its petition to quash); *see also FTC v. Complete Merch. Sols., LLC*, No. 2:19-cv-00996, 2020 WL 2059847, at *8 (D. Utah Apr. 28, 2020) (citing additional cases).

These holdings are eminently sensible. It would "make[] little sense" for Congress to set up an adversarial process for CID challenges before the Commission, only to leave the parties free to boycott that process in favor of separate litigation. *XCast Labs*, 2021 WL 6297885, at *3. Here, Media Matters had a legal obligation to exhaust its First Amendment retaliation claim and failed to do so. Therefore, the Court should dismiss Count I.

### C.      Media Matters Fails to State a First Amendment Retaliation Claim.

Media Matters' retaliation claim founders on the merits as well. To state a retaliation claim, Media Matters must allege (1) that it "engaged in conduct protected under the First Amendment," (2) that the FTC "took some retaliatory action sufficient to deter a person of ordinary firmness in [Media Matters'] position from speaking again," and (3) that there is "a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).

While Media Matters engages in some protected speech, it fails to plausibly allege the necessary causal link between its 2023 article and the CID or to allege that the CID caused a cognizable chilling effect.

### 1.      Media Matters Fails to Allege a Causal Link.

For causation, Media Matters must allege at a *minimum* that the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019); *Aref v. Holder*,

774 F. Supp. 2d 147, 169 (D.D.C. 2011) ("To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action.").[5]  In making that but-for showing, Media Matters must overcome the "longstanding presumption of regularity" that attaches to government action.  *Hartman v. Moore*, 547 U.S. 250, 263 (2006).  That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order" that "judicial intrusion . . . should be minimal."  *Id.*  Excessive judicial interference "could 'chill law enforcement,' cause delay, and 'impair the performance of a core executive constitutional function.'"  *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)); *see Trump v. Hawaii*, 585 U.S. 667, 702 (2018); *FTC v. Texaco, Inc.*, 555 F.2d 862, 872-73 (D.C. Cir. 1977) (en banc).

To state a claim, then, Media Matters' allegations must be robust enough to displace the presumption and to plausibly allege that the but-for cause of the CID was Media Matters' 2023 article about X.com—which is the sole piece of First Amendment expression Media Matters identifies in its complaint.  As an initial matter, Media Matters does not even allege in its complaint that the CID would not have been issued but for the alleged retaliation—that reason alone is grounds for dismissal.  But even if Media Matters had made such an allegation, the remaining facts alleged in the complaint do not come close to satisfying the legal standard.

---

[5] In fact, the requisite showing is more robust:  Media Matters actually must demonstrate that there was no reasonable basis for the CID.  For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *Nieves*, 587 U.S. at 399-400.  The same logic applies here too.  *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *12-13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons).  However, the Court need not reach that issue because Media Matters cannot satisfy even the basic but-for standard.

### a.    The Commission acted for nonretaliatory reasons.

The Commission's actions here display a clear nonretaliatory purpose: to investigate anticompetitive, collusive, and unlawful boycotts in the advertising industry.  *See* PTQ Order at 1-2.  As one part of that investigation, the Commission issued more than a dozen CIDs to a variety of entities, including advertising trade associations, policy advocacy groups, and brand safety/suitability ratings organizations.  *Id.* at 2.  The diversity of CID recipients—including entities with no conceivable connection to Media Matters' reporting—confirms that the CID to Media Matters was neither unique nor retaliatory and precludes any inference that the investigation targeted Media Matters for its speech.  Indeed, Media Matters does not allege (and has never argued elsewhere) that all of those CIDs were retaliation for a 2023 article in which Media Matters criticized Elon Musk.

Following this Court's issuance of a preliminary injunction and denial of motion to stay pending appeal, Dkt.42, the FTC sought a stay in the D.C. Circuit, which a panel denied 2-1.  *See* Order, *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ("Stay Order").  The stay panel majority understood that Media Matters had to differentiate itself from the other CID recipients because the FTC may "have issued the [CID] on nonretaliatory grounds anyway."  *Id.* at *9.  It relied on the unique facts Media Matters emphasized in its complaint, including the putative links to the 2023 article and earlier litigation involving state Attorneys General in Texas and Missouri.  *Id.* ("unusual and unprecedented array of facts"); *id.* at *11 ("unique factual circumstances").  And it addressed the other CIDs by assuming that the Media Matters CID was uniquely broad, and making clear that at the merits stage Commission could demonstrate nonretaliatory purpose by showing that "the scope and sweep of [other CIDs] matches the one given to Media Matters."  *Id.* at *9.  But there was never any basis for an assumption that

24

the Media Matters CID was broader than the rest.  And public information now shows that assumption is false: two other CIDs are at least as broad as the one issued to Media Matters.[6]

Media Matters therefore can no longer defend the theory that persuaded both this Court and the stay panel at the preliminary injunction stage: that the purported retaliation was linked to the 2023 article and the earlier litigation. *See* Appellee's Br. 44 n.7, *Media Matters for Am. v. FTC*, No. 25-5302 (D.C. Cir. Feb. 17, 2026) ("MM.Br.") (declining to take a position on "[w]hether the FTC targeted Media Matters for the 2023 article about X . . . or for some combination of that article and other reporting").  Instead, Media Matters has recently argued that the entire investigation was motivated by ideological disagreement with views on "the left."  *Id.* at 50.

This new theory fails for multiple reasons.  As Media Matters itself has acknowledged, it is speculative. *Id.* at 49-50 ("Media Matters takes no position" on the GDI matter).  Indeed, Media Matters has not even *alleged* that all of the CIDs were ideologically motivated.  Furthermore, the complaint must be dismissed because it alleged only the purportedly unique circumstances involving Media Matters and its November 2023 article.

### b.    Media Matters' allegations of retaliation fail as a matter of law.

The clear indications of the Commission's nonretaliatory intent suffice to dismiss Media Matters' claim.  But Media Matters' allegations of retaliation are also entirely inadequate.  That is true even without the presumption of regularity; applying the presumption only reinforces that conclusion.  Take Media Matters' categories of allegations in turn.

---

[6] *See* Attachment to Global Disinformation Index's Petition to Quash, FTC File No. 251-0061 (Sept. 17, 2025), https://tinyurl.com/v9mhhm8c (listing 29 specifications, including several not directed to Media Matters); *NewsGuard Techs., Inc. v. FTC*, No. 1:26-cv-0353, ECF No. 21, at 25 (D.D.C. Feb. 26, 2026) (asserting that the CIDs are "largely carbon copies").

**1. Timing.**  Media Matters alleges that the timing of the CID suggests that the FTC was acting in response to Media Matters' article about "content on X.com."  *E.g.*, Compl. ¶¶ 1-2, 8-14. But that story does not hold up.  The CID was issued in May 2025, a year and a half after the November 2023 article that supposedly triggered it.  As a matter of law, such a "lengthy time lapse . . . negates any inference" of a causal connection.  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005); *see Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (temporal proximity can support causation "only where the two events are very close in time" and even "a three-month period" may "be too lengthy").

Media Matters has offered various responses to this fatal flaw, but not one withstands scrutiny.  *First*, it has suggested that the timing lapse should be overlooked because Chairman Ferguson purportedly acted "promptly" once he became Chairman in January 2025.  MM.Br.42. But the four-month period that elapsed before the CID was issued is itself too long to support causation.  *See Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004).  And more fundamentally, any prompt action is equally consistent with what actually happened:  Chairman Ferguson treated this important antitrust investigation as a high priority.  *See, e.g.*, *Gonzalez v. Walgreen Co.*, 140 F.4th 663, 674 (5th Cir. 2025) (a fact that is equally consistent with both sides' positions does not constitute evidence in favor of either).

*Second*, Media Matters has asserted that the Texas and Missouri investigations into Media Matters or Mr. Musk's lawsuits fill the "temporal gap" between the November 2023 article and the May 2025 CID.  *See* Dkt.28 at 17; MM.Br.41-43.  This is wrong both legally and factually.  Media Matters has never identified any authority for the proposition that the actions of distinct sovereigns can be aggregated for timing purposes, especially (as here) in the absence of any allegations of coordination.  *See Zorn v. City of Marion*, 774 F. Supp. 3d 1279, 1326-27 (D. Kan. 2025)

26

(defendants allegedly "collud[ed]" and "agree[d]" to take retaliatory action). Besides, even combining the state actions with the FTC's distinct investigation would not help Media Matters because the state investigations had been enjoined by August 2024, *Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *19 (D.D.C. Aug. 23, 2024)—nine months before the CID was issued. *See Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (no causation for two-and-a-half-month gap). At any rate, Media Matters' timing arguments cannot support its retaliation theory because at least two other advertising boycott CIDs were issued on the same day, *see supra* note 6, and there is no suggestion that those CIDs were issued in response to Media Matters' speech.

Finally, "temporal proximity" alone is insufficient in any event. *Minter v. Dist. of Columbia*, 809 F.3d 66, 71 (D.C. Cir. 2015); *see also United States v. Rundo*, 108 F.4th 792, 805 (9th Cir. 2024) ("[T]iming" does not show "improper motive" because it "can merely be the sign of the government's change in enforcement priorities."). A plaintiff must identify "positive evidence [of retaliation] beyond mere proximity." *Minter*, 809 F.3d at 71-72. Accordingly, even if the timing of the CID supported causation, Media Matters also must provide additional probative allegations, which—as discussed below—it has not done.

**2. Public Statements.** Media Matters also alleges that the statements of various individuals suggest retaliation. *E.g.*, Compl. ¶¶ 13, 58-62, 70. But to state a claim, it must allege a retaliatory motive on the part of *the relevant decisionmaker*. Here, Media Matters identifies only one decisionmaker: Chairman Ferguson. And Media Matters has not pointed to a single statement from Chairman Ferguson that so much as mentions Media Matters (let alone any particular article that it published). Stay Order, 2025 WL 2988966, at *18 (Walker, J., dissenting) ("Ferguson . . . didn't even *mention* Media Matters.").

Notably, Media Matters offers no allegations about the motives of any other Commissioners. While Chairman Ferguson signed the CID, the entire Commission effectively ratified the CID by denying Media Matters' petition to quash (on a 2-0 vote, with Commissioner Meador recused). PTQ Order at 13. The key role played by the rest of the Commission further demonstrates the inadequacy of Media Matters' retaliation allegations. *See Nieves*, 587 U.S. at 400.

Media Matters points to Chairman Ferguson's general statements about his enforcement priorities with respect to advertising boycotts. *E.g.*, Compl. ¶¶ 53, 58-61. But such statements about enforcement priorities are common for enforcement officials; indeed, it "is what we expect of public servants tasked with enforcing the law." Stay Order, 2025 WL 2988966, at *18 (Walker, J., dissenting). For that reason, courts have long rebuffed efforts to treat similar comments as evidence of bias or pre-judgment. *E.g.*, *Nuclear Info. & Res. Serv. v. NRC*, 509 F.3d 562, 571 (D.C. Cir. 2007) (holding that "a mere showing that an official 'has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute'" is not a basis for disqualification (quoting *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1209 (D.C. Cir. 1980))); *see also FTC v. Cement Inst.*, 333 U.S. 683, 700 (1948) (rejecting allegations that the Commission was "prejudiced and biased" due to Commissioners' long-stated view that the practice at issue constituted illegal price fixing). Instead, the role of an FTC Commissioner is analogous to "that of a prosecutor," who is "necessarily permitted to be zealous in [his or her] enforcement of the law." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 63-64 (D.D.C. 2022).

That makes good sense. "Given the roles that agency officials must play," it is commonplace for them to develop views on how the laws they enforce may apply and to identify

28

conduct that may violate those laws. *Nuclear Info. & Res. Serv.*, 509 F.3d at 571; *see Marshall*, 647 F.2d at 1209 ("When Congress creates an agency with an express mission . . . the agency officials will almost inevitably form views on the best means of carrying out that mission."). Indeed, agency officials must be able "to formulate policy." *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1174 (D.C. Cir. 1979). Media Matters' notion that agency officials may *not* hold "policy views," by contrast, "would eviscerate the proper evolution of policymaking," barring action by any official "who has opinions on the correct course of his agency's future action." *Id.*[7] At any rate, Chairman Ferguson's statements certainly do not connect the CID to "Media Matters' 2023 article—an article that mentioned neither the FTC nor Chairman Ferguson, written by an organization that neither Ferguson nor any decisionmaker at the FTC is accused of ever mentioning before this investigation." Stay Order, 2025 WL 2988966, at *18 (Walker, J., dissenting).

Media Matters also points to statements by *non-decisionmakers*: three FTC staffers (who made the comments prior to joining the FTC) and one individual who is not even in the government. *E.g.*, Compl. ¶¶ 64, 70. Remarks from "non-decisionmakers are not generally direct evidence of retaliation." *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020); *accord Youssef v. Lynch*, 144 F. Supp. 3d 70, 101 (D.D.C. 2015).[8] The only way such statements could even conceivably enter the analysis is if the non-decisionmaker was involved in the decisionmaking process. And here, Media Matters has not alleged that *any* of these individuals

---

[7] Any attempt to frame Chairman Ferguson's statements as partisan or ideological would fail for yet another reason: That characterization could not support a *retaliation* claim because those general statements do nothing to connect the CID to a particular Media Matters article. Even if such a framing could support some other claim (such as a selective enforcement or viewpoint discrimination claim), Media Matters' complaint raises no such claim.

[8] In any event, none of these non-decisionmaker comments made any reference to the 2023 Media Matters article.

had *any* involvement in the issuance of the CID.  This is fatal to Media Matters' argument.  *See, e.g.*, *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009), *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) ("comments made by . . . non-decisionmakers[] are inadmissible" where "plaintiff [had] failed to proffer evidence . . . that the speakers had any influence . . . on the [relevant] decision"); *In re Architect of Capitol Emp. Disp.*, No. 23-2334, 2024 WL 3359515, at *3 (D.D.C. July 10, 2024) (disregarding comments by "non-decisionmakers" who "did not work for the [relevant entity]" and who plaintiffs "never link[ed] . . . to [their] termination"); *United States v. Biden*, 729 F. Supp. 3d 410, 422 (D. Del. 2024) (any "pressure campaign from Congressional Republicans" to charge defendant was irrelevant without "credible [allegations] to suggest that the conduct of those lawmakers (or anyone else) had any impact whatsoever on the Special Counsel").

**3. Nature of the CID.**  Finally, Media Matters alleges that the breadth of the CID suggests retaliation.  Compl. ¶ 103.  But all of the CID's specifications follow naturally from the Commission's objective of investigating potential advertising boycotts.  This Court acknowledged that several of the specifications are directly relevant to that goal, *see* Dkt.34 at 45, and the same is true for the other specifications.  Media Matters' financial documents, for example, could shed light on whether Media Matters expended funds on (or received funds for) coordinating activities. *See FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089-90 (D.C. Cir. 1992) (recognizing that "financial information can be relevant to a pre-complaint *investigation*").  Similarly, it is typical for the FTC, like ordinary civil litigants, to ask for already existing document productions

in "litigation . . . related to" the subject of its investigation, given that Media Matters had been engaged in litigation about advertising boycotts.  Dkt.22-4 at 5.[9]

Besides, the scope of the CID is typical for FTC investigations and, indeed, *narrower* than other CIDs the Commission has issued.  *E.g.*, Mot. Quash CID Ex. P, *In re Police Protective Fund*, 157 F.T.C. 1913 (2014) (76 interrogatories and 53 document requests), https://tinyurl.com/5264tuh8; Pet. Quash CID Ex. 1, *In re Lexium Int'l, LLC*, 162 F.T.C. 1212 (2016) (42 interrogatories and 36 document requests), https://tinyurl.com/bds3mwn9; *FTC v. Cigna Grp.*, No. 1:25-mc-00004, Dkt.1-2 (D.D.C. Jan. 15, 2025) (43 specifications).  And Congress gave the FTC broad power to issue CIDs for a reason: to further its mission of protecting the public.  *See Genuine Parts Co. v. FTC*, 445 F.2d 1382, 1391 (5th Cir. 1971) (FTC "must be" accorded "extreme breadth" in conducting its investigations in order to "'satisfy [itself] that corporate behavior is consistent with the law and the public interest'").  For that reason, "[b]roadness alone is not sufficient justification to refuse enforcement" of agency process.  *Texaco*, 555 F.2d at 882 & n.51; *see id.* at 882 ("There is no doubt that these subpoenas are broad in scope, but the FTC's inquiry is a comprehensive one and must be so to serve its purposes.").

---

[9] Media Matters has also suggested that advertiser boycotts are categorically protected speech. Dkt.28 at 20-21.  But as it has acknowledged elsewhere, Dkt.22-1 at 34, that assertion is at least debatable, and the Commission is entitled to investigate potential antitrust violations.  Similarly, Media Matters has suggested that it is immune from enforcement action as a nonprofit.  Dkt.22-1 at 33-34.  But even assuming that's true, it is emphatically *not* immune from CIDs.  The Commission can issue a CID to "any person," including a nonprofit, who "the Commission has reason to believe . . . may . . . have any information[] relevant to . . . antitrust violations."  15 U.S.C. § 57b-1(c)(1); *see id.* § 57b-1(a)(6) (defining "person" to include a "partnership, corporation, association, or other legal entity").  Accordingly, nonprofits may be required to respond to CIDs regardless of whether they are subject to the FTC's enforcement authority.  *See Blue Ribbon Quality Meats*, 560 F.2d at 875-76 (noting the difference "between the FTC's investigatory power" and its "regulatory power").

Moreover, the *initial* CID is not the final word.  FTC staff engage in meet-and-confer negotiations with CID recipients and attempt to narrow or eliminate disputed issues.  16 C.F.R. §§ 2.4, 2.7(k).  That process gives CID recipients the opportunity to explain, based on knowledge of their own documents, which requests are excessively burdensome or, in their view, not relevant to the investigation.  And FTC staff have every reason to engage in the process constructively, because the recipient has the option of simply refusing to comply until the Commission brings an enforcement action and persuades a federal court to enforce the CID.  *See SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512, 514 (10th Cir. 1980) (setting out applicable test); *Morton Salt*, 338 U.S. at 652 (same).  Unsurprisingly, then, staff often make important concessions and agree to significantly narrow CIDs as part of the meet-and-confer process.  *E.g.*, *NewsGuard Techs., Inc. v. FTC*, No. 1:26-cv-0353, Dkt.11-18, at 2 (D.D.C. Feb. 11, 2026) (FTC staff granted "substantial" modifications "to limit" a CID's scope); *Texaco*, 555 F.2d at 882 (negotiations with FTC staff "substantially mitigated" the "alleged burdensomeness of [a] subpoena").  Here, as noted below, staff modified the CID to provide a more detailed explanation of the investigation's purpose following Media Matters' request.  Ultimately, then, the purported breadth of the CID is not unusual or troubling.  And most importantly for present purposes, it does nothing to suggest retaliation.

Media Matters also suggests that the CID was retaliatory because it supposedly failed to identify the subject of the investigation as the FTC Act requires.  Compl. ¶ 77; *see* 15 U.S.C. § 57b-1(c)(2) (requiring a CID to "state the nature of the conduct constituting the alleged violation which is under investigation and the [applicable] provision of law").  But that's incorrect.  The explanation provided in the CID was legally sufficient, *see* Dkt.1-4 at 2, 20, as the Commission explained in ruling on Media Matters' petition to quash:

32

> [The CID] identifies the nature of the conduct ("persons . . . facilitating collusion or coordination in any way with any other market participants"), the methods of law violations ("private communications, public statements, sharing information, or other actions"), the relevant law that may have been violated (Section 5 of the FTC Act), and the investigation's purpose ("to determine the appropriate action or remedy, including whether injunctive and monetary relief would be in the public interest").

PTQ Order at 5 (citing *FTC v. Carter*, 636 F.2d 781, 787-89 (D.C. Cir. 1980) (rejecting argument that a Commission resolution "fail[ed] to provide adequate notice of the purposes of [an] investigation")). At any rate, even if there were some technical deficiency in the CID's description, it would be irrelevant for at least two reasons. *First*, the Commission amended the CID to provide further explanation in response to Media Matters' petition to quash (which argued that the explanation was statutorily inadequate). *See* PTQ Order at 3; *see also* Dkt.22-4 at 2, 5. The revised description indisputably cured any purported shortcomings in the original. *Second*, any issue with the description would at most be a regulatory or statutory concern that would have no bearing on Media Matters' *constitutional* claim.

Moreover, to the extent Media Matters suggests that the Commission should have explained what relevant documents it believes Media Matters possesses, *see* Dkt.28 at 20, that puts the cart before the horse. If the Commission already knew what information Media Matters possesses, there would be no need for a CID. Similarly, requiring the Commission to reveal *why* it believes Media Matters has relevant information would improperly force investigators to prove their cases *before* they begin investigating. *See Morton Salt*, 338 U.S. at 642-43 (the FTC "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"); *Texaco*, 555 F.2d at 874 ("an investigating agency is under no obligation to propound a narrowly focused theory of a possible future case" when enforcing a subpoena or CID). More broadly, requiring federal law enforcement agencies to disclose their preliminary evidence and theories to receive judicial signoff to begin their investigations would constitute an

improper judicial intrusion into core executive functions. *See Texaco*, 555 F.2d at 871-72 (describing a court's role in evaluating an FTC subpoena as "strictly limited").

### 2.    Media Matters Fails to Allege That the CID Had the Requisite Chilling Effect.

To state a claim, Media Matters must also allege that the CID is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking." *Aref*, 833 F.3d at 258. Media Matters fails to allege such a chilling effect.

As discussed below, if retaliatory investigation claims are cognizable at all, it would only be in extraordinary circumstances. *See infra* Section II.C.3. Likewise, asserting a sufficient chilling effect from a retaliatory investigation would also require extraordinary circumstances. The Supreme Court has expressly questioned whether the "adverse consequences of a retaliatory investigation would *ever* justify recognizing such an investigation as a distinct constitutional violation," *Hartman*, 547 U.S. at 262 n.9 (emphasis added), and this counsels skepticism that the adverse consequences of any particular investigation would chill a person of ordinary firmness.

Here, Media Matters has raised only a generic retaliatory investigation claim. The scope of the CID is standard for FTC investigations, and Media Matters has not alleged any unusual injury as a result of the CID. Instead, it points to alleged harms common to all CID recipients, such as the concern that third parties will treat it differently due to the CID or that increased regulatory scrutiny has prompted it to think twice about its operations. *E.g.*, Compl. ¶¶ 86, 88, 91. Such routine injuries are inadequate to demonstrate a chilling effect. *See Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 60 (2d Cir. 1983) (rejecting argument that "enforcement of [a CID would] have a chilling effect on [the recipient's] first amendment rights"); *FTC v. Cinderella Career & Finishing Sch., Inc.*, 404 F.2d 1308, 1316 (D.C. Cir. 1968) ("The practical effect of the Commission's initial press release, in this or any other complaint proceeding,

34

is undoubtedly deleterious to the respondents' economic, business, and community status. . . . Unfortunate though this result may be, we are convinced that this damage does not constitute a transgression of the appellees' legal rights.").

Media Matters' other allegations fare no better.  Media Matters attributes many of its alleged injuries to multiple causes, making it impossible to discern what (if any) chilling effect stems from the FTC's CID.  *E.g.*, Compl. ¶ 83.  And its threadbare assertion that "it is reasonable to expect" that a CID would deter a media company "from reporting activities," *id.* ¶ 102, is pure speculation.  In sum, all of these alleged harms are plainly insufficient.

### 3.    Media Matters' "Retaliatory Investigation" Claim is Not Cognizable.

Because Media Matters has failed to make out a First Amendment retaliation claim, this Court need not decide whether retaliatory *investigation* claims, such as the one asserted here, are cognizable at all.  If the Court does reach that question, it should hold that Media Matters has not made out a cognizable retaliatory investigation claim.

The Supreme Court expressly left the question open, and the D.C. Circuit has declined to answer it.  *See Hartman*, 547 U.S. at 262 n.9; *Paxton*, 138 F.4th at 584-85.[10]  One federal court of appeals appears to have assumed that such a claim could arise in extraordinary circumstances, *see Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (while no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of

---

[10] *Paxton* did not address the point because the defendant there forfeited this argument.  138 F.4th at 584.  And *Reporters Committee for Freedom of Press v. AT&T Co.*, 593 F.2d 1030 (D.C. Cir. 1978), predates the Supreme Court's decision in *Hartman* and the modern doctrine on this issue.  Even on its own terms, *Reporters Committee* does nothing more than recognize that "subpoenas issued in bad faith" could "*in theory*" "abridge First Amendment rights" "in some cases" where a plaintiff laid "an adequate foundation for such judicial intervention" by "establish[ing] *a clear and imminent* threat of [government] misconduct."  *Id.* at 1071 (emphasis added).  That demanding standard was not satisfied there and the same is true here.

a given investigation could violate the First Amendment), but several other courts of appeals have suggested that such claims should *not* be recognized at all, *see Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind.  Nor have other courts around the country."); *Colson v. Grohman*, 174 F.3d 498, 512 (5th Cir. 1999) (holding that "an investigation (or an attempt to start one)" is "not actionable under our First Amendment retaliation jurisprudence"); *Sivella v. Twp. of Lyndhurst*, No. 20-2342, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2011).  And the Eleventh Circuit has squarely held that the initiation of a retaliatory investigation "does not implicate a federal constitutional right."  *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *accord Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam).

Even if this Court ultimately adopts the most sweeping position on the issue—that contemplated by the Ninth Circuit in *Moore*—it would conclude only that *conducting* an investigation in certain unusually abusive ways could give rise to a constitutional claim.  No such allegations have been made here.  *See White v. Lee*, 227 F.3d 1214, 1220, 1233 (9th Cir. 2000) (addressing a challenge to government conduct during an investigation, which included threatening and defamatory actions not alleged here).

## III.    THE COURT SHOULD DISMISS MEDIA MATTERS' FIRST AND FOURTH AMENDMENT "IMPROPER INVESTIGATION" CLAIM (COUNT II).

In addition to its retaliation claim, Media Matters brings an "improper investigation" claim (Count II) that cobbles together various First and Fourth Amendment theories.  Compl. at 38.  At its core, the claim appears to be that some of the documents implicated by the CID are protected by a First Amendment privilege; therefore, the CID is overbroad under the Fourth Amendment.  Compl. ¶¶ 106-09; *see also* Dkt.43 at 16:7-12 (Media Matters' counsel agreeing that "the general

36

idea" behind its Fourth Amendment theory is that the CID "would require [Media Matters] to disclose privileged information, and so the breadth of it means that it violates the Fourth Amendment"). This claim fails as a matter of law.

To begin, Media Matters lacks a statutory or implied cause of action, as explained above. *See supra* Section II.A. The absence of a viable cause of action is sufficient to dismiss Count II. But it is far from the only reason to do so. The claim is also premature. It is premised on the threat of compelled "disclosure" of information, Compl. ¶ 106, but that cannot occur here until the Commission seeks enforcement of the CID and a federal court orders production, *Gen. Fin. Corp.*, 700 F.2d at 368. That is important because a CID is not a fixed document; the scope of documents the CID seeks can be modified. *See* 16 C.F.R. § 2.7(*l*). Here, the Commission has not yet indicated whether it will petition to enforce the CID, and if so, as to which specifications (or portions of specifications). *See Claire Furnace*, 274 U.S. at 174 (recognizing the "discretion" in "designating the inquiries to enforce"). Accordingly, the disputed status of any documents claimed to be privileged cannot become clear until an enforcement proceeding. For that reason, this Court recognized it is "odd" "to apply privilege in the abstract at this stage" because any privilege argument could be raised "in a more concrete way" in an enforcement action, where it would be clear if the FTC is "going to take issue with [the] assertions of privilege." Dkt.43 at 14:21-25, 15:1-19. That is the "reason" why there are "not pre-enforcement cases" in this context. *Id.* at 17:5-6.

Moreover, it is axiomatic that any assertion of privilege must proceed on a "document-by-document basis." *In re Grand Jury Procs.*, 220 F.3d 568, 571 (7th Cir. 2000). Here, however, Media Matters' complaint does not identify even a single privileged document that is in dispute. That is fatal to a claim of privilege and highlights why this pre-enforcement challenge is barred.

Anyway, no privilege applies.  The complaint points to *Perry v. Schwarzenegger* (Compl. ¶ 106), but that out-of-circuit case was expressly limited to internal political "communications concerning the *formulation of campaign strategy*."  591 F.3d 1147, 1160, 1165 n.12 (9th Cir. 2010). Media Matters makes no allegation that any of its documents fall into that category.  Moreover, the D.C. Circuit has held that there is no special First Amendment privilege in grand jury proceedings, *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145-49 (D.C. Cir. 2006), and an FTC investigation is "analogous to the Grand Jury," *Morton Salt*, 338 U.S. at 642-43.  *See also In re Grand Jury Procs.*, 486 F.2d 85, 90 (3d Cir. 1973) ("Grand jury subpoenas . . . are exactly analogous to subpoenas issued by a federal administrative agency."); *SEC v. McGoff*, 647 F.2d 185, 192 (D.C. Cir. 1981) (same).  Similarly, Media Matters' suggestion that the CID is subject to heightened scrutiny under the Fourth Amendment, *see* Compl. ¶ 108 (citing *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978)), ignores binding precedent:  "[T]he existence of First Amendment 'interests' does not give rise to any substantive or procedural protections above and beyond those afforded by the Fourth Amendment." *Reps. Comm. for Freedom of Press*, 593 F.2d at 1056 (citing *Zurcher*, 436 U.S. at 565); *see Google LLC v. United States*, No. 23-mc-67, 2025 WL 778150, at *8 (D.D.C. Feb. 25, 2025) (*Zurcher* "held that warrants impinging on First Amendment interests raise no special concerns" under the Fourth Amendment).

At bottom, then, Media Matters is left with a run-of-the-mill claim that the CID is overbroad.  To prevail on such a claim, Media Matters must allege more than "[b]roadness" or a "burden"; it must plausibly allege that the CID is "*unduly* burdensome or *unreasonably* broad." *Texaco*, 555 F.2d at 881-82 (citing *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186 (1946)).  Media Matters' complaint fails to allege, as it must in this pre-enforcement challenge, that the FTC's mere issuance of the CID is sufficient to "unduly disrupt or seriously hinder normal [business]

38

operations." *Id.* at 882; *see FTC v. Standard Am., Inc.*, 306 F.2d 231, 235 (3d Cir. 1962) (insufficient to merely allege that a subpoena is burdensome). Instead, it makes only a conclusory allegation that the ordinary costs of responding to or contesting a CID are "extremely expensive," *see* Compl. ¶ 94, which is far from sufficient, *see Texaco*, 555 F.2d at 882 ("Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest."); *cf. FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) ("The expense and annoyance of litigation is 'part of the social burden of living under government.'"). In an enforcement proceeding, by contrast, CID recipients like Media Matters have ample opportunity to assert that a specific document is privileged or that complying with a certain specification poses an undue burden. *E.g.*, *Texaco*, 555 F.2d at 881-84 (addressing claims of undue burden and trade secrets in a subpoena enforcement action). Moreover, any relevant First Amendment interests can be protected at that time "by entry of a protective order." *Perry*, 591 F.3d at 1160 n.6, 1165; *Texaco*, 555 F.2d at 884 & n.62 (protective orders for FTC subpoenas).

Count II therefore fails for multiple reasons.[11]

## CONCLUSION

For the reasons set forth above, the Court should dismiss Media Matters' complaint.

---

[11] This Court's preliminary injunction ruling did not address Media Matters' "improper investigation" claim; it held that the First Amendment retaliation claim was "all it needs at this stage." Dkt.34 at 3. As noted above, at the preliminary injunction hearing, the Court was pointedly skeptical of the improper investigation claim: "[I]t seems odd to me to apply privilege in the abstract at this stage. If what you're saying is certain documents called for in the CID are privileged, why wouldn't it make sense to wait for an enforcement action?" Dkt.43 at 14:21-24.

Dated:  April 15, 2026
        Washington, D.C.

                            Respectfully submitted,

OF COUNSEL:                    LUCAS CROSLOW (D.C. Bar #1048342)
                                 *General Counsel*

DANIEL GUARNERA
 *Director*                    H. THOMAS BYRON III (D.C. Bar #442856)
                                 *Deputy General Counsel*

KELSE MOEN
 *Deputy Director*             ALEX POTAPOV (D.C. Bar #998355)
                                 *Deputy General Counsel*

BUREAU OF COMPETITION

                               */s/ Ethan D. Beck*
                               ETHAN D. BECK (D.C. Bar #90024619
                                 *Counsel to the General Counsel*


                               FEDERAL TRADE COMMISSION
                               600 Pennsylvania Ave., N.W.
                               Washington, DC 20580

                               *Attorneys for the Defendants*

40